No. 23-30666

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

STATE OF LOUISIANA, AMERICAN PETROLEUM INSTITUTE, CHEVRON USA INCORPORATED,

*Plaintiffs-Appellees,*

v.

DEBRA HAALAND, in her official capacity as Secretary of the Interior; LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land & Minerals Management, ELIZABETH KLEIN, in her official capacity as Director of the Bureau of Ocean Energy Management; JAMES KENDALL, in his official capacity as Director of the Gulf of Mexico Regional Office of the Bureau of Ocean Energy Management; U.S. DEPARTMENT OF THE INTERIOR; and BUREAU OF OCEAN ENERGY MANAGEMENT,

*Defendants-Appellants,*

SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE EARTH; TURTLE ISLAND RESTORATION NETWORK,

*Intervenors-Appellants.*

_____

SHELL OFFSHORE, INCORPORATED,

*Plaintiff-Appellee,*

v.

DEBRA HAALAND, in her official capacity as Secretary of the Interior; LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land & Minerals Management, ELIZABETH KLEIN, in her official capacity as Director of the Bureau of Ocean Energy Management; JAMES KENDALL, in his official capacity as Director of the Gulf of Mexico Regional Office of the Bureau of Ocean Energy Management; U.S. DEPARTMENT OF THE INTERIOR; and BUREAU OF OCEAN ENERGY MANAGEMENT,

*Defendants-Appellants,*

SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE EARTH; TURTLE ISLAND RESTORATION NETWORK,

*Intervenors-Appellants.*

_____

On appeal from the United States District Court for the Western District of Louisiana, Lake Charles Division (Nos. 2:23-cv-1157 (lead); 2:23-cv-1167 (member), consolidated)

_____

**OPPOSED EMERGENCY MOTION UNDER CIRCUIT RULE 27.3 AND FED. R. APP. P. 8(a) FOR PARTIAL STAY PENDING APPEAL AND FOR IMMEDIATE PARTIAL ADMINISTRATIVE STAY (RELIEF REQUESTED BY SEPT. 26, 2023)**

TODD KIM
*Assistant Attorney General*
ANDREW M. BERNIE
MICHELLE MELTON
  *Attorneys*
Environment & Natural Resources Division
U.S. Department of Justice
 950 Pennsylvania Avenue NW
 Washington, DC 20530
 202-532-3251
 Michelle.melton@usdoj.gov

MELISSA HEARNE
*Assistant Solicitor*
 Department of the Interior

## CERTIFICATE OF INTERESTED PERSONS

No. 23-30666

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants, as governmental parties, need not furnish a certificate of interested persons.


/s/ Michelle Melton
MICHELLE MELTON

Counsel for Federal Defendants-Appellants

# TABLE OF CONTENTS

NATURE OF EMERGENCY ...................................................................1

INTRODUCTION AND SUMMARY ........................................................4

STATEMENT ...........................................................................................7

A.    LEGAL BACKGROUND................................................................7

    1.    Outer Continental Shelf Lands Act ............................................7

    2.    The Inflation Reduction Act ....................................................10

B.    BOEM'S PROCESS FOR LEASE SALE 261.................................11

C.    PROCEDURAL HISTORY ............................................................12

ARGUMENT ..........................................................................................16

I.    THE DISTRICT COURT ABUSED ITS DISCRETION AS TO THE DEADLINE FOR THE MODIFIED SALE. ....................................17

    A. The district court abused its discretion in crafting its remedy. .......17

    B. The district court erred by failing to reconcile the IRA and OCSLA. ...........24

II.    ABSENT A PARTIAL STAY, THE GOVERNMENT AND THE PUBLIC WILL BE IRREPARABLY HARMED. ...............................25

III.    A PARTIAL STAY WOULD IMPOSE NO COGNIZABLE HARM ON PLAINTIFFS. .......................................................................28

CONCLUSION ......................................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF CONFERENCE

CERTIFICATE OF SERVICE

EXHIBITS

# TABLE OF AUTHORITIES

## Cases

*Abraham v. Alpha Chi Omega,*
 708 F.3d 614 (5th Cir. 2013) ................................................................17

*Barnhart v. Peabody Coal Co.,*
 537 U.S. 149 (2003) ..........................................................................20

*Boston Parent Coalition for Academic Excellence Corp. v. School Comm. of Boston,*
 996 F.3d 37 (1st Cir. 2021) ...............................................................17

*Brock v. Pierce Cty.,*
 476 U.S. 253 (1986) .................................................................20, 21, 22

*California v. Watt,*
 668 F.2d 1290 (D.C. Cir. 1981) ...........................................................8

*California v. Watt,*
 712 F.2d 584 (D.C. Cir. 1983) .............................................................8

*Chemical Weapons Working Group v. Dep't of the Army,*
 101 F.3d 1360 (10th Cir. 1996) ...........................................................16

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
 563 F.3d 466 (D.C. Cir. 2009) .............................................................8

*E.T. v. Paxton,*
 19 F.4th 760 (5th Cir. 2021) ...............................................................25

*Enterprise Intern., Inc. v. Corparacion Estatal Petrolera Ecuatoriana,*
 762 F.2d 464 (5th Cir. 1985) ..........................................................17, 18

*Epic Sys. Corp. v. Lewis,*
 138 S. Ct. 1612 (2018) .......................................................................24

*Florida Medical Ass'n v. H.E.W.,*
 601 F.2d 199 (5th Cir. 1979) ...............................................................18

*Lemon v. Kurtzman,*
  411 U.S. 192 (1973) ................................................................18

*Nken v. Holder,*
  556 U.S. 418 (2009) ...........................................................16, 25

*Oxy USA Inc. v. Babbitt,*
  122 F.3d 251 (5th Cir. 1997) ...............................................25

*Sec'y of the Interior v. California,*
  464 U.S. 312 (1984) ...............................................................8

*U.S. Navy Seals 1-26 v. Biden,*
  27 F.4th 336 (5th Cir. 2022) ...............................................16

*Valentine v. Collier,*
  978 F.3d 154 (5th Cir. 2020) .................................................7

*Veasey v. Abbott,*
  870 F.3d 387 (5th Cir. 2017) ...........................................25, 26

*Watt v. Alaska,*
  451 U.S. 259 (1981) ...............................................................24

**Statutes**

43 U.S.C. § 1332(3) ...................................................................18

43 U.S.C. § 1337(a) .....................................................................9

43 U.S.C. § 1337(*l*) ................................................... 1, 3, 5, 9, 25

43 U.S.C. § 1344 .........................................................................8

43 U.S.C. § 1344(a)(1) .................................................................8

43 U.S.C. § 1345(a)-(b) ...............................................................9

43 U.S.C. § 1345(c) ............................................................... 9, 11

43 U.S.C. §§ 1301-1356c ............................................................8

## Rules

Fed. R. App. P. 8(a)(2)(A)(i) ...............................................................................16

## Regulations

30 C.F.R. § 550.207 ...........................................................................................10

30 C.F.R. § 556.200 .............................................................................................8

30 C.F.R. § 556.305(a) .........................................................................................9

30 C.F.R. § 556.307 .............................................................................................9

30 C.F.R. § 556.308(a) .........................................................................................9

30 C.F.R. § 556.308(a)(2) .....................................................................................9

30 C.F.R. § 556.500(a) .........................................................................................9

30 C.F.R. § 556.516(a) ........................................................................................10

30 C.F.R. § 556.516(b) ........................................................................................10

30 C.F.R. § 556.520 ............................................................................................10

## NATURE OF EMERGENCY

The Bureau of Ocean Energy Management ("BOEM"), an agency within the U.S. Department of the Interior ("Interior"), has spent months preparing for Lease Sale 261, an offshore oil and gas lease sale in the Gulf of Mexico. The last pre-sale step in that process was a Final Notice of Sale notifying the public and potential bidders of the sale and its terms. 43 U.S.C. § 1337(*l*). As described in the Final Notice of Sale, Interior's plan was to open more than 67 million acres of submerged lands for lease on the Outer Continental Shelf under specified terms.

Less than a week before Lease Sale 261 was to be held, the district court ordered Interior to change both the scope and the lease terms of Lease Sale 261 while still holding the sale by September 30, leaving Interior 6 business days to comply with the court's order. *See* Exh. 1. While Interior does not agree that any injunction was warranted, this Motion—filed roughly 18 hours after the district court's order—requests relief only from the district court's disruptive September 30 deadline.

Interior explained to the district court that altering the scope and terms of a lease sale days before it is held injects chaos into the ongoing sale process for two reasons. First, administrative realities related to the agency's computer systems make it impracticable for Interior to hold the modified sale on the deadline imposed by the district court. Interior set forth in an unrebutted declaration—not cited by the court—that it needs 10 business days to update its sale systems. Interior elaborates on its internal processes in a declaration attached to this Motion. Exh. 2.

Second, the district court's order is unfair to bidders and puts BOEM in the untenable position of deciding how to treat bids that are apples and oranges. Although Interior planned to *open* the sealed bids for Lease Sale 261 on September 27, the sale process as described in the Final Notice of Sale has long since begun. Pursuant to that portion of the Final Notice of Sale that the district court did not enjoin, all bids must be received by BOEM via mail no later than 10 a.m. on September 26. To meet this mail-in deadline, bidders have to finalize and submit their bids no later than September 22 (the day after the court's order). As expected, some bidders did so before the district court's order. Interior had already received bids for Lease Sale 261 from several companies and been notified that other bids are en route—including bids from companies not represented by Plaintiffs here. *See* Exh. 2. The bids received prior to the district court's order are presumably premised on the terms of the original sale notice, prior to its modification by the district court. Bidders wishing to withdraw their bids for a lease sale whose terms have changed must do so via a process also set forth in the Final Notice of Sale—but these withdrawals must also be received by mail and prior to the bid submission deadline.

In light of these realities, the district court's deadline will (1) prejudice those bidders who have already submitted bids and may not have time to withdraw their bids (much less submit new ones); (2) put the agency in the unprecedented position of figuring out what to do with bids for the same parcel that assumed *different* terms; and (3) harm the public's interest in the financial returns from a fair and competitive sale.

A partial stay that provides relief only from the district court's unnecessary deadline will give BOEM sufficient time to revise and publish a new sale notice, consistent with BOEM's statutory requirement and an orderly lease sale process. 43 U.S.C. § 1337(*l*). If this Court needs additional time beyond September 26 to consider this Motion, then Interior requests an immediate, and similarly limited, administrative stay pending this Motion's resolution.

## INTRODUCTION AND SUMMARY

On the evening of on September 21, the district court granted Plaintiffs'
request for "preliminary" relief to compel Interior to hold Lease Sale 261, an offshore
oil and gas lease sale, on terms different than those previously noticed to the public,
while still holding that sale by September 30.

In the district court, Interior defended the original terms of the sale as lawful
but also set forth in a declaration and in briefing its administrative and legal concerns
about holding a modified Lease Sale 261 by September 30.  Interior requested that, if
the court were to issue an injunction over Interior's protest, the court should also
afford the agency an additional six weeks—that is, until November 8—to conduct the
sale with the new required terms.  The district court disregarded Interior's concerns.

This Motion seeks to stay only a portion of the order causing the most serious
and immediate harm to the government, to non-Plaintiff members of the oil and gas
industry, and to the public—namely, the requirement that Interior hold the
substantially modified Lease Sale 261 by September 30.  This Court should grant
Interior's partial stay request for three reasons.

*First*, Interior is likely to prevail on the merits of its claim that the district court
abused its discretion in weighing the injunction factors.

The district court's order functionally ignored that Interior had offered an
alternative remedy of holding a sale on November 8.  Interior explained that
administrative necessity, a statutory notice requirement, and fundamental fairness to

4

bidders all necessitated a modest delay. Meanwhile, Plaintiffs did not show (or even meaningfully allege) that Interior's preferred alternative sale date would harm them—and indeed, their filings undercut this notion. Instead, Plaintiffs alleged irreparable harm from failing to hold a sale on the terms that they prefer—terms that this Motion does not ask this Court to change. Yet the district court disregarded, diminished, or overlooked each of Interior's concerns, while brushing past Plaintiffs' lack of harm from a delayed sale. The court abused its discretion in crafting a remedy that did not properly consider the equitable factors at play.

In reality, the district court's order ensures an unfair sale. Only Plaintiffs to this suit will have had time to prepare bids for the previously excluded acreage now included in the modified sale, giving these Plaintiffs an unfair competitive advantage and dampening the competitive dynamics of the sale. Congress sought to prevent exactly this result when it mandated that Interior provide 30-days' notice of any sale. 43 U.S.C. § 1337(*l*). A sale where the bidders are not on equal footing is uncompetitive and unfair, and consequently not in the public interest.

*Second*, for the same reasons stated above, the government and the public will be irreparably harmed if Interior is forced to hold Lease Sale 261 on changed terms by September 30. And the balance of the equities tips sharply in favor of a modestly delayed sale date.

A forced sale on the timeline in the district court's order is impossible for Interior to administer in a sound manner; for example, the agency does not have time

to verify and input the fiscal terms and stipulations for each reinstated parcel into its internal system—as a result, bidders may submit bids on parcels without knowing the precise stipulations, which may lead to unfairness. Exh. 2, 3. And the agency has no precedent for how to deal with bids received for a sale on terms that are no longer valid. If forced to proceed with this sale, the agency will be irreparably harmed.

Even putting this aside, the consequences of violating OCSLA's 30-day notice provision will irreparably harm those bidders who either have not had notice of the new terms, or have prepared their bids in reliance on the old terms. One major premise of Plaintiffs' assertion of irreparable harm was that Interior's changes from the Proposed Notice of Sale to the Final Notice of Sale skewed the economic dynamics of the sale and undercut their time to prepare bids. But the court's order causes a far worse harm to non-Plaintiff bidders—without providing them an opportunity to withdraw or amend their bids. The bid submission (and bid withdrawal) deadline is 10:00 a.m. Central time on September 26, less than 2 business days from this filing. If the sale goes forward on the timeframe in the district court's order, it is possible that Interior will accept a bid that non-Plaintiff bidders would have otherwise withdrawn or modified—and that harm is irreparable to both the winning and the losing bidders.

*Third*, the limited stay sought here would impose no cognizable harm on Plaintiffs. To the contrary, it would allow them to bid on the terms they desire on equal footing with all other interested bidders, a sale that, again, would be conducted

just weeks from now. Plaintiffs have never asserted (much less shown) that they would suffer any meaningful harm if Interior is afforded an additional six weeks to hold the sale on the terms Plaintiffs sought.

If the deadline is not stayed by September 26, the court's order will inject chaos into the ongoing sale process and result in a disorderly and unfair sale. A partial stay of the district court's injunction order extending the timeline for Interior to comply will ensure Interior's revised sale is conducted in an orderly, fair, and lawful manner with due notice to the public. The district court abused its discretion in concluding otherwise.

Interior respectfully requests a ruling on this Motion by September 26, the purpose of which is extend the effective date of the district court's injunction to November 8. If this Court wants to consider the Motion past September 26, Interior requests that the Court issue a partial temporary administrative stay by September 26 that postpones the effective date of the district court's injunction until the Court can rule on this Motion. *See, e.g.*, *Valentine v. Collier*, 978 F.3d 154, 160 (5th Cir. 2020).

## STATEMENT

**A.    Legal Background**

**1.    Outer Continental Shelf Lands Act**

The Outer Continental Shelf Lands Act ("OCSLA") of 1953, 43 U.S.C. §§ 1301-1356c, establishes a multi-stage process for development of offshore oil and gas resources. *Sec'y of the Interior v. California*, 464 U.S. 312, 337-40 (1984). "[T]he

leasing program's four-stage process is pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472-73 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting *California v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir. 1981)).

At the first stage, BOEM develops a "five year program," which culminates in the publication of a proposed schedule of Outer Continental Shelf ("OCS") oil and gas lease sales over a five year period. *See* 43 U.S.C. § 1344. In developing this program, BOEM balances "economic, social, and environmental values" including "the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1); 30 C.F.R. § 556.200. The five year program is a general, programmatic roadmap of the sales BOEM may conduct in the coming years, but does not require that BOEM hold each sale, nor does it dictate the precise terms and acreage to be leased at each sale. *See California v. Watt*, 712 F.2d 584, 588 (D.C. Cir. 1983).

The second stage, at issue in this case, encompasses the lease sale process. *See generally* 43 U.S.C. §§ 1334, 1337. The decisions made at this stage include whether and when to hold a lease sale, which lease blocks to offer in the sale, and the terms of the sale, such as the royalty and rental rates and any lease stipulations. 43 U.S.C. § 1337(a). Prior to a lease sale, BOEM prepares and publishes a Proposed Notice of Sale in the Federal Register. Following the publication of the Proposed Notice of

Sale, the governors of neighboring states have sixty days to provide comments on the size, timing, and location of the sale.  43 U.S.C. § 1345(a)-(b); 30 C.F.R. § 556.305(a). BOEM must consider the governors' recommendations, if any, on the size, timing, and location of the sale and provide a written response documenting the acceptance or rejection of the governors' recommendations.  43 U.S.C. § 1345(c), (d); 30 C.F.R. § 556.307.

After considering the comments and recommendations regarding the proposed sale, OCSLA requires BOEM to publish a Final Notice of Sale at least thirty days before the sale.  43 U.S.C. § 1337(*l*); 30 C.F.R. § 556.308(a).  The Final Notice of Sale describes "the areas offered for lease, the lease terms and conditions of the sale, and stipulations to mitigate potential adverse impacts on the environment."  30 C.F.R. § 556.308(a)(2).  It describes the minimum bid amounts, the lease terms—such as the length of the lease's primary term, the royalty and rental rates, and any stipulations to protect the environment or reduce space-use conflicts on the Outer Continental Shelf (e.g., to deconflict military use with oil and gas activity).  The Final Notice of Sale also contains the sale date, bidding instructions, and the bidding rules and restrictions.  *See, e.g.*, *id.*; *see also* 30 C.F.R. § 556.500(a), (b), (c).  Finally, the Final Notice of Sale contains a link to the lease form which will be issued to successful bidders.  *Id.* § 556.308(d).  In short, the Final Notice of Sale contains relevant information for bidders concerning (1) what parcels may be bid on; (2) the relevant minimum bid

amounts and terms by parcel; and (3) the instructions for bidders concerning how to participate in the sale.

On the sale date, BOEM opens all previously submitted sealed bids. *See* 30 C.F.R. § 556.516(a). BOEM opens the bids at the day and time specified in the Final Notice of Sale and announces and records every bid received. *Id.* Following the sale, BOEM has 90 days (which the agency may extend) to analyze the highest valid bids to ensure these bids reflect fair market value, among other requirements, and accept or reject the bids. *Id.* § 556.516(b). After BOEM accepts a bid, it issues a lease to the bidder, *id.* § 556.520, which entitles the lessee to conduct preliminary activities, such as lower-impact geophysical surveys, *see id.* § 550.207.

The third and fourth stages—involving exploration and production of commercial quantities of oil and gas, respectively—are not at issue here.

### 2.     The Inflation Reduction Act

Congress enacted the Inflation Reduction Act ("IRA") on August 16, 2022. *See* Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818. As relevant here, the IRA requires BOEM to hold Lease Sale 261 by September 30, 2023, notwithstanding the expiration of the 2017-2022 Five Year Program. IRA § 50264(e), 136 Stat. at 2060; *see also* IRA §§ 50264(c), (d) (similarly directing BOEM to hold Lease Sales 258 and 259 by certain dates).

**B.      BOEM's Process for Lease Sale 261**

In March 2023, BOEM issued a Proposed Notice of Sale for Lease Sale 261 ("Proposed NOS").  ECF 14-8 at 1.  The Proposed NOS indicated that the sale would take place on September 27, and listed the areas BOEM expected to be available for leasing.  *Id.* at 1-7.  The Proposed NOS expressly "reserve[d] the right to modify the sale area in the Final NOS, including removing additional areas from Lease Sale 261" and explained that BOEM was "considering removing the area comprising the northeastern Gulf of Mexico and continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area." *Id.* at 7.  BOEM also listed the stipulations that it proposed to include in the sale.  *Id.* at 10-11.  BOEM stated that it would "announce a final decision on the sale, including the sale area and applicable stipulations, in the Final NOS." *Id.* at 10.  The Proposed NOS was published in the Federal Register and subject to comment from affected governors.

To inform and document the Assistant Secretary's decision regarding Lease Sale 261, BOEM prepared a recommendation memorandum.  ECF 55-3.  The memorandum documented the objections of the Governors of Alabama, Mississippi, and Texas to the exclusion of acreage intended to protect the Rice's whale and stated that removal of that area would provide "a reasonable balance between protecting the endangered Rice's whale . . . and offering a sizeable area for leasing that will continue to meet national energy needs . . . ." *Id.* at 24; *see also* 43 U.S.C. § 1345(c), (d).

On August 22, Interior issued its decision authorizing the sale ("Lease Sale 261 ROD"), and BOEM issued a Final Notice of Sale ("Final NOS") as required by OCSLA soon thereafter. *See* ECF 14-2. Consistent with BOEM's internal recommendation memorandum, the acreage within the 100-meter to 400-meter isobath was excluded from the Final NOS. *Id.* at 10-12. The stipulations attached to the Final NOS included additional conditions in Stipulation 4 (related to Endangered Species) that were not included with the Proposed NOS. *See* ECF 14-4 at 10-14. Specifically, Stipulation No. 4 ("Protected Species"), at (B)(4), requires lessees "[d]uring the reinitiated consultation with NMFS . . . and until a new or amended [Biological Opinion] is issued" to comply with vessel speed limits and other restrictions within the 100-meter to 400-meter isobath (west of the existing Core Area identified in the 2020 Biological Opinion) to avoid impacts to the Rice's whale. *Id.* at 11. The Final NOS listed the sale date as September 27, and directed that BOEM must receive all bids by mail by 10:00 a.m. on September 26. ECF 14-2 at 1.

## C.  Procedural History

1. Plaintiffs filed their complaints shortly after BOEM issued its Final NOS. They sought to compel Interior to hold Lease Sale 261 on terms *other than* those published in Interior's Final NOS. Specifically, Plaintiffs alleged that the sale, as described in the Final NOS, was unlawful because: (1) it did not comport with the IRA's requirement to hold the sale "in accordance with" the 2017 Record of Decision for the 2017-2022 Five Year Program; (2) Interior did not provide affected governors

or the public appropriate notice, in BOEM's Proposed Notice of Sale, of the acreage restrictions related to the Rice's whale, or a stipulation related to that whale; and (3) Interior failed to adequately explain its reasoning for excluding the Rice's whale acreage and imposing the new stipulation.

2.  On August 29, Plaintiffs filed materially indistinguishable motions seeking a preliminary injunction to compel Interior to hold a revised Lease Sale 261 on September 27.  In particular, they sought a court order compelling Interior to: (1) include in Lease Sale 261 the acreage within the isobath range that was excluded for the Rice's whale; and (2) not include the new provisions of the Protected Species Stipulation at 4(B)(4) in the sale.

Interior filed a response opposing the preliminary injunction motion on all grounds.  In addition, Interior included a declaration from BOEM Deputy Director Walter Cruickshank explaining that the relief that Plaintiffs seek is wholly unworkable as a practical matter.  *See* Ex. 3.  Specifically, BOEM outlined that it would need a minimum of 10 business days to prepare its internal systems for a revised sale with new acreage and to update the sale maps available to bidders.  Additionally, it would need 37 days to effectuate OCSLA's 30-day notice provision (including seven days to get the notice published in the Federal Register, and 30 days to fulfill the notice requirement).

3.  On September 15, Plaintiffs filed a motion to waive or set an earlier hearing date on their injunction motion.  *See* ECF 61.  Plaintiffs informed the court that, if the

Court ruled on their motion *after* September 20, they would be prejudiced by any

relief, because they would need to submit bids for Lease Sale 261 by September 20 in

order to ensure that BOEM received any bids in time for the sale.  In Plaintiffs'

words, "the effective deadline for submitting *bids* is actually September 21 or 22."  *Id.*

To ensure they could comply with the deadline to submit bids, "Plaintiffs would

ideally mail their bids as early as Wednesday, September 20."  *Id.* at 2.  As Plaintiffs

stated, "if the September 21 hearing remains in place, Plaintiffs will have to submit

bids based on their assessment of the outcome of the litigation."  *Id.* at 3.

The district court denied the motion on the ground that Plaintiffs had known

of the September 21 hearing deadline but had only belatedly raised this concern.  ECF

62.

4.  On September 21, the district court held a hearing on Plaintiffs' preliminary

injunction motion.  A few hours later, the district court issued an order granting

Plaintiffs' motions and enjoining Interior from "implementing the acreage withdrawal

and Stipulation 4(B)(4) as described in the Final Notice of Sale and Record of

Decision for Lease Sale 261."  Exh. 1 at 30.

The court found that Plaintiffs had demonstrated a likelihood of success on the

merits of their claim that BOEM's Final Notice of Sale was procedurally invalid under

OCSLA and arbitrary and capricious for failing to explain its rationale. *Id.* at 16. The court did not address the merits of Plaintiffs' IRA-related claim.

In a discussion focused on *whether* a sale should go forward on Plaintiffs' terms, rather than *when* a sale should go forward, the court also found that Plaintiffs had demonstrated a substantial threat of irreparable injury. *Id.* 23-25. The court also concluded that the balance of the equities favored an injunction. *Id.* at 25-27. The court explained that Plaintiffs would suffer economic harm from failure to hold a sale, and further reasoned—despite Federal Defendants' argument to the contrary—that BOEM would not be under any mandate to proceed with the sale absent an injunction. *Id.* at 26.

On the other side of the ledger, the court cited the potential harm to the Rice's whale. *Id.* But the court discounted any harm to the Rice's whale because, in the court's view, the government could impose any necessary protective measures for the Rice's whale at later stages of development, such as stages three and four of OCSLA. *Id.* The court acknowledged the government's argument about its administrative burden, *id.* at 26, but, without citing or even acknowledging the Cruickshank declaration, it held that the government had "failed to substantiate" its claimed administrative challenges, *id.* at 29. The court also rejected the notion that the changed terms would disadvantage non-party bidders, faulting the government for failing to produce evidence on behalf of these non-parties to the suit. *Id.* at 26. In one, conclusory sentence—which failed to even acknowledge OCSLA's statutory

notice requirement—the court reasoned that there was simply no need for additional notice. *Id.* at 26-27. In a similarly conclusory manner, the court observed that, if the injunction was not granted, Interior would be under no mandate to proceed with the sale at all. *Id.* at 26.

5. On September 22, Federal Defendants noticed an appeal and filed this Motion.[1]

## ARGUMENT

In determining whether to grant a stay pending appeal, this Court considers (1) the likelihood of success on appeal; (2) whether the movant will suffer irreparable injury; (3) the balance of hardships; and (4) the public interest, which merges with harm to the government. *Nken v. Holder*, 556 U.S. 418, 426 (2009); *see also U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 349-350 (5th Cir. 2022). Each factor supports the limited request Interior makes here—for a six-week delay to comply with statutory notice requirements and ensure a sale that is administratively feasible for BOEM, as well as fair, transparent, and orderly for all potential bidders. The Motion should be granted.[2]

---

[1] Although Interior characterizes this Motion as one seeking partial stay of an injunction pending appeal, the Court could construe it as a request to partially modify or suspend the injunction. However characterized, the relief requested is warranted.

[2] Federal Defendants have not moved first in the district court because doing so would be impracticable. Fed. R. App. P. 8(a)(2)(A)(i). The district court already rejected the government's argument that it needed until November 8 to hold the sale. Re-asking the district court to issue relief that it has already declined would have been

I.    **The district court abused its discretion as to the deadline for the modified sale.**

The district court did not, in crafting its equitable remedy, compare a sale by September 30 with a sale on November 8.  In implicitly denying Interior's request for more time to comply with any injunction modifying Lease Sale 261, the district court relied primarily on the IRA's statutory deadline.  Exh. 1 at 27, 29.  But it was either outright error or a manifest abuse of discretion for the district court to prioritize the IRA's statutory deadline at the expense of other legal requirements and relevant considerations, and given that the government substantiated its administrative and fairness concerns and Plaintiffs alleged no harm from a delayed sale.

**A. The district court abused its discretion in crafting its remedy.**

A district court has considerable discretion in fashioning an appropriate injunction to balance the equities.  *See Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627-28 (5th Cir. 2013).  But that discretion, while broad, "is not unbridled." *Enterprise Intern., Inc. v. Corparacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985); *id.* at 474 (concluding that the district court abused its discretion in granting an injunction that did not properly weigh the equities).  To the contrary, "a preliminary

---

futile and thus impracticable.  *Chemical Weapons Working Group v. Dep't of the Army*, 101 F.3d 1360, 1362 (10th Cir. 1996) ("When the district court's order demonstrates commitment to a particular resolution, application for a stay from that same district court may be futile and hence impracticable.").  Additionally, given the limited time— mere days—Interior has to comply with the court's order, moving first in the district court is impracticable.  *See Boston Parent Coalition for Academic Excellence Corp. v. School Comm. of Boston*, 996 F.3d 37, 44 (1st Cir. 2021) (collecting cases).

injunction 'must be the product of reasoned application of the four factors held to be necessary prerequisites.'" *Id.* (quoting *Florida Medical Ass'n v. H.E.W.*, 601 F.2d 199, 202 (5th Cir. 1979)).  Or, put differently, "equitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973).  Because the district court's injunction requiring Interior to hold a modified sale by September 30, was neither necessary, nor fair, nor workable, it was an abuse of discretion.

First, the district court failed to adequately grapple with the fact that the IRA is not the only statute that governs this lease sale.  One of Congress' major goals in amending OCSLA in 1978 was to promote a competitive bidding system that would (1) allow small and independent oil and gas companies greater participation in developing the Outer Continental Shelf; and (2) result in a fair return to the public for the use of its lands.  *See* 43 U.S.C. § 1332(3) (purpose of OCSLA is to make Outer Continental Shelf available for development in a manner "consistent with the maintenance of competition"); *see also* H.R. 95-1835, 95th Cong., 2d Sess. at 14-17, 30 (1979) (describing reforms intended to promote competition in leasing).  OCSLA's 30-day notice provision helps ensure both of those goals are met by putting *all* bidders—not just the most sophisticated and well-capitalized companies—on equal footing.  The notice provision allows companies adequate (and equal) time to prepare their bids.

As Interior urged below, these fairness concerns are front and center in this suit.  Recent experience suggests that many bidders are not represented by the parties to this suit, as Interior indicated at the hearing.  Exh. 4 at 35.  In the most recent lease sale, for instance—Lease Sale 259—more than half of bidders were not listed members of Plaintiff American Petroleum Institute.  *See infra*, p. 27.  These unrepresented bidders may not learn that the court has ordered new terms for Lease Sale 261 with sufficient time to prepare new bids to reflect the new sale's terms—or, worse, will have submitted bids for a sale under terms that are no longer valid or foregone submitting bids on acreage they were not aware is available, without the ability to withdraw.  The result is that some bidders—for instance, Plaintiffs—would be aware of the sale's changed terms, but other bidders may not be.  And even assuming all bidders become aware of the changes, at least some bidders may not have sufficient time to prepare new bids for the sale that will actually be held on the terms required by the court's order.  Ordering BOEM to hold the lease sale by September 30, on terms *other than* those described in Interior's Final NOS, is directly contradictory to OCSLA and undermines the important protections afforded by these provisions to other bidders and the public fisc.

In passing, the district court offered two reasons downplaying these concerns. It asserted that Interior had previously modified the terms of a prior sale without issuing a new Final Notice of Sale.  Exh. 1 at 27 n.10.  That Interior on a single occasion—in markedly different circumstances, nearly 20 years ago—did not re-notice

a sale does not mean that the district court's decision to ignore OCSLA's notice

provision here is justified.  There are at least three reasons that situation differs from

this one.  First, as explained in the press release relied on by the district court, Exh. 1

at 27, Interior's decision was the result of an intervening change in law.  Congress

had passed a new law mandating certain royalty relief provisions in all leases moving

forward after Interior's Final NOS for Lease Sale 196.  Here, there was no such

intervening change of law (and, notably, the district court did *not* hold that the IRA

mandated these changes to the sale).  Additionally, Interior had time to notice that

change in the Federal Register; this limited protection is not available here.  Finally,

the change Interior noticed respecting Lease Sale 196 was not a meaningful change in

the sale's terms.  It concerned changes to volumes on which entities could obtain

royalty relief, long in the future, *if* lessees produced commercial quantities of oil and

gas.  As Interior's notice indicated, however, all other sale terms remained the same.

The small concerning royalty suspension volumes is not comparable to the

substantially changed terms imposed by the district court at the last minute, which

necessarily will affect all winning bidders.

The district court also dismissed Interior's objections about fairness and

OCSLA by resting on the IRA's statutory deadline.  *Id.* at 26.  The district court

mistakenly believed it was necessary to prioritize the IRA deadline because, absent

inflexible adherence to that date, Interior would have no duty to hold the sale at all.

Exh. 1 at 26 ("[T]he sale is currently under a statutory deadline. If it does not take

place as scheduled, government defendants are no longer under any congressional mandate to proceed with the lease sale."). But it is well-established that missing the IRA's deadline—which, to be clear, is only necessary *because of* the district court's injunction—does not alleviate the agency of its duty to hold Lease Sale 261. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) (agency has authority to act even after passage of a statutory deadline); *Brock v. Pierce Cty.*, 476 U.S. 253, 259 (1986) (same). If Interior receives the limited relief it seeks here, it recognizes its continuing obligation and fully intends to hold the sale by November 8—and has never asserted otherwise.

Additionally, it is no answer to say that the IRA set a mandatory deadline. OCSLA's 30-day notice provision is *also* mandatory. The primary difference between the two provisions is the *consequence* of violating these respective mandates. The consequences of violating the notice provision, elaborated further below in the irreparable harm section, are significant. By contrast, delaying the sale by six weeks beyond September 30 would cause no appreciable detriment to the public, the bidders to the sale, or to Plaintiffs.

Although Congress undoubtedly intended Interior to hold Lease Sale 261 by September 30—which Interior fully intended to do before the injunction—there is no indication that Congress intended inflexible adherence to that deadline even under circumstances where holding the sale by that date would violate other statutory commands, and result in a chaotic, unworkable, and unfair sale. *Cf. Brock v. Pierce Cty.*,

476 U.S. 253, 259 (1986) (failure of Congress to specify consequences for violating statutory deadline indicates that Congress did not intend to provide a remedy for missing the deadline).  In the absence of statutory consequences for failure to meet the deadline—or any other indication from Congress that Interior *must* hold the sale by September 30, even if doing so meant violating *other* statutory commands, motivated by a desire for competitive, fair sales—the district court erred by imputing to Congress "the desire to remedy such a failure by preventing the Secretary from protecting both the public fisc and the integrity of a Government program."  *Id.*

The district court also rejected as unsubstantiated the harms to the government.  Exh. 1 at 29.  But Interior put forward evidence of the difficulty of complying with the court's order.  Exh. 3.  That the court ignored the Cruickshank declaration, which plainly laid out why BOEM could not turn on a dime, does not mean that Interior did not submit it.

The declaration established that BOEM's administrative difficulties are real.  As BOEM explained, adding the excluded acreage was not as simple as just accepting bids on the previously excluded parcels.  *Id.* ¶ 3.  Some of the newly-reinstated blocks are affected by stipulations other the stipulation enjoined by the court.  For instance, some blocks that the district court ordered to be reinstated have stipulations related to military warning areas.  Other blocks would be excluded even applying the court's order, because they also fall under other (non-challenged) exclusions; for example, some blocks that were in the excluded Rice's whale area were *also* in the excluded

22

Flower Garden Banks area.  BOEM declared that it would need at least 10 business days to figure out which blocks to include, on what terms, to verify that information, and to put that information into its internal bidding administration system.  Exh. 3. The court improperly ignored this evidence, which contributed to the court's finding that the equities weighed in favor of Plaintiffs.

The district court also abused its discretion to the extent it assumed—without Plaintiffs ever arguing, much less establishing—that Plaintiffs would be harmed by a delayed sale.  The evidence does not bear this supposition out.  Plaintiffs' irreparable harm was premised on Interior holding a purportedly *unlawful* sale on September 27. They claimed that placing bids in that unlawful sale would alter the sale's outcome in ways that could not be undone, and would permanently deprive Louisiana of potential revenue.  ECF 14-1, at 2.  But these harms do *not* accrue if Interior holds a sale modified to address Plaintiffs' objections on November 8.  If Interior were to hold the modified sale on November 8, Louisiana would not be deprived of its potential revenue.  Industry Plaintiffs would have an opportunity to bid on the acreage that they claim they are entitled to bid on.  And their bidding strategies would not be harmed.  *Id.* at 27-29.

Indeed, any claim of harm is undercut entirely by Plaintiffs' concession in their district-court reply that they would be satisfied if the court were to order two sales: one sale without the excluded acreage on September 27, and a second sale including the formerly excluded acreage on November 8.  ECF 69, at 20.  It is impossible to

reconcile Plaintiffs' harms from a sale on November 8 with their receptiveness to a sale on November 8.  Rather, the logical conclusion is that Plaintiffs would suffer no harm from a modestly delayed sale.

Weighing all of these considerations, the district court should not have concluded that a sale by September 30 was necessary.  The district court's September 30 deadline flouts the requirements and purpose of OCSLA in ways that are unfair to both Interior and prospective bidders.  Compounding that error, the district court overstated Plaintiffs' harms and underplayed Interior's, in ways unsupported by the evidence before it.  Because the district court's deadline was unreasonable under the circumstances, the September 30 deadline should be stayed.

**B. The district court erred by failing to reconcile the IRA and OCSLA.**

The district court also erred by improperly reconciling the IRA's statutory deadline with OCSLA's 30-day notice mandate.  The district court should have read the IRA and OCSLA "to give effect to each," *Watt v. Alaska,* 451 U.S. 259, 267 (1981); *see also Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1624 (2018) (Congress will specifically address preexisting law when it wishes to suspend normal operations in a later statute).  Because the Court can preserve the sense and purpose of both the IRA and OCSLA by giving Interior additional time to hold the sale, it "must read the [two statutes] to give effect to each." *Watt,* 451 U.S. at 266, 267; *accord Epic Sys. Corp.*, 138 S.Ct. at 1624 (court should strive to give effect to both statutes).  In this context, reconciling these statutes requires Interior to hold the sale as soon as practicable,

consistent with OCSLA's sale procedures, including its notice provision. The district court erred in concluding otherwise.

But barring that, for the reasons explained above, the district court erred by implicitly concluding that OCSLA's notice provision must give way to the IRA's statutory deadline. As a matter of statutory reconciliation, there is no reason to believe that Congress intended to impliedly repeal OCSLA's statutory notice provision. The district court's interpretation thus works a disfavored implied repeal of OCSLA into the IRA. *Oxy USA Inc. v. Babbitt*, 122 F.3d 251, 258 (5th Cir. 1997).

## II. Absent a partial stay, the government and the public will be irreparably harmed.

The district court's deadline presents clear and irreparable harm to the federal government and the public interest. *Nken*, 556 U.S. at 435.

The order's deadline harms Interior. Compliance with the injunction will force BOEM to violate its statutory duty, 43 U.S.C. § 1337(*l*), to notice the sale and its terms for at least 30 days. The federal government "necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017)).

Moreover, the agency is harmed by being forced to hold a chaotic, unfair, and unlawful sale. As an initial matter, the agency has already stated, in an unrebutted declaration, that it cannot hold an orderly sale in the limited time afforded to it. As

discussed in the unrebutted Cruickshank Declaration and elaborated above, BOEM simply does not have sufficient time to update its internal bidding system to reflect the court-ordered terms in time to comply with the district court's order.  Exh. 3 ¶ 3. The agency also lacks the time necessary to update the maps that bidders rely on to assess the terms assigned to each parcel.  *Id.*

But even putting aside administrative impracticality, Interior would also be irreparably harmed by holding the modified sale by September 30.  The agency would have to attempt to figure out whether bids were submitted for the sale described in the Final NOS or the sale described in the district court's order.  It would have to figure out, on the fly, and without the benefit of any established process, how to treat each category of bids.  This would necessarily also expose the agency to further litigation risk.  Aggrieved bidders—including those whose bids were submitted based on the published Final NOS, those who will allege the sale was unfair because they did not have sufficient time to prepare a bid based on the new sale terms, and those who lose out on particular parcels because their bid was hastily prepared—might challenge the agency's issuance of particular leases to particular bidders.  This chaos— and the ensuing litigation risk it breeds—would be the direct result of the district court's order, and could be avoided by allowing BOEM the requisite time to carry out OCSLA's 30-day notice provision.  Exh. 2 ¶¶ 10-13.

But the harm of ordering BOEM to hold a revised Lease Sale 261 by September 30 on terms other than those in the Final Notice of Sale would not inure

only to the federal government; it would irreparably harm the non-Plaintiff bidders and the broader public.

Forcing Interior to hold a sale on terms that were not described in BOEM's public notice is unfair to sale participants who are *not* parties to this case. Those non-Plaintiff interested bidders may have spent considerable time and effort preparing bids for a sale whose terms are no longer valid and who will have only a handful of days to adjust to the new terms of the sale. While BOEM cannot know in advance every bidder that will ultimately participate in Lease Sale 261, Lease Sale 259—held in March 2023—is illustrative. Thirty-two companies participated in Lease Sale 259 by submitting bids for available tracts. Well over half of the bidding companies, however, were *not* members of API or otherwise parties to this lawsuit. *Compare* Lease Sale 259 Final Bid Recap, https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-259-Final-Bid-Recap.pdf (last accessed September 19, 2023) (listing bidders by company name) *with* API Member List, https://www.api.org/membership/members (last accessed September 19, 2023) (listing API's more than 600 members). In this sale, at least five of the twelve bidders are not members of API. *See* Exh. 2 ¶ 3. Indeed, Interior has *already* received notice from bidders who have mailed bids and are *not* Plaintiffs or members of Plaintiff API—and, since these bids were mailed before the court's injunction was issued, these bids are presumably for a sale on the terms included in BOEM's original notice. *See id.*

Plaintiffs cannot deny the irreparable harm this would impose on both bidders and the sale process.  Indeed, in the district court, one of the principal harms asserted by Plaintiffs was the alleged skewing of the bidding process from what they characterized as "last-minute changes to bidding dynamics" and "bidding strategy." ECF 14-1, at 28-29.  And that supposed harm was from changes to the Proposed NOS that were fully disclosed in a Final NOS issued thirty days before the sale date. The harms introduced by district court's order—which requires true eleventh-hour changes, imposed after bids have been prepared and submitted—cannot be seriously disputed.  If Plaintiffs' harms were irreparable, so, too, are the harms to *these* bidders, who are not represented by the Plaintiffs to this suit.  The court's order suggested otherwise because the government had supposedly produced no "evidence" on behalf of these third-party bidders.  Exh. 1. at 26.

Finally, a sale on equal footing, and with adequate notice, also ensures that the sale is competitive, and thus that the public receives a fair return on its resources.  The district court's order places Plaintiffs to this case on unequal footing with other bidders, potentially undermining the competitive dynamics of the sale, and harming the public's fiscal interest in its resources.  If an unfair sale moves forward and some Plaintiffs have underbid for parcels, the public cannot recover that lost revenue.

## III. A partial stay would impose no cognizable harm on Plaintiffs.

Allowing BOEM approximately six extra weeks to prepare for the revised Lease Sale 261 and provide notice of its terms to the public and all interested bidders

would not cause any cognizable injury to Plaintiffs. None of the potential harms Plaintiffs identified in the district court would occur by moving the sale date to November 8. Rather, industry Plaintiffs were concerned that, on September 27, BOEM would announce their bids, resulting in the release of their competitive information about which parcels they valued. Plaintiff Louisiana was concerned that Lease Sale 261's terms related to the Rice's whale—the acreage withdrawals and Stipulation 4(b)—would result in a lower economic return to the State. As explained elsewhere, moving the sale to November 8, based on the lease sale terms in the court's order will alleviate those concerns. Industry can still bid on the sale on the terms they desire. Their information will not be revealed until November 8. Nor will Louisiana be harmed by a six-week delay in holding the sale, as its only purported irreparable injury—the loss of revenue—will not accrue if a sale is held on the terms Louisiana desires on November 8, 2023.

## CONCLUSION

Interior asks this Court for limited relief to avoid a chaotic and unfair lease sale. This Court should stay the preliminary injunction's deadline to allow BOEM to hold a lawful and orderly sale by November 8 pending appeal. And, if the Court cannot rule on this motion by September 26, Interior also requests a temporary administrative stay of the deadline.

Respectfully submitted,

/s/ Michelle Melton

29

TODD KIM
*Assistant Attorney General*

SEPTEMBER 22, 2023

ANDREW BERNIE

MICHELLE MELTON

90-1-18-17251

*Attorneys*

Environment & Natural Resources Divsion

U.S. Department of Justice

950 Pennsylvania Avenue NW

Washington, DC 20530

202-532-3251

Michelle.melton@usdoj.gov

Counsel for Federal Defendants-Appellants

## CERTIFICATE OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-point Garamond, a proportionally spaced font.  This motion contains 7,485 words, according to the count of Microsoft Word, and is accompanied by a motion for leave to exceed the Fed. R. App. P. 27(d)(2)(A) limit of 5,200 words.

I also certify that, under 5th Cir. R. 27.4, Appellants conferred with counsel for Plaintiffs-Appellees and for Intervenor-Defendants-Appellees.  Plaintiff-Appellees Shell Offshore Inc., Chevron, the American Petroleum Institute, and Louisiana oppose this motion; Intervenor-Defendants-Appellees take no position on this motion.

I further certify that this emergency motion complies with the requirements of 5th Cir. R. 27.3 because:

- It was filed as close to 2:00 p.m. CST on the day of filing as reasonably possible.

- It was preceded by telephone calls to the Fifth Circuit Clerk's Office on September 22, 2023 and to the offices of opposing counsel on September 22, 2023, advising of the intent to file this emergency motion.

- The facts supporting emergency consideration of this motion are true and complete.

- The Court's review of this motion is requested as soon as possible, but no later than September 26, 2023. In addition, or alternatively, Appellants respectfully request an immediate administrative stay of the district court's deadline while the Court considers this motion.

- True and correct copies of relevant orders and other documents are attached as exhibits to this motion.

- This motion is being served at the same time it is being filed.

- The names of counsel representing the parties, including contract information of all counsel, are as follows:

Michelle Melton
Andrew Bernie
*Attorneys*
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7411
Washington, DC 20044
202-532-3251 (Melton)
202-514-4010 (Bernie)
michelle.melton@usdoj.gov
andrew.m.bernie@usdoj.gov

*Counsel for Federal Defendants-Appellants*

Elizabeth Murrill
*Solicitor General*
Joseph St. John
*Deputy Solicitor General*

Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
225-485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

James Holmes
Kyle Anderson
Christovich & Kearney
2300 Pan American Life Center
601 Poydras Street
New Orleans, LA 70130
504-561-5700
jaholmes@christovich.com
kanderson@christovich.com

Paul Clement
C. Harker Rhodes
Andrew C. Lawrence
James Xi
Clement & Murphy
706 Duke Street
Alexandria, VA 22314
202-742-8903 (Lawrence)
paul.clement@clementmurphy.com
harker.rhodes@clementmurphy.com
andrew.lawrence@clementmurphy.com
james.xi@clementmurphy.com

*Counsel for Plaintiffs-Defendants American Petroleum Institute*

Michael Phillips
Claire Juneau
Jeffrey Gelpi
Kean Miller LLP

909 Poydras St., Suite 3600
New Orleans, LA 70112
504-585-3050
mike.phillips@keanmiller.com
Claire.juneau@keanmiller.com
jeff.gelpi@keanmiller.com

Robert Kallam
Kean Miller LLP
600 Jefferson St., Suite 1101
Lafayette, LA 70502
337-235-2232
Robert.kallam@keanmiller.com

Catherine Stetson
Sean Marotta
Dana Raphael
Hogan Lovells US LLP
555 13th St. NW
Washington, DC 20004
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

*Counsel for Plaintiffs-Defendants Chevron U.S.A. Inc.*

Steven Rosenbaum
Bradley Ervin
Samuel Howe
Covington & Burling LLP
850 10th St, NW
Washington, DC 20001
202-662-5568 (Rosenbaum)
srosenbaum@cov.com
bervin@cov.com
showe@cov.com

R. Keith Jarrett

Kelly Becker
Liskow & Lewis, APLC
701 Poydras St., Suite 5000
504-556-4133
rkjarrett@liskow.com
kbbecker@liskow.com

Michael Mazzone
Haynes & Boone, LLP
1221 McKinney, Suite 4000
713-547-2000
Michael.mazzone@haynesboone.com

*Counsel for Plaintiffs-Defendants Shell Offshore Inc.*

Elizabeth Livingston de Calderon
Earthjustice
900 Camp St, Suite 303
New Orleans, LA 70130
504-910-1712
ecalderon@earthjustice.org

Steve Mashuda
Earthjustice
810 3rd Ave, Suite 610
Seattle, WA 98104
206-715-4912
smashuda@earthjustice.org

Brettny Hardy
George Torgun
EarthJustice
50 California St, Suite 5000
San Francisco, CA 94111
415-217-2000
bhardy@earthjustice.gov
gtorgun@earthjustice.org

*Counsel for Intervenor-Defendants Sierra Club, Center for Biological Diversity, Friends of the Earth, and Turtle Island Restoration Network*

/s/ Michelle Melton
Michelle Melton
Counsel for Federal Defendants-Appellants

## CERTIFICATE OF CONFERENCE

As noted above in the certificate of compliance, on September 22, 2023, counsel for Federal Appellants conferred with counsel for Plaintiffs-Appellees and Intervenors-Defendants-Appellees.  Plaintiffs-Appellees oppose the relief request in this motion.  Intervenors-Defendants-Appellees take no position on the requested relief.

/s/ Michelle Melton
Michelle Melton
Counsel for Defendants-Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 22, 2023, I electronically filed the foregoing emergency motion for stay pending appeal with the Clerk of Court by using the appellate CM/ECF system.  I further certify that the participants in the case are CM/ECF users and that service will be accomplished by using the appellate CM/ECF system.

/s/ Michelle Melton
Michelle Melton
Counsel for Defendants-Appellants

# EXHIBITS

1. District Court Opinion

2. Duplantis Declaration

3. Cruickshank Declaration

4. District Court Hearing transcript

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

STATE OF LOUISIANA ET AL          CASE NO.  2:23-CV-01157

VERSUS                        JUDGE JAMES D. CAIN, JR.

DEB HAALAND ET AL            MAGISTRATE JUDGE KAY

### <u>MEMORANDUM ORDER</u>

Before the court are Motions for Preliminary Injunction[1] filed, respectively, by plaintiffs the State of Louisiana, American Petroleum Institute, and Chevron USA Inc., and by plaintiff Shell Offshore Inc. Plaintiffs seek to halt the addition of a term to Lease Sale 261 by the Bureau of Ocean Energy Management and the withdrawal of six million acres from that sale. The motion is opposed by both the government defendants originally named in the suits as well as intervenor-defendants Center for Biological Diversity, Friends of the Earth, Sierra Club, and Turtle Island Restoration Network. Docs. 55, 70. The matter came before the court for hearing on September 21, 2023, and the undersigned now issues this decision.

## I.
### INTRODUCTION

This suit arises from the Bureau of Ocean Energy Management ("BOEM")'s plans regarding "Lease Sale 261," an oil and gas lease on the Outer Continental Shelf in the Gulf

---

[1] The first motion was filed in lead case *Louisiana v. Haaland*, No. 23-cv-1157, at doc. 14. The second was filed in member case *Shell Offshore Inc. v. U.S. Department of the Interior*, No. 23-cv-1167 (W.D. La.), at doc. 4.

of Mexico. Lease Sale 261 is proposed for sale on September 27, 2023, in accordance with deadlines set under the Inflation Reduction Act ("IRA"). On August 23, 2023, BOEM issued a Final Notice of Sale that withdrew six million acres from the lease and inserted a new lease stipulation restricting vessel activity in the lease area. The agency justified both measures as necessary for the protection of Rice's whale, a species of baleen whale native to the northeastern Gulf of Mexico that is protected under the Endangered Species Act.

Plaintiffs allege that the last-minute insertion of these provisions violates (1) the IRA, which directed BOEM to conduct Lease Sale 261 in accordance with the agency's previously adopted Five-Year Plan for oil and gas leasing, (2) the procedural requirements of the Outer Continental Shelf Lands Act, and (3) the Administrative Procedure Act ("APA"), insofar as they represent an arbitrary and capricious change in position by BOEM. Accordingly, plaintiffs have filed suit in this court seeking declaratory and injunctive relief. They also seek a preliminary injunction, asserting that delaying the sale or allowing it to proceed with the challenged provisions will result in irreparable harm. Defendants and intervenor-defendants[2] oppose the motion, arguing that (1) the challenged measures are well-supported and were properly implemented, (2) plaintiffs have not met the high bar for showing that preliminary injunctive relief is warranted, and (3) the court lacks the authority to grant the requested relief. Docs. 55, 70. An amicus brief has also been filed in support of plaintiffs by ten members of the United States Congress. Doc. 66.

---

[2] The court permitted the intervention of four environmental nonprofit organizations (Sierra Club, Center for Biological Diversity, Friends of the Earth, and Turtle Island Restoration Network) as defendants, based on their advocacy on behalf of Rice's whale in a suit in the District of Maryland, described infra, and the relation between that suit and the measures challenged here. *See* doc. 58.

## II.
### BACKGROUND

**A. Statutory Background**

**1. Outer Continental Shelf Lands Act**

The Outer Continental Shelf Lands Act of 1953 ("OCSLA") provides the framework through which the Department of the Interior leases areas of the Outer Continental Shelf for oil and gas exploration and development. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009). This is accomplished through a four-stage process, "proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir. 1981). The steps are: (1) formulation of a five-year leasing plan, (2) lease sales, (3) exploration by the lessees, and (4) development and production. *Secretary of the Interior v. California*, 464 U.S. 312, 337 (1984). The Secretary's delegated authority in this area is divided between BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE"), with BOEM overseeing lease sales and BSEE bearing primary responsibility for drilling operation safety and environmental protection. *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011).

At the first stage, formulation of the leasing plan, BOEM coordinates with other agencies to evaluate the impacts of the program and to balance the potential for discovery of oil and gas with the potential for environmental damage and adverse impacts to the coast. 43 U.S.C. §§ 1344(a)(1)–(3), (b)(3); 42 U.S.C. § 4332(C). OCSLA also requires that the Secretary consider the impact on affected states and communicate with the governors of

those states regarding their concerns. 43 U.S.C. §§ 1344(a)(2)(F), 1345. This consultation results in the development of a "schedule of proposed lease sales . . . which [the Secretary] determines will best meet national energy needs" for the applicable period, consistent with the balancing of environmental and social factors with economic and energy needs. 43 U.S.C. § 1344(a).

At the second stage Interior solicits bids and issues leases. 43 U.S.C. § 1337. To prepare for an individual lease sale, BOEM issues a "Call for Information and Nominations" on an area proposed in the Five-Year Plan through publication in the Federal Register. 30 C.F.R. § 556.301. To this end it requests comments from industry and the public on the sale area's potential for drilling as well as its "socioeconomic, biological, and environmental information." *Id.* BOEM considers these factors in determining the scope and terms of the lease, which are published in a proposed notice of sale ("PNOS"). *Id.* at §§ 556.302(b), 556.304(a). Upon approval by the Secretary, BOEM also sends the PNOS to the governors of affected states and publishes notice of its availability in the Federal Register. *Id.* at § 556.304(c). Governors of affected states may submit comments and recommendations to BOEM on the size, timing, and location of the proposed sale. *Id.* at § 556.305(a). The Secretary will accept these recommendations if it determines that they "provide a reasonable balance between the national interest and the well-being of the citizens of the State[.]" *Id.* at § 556.307(b). Finally, BOEM considers comments received in response to the proposed notice before publishing a final notice of sale ("FNOS"). *Id.* at §§ 556.307(a); 556.308(a). The sale is then conducted by a sealed-bid auction held at least 30 days after publication of the FNOS. *Id.* at § 556.308(a)–(b).

"A lessee does not, however, acquire an immediate or absolute right" to exploration and production in the lease area upon securing the lease; "those activities require separate, subsequent federal authorization." *Interior*, 464 U.S. at 317. At the third stage, Interior reviews and determines whether to approve exploration plans. *Ctr. for Biological Diversity*, 563 F.3d at 473. The Secretary will reject a plan if he determines that it may result in, *inter alia*, serious harm to the environment and "cannot be modified to avoid such condition." 43 U.S.C. § 1340(c)(1) (citing 43 U.S.C. § 1334(a)(2)(A)(i)). Finally, at the fourth stage, more detailed plans are required and reviewed in relation to the construction of platforms, installation of processing equipment, and the laying of pipelines. *See* 43 U.S.C. § 1351. Here, again, the plan and consequently the leasing program may be terminated if Interior finds a risk of serious harm or damage "to the marine, coastal or human environments." *Ctr. for Biological Diversity*, 563 F.3d at 473 (quoting 43 U.S.C. § 1351(h)(1)(D)(i)).

## 2. Endangered Species Act

The Department must also comply with federal environmental laws in its oversight of offshore leasing. Section 7(a)(2) of the Endangered Species Act ("ESA") provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). If the proposed action may affect a listed species, the agency must

formally consult with either the National Marine Fisheries Service ("NMFS") or the Fish

and Wildlife Service ("FWS"), depending on whether the species is marine or terrestrial.

*Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F.Supp.3d 147, 151 (D.D.C. 2014); *see* 50

C.F.R. §§ 402.01(b), 402.14(a).

NMFS, as applies here, then prepares a biological opinion using "the best scientific

and commercial data available" to evaluate the proposed action's impact on the species. 16

U.S.C. § 1536(a)–(b); 50 C.F.R. § 402.12. Here it considers whether the proposed action

is likely to violate the ESA by jeopardizing the continued existence of a listed species or

resulting in the destruction or adverse modification of a critical habitat. 16 U.S.C. §

1536(a)(2); 50 C.F.R. § 402.14(h)(1)(iv). If NMFS concludes that such a violation is likely

and issues a "jeopardy" opinion, it must provide "reasonable and prudent alternatives"

("RPAs"). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1)(iv), (h)(2). RPAs are

defined under the regulations as:

> alternative actions identified during formal consultation [1] that can be
> implemented in a manner consistent with the intended purpose of the action,
> [2] that can be implemented consistent with the scope of the Federal agency's
> legal authority and jurisdiction, [3] that is economically and technologically
> feasible, and [4] that the Director believes would avoid the likelihood of
> jeopardizing the continued existence of listed species or resulting in the
> destruction or adverse modification of critical habitat.

50 C.F.R. § 402.02. Following the issuance of a "jeopardy" opinion, Interior must either

terminate the action, implement the proposed alternative, or seek an exemption from the

Cabinet-level Endangered Species Committee. *Nat'l Ass'n of Home Builders v. Defenders*

*of Wildlife*, 551 U.S. 644, 653 (2007).

### B. Factual Background

### 1. Approval of the 2017-22 Leasing Program

The Secretary approved the 2017-22 Five-Year Plan on January 17, 2017, in a
Record of Decision that directed BOEM to proceed with 10 scheduled leases in the Gulf
and one in Alaska's Cook Inlet. Doc. 14, att. 22. The ten Gulf of Mexico sales were thereby
scheduled to occur over the five years of the program, with one sale in 2017, two each in
2018–2021, and one (Lease Sale 261) in 2022. *Id.* at 4. The Gulf of Mexico sales were to
be "region-wide and include unleased acreage not subject to moratorium or otherwise
unavailable, in the Western, Central, and Eastern Gulf," with the goal of "provid[ing]
greater flexibility to industry, including more frequent opportunities to bid on rejected,
relinquished, or expired OCS lease blocks." *Id.* This decision adopted BOEM's Proposed
Final Program and Programmatic Environmental Impact Statement ("EIS"), the latter of
which evaluated the environmental impact of sales of differing scopes. *Id.* at 2–4. In
reference to Rice's whale (then called Bryde's whale), the Programmatic EIS concluded
that the "biologically important area" for the whale off the Florida coast did not overlap
with the Gulf of Mexico program areas. Doc. 14, att. 24, p. 73. The evaluation assumed the
continued implementation "of protective measures required by statute, regulation, or
current lease stipulations that would likely continue to be adopted in the future." Doc. 14,
att. 24, p. 50. Among these were several measures relating to protection of endangered
species. Doc. 14, att. 25, pp. 548–58.

### 2. Additional measures adopted for protection of Rice's whale

Following approval of the Five-Year Plan BOEM and BSEE consulted with NMFS to determine the potential impact of the plan on protected species over the next fifty years. This culminated with NMFS's issuance of a biological opinion in March 2020 ("2020 BiOp"). *See* doc. 16, att. 2, pp. 28–29. NMFS concluded that oil and gas activity posed a risk to Rice's whale in portions of the eastern Gulf, particularly from vessel strikes. *Id.* at 578–81. NMFS determined that the jeopardy could be avoided, however, with an RPA consisting of several vessel operating conditions within the purple area shown below:



*Id.* at 624–26.

BOEM disagreed with NMFS's analysis and maintained that vessel traffic from the leases was unlikely to cross the identified habitat.[3] Doc. 16, att. 1, p. 232. Nevertheless, BOEM and BSEE formally accepted NMFS's RPA for Rice's whale and included it as a stipulation in future lease sales under the Five-Year Plan. *Id.*; *see* doc. 14, att. 20, p. 9 (FNOS for Lease Sale 256); doc. 14, att. 18, p. 9 (FNOS for Lease Sale 257); doc. 14, att. 10, p. 9 (PNOS for Lease Sale 261). Meanwhile, environmental groups filed suit against NMFS in the District of Maryland.[4] They argued that the 2020 BiOp understated the risks of oil and gas activity to various species, including Rice's whale, particularly through the threat of oil spills after the Deepwater Horizon disaster and the failure to consider alleged changes in habitat following that spill. *See Sierra Club v. NMFS*, No. 8:20-cv-3060 (D. Md.), at doc. 1.

### 3. Lease sales paused and then resumed under Inflation Reduction Act

In January 2021, President Biden entered an executive order directing the Department of the Interior to pause new oil and gas lease sales pending a comprehensive review. 86 Fed. Reg. 7,619, 7,624 (Jan. 27, 2021). At this point seven of the 10 Gulf lease sales scheduled under the Five-Year Plan had been conducted, with Lease Sales 257, 259, and 261 still pending. *See Louisiana v. Biden*, 622 F.Supp.3d 267, 287–89 (W.D. La. 2022). Louisiana and several other states sued to enjoin the pause and the district court granted

---

[3] Specifically, it noted (as NMFS had in the 2020 BiOP) that the whale's habitat was largely in the area of the Gulf of Mexico which had been under a congressional moratorium from leasing and was now subject to presidential withdrawal. Doc. 16, att. 1, p. 232. BOEM determined that vessels expected to service the leases were more likely to use ports closer to the Western and Central Planning Areas, and thus "unlikely to transit across greater distances through the withdrawal area to get to the leases." *Id.*

[4] As noted above, the plaintiffs in that matter are the same groups as the defendant-intervenors in this case.

the preliminary injunction. *Louisiana v. Biden*, 543 F.Supp.3d 388 (W.D. La. 2021).

BOEM then proceeded with Lease Sale 257 in November 2021. *See* doc. 14, att. 17 (Lease

Sale 257 FNOS). Before the leases could be issued to the winning bidders, however,

environmental groups challenged the sale through a lawsuit based on Interior's alleged

failure to consider foreign oil consumption in its pre-sale EIS. *See Friends of the Earth v.*

*Haaland*, 583 F.Supp.3d 113 (D.D.C. 2022). The court vacated BOEM's Record of

Decision to conduct the lease sale and industry parties intervened and appealed. *Friends of*

*the Earth v. Haaland*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

In August 2022, with the appeal of *Friends of the Earth* pending, Congress passed

the Inflation Reduction Act ("IRA"), PL 117–169. There it ordered Interior to proceed with

Lease Sale 257, in accordance with the terms and conditions in the FNOS. *Id.* at § 50264(b).

It also ordered that the remaining lease sales be scheduled by specific dates,

notwithstanding the expiration of the previous Five-Year Program, "in accordance with the

Record of Decision approved by the Secretary on January 17, 2017": Lease Sale 258 (Cook

Inlet) by December 31, 2022, Lease Sale 259 by March 31, 2023, and Lease Sale 261 by

September 30, 2023. *Id.* at § 50264(c)–(e).

## 4. BOEM conducts further environmental review and proceeds with Lease Sale 259

In October 2022 BOEM and BSEE sent a letter to NMFS requesting reinitiation of

consultation on the 2020 BiOp, based on the issues raised in the District of Maryland suit.

Doc. 55, att. 1. BOEM then issued a final supplemental EIS on the two remaining Gulf

lease sales, 259 and 261, in January 2023.[5] Doc. 16, att. 1. In the public comment period on this document, environmental groups urged BOEM to remove blocks in the western and central Gulf from the leasing area for the protection of Rice's whale and to expand the areas where mitigation measures were applied. *Id.* at 469, 626–27. In support they referenced a study published in July 2022 by Melissa Soldevilla and others, positing broader distribution of Rice's whale throughout the Gulf based on passive acoustic data. *Id.* at 560.

Upon review of the study, BOEM determined that "not enough information is available at this time to confirm [the whales'] distribution or any seasonal movements outside of the core area that is already considered in this Supplemental EIS." *Id.* It also stated that its environmental analyses had not identified justifiable reasons to restrict the lease sale area and that it believed its stipulations and mitigations provided adequate environmental protection. *Id.* at 469. It further noted that "any individual lease sale could be scaled back during the prelease sale process to offer a smaller area should circumstances warrant." *Id.* BOEM also advised that "BOEM and BSEE's review of plans, permits, and/or authorizations at the post-lease stage includes review of any planned transits through the Rice's whale core habitat." It noted that "[a]t this time, critical habitat has not been identified for the Rice's whale" and that it consulted with NMFS and FWS to determine the required mitigating measures. *Id.* at 626. Accordingly, BOEM stated in the final supplemental EIS:

---

[5] There it acknowledged that it had no discretion on whether to conduct these sales, but stated that it was preparing the supplemental EIS "to follow its normal leasing process to the fullest extent possible . . . ." *Id.* at 6.

> BOEM believes the potential for vessel strikes to sperm and Rice's whale is
> extremely unlikely to occur due to the generally slow vessel transiting and
> surveying speeds, limited vessel routes originating from the eastern GOM,
> and the additional mitigations on vessels within the Rice's whale core area
> (as defined by the 2020 GOM Biological Opinion [BiOp]) (Soldevilla et al.
> 2022). The core area has been changing over the years as baseline
> information becomes available (Rosel and Garrison 2022). **BOEM will
> continue to monitor current literature and work with NMFS as it relates
> to consultations, though the conclusions found in the 2017-2022 GOM
> Multisale EIS and 2018 GOM Supplemental EIS still remain valid.**

*Id.* at 170 (emphasis added). Lease Sale 259 was then conducted as scheduled in March
2023, as a regionwide sale of "all of the available unleased acreage in the GOM OCS" with
unrelated minor adjustments to the lease stipulations.[6] Doc. 14, att. 14 (Lease Sale 259
FNOS). The sale was closed with industry bidding nearly $310 million for 313 tracts
covering 1.6 million acres, and BOEM accepting bids and issuing leases for 295 tracts. *See*
Oil and Gas Lease Sale 259, Final Bid Recap (Mar. 29, 2023), *available at* bit.ly/3EfOhqQ.

That month, BOEM also issued a PNOS for Lease Sale 261 with the same
stipulations. Doc. 14, atts. 8 & 10. BOEM indicated, however, that it was "considering
removing the area comprising the northeastern Gulf of Mexico and continental shelf break
between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may
transit through the area." Doc. 14, att. 8, p. 7. It also expressly "reserve[d] the right to
modify the sale area in the Final NOS, including removing additional areas from Lease
Sale 261." *Id.* As required by statute, the PNOS was published in the Federal Register and
subject to comment from the governors of affected states. In response the governors of

---

[6] BOEM converted three stipulations (for Baldwin County, topographic features, and live bottom) into area exclusions
and added a stipulation for royalties, as required by § 50263 of the IRA. *See* doc. 14, att. 14, pp. 14–15.

Alabama, Mississippi, and Texas all objected to the proposed withdrawal. Doc. 55, att. 3, p. 23.

### 5. BOEM shifts approach to Rice's whale and adopts challenged provisions for Lease Sale 261's Final Notice of Sale

Despite the conclusions of the supplemental EIS, the government soon appeared to change its mind regarding the protections needed for Rice's whale. In a stipulation filed on July 21, 2023, in the *Sierra Club* suit, NMFS and plaintiffs agreed to stay proceedings while NMFS worked to update the challenged 2020 BiOP. No. 8:20-cv-3060 (D. Md.), at doc. 147. The stipulation indicated that this consultation had been prompted by the letter from BOEM and BSEE to NMFS, requesting to reopen consultation on the 2020 BiOp. *Id.* at doc. 147, p. 2. The stipulation also indicated that NMFS might designate a critical habitat for Rice's whale and that BOEM would issue notice to lessees and operators during the reinitiated consultation. *Id.* at doc. 147, pp. 2–3; *see* 88 Fed. Reg. 47,453, 47,460 (proposed designation). Finally, the parties agreed that a lease stipulation for the protection of Rice's whale would be added to Lease Sale 261 and any subsequent Gulf of Mexico oil and gas leases during the reinitiated consultation. *Sierra Club*, No. 8:20-cv-3060, at doc. 147, pp. 2–3; *see id.* at doc. 147, att. 2 (proposed lease stipulation). The proposed stipulation would add several vessel mitigation conditions between the 100- to 400-m -isobaths across the northern Gulf of Mexico on the OCS, eastward from the Mexican border with Texas and westward of the newly designated Rice's whale area shaded in blue below:



*Id.* at doc. 147, att. 2. The new mitigation measures include the presence of visual observers on vessels, speed restrictions, limitations on transit "after dusk and before dawn, and during other times of low visibility," and use of Automatic Identification Systems on vessels. *Id.* The district court granted the motion and stayed proceedings. *Id.* at doc. 154.

The FNOS for Lease Sale 261 was issued on August 23, 2023, incorporating the new measures in Stipulation 4(B)(4) and covering a lease area of approximately 67.3 million acres. Doc. 14, att. 4, pp. 11–13; *see* doc. 16, att. 5, pp. 4–5. BOEM also confirmed that it was withholding six million acres in the expanded Rice's whale area from the sale, as alluded to in the PNOS. Doc. 14, att. 2, pp. 11–13. The Department of the Interior explained the actions as follows in a Record of Decision:

> The existing 2020 Biological Opinion, as amended, remains in effect until the reinitiated consultation is completed and a new or amended Biological Opinion becomes available. During the reinitiation process, BOEM will continue to implement the Reasonable and Prudent Alternative for the Rice's whale, and comply with all Reasonable and Prudent Measures and Terms and Conditions under the existing 2020 Biological Opinion, as amended. This includes continuing to request step-down reviews for the prescribed activities and implementing and adaptively managing the mitigation, monitoring, and reporting requirements (2020 Biological Opinion Appendices and/or Conditions of Approval, as amended) imposed by the Bureaus on plans and permits, and as coordinated with NMFS and industry. **In addition, based on a recent study that the endangered Rice's whale occurs in portions of the**

> **northern Gulf of Mexico between the 100-meter and 400-meter isobaths eastward from the Mexico border with Texas and westward of the Rice's Whale Core Area identified in the 2020 Biological Opinion (as amended in April 2021), removing this area from the lease sale could reduce risks to this species while reinitiated consultation with NMFS is ongoing.** Further, the updated Protected Species Stipulation includes interim measures to require certain speed restrictions and other measures between the 100-meter to 400-meter isobaths. These measures will remain in place while the reinitiated consultation is ongoing and until a new or amended biological opinion is issued by NMFS.

Doc. 14, att. 5, pp. 13–14 (emphasis added).

On August 24, 2023, plaintiffs filed their petition for declaratory and injunctive relief in this court. Doc. 1. Four days later they filed a motion for preliminary injunction. Docs. 9, 14. Plaintiffs ask the court to enjoin BOEM from implementing the changes in the FNOS for Lease Sale 261 and argue that these violate the APA and the IRA. Doc. 14; *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 4. The two suits have been consolidated for briefing purposes and the environmental group plaintiffs from the District of Maryland suit have been granted leave to intervene. Docs. 52, 58. Government defendants and intervenor defendants oppose the motion. Docs. 53, 55, 56.

### III.
#### LAW & APPLICATION

To obtain a preliminary injunction, the movant must show (1) a substantial likelihood of success on the merits of its claims; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the harm the injunction may do to the nonmovant; and (4) that granting the injunction will not disserve the public interest. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). "The grant of injunctive relief is an extraordinary remedy which requires the movant to

unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d

1047, 1050 (5th Cir. 1997). The decision lies within the district court's discretion. *Allied*

*Mktg. Grp., Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

### A. Likelihood of Success on the Merits

Plaintiffs advance three legal grounds for voiding the challenged lease terms: (1)

their implementation was procedurally invalid; (2) the decision amounted to arbitrary and

capricious agency action; and (3) the implementation of the terms violated the IRA.

Finding a sufficient showing of merit under the first two arguments, the court does not

consider the third. First, however, the court considers procedural objections lodged by

defendants.

### 1. Defendants' procedural objections

Both sets of defendants have asserted that plaintiffs are unlikely to succeed on the

merits based on certain procedural objections. Intervenor defendants maintain that this

court is an improper venue while government defendants contend that plaintiffs have

violated OCSLA's requirement that potential litigants provide Interior with notice at least

60 days before filing suit. 43 U.S.C. § 1349(a)(2).

As to venue, a civil suit against a federal agency or official may only be brought in

the judicial district where:

> (A) a defendant in the action resides, (B) a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of property
> that is the subject of the action is situated, or (C) the plaintiff resides if no
> real property is involved in the action.

28 U.S.C. § 1391(e)(1). Plaintiffs base venue on § 1391(e)(1)(B) and (C) in both the lead case, *Louisiana v. Haaland*, and member case *Shell Offshore Inc. v. U.S. Department of Interior*. Intervenor defendants argue that venue is improper in the latter suit because Shell Offshore is the lone plaintiff and has admitted that it is headquartered in Houston, though it maintains facilities in this district in support of its offshore leasing program. *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 1, ¶¶ 5, 13. Intervenor defendants also assert that venue is improper under § 1391(e)(1)(B) because the challenged decision-making occurred in Washington, D.C. and the stipulated agreement was signed in Maryland.

On the venue objection, the issue has not been properly raised through a motion to transfer or dismiss. The court declines to issue an advisory opinion on the issue. On government defendants' procedural objection, the court finds no merit. First, as defendants point out, these provisions apply only to citizen suits under OCSLA. They are irrelevant when plaintiffs seek review under the APA. *Hornbeck Offshore Servs., LLC v. Salazar*, 696 F.Supp.2d 627, 636 (E.D. La. 2010). And even if the notice requirements did apply, they are likely excused under § 1349(a)(3) because "the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3).[7] Plaintiffs' failure to provide notice therefore has no impact on their ability to proceed with these claims.

---

[7] Defendants maintain that plaintiffs' prospective interest in the parcels does not qualify as a legal interest and so they have no recourse for challenging any changes in the FNOS. This position is based on an unpublished decision from the D.C. Circuit, wherein the court held that a scheduled wind lease auction did not immediately affect plaintiffs' legal interests because the leases themselves did not authorize any activity in the leased area. *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 374 (D.C. Cir. 2021). As explained in *Friends of the Earth*, however, a case involving Lease Sale 257, the lease sale stage for oil and gas leases authorizes certain ancillary activities including geological and geophysical exploration. 583 F.Supp.3d at 133. Additionally, the lease sale form grants the lessee exclusive rights to drilling and production and the applicable regulations provide "an irretrievable commitment of resources in the

## 2. Whether the changes were procedurally valid

Plaintiffs contend that the implementation of the challenged provisions and acreage withdrawal were procedurally invalid. Specifically, they assert that BOEM/Interior were obliged under OCSLA to provide notice and an opportunity for comment before altering the terms of Lease Sale 261 in the FNOS. Defendants maintain that the PNOS provided sufficient notice of the changes, and point out that governors of certain affected states already objected to the proposed acreage withdrawal.

As to those violations, the APA requires that the court hold unlawful and set aside any agency action found to be "without observance of procedure required by law." 5 U.S.C. 706(2)(D). OCSLA carves out a significant opportunity for state stakeholders to participate in the leasing process. Within sixty days of a PNOS, state and local governments may submit recommendations on "the size, timing, or location of a proposed lease sale." 43 U.S.C. § 1345(a)–(b). The Secretary must accept these recommendations if they "provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id.* at § 1345(c). The Secretary must also communicate his or her decision on the recommendation in writing to the governor of the affected state. *Id.*

BOEM's regulations facilitate this input as well comment by the public. Specifically, BOEM is required to publish each proposed notice of sale in the Federal Register to facilitate the state and local governments' input. 30 C.F.R. § 556.304(c). The publication must include "the proposed lease terms and conditions of sale, and proposed

---

sense that once a lease is issued, BOEM cannot unilaterally undo that decision for at least five years and the government must pay a penalty if it does so." *Id.* at 136. Accordingly, the lease sale stage grants the lessee a legal right and this right is immediately impacted by changes to the FNOS.

stipulations to mitigate potential adverse impacts on the environment." *Id*. BOEM must "consider **all** comments and recommendations received in response to the proposed notice of sale." 30 C.F.R. § 556.307(a) (emphasis added).

The PNOS for Lease Sale 261 was issued in March 2023, soon after BOEM had publicly confirmed through its supplemental EIS that it did not believe additional measures were required to protect Rice's whale. The challenged lease term for the expanded Rice's whale area only arose in a July 2023 district court filing and then appeared in the FNOS for Lease Sale 261 on August 25, 2023—one month before the statutory deadline for the sale. BOEM failed to follow its own procedures by making significant changes to the FNOS, thereby depriving both affected states and the public the opportunity for meaningful review and comment. The procedural error is particularly grave here, because of both the compressed timeline and BOEM's inexplicable about-face on the scientific record it had previously developed. As described below, Louisiana has a significant stake in offshore leasing. Because of BOEM's bait and switch tactics, however, it was deprived of its statutorily guaranteed right to address a significant modification to leasing protocols for a long-term lease sale off its coast. As emphasized at oral argument, the last-minute changes and challenged terms may also have sizable impacts on bidding dynamics and operations for the industry parties.[8] Accordingly, the insertion of the challenged provisions into the FNOS for Lease Sale 261 was procedurally invalid. Plaintiffs have carried their burden of showing a likelihood of success on the merits under this claim.

---

[8] *See, e.g.*, doc. 14, atts. 13 & 15.

### 3.  Whether the challenged provisions are arbitrary and capricious

The APA also requires that a court "hold unlawful and set aside" an agency action if it is found to be "arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, __ U.S. __, 141 S.Ct. 1150, 1158 (2021). The court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (internal quotations omitted). Put another way, the reviewing court must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S.Ct. at 1158. In reviewing an agency's action, the court may only consider the reasoning articulated by the agency itself and may not credit post hoc rationalizations. *Wages and White Lion Investments, LLC v. USDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 53 (1983)).

Plaintiffs assert that BOEM acted arbitrarily and capriciously by failing to (1) explain its change in position, (2) justify the challenged provisions, and (3) consider other important factors. They show a strong likelihood of success on the merits under all three prongs. Neither the Record of Decision announcing the new provisions nor the FNOS explains BOEM's shift in position from its supplemental EIS issued in January 2023. In the latter document BOEM concluded on review of the Soldevilla study that "not enough information is available at this time to confirm [the whales'] distribution or any seasonal

movements outside of the core area that is already considered in this Supplemental EIS."
Doc. 16, att. 1, p. 560. Accordingly, it determined that "the potential for vessel strikes to
sperm and Rice's whale is extremely unlikely to occur due to the generally slow vessel
transiting and surveying speeds, limited vessel routes originating from the eastern GOM,
and the additional mitigations on vessels within the Rice's whale core area" and "the
conclusions found in the 2017-2022 GOM Multisale EIS and 2018 GOM Supplemental
EIS still remain valid." *Id.* at 170. In the Record of Decision supporting the challenged
provisions, however, the Secretary justified the change in position "based on a recent study
that the endangered Rice's whale occurs in portions of the northern Gulf of Mexico
between the 100-meter and 400-meter isobaths eastward from the Mexico border with
Texas and westward of the Rice's Whale Core Area identified in the 2020 Biological
Opinion," i.e., the Soldevilla study.

  This is the only scientific justification offered for the challenged provisions,
representing an unexplained about-face from a position taken by the agency just months
before. BOEM offered no explanation for its new stance on the same body of evidence, let
alone using this pivot to justify measures pending a final determination by NMFS. This
leaves the impression that the 2023 Record of Decision is merely an attempt to provide
scientific justification to a political reassessment of offshore drilling. Additionally, the
2023 Record of Decision does not show any reevaluation of the other factors BOEM is
required to consider in recommending areas for leasing. *See* 43 U.S.C. § 1344(a)(2); 30
C.F.R. § 556.302(a)(1). Though the relevant paragraph discusses BOEM's obligations
under the ESA and its other environmental obligations, it makes no reference to the impact

of the measures on production or the availability of acreage for energy exploration. BOEM devoted only one paragraph to its decision and failed to explain how these alternatives were selected, a stark contrast to the prior environmental reviews conducted with respect to the leases authorized under this Five-Year Plan.

The agreed-upon RPAs for protection of Rice's whale were added after years of deliberation. After the leasing pause, BOEM conducted a supplemental EIS with notice and comment but found no basis for altering its measures with respect to the whale. The challenged provisions inserted into these leases at the eleventh hour, and the acreage withdrawal, are based only on an unexplained change in position by BOEM on a single study a few months after that supplemental EIS. The process followed here looks more like a weaponization of the Endangered Species Act than the collaborative, reasoned approach prescribed by the applicable laws and regulations. Even when an agency's decision is based on political considerations, it is not excused from justifying the position—particularly when the decision is a pivot from a prior policy. Failure to do so leads to "surprise switcheroo" by an agency against regulated entities. *E.g.*, *Wages and White Lion Investments, LLC*, 16 F.4th at 1138 (quoting *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)). The law requires more, especially where the prior policies have engendered reliance interests. *Id.* at 1139. Here BOEM failed to justify its pivot or account for those reliance interests, reinforcing the arbitrariness of its decision. Accordingly, plaintiffs have shown a sufficient likelihood that they will succeed on this claim.

### B. Substantial Threat of Irreparable Injury

Next, plaintiffs must show a substantial threat of irreparable harm. Here plaintiffs rely on their economic harm and lost business opportunities. Specifically, the acreage removal and the addition of burdensome lease stipulations will result in lost revenue from Lease Sale 261. Doc. 14, att. 27, ¶¶ 28–34. This could cause economic injury of up to $2.2 million to Louisiana, which is entitled to a share of offshore royalties. *Id.* The industry plaintiffs will also suffer economic injury and impairment to their business development. According to an affidavit from Shell's commercial manager, the new restrictions on vessel traffic apply to an area of the northern Gulf that separates Shell's existing offshore leases from the onshore infrastructure that supports them. *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 4, att. 2, ¶¶ 23–27. Imposition of restrictions in this barrier will undermine long-term planning for and execution of its lease operations by, for example, (1) reducing the available hours for supply and increasing the number of ships necessary to make supply runs, (2) restricting Shell's ability to obtain seismic survey data for areas obtained in other lease sales because a survey cannot be designed to exclude individual blocks that are subject to the new stipulation, and (3) creating "costly and unreasonable complications" for Shell as it loses the ability to consolidate operations across leases because of the new restrictions. *Id.* at ¶¶ 23–27. These complications will increase attendant costs for all leases issued from Lease Sale 261 as well as some issued from non-Lease Sale 261 sales. *Id.* at ¶ 23. The same logistical complications apply to Chevron, whose operations manager posits that vessel delays and inefficiencies caused by the challenged stipulation will likely add to the amount of time needed to complete projects in the Lease Sale 261 and increase drilling

costs on Lease Sale 261 leases "by a significant factor."[9] Doc. 14, att. 15. Finally, the industry plaintiffs show that the last-minute changes impact their ability to bid fairly on leases under Lease Sale 261 and to bid on the six million acres withdrawn from the sale. Doc. 14, att. 11, ¶¶ 12–16; doc. 14, att. 13, ¶¶ 14–16; *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 4, att. 2, ¶ 28.

In return defendants point out that there was low interest in the now-excluded area when it was offered during Lease Sale 259, with BOEM receiving bids on only 16 out of the circa 1200 blocks in that area. Doc. 55, att. 6, ¶ 8. They challenge Louisiana's estimate of lost revenues, arguing that the calculations are simplistic and overlook that most revenue is generated from older leases. They also argue that this harm is not irreparable because, if the court were to ultimately vacate Lease Sale 261 in a final adjudication on the merits of this case, Interior would then conduct a sale consistent with the court's orders. Finally, they maintain that the industry defendants' purported compliance costs are too speculative. They also assert that alleged harms based on bidding dynamics are based on the faulty premise that bidders are entitled to know all final conditions of sale at the time of the PNOS.

A harm is irreparable when "there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Economic loss therefore rarely qualifies as an irreparable harm. *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F.Supp.3d 701, 725 (5th Cir. 2020). Because of the government's sovereign immunity, however, it will "be difficult, if not impossible" for plaintiffs to recover their funds.

---

[9] Robichaux estimates that this cost could rise to a million dollars or more per vessel, per day if supply disruptions cause drilling to be suspended. *Id.* at ¶ 14.

*Louisiana v. Biden*, 543 F.Supp.3d at 417. "In determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'" *Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016)). Accordingly, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and concurring in the judgment)).

The court observes that plaintiffs have demonstrated substantial potential costs resulting from the challenged provisions. While the government defendants largely focus on the acreage withdrawal and dynamics of the sale itself, many of plaintiffs' alleged hardships arise from the vessel restrictions. Industry plaintiffs have shown a likelihood that these will burden their operations on current and planned leases. The resulting costs would not be undone by the court's entry of a permanent injunction and order of another sale. Plaintiffs also show that no other mechanism exists for recovering the compliance costs because of the government's sovereign immunity. Accordingly, plaintiffs satisfy this step of the inquiry.

### C. Whether Balance of Equities Supports Injunctive Relief

Finally, the party seeking a preliminary injunction must show that (1) the threatened injury to the movant outweighs the harm the injunction may do to the nonmovant and (2) granting the injunction will not disserve the public interest. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). When the government is a party, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As described above, the industry plaintiffs and the state of Louisiana face a substantial risk of irreparable economic harm if the injunction is not granted. Additionally, the sale is currently under a statutory deadline. If it does not take place as scheduled, government defendants are no longer under any congressional mandate to proceed with the lease sale. Meanwhile, if the government finds justification for additional measures to protect Rice's whale, it may pursue these through the Department of the Interior's oversight of lessees' exploration and production plans. *See* 43 U.S.C. §§ 1340(c)(1), 1351(c) (describing Interior's ability to require modifications of exploration and production plans or cancel them to avoid environmental harm); *see also Ctr. for Biological Diversity*, 563 F.3d at 473 (same). Given the shaky justification offered by BOEM, the court cannot find that the challenged provisions are so necessary that withholding them even on a preliminary basis will outweigh the risk of irreparable economic harm shown by plaintiffs. Additionally, "there is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (internal quotations omitted).

The government defendants contend that last-minute changes to the sale will create administrative chaos for BOEM and potentially disadvantage non-party bidders who have been preparing for the sale on the announced terms. They have produced no evidence on behalf of these non-party bidders, however. Meanwhile, API, as representative of nearly 600 companies in the oil and gas industry, is one of the parties to this suit requesting preliminary injunctive relief. Additionally, the plaintiffs only request that certain terms be stricken from the existing FNOS. Government defendants fail to show that this necessitates

the issuance of a new Notice of Sale.[10] The court must also balance the IRA's mandate that this sale proceed with the regulatory complications created by the unlawful agency action. Accordingly, the weight of equities supports injunctive relief.

### D. Court's Authority to Grant Injunction

Finally, defendants challenge the court's ability to grant the requested injunctive relief. They argue that (1) plaintiffs seek an improper permanent injunction; (2) a mandatory injunction is not available on plaintiffs' claims under § 706(2) of the APA; (3) alternatively, plaintiffs have not met the heightened standard for a mandatory injunction; and (4) the court lacks authority to grant mandamus relief.

#### 1. Whether relief sought is improper permanent injunction

Government defendants assert that plaintiffs' motion for preliminary injunction is *per se* a motion for permanent injunction because it is indistinguishable from the final relief sought under the complaint. But certain factors in this case, namely the eleventh-hour change to the FNOS and the looming statutory deadline for the sale, necessitated that plaintiffs seek injunctive relief before the court could issue a final adjudication on the merits.[11] Additionally, plaintiffs have shown a substantial likelihood of success on the merits of their claims. Given that the statutory deadline for the sale will expire before this matter can be brought to trial, and that plaintiffs have established a legal interest in seeing

---

[10] Indeed, as plaintiffs point out, BOEM has changed actual terms less than a week prior to a sale in order to comply with the law. *See* News Releases, Fact Sheets, and Notices for Sale 196, BOEM, https://www.boem.gov/oil-gas-energy/leasing/news-releases-fact-sheets-and-notices-sale-196 (including "Change to Notice of Sale 196" on August 10, 2005, and sale results on August 16, 2005).

[11] Government defendants point out that the statutory mandate may remain in effect even if the deadline is missed. *E.g.*, *Brock v. Pierce Cnty.*, 476 U.S. 253 (1986). Given the lengthy political fight over these sales, however, and the resulting congressional mandate, the court views the statutory deadline as a critical matter.

this sale proceed, the court can only preserve their right to relief in a final adjudication through the issuance of a preliminary injunction. Meanwhile, the government can see these preliminary measures undone if it does prevail on the merits by voiding the sales or proceeding with additional regulation through Interior's authority over further steps of offshore leasing, exploration, and production.

### 2. Availability of mandatory injunction for APA violations

Next, the court turns to the availability of mandatory injunctive relief under the APA. Both of plaintiffs' claims arise under § 706(2) of that statute, based on government defendants' failure to follow procedures and the arbitrary and capricious agency action. Plaintiffs maintain that their requested relief is not an order for affirmative agency action but instead one prohibiting the agency from including the two challenged provisions in the sale. They therefore maintain that it is well within the scope of the court's authority. *See, e.g.*, *Cigar Ass'n of Am. v. FDA*, 480 F.Supp.3d 256, 281 (D.D.C. 2020) (enjoining only one aspect of agency action).

Assuming that the requested relief amounts to a mandatory injunction, the court finds that such relief would be available in this matter. In "rare circumstances," remand to the agency is not the appropriate solution for a § 706(2) violation and the court may instead order affirmative agency action. *O'Reilly*, 477 F.3d at 238–39 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given the opportunity to do so" and where vacatur would be "disruptive." *Tex. Assoc. of Manufacturers v. U.S. Consumer Product Safety Comm.*, 989 F.3d 368, 389–390

(5th Cir. 2021); *Cent. & S.W. Servs.*, 220 F.3d 683, 692 (5th Cir. 2000). Here the government defendants have not shown such a possibility, even if the court credits their post hoc rationalizations. As for disruptiveness, government defendants have failed to substantiate their claims of the complications arising from changes to the sale. Additionally, the court must consider the statutory deadline imposed on this specific lease sale after multiple contentious legal battles over the remaining leases in the 2017–22 Five-Year Plan. Plaintiffs have shown that it would be significantly disruptive to their interests to allow Interior to proceed with Lease Sale 261 under the challenged terms, and that it is plaintiffs rather than defendants who lack any other recourse. Accordingly, remand is not the proper remedy here.

Finally, as defendants note, preliminary injunctions ordering a party to take a certain action must meet a higher standard. Mandatory preliminary injunctive relief, "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted). In this matter, plaintiffs have met the heightened standard. The imposition of the challenged terms right before a statutory sale deadline, the unavailability of any other recourse to plaintiffs, and the fact that defendants may see all this neatly undone if they prevail on the merits leave the court with only one option at this stage.

## IV.
### CONCLUSION

For the reasons stated above, the court hereby **ORDERS** that the Motions for Preliminary Injunction be **GRANTED.** Accordingly, the government defendants are enjoined from implementing the acreage withdrawal and Stipulation 4(B)(4) as described in the Final Notice of Sale and Record of Decision for Lease Sale 261. Government defendants are ordered to proceed with Lease Sale 261, absent the challenged terms, by September 30, 2023.

**THUS DONE AND SIGNED** in Chambers on the 21st day of September, 2023.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

| | |
|---|---|
| THE STATE OF LOUISIANA, et al., | ) |
| | ) |
| | ) |
| *Plaintiffs-Appellees*, | ) Case No. 23-30666 |
| | ) |
| | ) |
| v. | ) |
| | ) |
| DEB HAALAND, et al., | ) |
| | ) |
| | ) |
| *Defendants-Appellants,* | ) |
| | ) |
| SIERRA CLUB, et al., | ) |
| | ) |
| *Intervenors-Defendants* | ) |
| *-Appellants.* | ) |
| | ) |

**DECLARATION OF BRIDGETTE DUPLANTIS**

I, Bridgette Duplantis, declare as follows:

1.       I currently serve as the Chief of the Leasing and Financial

Responsibility Section in the Office of Leasing and Plans of the Bureau of Ocean

Energy Management (BOEM) Gulf of Mexico Region, in the United States

Department of the Interior (Interior).  I  have been employed with BOEM or its

predecessor agencies for 10 years.  In September of 2018, I joined the Leasing and

Financial Responsibility Section as a Program Analyst.  I have served as Chief of the

section from August 2022 until the present.   In this role, I supervise the BOEM

office that prepares for, and conducts, Gulf of Mexico oil and gas lease sales,

including Lease Sale 261.  I am responsible for the publication of all lease sale

documents including the Proposed Notice of Sale and Final Notice of Sale as well as

the execution of all lease sale logistical activities. My section receives lease sale bids

from industry and is responsible for inputting data into the sale software called the

Technical Information Management System.

2.      The Final Notice of Sale for Lease Sale 261 informed bidders that bids

must be submitted by mail prior to the bid submission deadline, 10:00 a.m. CT on

September 26, 2023. BOEM advised bidders to inform BOEM by email immediately

after placing a bid in the mail.

3.      As of September 22, 2023, BOEM had been advised by twelve

companies (via email or phone call) that they had either submitted bids or planned to

do so by the bid submission deadline. Seven of the twelve bidders either submitted

bids or notified BOEM that they planned to do so prior to the September 21, 2023

order from the District Court of the Western District of Louisiana in case No. 2:23-

cv-01157.  Of those seven, two are not listed as members of the American Petroleum

Institute (API).

4.      The bidder's identity is not made public until the bids are opened and

read on the sale date. Therefore, for purposes of this declaration, I am preserving the

bidders' anonymity but have reviewed the API membership list to provide

background information on the bidder as to whether they are an identified member

of API. *See* https://www.api.org/membership/members, last visited on September

21, 2023.

     5.    Prior to the district court's order, BOEM received bids from two

companies and was informed that five other companies had mailed bids:

       a.  BOEM has received bids from Bidder A, who submitted 35 bids.

       b.  BOEM has received bids from Bidder B, submitted 20 bids.

       c.  Bidder C notified BOEM via email that it had already mailed 16

           bids to BOEM and provided BOEM with a tracking number

           indicating the bids were already enroute.

       d.  Bidder D informed BOEM that it had already mailed bids and

           indicated that they may try to submit additional and/or

           replacement bids before the deadline. Bidder D did not specify

           the number of bids already enroute but did supply a tracking

           number.

       e.  Bidder E informed BOEM that it had already mailed bids and

           later provided BOEM with a tracking number indicating that

           BOEM would receive their 4 bids by the bid submission

deadline.  Bidder E is not listed as a member of API.

    f.   Bidder F informed BOEM that it had 4 mailed bids and provided a tracking number.

    g.   Bidder G informed BOEM that it had mailed 3 bids and provided a tracking number.  Bidder G is not listed as a member of API.

6.    After the district court's order, the following Bidders sent BOEM emails indicating that they plan to submit bids: Bidder H (not listed as a member of API), 3 bids; Bidder I (not listed as a member of API), 3 bids; Bidder J (not listed as a member of API), 5 bids; Bidder K, 44 bids; and Bidder L, 26 bids.  Each of these bidders also supplied BOEM with tracking numbers.  BOEM does not know whether these bids were submitted based on the Final Notice of Sale or the court's order.

7.    In sum, as of September 22, 2023, BOEM has heard from twelve companies about Lease Sale 261.  Of the twelve bidders that have either already submitted bids or notified BOEM that they intend to submit bids by the deadline, five of the bidders do not appear on the API's list of members (https://www.api.org/membership/members).  Two of these non-API bidders had placed their bids in the mail before the district court's order.

8.    BOEM relies on the Technical Information Management System (TIMS) to conduct orderly and timely lease sales—including Lease Sale 261. TIMS

is BOEM's database which stores the considerable amount of data relevant to each block of the OCS under BOEM's leasing authority. BOEM uses TIMS to generate available block lists which bidders rely on when preparing their bids. Without TIMS, the likelihood that BOEM would produce an available block list containing errors would increase significantly. Errors in the available block list could result in bidders placing bids on unavailable blocks, which BOEM must reject. In addition, an available block list with errors could deprive bidders of key information (such as lease terms, royalty rates, and applicable lease stipulations) necessary to make informed bidding decisions. Bidders that have their bids rejected as a result of such errors would miss out on the opportunity to bid on other available blocks, which may result in claims that the sale was unfair and invalid. Bidders who bid on blocks based on incomplete or erroneous information contained on the available block list, may also claim that the sale was fundamentally flawed and insist on compensation or a new sale. In addition, when BOEM receives a bid in the mail, it enters certain information (such as the location of each block) into TIMS to make a preliminary determination if a bidder has bid on an available block. BOEM has in the past notified bidders, prior to the bid deadline, that the bidder placed a bid on an unavailable block, giving such bidders an opportunity to withdraw and/or correct their bid prior to the published deadline. There currently is no feasible alternative to TIMS, and attempting a sale without TIMS would cause significantly more delays.

9.     It would be impossible for BOEM to conduct Lease Sale 261 on September 27, 2023 in a competitive, fair, and orderly manner if BOEM is ordered to include the whole and partial blocks between the 100 m and 400 m isobaths that BOEM excluded to protect the Rice's whale.  As explained in the declaration from Deputy Director Walter Cruickshank, BOEM would need ten working days to repopulate the available block list in TIMS and to verify the entire list of approximately 13,000 blocks for the accurate assignment of the minimum bid amount, royalty rates, and stipulations for each block.  BOEM has decades of experience with TIMS and can practically guarantee that there will be errors in the sale that will not be caught and corrected if BOEM is forced to proceed with the sale without verifying the block lists.

10.     This is not simply a matter of adding blocks to the sale, without further modification.  For example, to add just one block to the sale in the TIMS program, BOEM must manually (1) determine if the block is in the western, central, or eastern Gulf of Mexico, and update the sale schedule table to include only that one area; (2) add the block to the available tracts table for that one planning area; (3) update the tract table in TIMS to include the protraction, block, rental rate, minimum bid, bid system code, tract description and coordinates; and (4) update the sale tables in TIMS to add the block. Those tables include Bid System Blocks, Lease Term Blocks, Minimum Bid Blocks, Stipulation Blocks (which may have to be done

multiple times depending on how many stipulations apply to that one block). Steps

1-4 are each a separate action, requiring manual data entry.  Simply supplying a

company with a protraction area and block number is not enough information for

bidders to make an informed bid.

11.     BOEM would have to repeat the actions described in the preceding

paragraph for each block added to the lease sale. Thus, if BOEM is required to add

1,200 Blocks to the lease sale, it could take as much as 200 hours of data entry.

Additionally, use of the TIMS systems requires specialized knowledge and training,

and there are only four BOEM staff members, including myself, that possess the

knowledge and training to operate TIMS for this function.  Therefore, providing

additional personnel to this process would not assist BOEM to revise the sale sooner.

In fact, tasking personnel who do not have the specialized TIMS training would

likely result in other errors and additional delays to correct those errors.

12.     Furthermore, many of the blocks encompassed by the court's order

overlap with blocks that would have been excluded for other reasons (e.g., those

previously subject to the topographic features and live bottoms stipulations) and/or

that require their own stipulations (e.g., for military warning areas).  Some of the

necessary stipulations (used, e.g., in lease sale 257) were not even included in the

Final Notice of Sale for Lease Sale 261, because all blocks implicating the

stipulations were excluded entirely from the published Final Notice of Sale (e.g., the

topographic features and live bottom blocks). Ensuring that these blocks are properly characterized in the available block list will require an additional amount of attention and time.

13.     In addition, because BOEM has already received some bids that were necessarily based on the Final Notice of Sale published in August 2023, rather than the court order of September 21, 2023—and because others are en route to the agency—BOEM and bidders must now determine whether and how to process those bids, with less than two business days before the bid submission deadline by hard copy and by mail.  See LA Ex. A at 31 (Final Notice of Sale for Lease Sale 261).

14.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 22nd day of September 2023, in New Orleans, Louisiana.

BRIDGETTE DUPLANTIS
Digitally signed by
BRIDGETTE DUPLANTIS
Date: 2023.09.22
14:22:10 -05'00'

BRIDGETTE DUPLANTIS
Chief
Leasing and Financial Responsibility Section
Office of Leasing and Plans
Gulf of Mexico Regional Office
Bureau of Ocean Energy Management
U.S. Department of the Interior

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| THE STATE OF LOUISIANA, et al., ) | |
| ) | |
| ) | |
| *Plaintiffs*, ) | CASE NO. 2:23-cv- |
| ) | 01157 |
| ) | |
| v. ) | |
| ) | |
| DEB HAALAND, et al., ) | |
| ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

## DECLARATION OF WALTER D. CRUICKSHANK

I, Walter D. Cruickshank, declare as follows:

1.      I currently serve as the Deputy Director of the Bureau of Ocean

Energy Management (BOEM), in the United States Department of the Interior

(Interior).  I have been employed with BOEM or its predecessor agencies for 34

years.  I have served as the Deputy Director of BOEM or its predecessor agencies

since 2002; I served as Acting Director of BOEM from January 2017 until

February 2021.  Since February 2021, I have again served as BOEM Deputy

Director.  I supervise the BOEM offices that prepare for, and conduct oil and gas

lease sales, including Gulf of Mexico Lease Sale 261.

2.      On August 24, 2023, the State of Louisiana, the American Petroleum Institute, and Chevron U.S.A. Inc. filed a Complaint for Declaratory and Injunctive Relief in the United States District Court for the Western District of Louisiana, Lake Charles Division.  On August 28, 2023, Shell Offshore Inc. also filed a Complaint for Declaratory and Injunctive Relief in the same Court.  The Plaintiffs in both cases make similar allegations: that BOEM violated the Inflation Reduction Act, the Outer Continental Shelf Lands Act, and the Administrative Procedure Act regarding two aspects of the decision to hold Lease Sale 261 and implement measures intended to protect the endangered Rice's whale within the 100-meter to 400-meter isobaths across the northern Gulf of Mexico: (1) an updated Protected Species Stipulation, including mitigation measures to be applied in this area while BOEM engages in a reinitiated consultation under the Endangered Species Act; and (2) the exclusion of whole and partial blocks between the 100-meter to 400-meter isobaths to reduce the possibility of incidental take of Rice's whales.  On August 28, 2023, in the case filed by Shell, and on August 29, 2023, in the case filed by Louisiana, Plaintiffs filed Motions for Preliminary Injunction requesting the court to compel Defendants to proceed with Lease Sale 261 on September 27, 2023, without the lease stipulation and including the excluded blocks.  I am providing this declaration to the court to explain the steps BOEM must take if the court grants Plaintiffs' motions.

3.      If ordered to include the whole and partial blocks that BOEM excluded

to protect the Rice's whale, BOEM would need to implement a number of time-

consuming changes to Lease Sale 261, which is currently scheduled to occur on

September 27, 2023, and is required by the Inflation Reduction Act of 2022 (IRA) to

be held by September 30, 2023.  Pub. L. No. 117-162, sec. 50264(e) (effective

August 16, 2022).  To add the 1,200 additional blocks, BOEM would need to

repopulate the entire available block list for the lease sale to take advantage of time-

saving automation provided by BOEM's lease sale software.  Once the block list is

repopulated, BOEM would then need to manually verify the entire list of

approximately 13,000 blocks for accuracy and assignment of the correct minimum

bid amount, royalty rates, and stipulations for each block in the sale, consistent with

BOEM's standard lease sale protocol. BOEM would require approximately 10 days

to complete this verification process.  Due to the technical limitations of BOEM's

lease sale software and the large amount of data associated with each block,

manually adding the 1,200 additional blocks into the existing block list created for

the Final Notice of Sale would require significantly more time.  Concurrent with this

process, BOEM would also need to create new leasing maps and proof those new

maps.  In total, BOEM estimates that these technical procedures would require a

minimum of 10 business days.

4.      In accordance with the Outer Continental Shelf Lands Act (OCSLA),

43 U.S.C. § 1337(l), and regulations implementing OCSLA at 30 CFR § 556.308,

BOEM must publish a Final Notice of Sale at least 30 days prior to the date of the

sale. The notice provides the public and potential bidders key information on the

sale, including a description of the areas offered for lease, the lease terms and

conditions of sale, and stipulations to mitigate potential adverse impacts on the

environment. If BOEM were to modify the size, timing, location, or other material

terms of a lease sale *after* it has already issued a Final Notice of Sale, BOEM is

required to issue a revised Final Notice of Sale in the *Federal Register* to inform all

potential bidders and the public of these changes, and then wait at least 30 days to

hold the sale to comply with the requirements in 43 U.S.C. § 1347(l) and 30 CFR

556.308.

5.      In this case, if BOEM were directed to modify the sale area and terms

from what is described in the Final Notice of Sale for Lease Sale 261 published on

August 25, 2023, in accordance with 43 U.S.C. § 1337(l) and 30 CFR § 556.308,

BOEM would be required to publish a revised Final Notice of Sale 30 days before

holding the sale to announce the revised details of the sale and to provide sufficient

notice to all prospective bidders, not just the parties to this case. In addition to the

time described above to make necessary technical changes to the lease sale, BOEM

would need a minimum of one week to draft, approve, and submit the revised Final

Notice of Sale to the *Federal Register* and to post the revised Final Notice of Sale

and lease stipulations to BOEM's website. While BOEM may be able to perform certain steps to prepare the revised Final Notice of Sale concurrently with the process to change the lease sale (e.g., the block list and maps described in paragraph 3), BOEM must wait at least 30 days after publication of the revised Final Notice of Sale in the *Federal Register* before holding the sale in accordance with 43 U.S.C. 1337(l); 30 CFR 556.308. In summary, BOEM estimates that it would take a minimum of 6 weeks total to perform required technical updates and to publish a revised Final Notice of Sale, List of Available Blocks, and Lease Stipulations prior to holding any court-ordered sale.

6.      The IRA requires the Secretary to conduct Lease Sale 261 "not later than September 30, 2023." IRA, Sec. 50264(e). Due to the time necessary to complete the steps described above, if the court grants Plaintiffs' preliminary injunction motion, BOEM would be unable to meet the deadline for Lease Sale 261 set in the IRA.

7.      Any eleventh-hour material change to Lease Sale 261 would have significant implications for non-parties to this litigation. BOEM published the Final Notice of Sale for Lease Sale 261 on August 25, 2023, providing potential bidders certainty on the key details of the sale. All bidders currently have the same information in the final period before the sale, and none have an advantage – all potential bidders are on the same footing. An order from the court to conduct Lease

Sale 261 that does not provide sufficient time to publish an amended Final Notice of Sale, however, could harm oil and gas industry members and potential bidders who are not part of this litigation and who are not aware of the material changes requested by Plaintiffs. Potential lease sale bidders who are not party to this lawsuit may claim that the Plaintiffs had an unfair advantage because they had significantly more time to (i) study the areas that Plaintiffs have requested the Court order BOEM to offer in the lease sale, and (ii) consider the effect of operating without the new protected species stipulation. Potential lease bidders who are not part of this litigation will also arguably have wasted time and resources preparing their bids in accordance with the Final Notice of Sale issued in August, only to then suddenly have to change approach and prepare bids for a modified sale area with different terms in the lease stipulations.

8.     Even if the court required BOEM to include the lease blocks in the Expanded Rice's Whale Area (100-meter to 400-meter isobath) in holding Lease Sale 261, interest or bids on these blocks is expected to be minimal. In the most recent Gulf of Mexico sale, Lease Sale 259 which was held on March 29, 2023, BOEM issued 295 leases total, and only 16 leases (5.4% of all issued leases) were within the area containing the 100-meter to 400-meter isobaths. Based on the prior sale—which was held recently—it does not appear that there is much industry interest in the isobath area.

9.      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the foregoing is true and correct.

Executed this 13th day of September, 2023, in Washington, D.C.

WALTER CRUICKSHANK

Digitally signed by
WALTER CRUICKSHANK
Date: 2023.09.13 18:00:59
-04'00'

WALTER D. CRUICKSHANK
Deputy Director
Bureau of Ocean Energy
Management
U.S. Department of the Interior

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION


STATE OF LOUISIANA, ET AL      *   Docket No. 2:23-cv-1157
                               *
                               *
VERSUS                         *   September 21, 2023
                               *
                               *
DEB HAALAND, ET AL             *   Lake Charles, Louisiana


\* \* \* \* \* \* \* \* \* \* \* \*


SHELL OFFSHORE, INC., ET AL    *   Docket No. 2:23-cv-1167
                               *
                               *
VERSUS                         *   September 21, 2023
                               *
                               *
U.S. DEPT OF INTERIOR, ET AL   *   Lake Charles, Louisiana

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

OFFICIAL TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
BEFORE THE HONORABLE JAMES D. CAIN, JR.,
UNITED STATES DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**A P P E A R A N C E S**


FOR THE PLAINTIFF STATE OF LOUISIANA:

                    JORDAN BAILEY REDMON
                    LA Department of Justice
                    909 Poydras, Suite 1850
                    New Orleans, LA 70112


FOR THE PLAINTIFF AMERICAN PETROLEUM INSTITUTE:

                    ANDREW C. LAWRENCE
                    Clement & Murphy
                    706 Duke Street
                    Alexandria, VA 22314

FOR THE PLAINTIFF CHEVRON USA, INC.:

                    CATHERINE E. STETSON
                    DANA A. RAPHAEL
                    Hogan Lovells
                    555 13th Street NW
                    Washington, DC 20004


FOR THE PLAINTIFF SHELL OFFSHORE, INC.:

                    MARK W. MOSIER
                    Covington & Burling
                    850 10th Street NW
                    Washington, DC 20001

                    CECILIA GRACE VAZQUEZ
                    Liskow & Lewis
                    701 Poydras, Suite 5000
                    New Orleans, LA 70139


FOR THE DEFENDANTS:

                    LUTHER L. HAJEK
                    U.S. Department of Justice
                    Environment & Natural Resources Division
                    999 18th Street, South Terrace, Suite 370
                    Denver, CO 80202


FOR THE INTERVENOR DEFENDANTS:

                    GEORGE TORGUN
                    Earth Justice
                    50 California Street, Suite 500
                    San Francisco, CA 94111


REPORTED BY:        DEIDRE D. JURANKA, CRR
                    USDC - Western District of LA
                    611 Broad Street
                    Lake Charles, LA 70601

| | |
|---|---|
| 1 | **COURT PROCEEDINGS** |
| 2 | (Call to Order of the Court.) |
| 3 | THE COURT:  Good afternoon.  Good afternoon, ladies |
| 4 | and gentlemen.  How are y'all?  Let me call the case and |
| 5 | I'll have everybody make their appearance.  Okay.  This |
| 6 | is the State of Louisiana, et al. versus Deb -- is it |
| 7 | Haaland?  Am I pronouncing it correctly? |
| 8 | MR. HAJEK:  Yes, Your Honor. |
| 9 | THE COURT:  Got two A's.  Be sure I get it right. |
| 10 | I think it was consolidated.  Is this case consolidated? |
| 11 | What's that docket number, the consolidated one? |
| 12 | 23-1167.  And this one is 23-1157. |
| 13 | If I could, let me have counsel make their |
| 14 | appearances, please.  We'll start with the movers here. |
| 15 | MS. STETSON:  Good afternoon, Your Honor.  My name |
| 16 | is Kate Stetson.  I represent and I'll be arguing on |
| 17 | behalf of the plaintiffs in 1157. |
| 18 | THE COURT:  Okay.  Anyone else on this side who |
| 19 | wants to make their appearance?  Don't be bashful. |
| 20 | MR. REDMON:  Your Honor, Jordan Redmon for the |
| 21 | State of Louisiana. |
| 22 | THE COURT:  Who we got in the book back there? |
| 23 | MR. MOSIER:  Good afternoon, Your Honor.  Mark |
| 24 | Mosier on behalf of Shell.  We're plaintiffs in the |
| 25 | consolidated case.  With the Court's permission, I have |

The times in the left margin read: 01:30PM (lines 2–14), 01:31PM (lines 15–25).

01:31PM      1        a couple points I would like to make in argument.  But

01:31PM      2        beyond that, we'd be relying and joining the arguments

01:31PM      3        of plaintiffs --

01:31PM      4             THE COURT:  Absolutely.  That's why I'm having the

01:31PM      5        hearing, let everybody have their say.  Anyone else need

01:31PM      6        to make an appearance?

01:31PM      7             MR. LAWRENCE:  Good afternoon, Your Honor.  Andrew

01:31PM      8        Lawrence on behalf of the American Petroleum Institute.

01:31PM      9             THE COURT:  Okay.  Sir?

01:31PM     10             MR. HAJEK:  Good afternoon, Your Honor.  Luke Hajek

01:31PM     11        on behalf of the federal defendants.

01:31PM     12             THE COURT:  All right.  Thank you very much.  Okay.

01:31PM     13        If you -- you can -- you're more than happy to argue

01:32PM     14        from there, you can come to the podium, whatever you

01:32PM     15        would like, whatever you're most comfortable with.

01:32PM     16             MS. STETSON:  Come to the podium if that's okay.

01:32PM     17             THE COURT:  Okay.

01:32PM     18             MS. STETSON:  Thank you, Your Honor.

01:32PM     19             THE COURT:  Sure.

01:32PM     20             MS. STETSON:  So as you know by now, this is a case

01:32PM     21        under the Administrative Procedure Act involving what we

01:32PM     22        contend are unlawful actions by BOEM, the Bureau of

01:32PM     23        Ocean Energy Management.  In late August BOEM issued a

01:32PM     24        final Notice of Sale scheduled for September 27th that

01:32PM     25        made two significant changes from its proposed Notice of

01:32PM  1    Sale.  It added a burdensome set of vessel restrictions

01:32PM  2    in a certain area of the Gulf and also withdrew six

01:32PM  3    million acres of otherwise available area to lease.

01:32PM  4         The APA directs that a court shall hold unlawful

01:32PM  5    and set aside any Agency finding or conclusion or action

01:32PM  6    that is not authorized under the statute, that

01:33PM  7    contradicts the statute, or that doesn't have sufficient

01:33PM  8    explanation or support.  Our contention here is that the

01:33PM  9    Agency fails on all of those marks.  The Agency

01:33PM  10   contradicted the Inflation Reduction Act of 2022 when it

01:33PM  11   imposed new stipulations and withdrew acreage that was

01:33PM  12   not -- that was otherwise available under the 2017 to

01:33PM  13   2022 Record of Decision.  It contravened the limitations

01:33PM  14   in OCSLA, the Outer Continental Shelf Leasing Act.  And

01:33PM  15   it also contravenes the Administrative Procedure Act in

01:33PM  16   several different ways alone, including its inexplicable

01:33PM  17   shift from the position that it took just a short few

01:33PM  18   weeks earlier that no changes were necessary in order to

01:33PM  19   protect the habitat of what's now called the Rice's

01:33PM  20   whale.

01:33PM  21        So on top of all of those arguments, the parties

01:34PM  22   before you, and I'm arguing today on behalf of Louisiana

01:34PM  23   and Chevron and API, each of them will suffer

01:34PM  24   irreparable harm if this particular -- these changes are

01:34PM  25   not enjoined.  Louisiana, of course, will suffer harm

01:34PM  1    because it will lose out on the revenues that would have

01:34PM  2    flowed to it from the sale of six million additional

01:34PM  3    acres of available land, among other things.  API and

01:34PM  4    Chevron, as the Government actually conceded at Page 34

01:34PM  5    of its opposition brief, suffer because this late

01:34PM  6    breaking change changed the competitive dynamics of the

01:34PM  7    sale.  And the impact of that on API's members and on

01:34PM  8    Chevron is that they are having to bid with a level of

01:34PM  9    uncertainty that has been created at this very last

01:34PM  10   minute by changes that were not notified in the proposed

01:34PM  11   Notice of Sale.  So up one side and down the other,

01:34PM  12   these are unlawful actions.

01:35PM  13        The Government, in order to prevail here, has to

01:35PM  14   essentially run the table on all of the arguments that I

01:35PM  15   just said.  For us to prevail, we have to convince you

01:35PM  16   of just one.  So if the Court has questions, I'm happy

01:35PM  17   to answer them.  Otherwise, I'm happy to walk through

01:35PM  18   some of the merits arguments that we've got.

01:35PM  19        THE COURT:  Well, my only -- in my reading of

01:35PM  20   everything, a lot of briefs and they were very well

01:35PM  21   written by both sides, seems that this process had been

01:35PM  22   ongoing for a number of years and then there was some

01:35PM  23   delay in the leasing and then the -- I guess the -- my

01:35PM  24   understanding, as I've laid out the procedural history,

01:35PM  25   the Inflation Reduction Act's passed and part of that

01:35PM    1    bill or legislation said, hey, this sale has to now

01:35PM    2    happen by a certain date.

01:35PM    3            MS. STETSON:  Yes.

01:35PM    4            THE COURT:  And it seemed to make sense, I guess,

01:36PM    5    in the sense that the process had been ongoing for the

01:36PM    6    five year -- I guess it's the five-year plan that has to

01:36PM    7    be taken -- it has to go through for the lease sale to

01:36PM    8    take place.  So you're well down the road, I guess, at

01:36PM    9    that point.  Am I getting this correct on that part of

01:36PM   10    it?

01:36PM   11            MS. STETSON:  You are.  And I think our -- the

01:36PM   12    preliminary injunction brief filed in the lead case, and

01:36PM   13    Shell's as well, I think points out the long and

01:36PM   14    sometimes torturous history of these particular lease

01:36PM   15    sales.  When Congress came in in 2022 with the Inflation

01:36PM   16    Reduction Act one of the things it said with respect to

01:36PM   17    this particular lease sale is that BOEM will conduct it

01:36PM   18    in accordance with the Record of Decision for the 2017

01:36PM   19    to 2022 lease sale plan.  And that's the key, I think,

01:36PM   20    to this argument.

01:36PM   21            As we say in our reply brief, Congress could have

01:37PM   22    said conduct the lease sale in accordance with OCSLA,

01:37PM   23    the Continental Shelf Leasing Act.  It didn't.  What it

01:37PM   24    said was conduct the sale in accordance with the Record

01:37PM   25    of Decision, and that Record of Decision is very

01:37PM  1      specific about what it does and doesn't contemplate.  In
01:37PM  2      particular, when you're talking about the stipulations
01:37PM  3      that are generally contemplated, the final Record of
01:37PM  4      Decision as to that 2017 to 2022 timeframe makes clear
01:37PM  5      that the stipulations that it contemplates are
01:37PM  6      essentially the standard stips.
01:37PM  7           And I know you've been inundated with exhibits, but
01:37PM  8      if you look at and I can give you a few cites just so
01:37PM  9      you can see the consistency of these stipulations.  So
01:37PM  10     Gas Lease Sale 247 which is Exhibit W to our preliminary
01:37PM  11     injunction motion --
01:37PM  12           THE COURT:  Right.
01:37PM  13           MS. STETSON:  -- on Page 8 lists the standard
01:37PM  14     stipulations.  Gas Lease 256 which is Exhibit O lists
01:38PM  15     the ten standard stipulations and one more involving a
01:38PM  16     time frame for decisions that isn't particularly
01:38PM  17     relevant.  Gas Lease 257 which is Exhibit N, leases are
01:38PM  18     offered subject to the lease stipulations described in
01:38PM  19     the supplemental EIS, which is the same ten standard
01:38PM  20     stipulations.  Gas Lease 257 stipulations, Exhibit M,
01:38PM  21     the ten stips are listed at Page 1.  Exhibit L which is
01:38PM  22     the final Notice of Sale of 257, ten stips are listed at
01:38PM  23     Page 11.  So there is a drumbeat that is consistently
01:38PM  24     there about the stipulations that were contemplated and
01:38PM  25     reflected in --

01:38PM   1      THE COURT:  I guess your client's position is y'all
01:38PM   2   are acting on these stipulations going forward through
01:38PM   3   this process and then -- and I'm sure he's going to
01:38PM   4   address why all of a sudden the 360-degree turn.
01:38PM   5      MS. STETSON:  Well, if it were a 360-degree turn, I
01:39PM   6   think we'd be completely happy.  It's more of a 180, I
01:39PM   7   think.
01:39PM   8      THE COURT:  You're right.  Sorry, my geometry --
01:39PM   9   that's why I went to law school.
01:39PM  10      MS. STETSON:  I missed that day in math.  But the
01:39PM  11   180 had to do with what I think the intervenors actually
01:39PM  12   are quite candid about which is this other case that was
01:39PM  13   pending in Maryland in which the parties agreed to a
01:39PM  14   stay and as part of that agreement the parties entered
01:39PM  15   into a series of stipulated paragraphs, the stipulations
01:39PM  16   in that stay agreement, but they also had this curious
01:39PM  17   preliminary recitation of a bunch of whereas clauses.
01:39PM  18   And we point out whereas clauses, as the Supreme Court
01:39PM  19   has said, don't carry any weight.  They're just --
01:39PM  20   they're almost accessories to what the actual
01:39PM  21   stipulations are.  But these whereas clauses committed
01:39PM  22   BOEM, which was not a party to that other case, to make
01:39PM  23   certain changes including to these stipulations.
01:40PM  24      So that's how we got here.  That's where the shift
01:40PM  25   happened.  But the problem, I think from an

01:40PM   1        administrative procedure point of view in addition to

01:40PM   2        what we've already pointed out is the problem under the

01:40PM   3        Inflation Reduction Act, is that BOEM has gone on record

01:40PM   4        over and over again as saying that the Rice's whale

01:40PM   5        habitat that it needs to protect is in a completely

01:40PM   6        different off-limits section of the Gulf.  And it said

01:40PM   7        as early, as recently, as August of this year, so last

01:40PM   8        month, in a filing that it made in the District of

01:40PM   9        Columbia in response to a challenge there of Lease

01:40PM   10       Sale 259 that BOEM had determined that no additional

01:40PM   11       protections were necessary for the Rice's whale.

01:40PM   12            THE COURT:  I read that.

01:40PM   13            MS. STETSON:  So that flip is what we are saying is

01:40PM   14       completely inexplicable on this record.  What you see

01:41PM   15       from the Government's briefing is almost just a series

01:41PM   16       of conclusory statements.  They say we've concluded that

01:41PM   17       new evidence supports this new additional carve-out, the

01:41PM   18       six million acres, and these incredibly onerous vessel

01:41PM   19       restrictions but the new --

01:41PM   20            THE COURT:  Seems like they changed their mind on

01:41PM   21       that.  They seem to have looked at that early on, in the

01:41PM   22       beginning of the year, said that wasn't necessary and

01:41PM   23       then, like my view, did the 180 a month ago.

01:41PM   24            MS. STETSON:  So I think they certainly did change

01:41PM   25       their mind.  The question that we're left with, though,

01:41PM  1    I think under the Administrative Procedure Act is what
01:41PM  2    was the explanation for them changing their mind.  So in
01:41PM  3    the supplemental EIS which is Exhibit I to our PI
01:41PM  4    motion, which was in January of 2023, the Government
01:41PM  5    says repeatedly throughout that document that there's
01:42PM  6    not enough conclusive data to support expanding that
01:42PM  7    Rice's whale habitat over into the western side of the
01:42PM  8    Gulf over into what everyone calls the 100 to 400-meter
01:42PM  9    isobath.  You can see that at the final BSEE IS at 4-59,
01:42PM  10   see it again in response to comments at C-125.
01:42PM  11       Now, what I suspect Mr. Hajek will say is that they
01:42PM  12   changed their mind because there is some new evidence
01:42PM  13   which they concede is limited that suggests the presence
01:42PM  14   of Rice's whale outside of their usual habitat to the
01:42PM  15   east in the Gulf.  The problem with that argument is
01:42PM  16   that evidence was available and considered in January
01:42PM  17   of 2023.
01:42PM  18       THE COURT:  That's what I'm saying.  That's where
01:42PM  19   to me the 180 happened.
01:42PM  20       MS. STETSON:  Yes.  Yes, I think that's right.  But
01:42PM  21   in order for the Agency to successfully execute a 180
01:42PM  22   the Agency needs to explain itself and it needs to
01:43PM  23   acknowledge that it is flipping its position.
01:43PM  24                     (Phone rings.)
01:43PM  25       THE COURT:  I guess I'm the only one that gets to

01:43PM   1    bring a phone in here.  Sorry.  I apologize.

01:43PM   2        MS. STETSON:  No worries.

01:43PM   3        THE COURT:  I bar phones and then I bring mine and

01:43PM   4    break my own rule.  I do let lawyers bring their phones,

01:43PM   5    though.  I think I also -- I don't know if there's

01:43PM   6    anybody from the media here.  I did allow anyone to

01:43PM   7    bring their laptop, I think.

01:43PM   8        MS. STETSON:  I appreciate that.  Thank you.

01:43PM   9        THE COURT:  I'm sorry.  I apologize.

01:43PM   10       MS. STETSON:  No, not a worry.  So that is exactly

01:43PM   11   where the shift happened.  I think the amicus brief for

01:43PM   12   the members of Congress that you saw calls it a surprise

01:43PM   13   switcheroo.

01:43PM   14       THE COURT:  You know, and I was very open.  I know

01:43PM   15   there was some intervenors and I know some other cases

01:43PM   16   that have happened on these different leases.  The

01:43PM   17   interventions have been denied.  I kind of felt like

01:44PM   18   since all this had been going on in different courts I

01:44PM   19   should let them intervene here to let them have an

01:44PM   20   opportunity, and they wrote some very good briefs.  I've

01:44PM   21   looked at those.  So I was trying to get it all -- let's

01:44PM   22   get it all here in one place and try to not keep people

01:44PM   23   out.  But I understand.  It's complex issue.  It's a

01:44PM   24   complex process, is what it is.  It's a very complex

01:44PM   25   process.

01:44PM  1          MS. STETSON:  It is a complex process in many ways,
01:44PM  2     I think; but it boils down to some very simple issues.
01:44PM  3     The Inflation Reduction Act issue is when the Inflation
01:44PM  4     Reduction Act says you shall conduct this lease sale in
01:44PM  5     accordance with this Record of Decision, is BOEM allowed
01:44PM  6     to depart from that.  The OCSLA issue is when OCSLA
01:44PM  7     tells you to give notice to states among others about
01:44PM  8     the stipulations that are going to appear in your final
01:44PM  9     Notice of Sale, does OCSLA permit you to flout that
01:45PM  10    commitment.  And then the APA, as we've discussed, the
01:45PM  11    APA requires nonarbitrary and capricious
01:45PM  12    decision-making; and that includes explaining yourself,
01:45PM  13    acknowledging that you're changing your mind, and
01:45PM  14    providing sufficient evidence that you have considered
01:45PM  15    all of the factors that are supposed to be wrapped into
01:45PM  16    that decision.
01:45PM  17         You know, I do respect your decision to let in the
01:45PM  18    intervenors here; but I think -- as you have homed in
01:45PM  19    on, I think the reason for this switch has to do with
01:45PM  20    the participation in that other case and an attempt to
01:45PM  21    reach some kind of additional agreement off the books
01:45PM  22    with the plaintiffs in that Maryland case.  But what
01:45PM  23    we're left with here --
01:45PM  24         THE COURT:  Let me ask you this.  I really didn't
01:45PM  25    deep dive into the Maryland case.  I mean, I read what

01:45PM  1    was in the briefs about it.  Were Chevron and Shell

01:46PM  2    asked to -- were they brought into that case or did

01:46PM  3    y'all try to intervene in that case at all to have some

01:46PM  4    input?

01:46PM  5        MS. STETSON:  Chevron and API and two other

01:46PM  6    intervenors actually did intervene in that case.  I

01:46PM  7    would want to make one thing clear.  It's a little bit

01:46PM  8    uncomfortable to have to argue it; but the intervenors

01:46PM  9    argue in their brief that Chevron and API and the other

01:46PM  10   intervenors had a full and fair opportunity to

01:46PM  11   participate in what resulted in the stay and the

01:46PM  12   agreement.  I can't talk about settlement discussions,

01:46PM  13   obviously, because of the confidentiality issues; but I

01:46PM  14   can assure you that there was not a full and fair

01:46PM  15   opportunity to participate in those discussions.

01:46PM  16       So what we're left with here is a situation where

01:46PM  17   BOEM --

01:46PM  18       THE COURT:  When did that take place?  I'm sorry.

01:46PM  19       MS. STETSON:  Sure.  That took place --

01:46PM  20       THE COURT:  That's not going to breach your --

01:46PM  21       MS. STETSON:  Earlier this summer, I believe.

01:46PM  22   Can't remember the precise date when --

01:46PM  23       THE COURT:  When was the Inflation Reduction Act,

01:47PM  24   refresh my memory on that, when was it passed?

01:47PM  25       MS. STETSON:  I believe August of '22.

01:47PM   1    THE COURT:  August of '22.

01:47PM   2    MS. STETSON:  So with respect to why we're here,

01:47PM   3    essentially, I think BOEM found itself between a rock

01:47PM   4    and a hard place.  It was not a party to that Maryland

01:47PM   5    proceeding.  It had whereas clauses that had been

01:47PM   6    included in that stipulation in the Maryland proceeding

01:47PM   7    that said that BOEM was going to do certain things.

01:47PM   8    BOEM, despite that consistent recitation that it didn't

01:47PM   9    see a need to change the Rice's whale habitat area, it

01:47PM   10   didn't see a need to protect additional acreage, it

01:47PM   11   didn't see a need to wall off the 100 to 400-meter

01:47PM   12   isobath, all of those times that it said that, BOEM

01:47PM   13   found itself having to come in in this lease sale and

01:48PM   14   make a sea change to the stipulations that all of the

01:48PM   15   parties thought were going to control.  And the result

01:48PM   16   of that and the reason we're here today, of course, is

01:48PM   17   because of the irreparable harm.

01:48PM   18        I'm happy to speak to that issue.  I know

01:48PM   19   Mr. Mosier wants to make some points on irreparable harm

01:48PM   20   as well.  Irreparable harm, as I alluded to early in the

01:48PM   21   argument, falls into two main categories.  One of them

01:48PM   22   is Louisiana's interest in getting the revenues that

01:48PM   23   flow directly to it from lease sales in the Gulf.  The

01:48PM   24   other is what the Government conceded which is that this

01:48PM   25   change at the last minute has altered the competitive

01:48PM   1      dynamics of the sale.  You can see from the Carpenter

01:48PM   2      declaration that Chevron submitted which is in the

01:48PM   3      record at Exhibit FF, Chevron takes a great deal of time

01:48PM   4      and invests a great deal of effort in figuring out what

01:48PM   5      it's going to bid on and where and how.  And when a

01:49PM   6      final Notice of Sale comes out that changes the entire

01:49PM   7      dynamic of that sale it creates a level of uncertainty

01:49PM   8      in the bid, not just for Chevron but for API and all its

01:49PM   9      members, everybody bidding on these leases in the Gulf.

01:49PM   10     That's the reason that we're here with the urgency that

01:49PM   11     we're here today and the reason we've asked for the

01:49PM   12     early ruling we've asked for today.

01:49PM   13          I'm happy to stand down, answer any more questions

01:49PM   14     you've got, or --

01:49PM   15          THE COURT:  I may think of one in a moment.

01:49PM   16          MS. STETSON:  Okay.

01:49PM   17          THE COURT:  But if you would like to say -- you

01:49PM   18     have, come on up, something you'd like to address?

01:49PM   19          MS. STETSON:  Thank you.

01:49PM   20          THE COURT:  Sorry.  I know you're chomping at the

01:49PM   21     bit over there.

01:49PM   22          MR. MOSIER:  Yes, Your Honor.

01:49PM   23          THE COURT:  I promise you you'll get all the time

01:49PM   24     you need.

01:49PM   25          MR. MOSIER:  Mark Mosier on behalf of Shell.  I

01:49PM    1     have two quick points I'd like to make.  As my colleague
01:49PM    2     just mentioned, first address irreparable harm.  There's
01:49PM    3     really for Shell, like a lot of the plaintiffs, two ways
01:49PM    4     it's going to suffer irreparable harm.  As we just
01:50PM    5     heard, the last minute changes does change the
01:50PM    6     competitive balance of these bids.  These are very
01:50PM    7     competitive bids where leases are won and lost on very
01:50PM    8     slim margins.  So this change could affect who wins a
01:50PM    9     bid and who loses a bid.  That's the sort of irreparable
01:50PM   10     harm that Shell and other bidders could suffer.
01:50PM   11          The other form of irreparable harm relates really
01:50PM   12     to the restrictions on the vessel transit.  The Fifth
01:50PM   13     Circuit has said over and over again that increased
01:50PM   14     compliance costs that are incurred in complying with an
01:50PM   15     invalid regulation can result in irreparable harm
01:50PM   16     because you can't seek damages after the fact from the
01:50PM   17     Government.
01:50PM   18          THE COURT:  Tell me something, a little bit more
01:50PM   19     about -- I mean, I've read about the vessel
01:50PM   20     restrictions, speed restrictions, and maybe the
01:50PM   21     requirement to have a lookout, some of those things.  I
01:50PM   22     mean, I can understand something about the speed
01:51PM   23     restrictions a little bit.  I mean, there's been
01:51PM   24     offshore oil and gas activity off the coast of Louisiana
01:51PM   25     for decades.  I grew up on the Gulf Coast.  I'm very

01:51PM    1    familiar with it.  I'm assuming that -- expound on that

01:51PM    2    a little bit, about how these restrictions -- because it

01:51PM    3    seemed to me one of the big concerns the intervenors

01:51PM    4    have is that one of the dangers to this whale, if it's

01:51PM    5    even in this part of the Gulf, is that a boat's going to

01:51PM    6    hit it.  Fair enough?

01:51PM    7         MR. MOSIER:  Yes, I think that is --

01:51PM    8         THE COURT:  I mean, are cruise ships coming up into

01:51PM    9    the mouth of the Mississippi going to have to slow down

01:51PM   10    too?

01:51PM   11         MR. MOSIER:  There's no regulation contemplated now

01:51PM   12    for --

01:51PM   13         THE COURT:  Just all the crewboats going out to the

01:51PM   14    offshore platforms, that the only ones this affects, not

01:51PM   15    the cruise ships?  They've got a lot of cruise ships

01:51PM   16    floating around out of the Galveston and New Orleans.

01:51PM   17         MR. MOSIER:  Yeah, and I think the evidence in the

01:51PM   18    record suggests that less than half of the traffic

01:51PM   19    through that area is as a result of the offshore

01:52PM   20    drilling.

01:52PM   21         THE COURT:  But they're the only ones that have to

01:52PM   22    slow down and have a lookout.

01:52PM   23         MR. MOSIER:  And they're barred from traveling

01:52PM   24    overnight or in low visibility even during the day.  The

01:52PM   25    problems that causes for Shell is Shell currently has up

01:52PM  1     to 20 vessels operating around the clock.  So if they're
01:52PM  2     limited to the time of day and the speed, that clearly
01:52PM  3     will impose additional costs.  I mean, it also can raise
01:52PM  4     safety concerns if there's an emergency.
01:52PM  5          THE COURT:  I didn't understand how it could only
01:52PM  6     be -- I was curious about how it's limited to one
01:52PM  7     particular type of boat in industry but -- you know, it
01:52PM  8     seems to me, you know, any vessel that could potentially
01:52PM  9     hit something doesn't discriminate.  Any vessel could do
01:52PM  10    it whether it be a cruise -- I'd like to see you stop a
01:52PM  11    cruise ship on a dime.
01:52PM  12         MR. MOSIER:  I was going to say, if anything --
01:52PM  13         THE COURT:  I'm using that because I know a lot of
01:53PM  14    them come in and out and there's a lot more cruise ship
01:53PM  15    activity.  I guess maybe you can address why they don't
01:53PM  16    have to slow down, because I'd be curious to know why
01:53PM  17    they don't have to slow down.  What about fishing boats?
01:53PM  18    Do you know how many people fish, commercial fishermen
01:53PM  19    go out into the Gulf, shrimpers out of Cameron?  Do they
01:53PM  20    have to slow down?
01:53PM  21         MR. MOSIER:  It's not contemplated they would.  If
01:53PM  22    anything, I'd think there could be a greater risk from
01:53PM  23    boats that don't travel through there with the frequency
01:53PM  24    and have the experienced crew that --
01:53PM  25         THE COURT:  I know fishermen go out a hundred miles

01:53PM    1      and they go pretty fast in those center console bay

01:53PM    2      boats, and they don't have near the technology on them

01:53PM    3      for monitoring hitting something out -- I guess I'm just

01:53PM    4      trying to understand the rationale behind that when it's

01:53PM    5      not applicable to any other type of vessel but a

01:53PM    6      crewboat servicing a rig platform.  What about when --

01:54PM    7      they just did a big lease out here off the coast of

01:54PM    8      Cameron for a bunch of windmills.  Did they have to slow

01:54PM    9      down when they haul all these windmills and the turbines

01:54PM   10      and things?  Are they subject to this?

01:54PM   11           MR. MOSIER:  I --

01:54PM   12           THE COURT:  It's going to go right through this

01:54PM   13      area.  I'm just kind of curious.  I guess I'm trying to

01:54PM   14      understand the rationale on that part of it.

01:54PM   15           MR. MOSIER:  We, for Shell, don't understand the

01:54PM   16      rationale and we certainly think that is a relevant

01:54PM   17      factor in the balance of equities the Government

01:54PM   18      suggests that these provisions will help protect --

01:54PM   19           THE COURT:  I would be more open to that if it

01:54PM   20      applied to everybody, everybody, you know, not just one

01:54PM   21      industry, one particular group.  It has to be fair and

01:54PM   22      equal to everyone, and that's my problem that I'm seeing

01:54PM   23      with that.

01:54PM   24           MR. MOSIER:  We certainly share that concern.  If I

01:54PM   25      could, I'll turn to one final answer and this is to

01:55PM   1    address the argument that the Government makes at the
01:55PM   2    end of its brief where it says if the Court were to
01:55PM   3    enter an injunction it should give the Government
01:55PM   4    permission to delay the sale until November 8th.  That
01:55PM   5    delay would violate the Inflation Reduction Act.
01:55PM   6         THE COURT:  Look, on that point I'll just tell you,
01:55PM   7    Congress spoke.  You know, the Legislative Branch has
01:55PM   8    spoken on this.  The President signed it.  It says
01:55PM   9    October -- September 30th.
01:55PM   10        MR. MOSIER:  September 30th.
01:55PM   11        THE COURT:  That's what I've been operating under.
01:55PM   12   I'm going to -- I've been working on this for weeks.  My
01:55PM   13   anticipation for everyone is to get a ruling out tonight
01:55PM   14   because this is last minute and I know it's a time
01:55PM   15   sensitive thing.  And I'm not going to in any way
01:55PM   16   violate the congressional mandate that I see in the
01:56PM   17   Inflation Reduction Act and so it's my job to get it out
01:56PM   18   ASAP.  We've been working on it.  I've been reading
01:56PM   19   everything and getting all the procedural history
01:56PM   20   together.  I want to make a final decision, but I wanted
01:56PM   21   to give everyone an opportunity to come here.  I guess I
01:56PM   22   could have done it without the oral arguments, but I
01:56PM   23   always find it's better to let everybody have a day to
01:56PM   24   at least come and have a -- you know, let you -- you
01:56PM   25   can't put it always in a brief, you know what I mean.

01:56PM  1    MR. MOSIER:  Yeah, I know.  We're happy to be here.

01:56PM  2  This is obviously a very important issue for Shell and

01:56PM  3  the other plaintiffs here.  With that, I want to end by

01:56PM  4  stressing, which I think Your Honor understands, the

01:56PM  5  importance of having this all go forward by

01:56PM  6  September 30th.  So on that I will rest and let you hear

01:56PM  7  from the Government.  Thank you.

01:56PM  8    THE COURT:  Thank you.

01:56PM  9    MR. HAJEK:  Good afternoon, again, Your Honor.

01:56PM 10    THE COURT:  Good afternoon.

01:56PM 11    MR. HAJEK:  Plaintiffs' motion for preliminary

01:57PM 12  injunction should be denied.  They have failed to

01:57PM 13  demonstrate a likelihood of success on their Inflation

01:57PM 14  Reduction Act, OCSLA, and EPA claims.  They've failed to

01:57PM 15  demonstrate that irreparable harm would occur in the

01:57PM 16  absence of an injunction, and they've failed to show the

01:57PM 17  balance of the harms weighs in favor of the injunction.

01:57PM 18  Further, the relief that they seek is extraordinary.

01:57PM 19  They don't seek the typical APA remedy.  They don't seek

01:57PM 20  to set aside the Agency action, remand of the Agency.

01:57PM 21  Instead, they ask the Court to direct that Lease Sale

01:57PM 22  261 proceed by September 30th.

01:57PM 23    THE COURT:  Isn't that what the law says?  That's

01:57PM 24  what the Inflation Reduction -- that's what Congress

01:57PM 25  said.  I think that's why they're arguing that.  If I

01:57PM  1    had until next year, if I decide to go that way, I don't

01:57PM  2    see -- what's my alternative, to violate the

01:57PM  3    congressional act?  Do I have the authority to extend

01:57PM  4    it?  Congress said September 30th.

01:57PM  5         MR. HAJEK:  So we can go to that point because

01:58PM  6    counsel just raised it.  What I'll point out is that

01:58PM  7    certainly there was a deadline.  The main thing that

01:58PM  8    Congress demanded was that the sale go forward and it

01:58PM  9    set a deadline.  There are times --

01:58PM  10        THE COURT:  So we don't need to honor Congress's

01:58PM  11   mandate of September 30th?  We just go, oh, they didn't

01:58PM  12   really mean September 30th?

01:58PM  13        MR. HAJEK:  All things being equal, if the Court

01:58PM  14   issues no injunction, Interior prepared a sale and is

01:58PM  15   ready to go forward by September 30th.  But my point is

01:58PM  16   if there's some extenuating circumstances like an order

01:58PM  17   of the Court remanding to the Agency, there are cases

01:58PM  18   saying that the deadline can be missed and the Agency

01:58PM  19   would still have the authority to conduct the sale as

01:58PM  20   soon as possible.  I would point the Court in particular

01:58PM  21   to *Brock v. Pierce County*, 476 U.S. 253, from 1986.

01:58PM  22        THE COURT:  What was the last --

01:58PM  23        MR. HAJEK:  476 U.S. 253.  As well as *Barnhart v.*

01:58PM  24   *Peabody Coal Co.,* 537 U.S. 149.

01:59PM  25        The point is not that the Government wants to miss

01:59PM  1    this deadline.  It wants to meet it.  But the Court

01:59PM  2    seems concerned that if it were to order that the sale

01:59PM  3    be extended that it would be violating Congress's

01:59PM  4    instructions --

01:59PM  5         THE COURT:  That's a concern.

01:59PM  6         MR. HAJEK:  -- but my point is it could do so based

01:59PM  7    on Supreme Court authority.  And we would request, and I

01:59PM  8    do want to hit this point at the end, but we would

01:59PM  9    strongly urge the Court to -- if the Court orders the

01:59PM  10   injunction the plaintiffs request, to extend the sale to

01:59PM  11   November 8th.

01:59PM  12        THE COURT:  Let me ask you this.  Why?

01:59PM  13        MR. HAJEK:  So the short answer, Your Honor, is to

01:59PM  14   allow the sale to proceed in an orderly manner and to

01:59PM  15   provide --

01:59PM  16        THE COURT:  It's already been in the works for --

01:59PM  17   five-year plan's been in the works for five years.

01:59PM  18   You've known since August of last year in the Inflation

01:59PM  19   Reduction Act that this sale was to take place by

01:59PM  20   September 30th.  Why are you not prepared to go on the

02:00PM  21   30th?

02:00PM  22        MR. HAJEK:  So there are certain technical steps

02:00PM  23   that need to be taken to correct the terms of the sale.

02:00PM  24   As we explained in the Crookshank declaration, there are

02:00PM  25   certain changes to -- they need to put the maps

02:00PM   1    together.  They need to put the terms of the leases

02:00PM   2    together.  The excluded --

02:00PM   3         THE COURT:  I would think all that's probably

02:00PM   4    already done.  Y'all been working on it for months.  You

02:00PM   5    probably already got it all ready to go probably both

02:00PM   6    ways.  You took six million acres out or you can add six

02:00PM   7    million acres back in.  I mean, you know where the lease

02:00PM   8    territory is.

02:00PM   9         MR. HAJEK:  Unfortunately, it's not quite that

02:00PM  10    simple, Your Honor.  The area that was excluded for the

02:00PM  11    expanded Rice's whale area overlaps with other

02:00PM  12    exclusions and so if we put those parcels back in the

02:00PM  13    Agency has to consider where those parcels are.  There

02:00PM  14    are also stipulations that apply to particular areas and

02:00PM  15    particular terms.  And the counsel suggested that we

02:01PM  16    could just go back and re-notice Lease Sale 259; but we

02:01PM  17    can't because, one, there are some terms that are

02:01PM  18    slightly different and, second, some parcels were sold,

02:01PM  19    some parcels were sold but returned, so it's not as

02:01PM  20    simple as just putting together the parcel list from

02:01PM  21    259.

02:01PM  22         I'd like to talk a little bit about the Inflation

02:01PM  23    Reduction Act.  The plaintiffs argue that the Inflation

02:01PM  24    Reduction Act limited Interior's discretion with respect

02:01PM  25    to Lease Sale 261.  What they home in on is the language

02:01PM   1    which says that the sale must be conducted in accordance

02:01PM   2    with the 27 (sic) to 2022 five year program.  They

02:01PM   3    assumed that that language required Interior to offer

02:01PM   4    certain acreage and under certain terms, but it did not.

02:01PM   5         And there are a couple problems with that and the

02:01PM   6    first is a legal one.  Their argument is that the IRA

02:01PM   7    limited the discretion that the Agency has such that

02:02PM   8    OCSLA no longer applies.  I would point out that that's

02:02PM   9    intentioned with their second argument where they say

02:02PM   10   that the Agency violated OCSLA by not following certain

02:02PM   11   procedures, but let's put that aside.  They don't

02:02PM   12   seriously dispute that BOEM has the authority under

02:02PM   13   OCSLA to exclude certain areas or include stipulations.

02:02PM   14   Instead, they argue that IRA removed it.  And again, it

02:02PM   15   comes back to this "in accordance with" language.  I

02:02PM   16   would point out, as we did in our brief, that this

02:02PM   17   language simply repeats language in OCSLA, 43 U.S.C.

02:02PM   18   1344(d) and 43 U.S.C. 1344(d)(3), which requires BOEM to

02:02PM   19   issue leases only in accordance with an approved

02:02PM   20   program, meaning the five-year program.  In other words,

02:02PM   21   the IRA changed nothing.  The IRA said that the agency

02:03PM   22   is supposed to conduct lease sales in accordance with

02:03PM   23   the program, and that's what OCSLA says as well.

02:03PM   24        The second problem is factual.  The program ROD did

02:03PM   25   not specify a particular acreage that must be leased and

02:03PM  1    it also allowed for additional stipulations at the lease

02:03PM  2    stage.  The program ROD which is Louisiana Exhibit Q

02:03PM  3    stated, quote:  Additional specific mitigation measures

02:03PM  4    may also be developed and applied as appropriate at the

02:03PM  5    leasing stage.  Simply put, the five-year program did

02:03PM  6    not mandate the Interior hold a sale of a particular

02:03PM  7    size or with specific stipulations.

02:03PM  8         They also pointed to the language that says the

02:03PM  9    sale must be region wide.  As we pointed out in our

02:03PM  10   briefing, the sale was region wide.  It was across the

02:03PM  11   Gulf.

02:03PM  12        Moreover, Interior offered 67 million acres for

02:04PM  13   sale.  It offered 73 million in Lease Sale 259, and

02:04PM  14   Louisiana and Shell and Chevron didn't complain about

02:04PM  15   that.

02:04PM  16        I would also point out that the IRA contains a 60

02:04PM  17   million acre threshold for offshore wind.  What it says

02:04PM  18   is that in the ten years after the enactment of the IRA

02:04PM  19   in 2022, if Interior wishes to conduct offshore wind

02:04PM  20   leasing, it must conduct an offshore oil and gas lease

02:04PM  21   sale within the preceding year and must offer at least

02:04PM  22   60 million acres for lease.  And so it didn't say that

02:04PM  23   Lease Sale 259 and Lease Sale 261 must be at least 60

02:04PM  24   million acres; but the only threshold value that we have

02:04PM  25   in the IRA which is any indication of that is the 60

02:04PM    1    million acre threshold, and Interior offered 67 million
02:05PM    2    acres for sale.
02:05PM    3        The plaintiffs -- I'll go on to discuss OCSLA
02:05PM    4    unless you have other questions.
02:05PM    5        THE COURT:  No, no.  I got it.  It's an interesting
02:05PM    6    point about the acreage.
02:05PM    7        MR. HAJEK:  So OCSLA.  The plaintiffs argue, and
02:05PM    8    they did today, that Interior's proposed Notice of Sale
02:05PM    9    differed from the final Notice of Sale.  Interior's
02:05PM   10    required by the statute as well as its regulations to
02:05PM   11    provide the governors an opportunity to comment on the
02:05PM   12    size, timing, and location of the sale, and Interior did
02:05PM   13    so.  It --
02:05PM   14        THE COURT:  But you did so before you took the six
02:05PM   15    million out and you added the vessel restrictions.  You
02:05PM   16    haven't allowed the governors to comment since you made
02:05PM   17    those changes less than three, maybe four weeks ago.
02:06PM   18        MR. HAJEK:  And so in the proposed Notice of Sale
02:06PM   19    there was a statement that Interior reserved the right
02:06PM   20    to exclude the areas in the 100 to 400-meter isobath,
02:06PM   21    and Louisiana claims that it didn't have adequate notice
02:06PM   22    of that and yet the governors of Mississippi and Texas
02:06PM   23    as well as Chevron and Shell specifically provided
02:06PM   24    comments saying that BOEM should not exclude the areas
02:06PM   25    in that expanded Rice's whale area.  So they knew.  They

02:06PM   1    were on notice of the area.  It's a closer question as

02:06PM   2    to whether they were sufficiently on notice of the

02:06PM   3    stipulation; but the point we made in our brief is that

02:06PM   4    the statute and the regulations specifically allow them

02:06PM   5    to comment on the size, timing, and location of the sale

02:06PM   6    and there's no analogous requirement for the

02:06PM   7    stipulations.

02:06PM   8         Unless there are questions about that, I'll go on

02:07PM   9    to the APA.

02:07PM   10         THE COURT:  No.

02:07PM   11         MR. HAJEK:  So here the plaintiffs argue that

02:07PM   12    Interior did not adequately explain the basis for its

02:07PM   13    decision, but it did.  It reasonably explained that

02:07PM   14    excluding the expanded Rice's whale area, including the

02:07PM   15    revision to the stipulation, would provide protection

02:07PM   16    for the Rice's whale while the consultation with NMFS,

02:07PM   17    the National Marine Fisheries Service, is ongoing and

02:07PM   18    so --

02:07PM   19         THE COURT:  Didn't they conclude that they didn't

02:07PM   20    have really any evidence that this whale was in this

02:07PM   21    part of the Gulf?  I mean, y'all have pretty much --

02:07PM   22    they pretty much said that in the reports --

02:07PM   23         MR. HAJEK:  So --

02:07PM   24         THE COURT:  -- except for one study where there was

02:07PM   25    some sonar sounds.  I mean, you know how much stuff's in

02:07PM  1   the Gulf moving around?

02:07PM  2        MR. HAJEK:  So for Lease Sale 259 the acreage was

02:07PM  3   not excluded and the additional stipulation was not

02:08PM  4   excluded.  There was a supplemental environmental impact

02:08PM  5   statement prepared prior to that sale, and that's what

02:08PM  6   the plaintiffs are referring to.  It's an analysis in a

02:08PM  7   NEPA document discussing the Soldevilla study and

02:08PM  8   whether it provides --

02:08PM  9        THE COURT:  Initially the Government said there

02:08PM  10   wasn't enough data in that study to exclude this area.

02:08PM  11   That's where my 360-degree turn comes.  You know, the

02:08PM  12   Government initially said, hey, that's not enough data.

02:08PM  13   All of a sudden a month later you turn around and you

02:08PM  14   make an about-face on it.

02:08PM  15        MR. HAJEK:  But it also said in the same SCIS that

02:08PM  16   it would continue to look at information and --

02:08PM  17        THE COURT:  But you didn't look at any new

02:08PM  18   information.  You looked at the same information again.

02:08PM  19        MR. HAJEK:  Well, the plaintiffs mostly ignore

02:08PM  20   this; but there was an important thing that happened

02:08PM  21   between the decision for Lease Sale 259 and Lease

02:09PM  22   Sale 261 and that is in July the National Marine

02:09PM  23   Fisheries Service proposed this very area for critical

02:09PM  24   habitat.  It's proposed.  It's not final.  And we won't

02:09PM  25   know whether that area is designated as critical habitat

02:09PM  1    until that process is completed.  That process could be

02:09PM  2    completed around the same time as the Biological Opinion

02:09PM  3    sometime later next year, but I'm not sure.  So that was

02:09PM  4    a really valid reason.

02:09PM  5         I think where the plaintiffs are coming at this

02:09PM  6    from is this was just a change with no reason; but the

02:09PM  7    National Marine Fisheries Service has proposed this area

02:09PM  8    for critical habitat, and the only thing that BOEM did

02:09PM  9    was it excluded this area from this sale.  We'll see

02:09PM  10   what the National Marine Fisheries Service does.

02:09PM  11   There's going to be a new five-year program.  There

02:09PM  12   could be opportunities for Shell and Chevron to bid on

02:09PM  13   parcels later.  We don't know.  But the stipulation is

02:10PM  14   also temporary.  It's only going to be in place until

02:10PM  15   the consultation with NMFS is completed sometime next

02:10PM  16   year and then will be superseded by whatever it says in

02:10PM  17   the BiOp.  None of us know what that will be, but

02:10PM  18   it's -- they're complaining about the exclusion of six

02:10PM  19   million acres to make it a 67 million acre sale and

02:10PM  20   they're complaining about a stipulation that will be in

02:10PM  21   place for just one year until --

02:10PM  22        THE COURT:  What's the one year?  What are you

02:10PM  23   referring to there?

02:10PM  24        MR. HAJEK:  Well, I don't know if it'll be exactly

02:10PM  25   a year; but I'm estimating that that's when the

02:10PM  1    consultation with National Marine Fisheries --

02:10PM  2         THE COURT:  What about vessel restrictions?  I

02:10PM  3    mean, that to me is pretty burdensome.

02:10PM  4         MR. HAJEK:  Those are the ones that are temporary

02:10PM  5    until the consultation is completed.  And I take the

02:10PM  6    plaintiffs point that it's different from other vessels,

02:10PM  7    but the only thing that Interior can regulate in a

02:10PM  8    leasing decision is the vessels involved in oil and gas

02:11PM  9    operations.  It can't say in a leasing decision that

02:11PM  10   it's going to regulate cruise ships or fishing vessels

02:11PM  11   or anything else.  Maybe some regulations like that

02:11PM  12   would be appropriate, but it's not up for Interior to do

02:11PM  13   that in this context.

02:11PM  14        I'd like to talk a little bit about the irreparable

02:11PM  15   harm that they allege.  They argue that there will be

02:11PM  16   financial harms if the sale does not go forward with the

02:11PM  17   preferred terms, but these are things that could be

02:11PM  18   addressed on the merits.  They're not the kind of

02:11PM  19   financial losses in the very near term that would

02:11PM  20   justify the drastic remedy of a preliminary injunction.

02:11PM  21   If they're ultimately correct, if they prevail on the

02:11PM  22   merits through any potential appeals, then the -- then

02:11PM  23   there could be a remand instructing the Agency to follow

02:12PM  24   certain procedures or even, if the IRA demands, to

02:12PM  25   include certain provisions in the sale, if that's what

02:12PM 1    the Courts ultimately say.  But the proper remedy is a

02:12PM 2    remand, not to force the Agency to ask the Court to

02:12PM 3    essentially rewrite Interior's conditions.  That's the

02:12PM 4    Agency's job.

02:12PM 5        The plaintiffs also seem to assume that there is

02:12PM 6    some right to a lease sale with particular stipulations

02:12PM 7    and they argue that those rights have been violated and

02:12PM 8    that they will suffer harm because of that, but Interior

02:12PM 9    has the discretion to determine which areas will be

02:12PM 10   included in the sale and under what stipulations.  Until

02:12PM 11   it's final, there is no -- it's still in the Agency's

02:13PM 12   deliberative process.  So to the extent that they had

02:13PM 13   expectations based on the proposed Notice of Sale, those

02:13PM 14   are not actual losses because the only expectation that

02:13PM 15   they can have should be based on the final Notice of

02:13PM 16   Sale.

02:13PM 17       I would also point out that it's ironic to me that

02:13PM 18   they're telling the Court that the Government has

02:13PM 19   created the uncertainty here.  The Government made a

02:13PM 20   decision to offer parcels for lease and under certain

02:13PM 21   stipulations, and companies can bid on those.  Before

02:13PM 22   I -- to make sure I don't forget this, some bids, we

02:13PM 23   understand, have already been mailed to Interior.

02:13PM 24   Interior gets e-mail notice when bids are mailed.  And

02:13PM 25   so we understand that some bids have already been

02:13PM  1     mailed, but it is plaintiff's lawsuit that is now
02:13PM  2     creating this uncertainty.  Companies that may be
02:14PM  3     bidding today or tomorrow, before the Court's ruling or
02:14PM  4     afterwards, will be unsure as to which stipulations and
02:14PM  5     which acreage is available.
02:14PM  6          THE COURT:  You know, I guess, though -- I'm sure
02:14PM  7     these bids have been in the works for some time.  It's
02:14PM  8     not something you can just throw together.  I think
02:14PM  9     probably the problem is when you changed it a month ago
02:14PM  10    and took out -- and added all these restrictions you did
02:14PM  11    create uncertainty because you changed the playing --
02:14PM  12    the board.  Okay.  You moved the pieces around.  And I
02:14PM  13    don't see how you can argue that, that you didn't.
02:14PM  14    Because I can promise you, it takes probably -- it's why
02:14PM  15    it's a five-year plan.  It takes a long time to get
02:14PM  16    these leases for them to probably do whatever they have
02:14PM  17    to do logistically to set up the engineering, all the
02:15PM  18    studies, all the planning that has to go in place for
02:15PM  19    this.  And they probably had in their minds, well, I'm
02:15PM  20    going to bid on this, we're going to be able to do it
02:15PM  21    this way, we're going to be able to move equipment this
02:15PM  22    way; and all of a sudden y'all rip out six million acres
02:15PM  23    and say, "But your boats can't go over 10 miles an
02:15PM  24    hour."  Do you know how long it takes to get out in the
02:15PM  25    Gulf of Mexico going 10 miles an hour in a boat?  A long

1    time.

2           MR. HAJEK:  Well, it applies to --

3           THE COURT:  A long time.  I've been out there and

4    it takes a while.  You want to go a little faster than

5    that.

6           What are you going to do in weather?  What's the

7    deal with the weather, if you have bad weather and you

8    got to get people off those rigs in a hurry?  Is there

9    an exception for them to go a little faster than 10

10   miles an hour?  Answer my question.  Is there an

11   exception for them to be able to go faster than that?

12          MR. HAJEK:  I'd have to look at the stipulation

13   again.  I believe there are exceptions for safety and

14   that sort of thing.

15          But my point is the Court's -- if the Court orders

16   the injunction the plaintiffs are asking for, that's

17   going to add to the uncertainty.  We'll have bidders who

18   don't know which stipulations apply, and bids are

19   already coming in.

20          And another thing I would point out is that not all

21   of the bidders are API members.  They're not privy to

22   what's going on in these proceedings.  We've looked at

23   the results of the last sale and about half of them were

24   not API members.  So the parties that are in this case

25   should not be given an advantage over companies that are

02:16PM 1    not in this case.

02:16PM 2        I made the point in the beginning that the remedy

02:16PM 3    they seek is improper.  It's improper really for two

02:16PM 4    reasons.  One is that they're seeking, essentially,

02:16PM 5    final relief.  They're asking the Court to order that

02:16PM 6    the sale proceed under the terms that they want and that

02:17PM 7    will be pretty much the end of it.  That's the kind of

02:17PM 8    relief that could only be awarded after the merits and

02:17PM 9    should not be awarded at the preliminary stage.

02:17PM 10       And the second is the point I made at the

02:17PM 11   beginning.  This is an Administrative Procedure Act

02:17PM 12   case.  We get challenges from industry.  We get

02:17PM 13   challenges from environmental groups.  And sometimes

02:17PM 14   when we lose the case the action that we've taken is

02:17PM 15   enjoined and then the result is a remand back to the

02:17PM 16   Agency to address either the procedural or substantive

02:17PM 17   deficiencies addressed by the Court.  So an analogy

02:17PM 18   would be the environmental groups suing in DC or

02:17PM 19   Maryland and telling the Court this sale should not go

02:17PM 20   forward with this acreage because it should be excluded

02:17PM 21   to protect the Rice's whale and, Court, you need to

02:17PM 22   change the stipulation so it's more protective for the

02:17PM 23   Rice's whale.  The plaintiffs behind me would scream

02:18PM 24   bloody murder if a court in DC or Maryland did that, but

02:18PM 25   that's exactly what they're asking the Court to do.  The

correct solution is to remand to the Agency to fix the
problem recognizing that Congress has put a deadline on
this and the Agency needs to proceed expeditiously to
fix it, but it's not for the Court to put itself in the
shoes of the agency.

     And finally, Your Honor, we would strongly request
that if the Court orders the injunction that it give the
Agency until November 8th to conduct the sale.  I cited
the cases earlier from the Supreme Court which said that
the Court has the authority to do this.  It would be in
everyone's interest.  Certainly we don't know whether
appeals might ensue, but it's certainly a possibility.

     THE COURT:  Let's not kid anybody in this room
about that.

     MR. HAJEK:  So the Court understands that.

     THE COURT:  It's going up.  Okay.  Let's just own
it.  I don't live in DC so let's just talk frankly.
It's going up no matter what I do, so, you know.

     MR. HAJEK:  And putting the deadline on
November 8th would decrease some of the chaos that may
ensue.  Thank you for hearing me out.

     THE COURT:  No, no.  I appreciate the argument and
the brief.  Thank you very much.  And I'll let you --
y'all have anything you want to address?

     MS. STETSON:  If I could.

02:19PM   1         THE COURT:  Sure.  Go ahead.

02:19PM   2         MS. STETSON:  Just a few quick points, Your Honor.

02:19PM   3    And just to start with the last, the remedy and the

02:19PM   4    timing, Mr. Hajek knows better than probably all of us

02:19PM   5    that the APA requires a court to find unlawful and set

02:19PM   6    aside Agency actions, findings, or conclusions that are

02:20PM   7    unlawful.  So what we're asking for here is classic,

02:20PM   8    middle of the road APA relief which is the Agency's new

02:20PM   9    stipulations and withdrawn acreage should be found

02:20PM  10    unlawful and set aside, simply taken out of the lease

02:20PM  11    sale.  There's nothing to remand.  You remand in an APA

02:20PM  12    case in circumstances where an agency may be able to fix

02:20PM  13    the problem, which is exactly what Mr. Hajek said.

02:20PM  14    There's no fixing the problem that BOEM has invited by

02:20PM  15    changing the terms of the lease sale that Congress

02:20PM  16    directed it to conduct.  There's no fixing that problem.

02:20PM  17    There's no fixing the problem that they didn't give

02:20PM  18    notice under OCSLA, and there's no fixing the problem

02:20PM  19    that they completely flipped their view on whether or

02:20PM  20    not that additional six million acres and all of those

02:20PM  21    vessel restrictions needed to be in place in order to

02:21PM  22    protect the Rice's whale when they've repeatedly said it

02:21PM  23    doesn't.  So that's the APA issues.

02:21PM  24         With respect briefly to the three merits points, on

02:21PM  25    the IRA, you said it yourself, the Legislature has

02:21PM  1    spoken on this and one of the things the Legislature
02:21PM  2    specifically said was you do the sale in accordance with
02:21PM  3    the Record of Decision.  What Mr. Hajek -- what I heard
02:21PM  4    Mr. Hajek say was Record of Decision contemplates
02:21PM  5    additional stipulations; but that's why I took the time
02:21PM  6    that I did when I first stood up to walk through all of
02:21PM  7    the other lease sales and all of the other repeated,
02:21PM  8    standard, same stipulations that are always in place in
02:21PM  9    these lease sales.  So the Record of Decision does
02:21PM  10   contemplate stipulations.  That's why I read all of
02:21PM  11   those other exhibits into the record.
02:21PM  12        With respect to OCSLA, there was no reason for
02:21PM  13   Louisiana to comment on withdrawn acreage when the
02:21PM  14   Agency had made it clear just a few months earlier, in
02:21PM  15   January of '23, in their final supplemental EIS that
02:22PM  16   there was no reason to change the Rice's whale habitat
02:22PM  17   or to further protect it beyond what the habitat they
02:22PM  18   know exists which is already protected.
02:22PM  19        With respect to the APA, now this was interesting,
02:22PM  20   you heard Mr. Hajek say that the Agency reasonably
02:22PM  21   explained extending the Rice's whale area.  What you
02:22PM  22   didn't hear him say because it doesn't exist is why they
02:22PM  23   explained their flip, why they explained their change of
02:22PM  24   position.  And you correctly called him out on the fact
02:22PM  25   that their explanation, such as it was, was as to the

02:22PM 1    exact same evidence they'd already found wanting in

02:22PM 2    those prior -- in the prior EIS and in prior statements.

02:22PM 3        And I want to say one thing in particular on this

02:22PM 4    as well.  What Mr. Hajek said changed, and I wrote this

02:22PM 5    down, was that NMFS, NMFS, has now proposed, proposed, a

02:22PM 6    critical habitat for the Rice's whale that extends into

02:23PM 7    that new area, right.  The brief that the Government

02:23PM 8    filed last month in the District of Columbia Federal

02:23PM 9    District Court defending Lease Sale 259 says, and I'll

02:23PM 10   quote, quote in just a minute -- I don't need to quote

02:23PM 11   it.  I'll just tell you.  What it says is that until a

02:23PM 12   final critical habitat determination has been made

02:23PM 13   there's no conclusion that BOEM can reach to protect

02:23PM 14   that particular habitat.  So now it's telling you that

02:23PM 15   that's been the game changer, the proposed critical

02:23PM 16   habitat.  It said exactly the opposite a month ago to

02:23PM 17   the Federal District Court in DC.

02:23PM 18       THE COURT:  How long is that going to take?

02:23PM 19       MS. STETSON:  How long is the DC decision going to

02:23PM 20   take?

02:23PM 21       THE COURT:  No.  How long does it take them to do

02:23PM 22   the critical habitat, to figure that out?

02:23PM 23       MS. STETSON:  Well, you heard Mr. Hajek say

02:23PM 24   sometime next year.  I'm not sure whether to label that

02:24PM 25   a pipe dream or not.  These consultations --

| | | |
|---|---|---|
| 02:24PM | 1 | THE COURT:  There's slow and then there's |
| 02:24PM | 2 | Government slow. |
| 02:24PM | 3 | MS. STETSON:  Right.  So sometime next year could |
| 02:24PM | 4 | be sometime in 2027.  I don't know the answer to that. |
| 02:24PM | 5 | Two more quick points.  The first is with respect |
| 02:24PM | 6 | to vessels.  You had a colloquy with Mr. Mosier about |
| 02:24PM | 7 | the fact that this is a highly uneven regime because |
| 02:24PM | 8 | BOEM -- as Mr. Mosier mentioned and Mr. Hajek agreed, |
| 02:24PM | 9 | BOEM's only able to regulate vessels that serve oil and |
| 02:24PM | 10 | gas.  So that leaves all those other vessel, cruise |
| 02:24PM | 11 | ships, fishing vessels, out there doing whatever speed |
| 02:24PM | 12 | they're going to do wherever in the Gulf at whatever |
| 02:24PM | 13 | time of day.  But the other thing I would mention, too, |
| 02:24PM | 14 | is we're not even talking about all of the oil and gas |
| 02:24PM | 15 | vessels.  We are talking about only the vessels that |
| 02:24PM | 16 | service areas associated with Lease Sale 261.  So you've |
| 02:24PM | 17 | got this crazy patchwork of a regime out there where, |
| 02:25PM | 18 | depending on whether a vessel is dedicated to one area |
| 02:25PM | 19 | or another, it can or cannot traverse this particular |
| 02:25PM | 20 | area at night.  And you're exactly right.  This does |
| 02:25PM | 21 | cause issues in weather, particularly because one of the |
| 02:25PM | 22 | stipulations that the lease sale sets in place is that |
| 02:25PM | 23 | you're not allowed to travel across a particular area in |
| 02:25PM | 24 | bad weather.  So it puts a lot of risk on the table in |
| 02:25PM | 25 | terms of getting supplies where they're needed when |

02:25PM  1    they're needed by vessels that are going to be able to

02:25PM  2    actually do their jobs, which they do 24/7, and not have

02:25PM  3    to stop and idle outside a particular area for no reason

02:25PM  4    whatsoever except that the Government says that there's

02:25PM  5    been a proposed critical habitat that may or may not be

02:25PM  6    final for another year or two.

02:25PM  7         The last point I'll make is the point that you

02:25PM  8    made.

02:25PM  9         THE COURT:  Has there been any evidence that -- in

02:25PM  10   this area that they pulled out that one of these whales

02:26PM  11   has ever been hit by a boat in this area?

02:26PM  12        MS. STETSON:  The only thing that I remember being

02:26PM  13   in the record is that there was a whale that was found,

02:26PM  14   I think, onshore that had blunt force injuries

02:26PM  15   consistent with a vessel strike but, of course --

02:26PM  16        THE COURT:  Where was that at?  That wasn't off the

02:26PM  17   coast of Louisiana, was it?

02:26PM  18        MS. STETSON:  I can't tell you.  I know it was

02:26PM  19   somewhere on the Gulf Coast, but I can't tell you

02:26PM  20   whether it was the Louisiana coast or not.  But we don't

02:26PM  21   know what vessel struck it or even if a vessel struck

02:26PM  22   it.  So the point, again, about the irregular regime I

02:26PM  23   think is very well taken.

02:26PM  24        The last thing I'll note is the point --

02:26PM  25        THE COURT:  Well, if you really want to protect it

02:26PM  1    from that, then all these federal agencies should get
02:26PM  2    together that regulate different types of industries and
02:26PM  3    come up with a uniform plan.  It doesn't really seem to
02:26PM  4    me to do much good to say you slow down, but you can go
02:27PM  5    a hundred miles an hour.  Doesn't make any sense.  Be
02:27PM  6    like me driving on the interstate, you know, and saying,
02:27PM  7    well, if you're driving a car you got to go 10 but if
02:27PM  8    you're driving a truck you can go 50.  That makes no
02:27PM  9    sense to me.
02:27PM  10        MS. STETSON:  That's one of the reasons when you
02:27PM  11   think about the Administrative Procedure Act and the way
02:27PM  12   it breaks down into different requirements that the
02:27PM  13   Agency has to establish.  The Agency has to explain
02:27PM  14   itself, has to explain why it changed its mind, that it
02:27PM  15   changed its mind, but it also has to show that the
02:27PM  16   Agency action that it took is not completely arbitrary
02:27PM  17   and capricious.  And the point that you're making I
02:27PM  18   think goes to that last point.
02:27PM  19        THE COURT:  The point I'm making is, and I think
02:27PM  20   this is the problem in the country today, we all need to
02:27PM  21   use some common sense and that doesn't make any sense.
02:27PM  22   If we applied things in a common sense manner, I think
02:27PM  23   things would move a little smoother; but this is just
02:27PM  24   so --
02:27PM  25        MS. STETSON:  Common sense and evidence; and I

02:28PM  1    think both of those appear to be lacking with this

02:28PM  2    particular stipulation, as the Agency itself realized.

02:28PM  3         The last thing I'll say is actually something that

02:28PM  4    Your Honor said which is they took six million acres out

02:28PM  5    just last month, they can add them back in.  They added

02:28PM  6    a stipulation that imposes these arbitrary and

02:28PM  7    burdensome vessel requirements, they can take that back

02:28PM  8    out.

02:28PM  9         THE COURT:  What do you say to his comment that

02:28PM  10   that's not that easy to add them back in?  In my mind, I

02:28PM  11   figure they'd been going along planning this for a long

02:28PM  12   time.

02:28PM  13        MS. STETSON:  Years.

02:28PM  14        THE COURT:  Then just a month ago they do the 360.

02:28PM  15   So to me they probably had it all trucking along pretty

02:28PM  16   good and they were able to take it out four weeks ago.

02:28PM  17        MS. STETSON:  They were able to take it out really

02:28PM  18   quick.

02:28PM  19        THE COURT:  I'm trying to understand why -- I'm

02:28PM  20   with you.  If I -- depending on what I do, I don't know

02:28PM  21   yet, it doesn't make sense to me.  Common sense.  Why

02:29PM  22   can't you just add it back in.  You hadn't opened those

02:29PM  23   bid packages yet.  I don't think you're supposed to open

02:29PM  24   them until September 30th.  I know they got to be

02:29PM  25   mailed.  That's an antiquated rule.  Why can't you FedEx

02:29PM    1    them or e-mail them, but you got to mail them.

02:29PM    2          MS. STETSON:  But the point about timing I think is

02:29PM    3    an important one here.

02:29PM    4          THE COURT:  Can you hand deliver them?  Is that

02:29PM    5    allowed?  Can somebody show up at your office in

02:29PM    6    Washington and hand deliver it if they don't want to

02:29PM    7    trust the postal service to get it there on time?

02:29PM    8          MR. HAJEK:  I think overnight FedEx is allowed, but

02:29PM    9    it could just be mail.

02:29PM   10          THE COURT:  I'm just curious.  Really, I'm not

02:29PM   11    making a joke about that.  I was really curious about

02:29PM   12    that.  When they said mail, you know, I was really, it's

02:29PM   13    got to still be mail.

02:29PM   14          MS. STETSON:  U.S. mail.  So this timing issue,

02:29PM   15    though, the point you just made, Your Honor, about the

02:29PM   16    Government kind of changing the rules last month, this

02:29PM   17    is a problem of their own creation.  And for the

02:30PM   18    Government now to say, well, we couldn't possibly put

02:30PM   19    this back together in time I think is a problem that

02:30PM   20    they should be able to deal with because, as you've

02:30PM   21    said, the Legislature has spoken on this.  At the very

02:30PM   22    least what we said in our -- the end of our reply brief,

02:30PM   23    and I don't think the Government really contested this,

02:30PM   24    the Government's declaration that they submitted has to

02:30PM   25    do with withdrawing that acreage and putting it back in

02:30PM  1    and how complicated it would be because then there would

02:30PM  2    be more acreage that's available and they'd have to make

02:30PM  3    a list and they'd have to make a chart or whatever they

02:30PM  4    have to do.  They said nothing about the stipulations.

02:30PM  5    So, if nothing else, we would suggest the stipulations

02:30PM  6    can be easily withdrawn in plenty of time for that sale

02:30PM  7    to go forward.  And if need be and only if need be, they

02:30PM  8    can lease the six million acres on November 8th which is

02:30PM  9    when the Government says they can do it; but that's a

02:30PM  10   last ditch alternative, I think.

02:30PM  11       THE COURT:  What's your thoughts about his

02:30PM  12   suggestion if I was to grant your relief but kick it

02:31PM  13   to -- I struggle with that because that's not what

02:31PM  14   Congress said, and who am I to supplement my judgment on

02:31PM  15   that.  They set a deadline.  Who am I to -- I mean, he

02:31PM  16   act -- no offense.  Oh, that's a fluid deadline Congress

02:31PM  17   gave.  I don't read it that way.

02:31PM  18       MS. STETSON:  There's nothing fluid about

02:31PM  19   September 30th.  I think it is a fixed deadline.  And

02:31PM  20   Congress said shall.  It didn't say may, didn't say

02:31PM  21   might.  Congress said this lease sale shall be conducted

02:31PM  22   in accordance with this Record of Decision by this date.

02:31PM  23   And again, the only reason that we're in this mess right

02:31PM  24   now is because the Agency changed its approach just a

02:31PM  25   few weeks ago.  So I don't think the Agency should be

02:31PM  1    heard to complain that now it has to go back and change
02:31PM  2    its approach again.  It's very straightforward to do it.
02:32PM  3        If there are no further questions for me, I'm happy
02:32PM  4    to stand down.
02:32PM  5        THE COURT:  I have no further questions.
02:32PM  6        MS. STETSON:  Thank you, Your Honor.
02:32PM  7        THE COURT:  I'm not going to cut you off if you --
02:32PM  8    if there's something else you want to say.  That's why
02:32PM  9    we're here.  I'm here to listen.
02:32PM  10        MR. HAJEK:  I can answer a couple things --
02:32PM  11        THE COURT:  Yeah.  Sure.
02:32PM  12        MR. HAJEK:  -- starting maybe with the last first.
02:32PM  13    So one thing I haven't heard from plaintiffs is other
02:32PM  14    than the fact Congress set a deadline of September 30th
02:32PM  15    and we all want to try to meet it but, you know, we've
02:32PM  16    argued to the Court that potentially the Court could
02:32PM  17    make it later if necessary.  But what I've heard from
02:32PM  18    the plaintiffs is why it's so important for them that it
02:32PM  19    has to go forward by September 30th and couldn't be
02:32PM  20    conducted six weeks later.  There was just a lease sale
02:32PM  21    in March.  I don't know of any deadlines.  They haven't
02:32PM  22    explained anything that would necessitate the lease sale
02:32PM  23    going forward by the end of September for their
02:32PM  24    purposes.
02:32PM  25        Turning to the stipulation, we have asked the

02:33PM   1   Agency whether the stipulation could be added quickly,
02:33PM   2   aside from the acreage which would take longer, and
02:33PM   3   they've said that they could put a notice on their
02:33PM   4   website -- do the necessary corrections and put a notice
02:33PM   5   on their website by Monday telling everyone that the
02:33PM   6   stipulation had changed.  So yes, that one could be done
02:33PM   7   quickly.
02:33PM   8       One final point I would make is that, yes, the
02:33PM   9   Government is defending various cases.  There are
02:33PM   10  differences and nuances in the way we argue different
02:33PM   11  things.  In the case of the District of Columbia we are
02:33PM   12  arguing that the analysis that was done under the
02:33PM   13  National Environmental Policy Act was sufficient.
02:33PM   14  Different argument than the plaintiffs are making here.
02:33PM   15  There's no OCSLA claim in that case.  I think our
02:33PM   16  arguments are consistent.  But I would just point out
02:33PM   17  that we are, the Government as a whole, is doing the
02:34PM   18  best it can to defend those cases and walk a middle
02:34PM   19  ground between the litigation risk that it sees from --
02:34PM   20  in this case and other cases brought by the
02:34PM   21  environmental groups.
02:34PM   22       And as far as the Maryland case, there is
02:34PM   23  essentially an uneasy truce in that case.  Depending on
02:34PM   24  what the Court orders in this case, it could undo that
02:34PM   25  and we could find ourselves litigating that case and

02:34PM 1   defending the Biological Opinion.  The Biological

02:34PM 2   Opinion and the associated incidental statements are

02:34PM 3   what allows a lot of the activity -- oil and gas

02:34PM 4   activity in the Gulf to occur.  Without that coverage

02:34PM 5   they can't do it.  So our calculation is better for

02:34PM 6   everyone if that Maryland case does not proceed.  If the

02:34PM 7   Court's injunction -- the Court's injunction could upset

02:34PM 8   that.

02:34PM 9         THE COURT:  I appreciate that.

02:34PM 10        MR. HAJEK:  Thank you.

02:34PM 11        MS. STETSON:  Could I have 30 more seconds.

02:35PM 12        THE COURT:  Yeah.  Absolutely.  I'm not going to

02:35PM 13   tell y'all this, but this is all I have this afternoon.

02:35PM 14   But don't take advantage of that.

02:35PM 15        MS. STETSON:  No, just real quick.  Since Mr. Hajek

02:35PM 16   asked, I can say out loud the lease sale is important to

02:35PM 17   us to be held by the congressional deadline, not just

02:35PM 18   because it's a congressional deadline but because we,

02:35PM 19   Chevron, API's members, Shell, have worked towards this

02:35PM 20   deadline with the understanding that this is when the

02:35PM 21   bids are going to go in and all of the work has been

02:35PM 22   bent toward this particular timeframe.  So it is

02:35PM 23   important.

02:35PM 24        The last thing I would say, I hope, is that the --

02:35PM 25   what the Government describes as the nuances between or

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
| 02:35PM | 1  | among the positions that it has taken in various                   |
| 02:35PM | 2  | litigations are not nuances.  They are flat out                    |
| 02:35PM | 3  | contradictions.  And I would encourage you to look at              |
| 02:35PM | 4  | the DDC docket which is Docket No. 23-604.  Docket Entry            |
| 02:35PM | 5  | 54 is the Government's brief, and the relevant pages are            |
| 02:36PM | 6  | Pages 28 to 34.  And that will tell you everything you              |
| 02:36PM | 7  | need to know about the difference between the                      |
| 02:36PM | 8  | Government's position here and the Government's position            |
| 02:36PM | 9  | there.  Thank you, Your Honor.                                      |
| 02:36PM | 10 | THE COURT:  I failed to ask.  Do we have anyone                     |
| 02:36PM | 11 | from the intervenors here?                                          |
| 02:36PM | 12 | MR. TORGUN:  Good afternoon, Your Honor.  George                    |
| 02:36PM | 13 | Torgun for the intervenors.  I know I wasn't permitted              |
| 02:36PM | 14 | an opportunity to --                                                |
| 02:36PM | 15 | THE COURT:  No, no, I wanted to --                                  |
| 02:36PM | 16 | MR. TORGUN:  (Indiscernible.)                                       |
| 02:36PM | 17 | THE COURT:  Come up here.  I'm sorry.  I can't hear                 |
| 02:36PM | 18 | you.  I know DD, my court reporter, is fixing to fuss at            |
| 02:36PM | 19 | me because she can't hear you.                                      |
| 02:36PM | 20 | MR. SAYE:  I'm from the energy industry.                            |
| 02:36PM | 21 | THE COURT:  I was just going to allow you -- come                   |
| 02:36PM | 22 | on up, allow you to make your appearance.  I want it on             |
| 02:36PM | 23 | the record that you did --                                          |
| 02:36PM | 24 | MR. TORGUN:  Good afternoon.  George Torgun on                      |
| 02:36PM | 25 | behalf of the defendant intervenors.                                |

02:36PM  1      THE COURT:  All of them?

02:36PM  2      MR. TORGUN:  Yes, all of them in both consolidated

02:36PM  3  cases.

02:36PM  4      THE COURT:  Thank you.  I got your brief.  I didn't

02:37PM  5  know if anyone was here but wanted to let you at least

02:37PM  6  make your appearance.

02:37PM  7      MR. TORGUN:  Thank you, Your Honor.

02:37PM  8      THE COURT:  Look, if you have something you want to

02:37PM  9  say, I'll let you say it real quick.  I didn't know how

02:37PM  10  many people were coming.  I didn't know what the length

02:37PM  11  of the arguments would be.  But, you know, I'm fine

02:37PM  12  letting you -- if you have something you want to add to

02:37PM  13  it real quick.

02:37PM  14      MR. TORGUN:  Well, let me make two points, then.

02:37PM  15      THE COURT:  Sure.

02:37PM  16      MR. TORGUN:  With the lease sales in the 2017 to

02:37PM  17  2022 program, they've continued to evolve as they've

02:37PM  18  implemented over time.  There have been ten or so lease

02:37PM  19  sales.  They haven't all had the same stipulations.

02:37PM  20  They haven't all had the same acreage.  Lease Sale 259,

02:37PM  21  which was also one that was required to be implemented

02:37PM  22  by the IRA, in fact, at the -- in the final Notice of

02:37PM  23  Sale included a seven million acre reduction to take out

02:37PM  24  areas that were now proposed for wind leasing.  That's

02:37PM  25  not something that was actually contemplated in the

02:38PM    1      proposed program or in the ROD, something that has sort

02:38PM    2      of happened over time.  And the Government, as it

02:38PM    3      should, continues to evaluate the most recent

02:38PM    4      information and decided with Lease Sale 259 to take out

02:38PM    5      seven million acres.  Plaintiffs here never complained

02:38PM    6      about that.  So that's very analogous to Lease Sale 261

02:38PM    7      where the Government has continued to look at new

02:38PM    8      information with --

02:38PM    9           THE COURT:  Do you have a problem with the wind

02:38PM   10      sales going forward and they don't put a restriction on

02:38PM   11      the boats taking the stuff out there for the wind

02:38PM   12      people?  I got a problem -- I'm going to be honest, I

02:38PM   13      got a problem with the vessel thing.  It's a real

02:38PM   14      problem for me.

02:38PM   15           MR. TORGUN:  I've heard your concern, and I'm

02:38PM   16      hopeful that at some point in the near future we'll have

02:38PM   17      a vessel restriction that applies to all potential

02:38PM   18      vessels that might strike Rice's whales in the Gulf.

02:38PM   19      Maybe we'll get there once we get that critical habitat

02:38PM   20      and there's a new Biological Opinion, but it's going to

02:38PM   21      take a little time.  As you know, the critical habitat

02:39PM   22      was just proposed in July.  But as Mr. Hajek said, BOEM

02:39PM   23      here cannot regulate cruise ships or fishing vessels.

02:39PM   24      What it can regulate is oil and gas vessels and that's

02:39PM   25      what it's doing.

02:39PM    1          THE COURT:  My problem is you can't regulate

02:39PM    2    international vessels either.  So they can't, the

02:39PM    3    Federal Government can't, so every other vessel in the

02:39PM    4    world coming through the Gulf of Mexico outside our 10

02:39PM    5    mile limit is going to be able to go whatever speed they

02:39PM    6    want because you can't regulate that.

02:39PM    7          MR. TORGUN:  I understand that concern, Your Honor.

02:39PM    8          THE COURT:  So at the end of the day this whole

02:39PM    9    speed thing to me is pointless.  And secondly, I still

02:39PM   10    haven't really heard anybody tell me the whale got hit

02:39PM   11    by a boat.

02:39PM   12          MR. TORGUN:  Let me just --

02:39PM   13          THE COURT:  I think your big concern is the oil and

02:39PM   14    gas drilling.  Let's be honest, that's your big concern.

02:39PM   15    It's not the boats.  The boats limit their ability to do

02:39PM   16    their production.  Fair enough?

02:40PM   17          MR. TORGUN:  In this case as with the Maryland

02:40PM   18    case, our concern is protection of the Rice's whale.

02:40PM   19    It's the only whale that inhabits solely the Gulf

02:40PM   20    entirely in U.S. waters.  It is one of the most

02:40PM   21    endangered marine mammals in the world.  There may be 50

02:40PM   22    of them left.  So any protection --

02:40PM   23          THE COURT:  I understand that.  They live over off

02:40PM   24    the coast of Florida.  I read everything about it.  I'm

02:40PM   25    just asking you:  How are you ever going to limit this

02:40PM  1      thing with boats when you can't regulate international

02:40PM  2      vessels?  Most foreign -- most shipping vessels today

02:40PM  3      are not American flagged, they're foreign flagged.

02:40PM  4           MR. TORGUN:  As far as the critical habitat in the

02:40PM  5      Gulf, the United States has jurisdiction over those

02:40PM  6      waters.

02:40PM  7           THE COURT:  Not out beyond, what is it, 20 miles we

02:40PM  8      don't.  It's international waters.

02:40PM  9           MR. TORGUN:  But the Rice's whale only inhabits a

02:40PM  10     narrow band within U.S. waters.

02:40PM  11          THE COURT:  Then why are you trying to restrict the

02:41PM  12     speed of vessels out in the middle of the Gulf?

02:41PM  13          MR. TORGUN:  It's not -- it's within this narrow

02:41PM  14     band where the shelf break is, but it is within U.S.

02:41PM  15     waters.  I would say the protections we're getting with

02:41PM  16     Lease Sale 261 are a start.  They're very much needed.

02:41PM  17     We need to do more to protect the species, but it's

02:41PM  18     certainly welcome to have these minimal protections in

02:41PM  19     place now.

02:41PM  20          THE COURT:  Okay.  Thank you.

02:41PM  21          MR. TORGUN:  Thank you, Your Honor.

02:41PM  22          THE COURT:  I saw you back there.  You wanted to

02:41PM  23     make an appearance?  I caught you off guard, didn't I?

02:41PM  24          MR. SAYE:  I'm not sure what I'm supposed to do

02:41PM  25     here.

02:41PM  1      THE COURT:  If you filed something, if you want to
02:41PM  2  make your appearance --
02:41PM  3      MR. SAYE:  My name is Jim Saye.  I'm with Houston
02:41PM  4  Energy, a small company in Houston, 40 people.  We work
02:41PM  5  in the deep water Gulf of Mexico.  Our traffic has to
02:41PM  6  cross this area that's going to be -- proposed to be
02:41PM  7  excluded.  Two things come to mind.  We have spent years
02:42PM  8  and millions of dollars, licensing, seismic, preparing
02:42PM  9  for this sale and for potentially leasing blocks in this
02:42PM  10  area.  And to have 30 days before our bids were -- we
02:42PM  11  were preparing those six months ago.  For those to be
02:42PM  12  taken out at the last minute is complete surprise and
02:42PM  13  it's going to cost us a lot of money.
02:42PM  14      The second thing, you know, there are leases that
02:42PM  15  were awarded ten years ago which will not have these
02:42PM  16  stipulations and then leases supposedly awarded in this
02:42PM  17  sale would have the stipulations.  How do you -- if you
02:42PM  18  have a boat that's serving a lease from ten years ago
02:42PM  19  and a boat that's serving a lease from this sale, how do
02:42PM  20  you -- one goes through the area at regular speed,
02:43PM  21  30 knots, one goes through at 10.  How is that fair?
02:43PM  22      THE COURT:  I have two words, common sense.  It
02:43PM  23  doesn't make no sense to me.
02:43PM  24      MR. SAYE:  I didn't mean to speak.
02:43PM  25      THE COURT:  That's okay.  Look, this Court belongs

02:43PM    1    to the people of the United States.  If you're here and

02:43PM    2    I'm having a hearing, I know it's an important issue for

02:43PM    3    people, so I want to give everybody a chance to make an

02:43PM    4    appearance.  Not a public comment section, but I figured

02:43PM    5    what the heck.

02:43PM    6            MR. SAYE:  Thank you.

02:43PM    7            THE COURT:  Anything else?  Like I said -- no, go

02:43PM    8    ahead.

02:43PM    9            MR. HAJEK:  Your Honor, so I think you mentioned

02:43PM   10    you may issue a ruling tomorrow?

02:43PM   11            THE COURT:  Look, I feel like this is very time

02:43PM   12    sensitive.  I think I even had a request to move this

02:43PM   13    hearing up.  I had a jury trial.  I couldn't move it up.

02:43PM   14    And I knew people had made travel plans.  I was assuming

02:43PM   15    people had made travel arrangements.  For me to last

02:43PM   16    week move it up -- I think maybe y'all wanted me to move

02:43PM   17    it up a day.  So I've been working, reading, my staff

02:44PM   18    has, to formulate -- I've got the procedural history to

02:44PM   19    be able to do a very quick ruling and get it out,

02:44PM   20    hopefully, maybe even tonight because I don't -- I don't

02:44PM   21    want to be the cause of any more delays.  I want to get

02:44PM   22    this out as fast as I can to y'all so y'all can do

02:44PM   23    whatever it is that needs to be done.  That make sense?

02:44PM   24    So that's my plan.  But before I made a final decision I

02:44PM   25    wanted to hear the arguments and be able to hear from

02:44PM  1    everyone on the issue because I know -- apparently it's
02:44PM  2    an important issue to a lot of people and so that's why
02:44PM  3    I wanted to have the hearing.
02:44PM  4         I'm sorry.  I think you used to clerk for my
02:44PM  5    colleague, Judge Joseph in Lafayette.  She probably can
02:44PM  6    inform you very quickly that I'm not a fan of Zoom.  I
02:45PM  7    don't do Zoom court.  I know it's very convenient for
02:45PM  8    people, but I still believe in court.  People should
02:45PM  9    come.  I'm old school, I guess.  So I appreciate you
02:45PM  10   coming here and traveling and everyone coming to make
02:45PM  11   their arguments.
02:45PM  12        Yeah, we're going to get something out either
02:45PM  13   tonight or first thing in the morning.  I might even --
02:45PM  14   where you from, sir?
02:45PM  15        MR. HAJEK:  I live in Denver, Colorado.
02:45PM  16        THE COURT:  I'll probably have it out before you
02:45PM  17   get off the plane in Denver.  That's a big airport in
02:45PM  18   Denver.
02:45PM  19        MR. HAJEK:  Houston's even bigger.
02:45PM  20        THE COURT:  Yeah.  Let me ask you this.  This is
02:45PM  21   totally off subject.  Where'd you go to college,
02:45PM  22   University of Colorado?  I'm digging some football right
02:45PM  23   now.  Really, I love college football.  I'm really
02:45PM  24   enjoying this whole run.
02:45PM  25        MR. HAJEK:  I'm originally from the east coast but,

02:46PM    1          yeah, we love Coach Prime.

02:46PM    2              THE COURT:  I had to get him on the record.  All

02:46PM    3          right.  Well, thank y'all very much.

           4                      (Proceedings adjourned.)

           5

           6

           7                      * * * * * * *

           8

           9

          10                      **CERTIFICATE**

          11

          12      I hereby certify this 21st day of September, 2023 that

          13  the foregoing is, to the best of my ability and

          14  understanding, a true and correct transcript of the

          15  proceedings in the above-entitled matter.

          16

          17                      _Deidre D. Juranka_

          18                      Deidre D. Juranka, CRR
                                   Official Court Reporter

          19

          20

          21

          22

          23

          24

          25