No. 23-30666

# In the United States Court of Appeals for the Fifth Circuit

STATE OF LOUISIANA, AMERICAN PETROLEUM INSTITUTE,
AND CHEVRON U.S.A. INC.,

*Plaintiffs-Appellees,*

v.

DEB HAALAND, et al.,

*Defendants-Appellants.*

SHELL OFFSHORE INC.,

*Plaintiff-Appellee,*

v.

U.S. DEPARTMENT OF THE INTERIOR, et al.,

*Defendants-Appellants.*

On Appeals from the United States District Court for the Western District of
Louisiana, Lake Charles Division, Case Nos. 2:23-cv-1157, 2:23-cv-1167
Hon. Judge James D. Cain, Jr.

## PLAINTIFFS-APPELLEES' OPPOSITION TO EMERGENCY STAY PENDING APPEAL

Paul D. Clement
Andrew Lawrence*
James Y. Xi*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com

Jeff Landry
   *Attorney General of Louisiana*
Elizabeth B. Murrill
   *Solicitor General*
Joseph S. St. John
   *Deputy Solicitor General*
Jordan B. Redmon
   *Assistant Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE

**ADDITIONAL COUNSEL LISTED ON INSIDE COVER**

james.xi@clementrmurphy.com

*Supervised by principals of the firm
who are members of the Virginia Bar

*Counsel for Plaintiff American
Petroleum Institute*

Steven J. Rosenbaum
Mark W. Mosier
Bradley K. Ervin
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000
srosenbaum@cov.com

*Counsel for Plaintiff Shell Offshore
Inc.*

September 25, 2023

1885 N. Third Street
Baton Rouge, LA 70804
(225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Catherine E. Stetson
Sean Marotta
Dana A. Raphael
Hogan Lovells US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

*Counsel for Plaintiff Chevron U.S.A. Inc.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.  <u>Plaintiffs-Appellees:</u>

    State of Louisiana

    American Petroleum Institute

    Chevron U.S.A. Inc.

    Shell Offshore Inc.

2.  <u>Counsel for Plaintiffs-Appellees:</u>

    Jeff Landry, Louisiana Department of Justice

    Elizabeth B. Murrill, Louisiana Department of Justice

    Joseph S. St. John, Louisiana Department of Justice

    Jordan B. Redmon, Louisiana Department of Justice

    Paul D. Clement, Clement & Murphy, PLLC

    Andrew Lawrence, Clement & Murphy, PLLC

    James Y. Xi, Clement & Murphy, PLLC

    Catherine E. Stetson, Hogan Lovells US LLP

    Sean Marotta, Hogan Lovells US LLP

Dana A. Raphael, Hogan Lovells US LLP

Steven J. Rosenbaum, Covington & Burling LLP

Mark W. Mosier, Covington & Burling LLP

Bradley K. Ervin, Covington & Burling LLP

3.   Defendants-Appellants:

Deb Haaland

Laura Daniel-Davis

Elizabeth Klein

James Kendall

U.S. Department of the Interior

Bureau of Ocean Energy Management

4.   Counsel for Defendants-Appellants:

Michelle Melton

Andrew Marshall Bernie

Luther L. Hajek

Alexis G. Romero

5.   Intervenor-Appellants:

Sierra Club

Center for Biological Diversity

Friends of the Earth

Turtle Island Restoration Network

6.    <u>Counsel for Intervenor-Appellants:</u>

Christopher Eaton, Earthjustice

Brettny E. Hardy, Earthjustice

Elizabeth Grace Livingston de Calderon, Earthjustice

Stephen D. Mashuda, Earthjustice

<u>/s/ Catherine E. Stetson</u>
Catherine E. Stetson

# TABLE OF CONTENTS

<u>Page</u>

CERTIFICATE OF INTERESTED PERSONS ........................................................i

TABLE OF AUTHORITIES ...................................................................................vi

INTRODUCTION ....................................................................................................1

BACKGROUND .......................................................................................................3

    A.    The 2017–2022 Leasing Program Schedules 10 Regionwide
           Lease Sales In The Gulf Of Mexico .........................................................3

    B.    The Federal Government And Environmental Groups
           Interfere With The Final Three Gulf Sales ...............................................4

    C.    Congress Passes The Inflation Reduction Act To Require
           Remaining Sales Be Conducted In Accordance With The
           2017–2022 Leasing Program .....................................................................6

    D.    The Federal Government Suddenly Deviates From The
           2017–2022 Leasing Program Scope And Terms ......................................9

    E.    The District Court Enjoins The Last-Minute Changes .........................12

ARGUMENT ..........................................................................................................14

I.    DEFENDANTS AND INTERVENORS HAVE NOT MADE
    A STRONG SHOWING OF LIKELY SUCCESS ON THE
    MERITS ..........................................................................................................14

    A.    The Enjoined Provisions Are Procedurally Invalid ..............................15

    B.    The Enjoined Provisions Are Arbitrary And Capricious ......................19

    C.    The Enjoined Provisions Violate the Inflation Reduction Act ..........21

II.    THE EQUITABLE FACTORS WEIGH DECISIVELY
    AGAINST A STAY ........................................................................................24

    A.    The Government And Intervenors Face No Harm, Irreparable
           Or Otherwise, Absent A Stay ................................................................24

# TABLE OF CONTENTS—Continued

Page

    B.   A Stay Would Substantially Injure Plaintiffs And Other Parties ........................................................................28

    C.   The Public Interest Weighs Against An Extraordinary Stay ..............31

CONCLUSION .........................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES:**

*Aransas Project v. Shaw*,
  775 F.3d 641 (5th Cir. 2014) ............................................................. 33

*Barnhart v. Peabody Coal Co.*,
  537 U.S. 149 (2003) .................................................................... 22, 23

*Brock v. Pierce Cnty.*,
  476 U.S. 253 (1986) .......................................................................... 22

*Center for Biological Diversity v. EPA*,
  937 F.3d 533 (5th Cir. 2019) ............................................................. 27

*Chemical Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................................. 16

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .......................................................................... 20

*Fath v. Texas Dep't of Transp.*,
  670 F. App'x 294 (5th Cir. 2016) ...................................................... 24

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) .......................................................................... 22

*Friends of the Earth v. Haaland*,
  583 F. Supp. 3d 113 (D.D.C. 2022) ..................................................... 5

*Friends of the Earth v. Haaland*,
  2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ................................. 5, 6

*In re Prescription Home Health Care, Inc.*,
  316 F.3d 542 (5th Cir. 2002) ............................................................. 23

*Louisiana v. Biden*,
  45 F.4th 841 (5th Cir. 2022) ............................................................... 5

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ........................................................... 28

vi

## TABLE OF AUTHORITIES—Continued

Page

*Louisiana v. Biden*,
543 F. Supp. 3d 388 (W.D. La. 2021) .................................................. 5

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) ....................................... 4, 5, 31

*Maine Lobstermen's Ass'n v. NMFS*,
70 F.4th 582 (D.C. Cir. 2023) ............................................................ 21

*Mexican Gulf Fishing Co. v. Department of Com.*,
60 F.4th 956 (5th Cir. 2023) ............................................................... 18

*Mock v. Garland*,
75 F.4th 563 (5th Cir. 2023) ............................................................... 17

*Restaurant Law Ctr. v. Department of Lab.*,
66 F.4th 593 (5th Cir. 2023) ............................................................... 28

*Robinson v. Ardoin*,
37 F.4th 208 (5th Cir. 2022) ............................................................... 14

*Texas v. Biden*,
10 F.4th 538 (5th Cir. 2021) .......................................... 26, 27, 31, 32

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) ....................................................... 14, 20

*Town of Chester v. Laroe Ests., Inc.*,
581 U.S. 433 (2017) ............................................................................ 15

*U.S. Navy Seals 1-26 v. Biden*,
27 F.4th 336 (5th Cir. 2022) ............................................................... 31

**STATUTES:**

43 U.S.C. § 1331(3) ............................................................................... 3

43 U.S.C. § 1332(3) ............................................................................... 3

43 U.S.C. § 1332(4) ............................................................................. 15

# TABLE OF AUTHORITIES—Continued

<u>Page</u>

43 U.S.C. § 1344(a) ................................................................. 3

43 U.S.C. § 1345(a) ................................................................ 16

43 U.S.C. § 1345(b) ................................................................ 16

43 U.S.C. § 1345(c) ................................................................ 16

Inflation Reduction Act of 2022,
  Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ....................... 1

  § 50263 ......................................................................... 9

  § 50264 ......................................................................... 6

  § 50264(a)(3) ................................................................... 7

  § 50264(a)(4) ................................................................... 7

  § 50264(b) ...................................................................... 6

  § 50264(d) ...................................................................... 6

  § 50264(e) ................................................... 1, 6, 21, 22, 30, 31

**REGULATIONS:**

30 C.F.R. § 556.304(a) ........................................................... 16

30 C.F.R. § 556.304(c) ........................................................... 16

30 C.F.R. § 556.305(a) ........................................................... 16

30 C.F.R. § 556.307(a) ........................................................... 16

30 C.F.R. § 556.307(b) ........................................................... 16

86 Fed. Reg. 7,619 (Jan. 27, 2021) ............................................... 4

86 Fed. Reg. 10,132 (Feb. 18, 2021) .............................................. 4

88 Fed. Reg. 16,030 (Mar. 15, 2023) .............................................. 9

# INTRODUCTION

This case involves an upcoming competitive, sealed-bid auction of offshore oil-and-gas leases—Lease Sale 261—that Congress has mandated take place "not later than September 30, 2023."  Inflation Reduction Act of 2022, § 50264(e), Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA").  Congress set specific parameters for Lease Sale 261 after the Biden Administration's and environmental groups' years-long efforts to derail oil-and-gas leasing in the Gulf of Mexico.

Five months ago, the Bureau of Ocean Energy Management ("BOEM") issued its required Proposed Notice of Sale setting out the area that Lease Sale 261 would cover and the stipulations that would attach to any awarded leases.  Last month—just a few weeks before BOEM's scheduled sale-date of September 27— BOEM radically changed the scope and terms of Lease Sale 261.  BOEM imposed a burdensome new lease stipulation restricting vessel transit across the 100- to 400-meter isobaths for the entire Gulf of Mexico and withdrew that same six-million-acre area from the sale entirely.  BOEM made those last-minute changes in a claimed effort to further protect the Rice's whale, even though BOEM failed to provide the statutorily-required notice of the changes to affected States like Louisiana, and even though BOEM had repeatedly rejected the same vessel restrictions and acreage exclusion as unjustified by the science.

Plaintiffs in these consolidated cases—the State of Louisiana, American Petroleum Institute, Chevron U.S.A. Inc., and Shell Offshore Inc.—immediately sought to enjoin BOEM's last-minute changes to prevent BOEM from irreparably tainting the sale. After considering thousands of pages of exhibits, holding an hour-and-a-half hearing, and thoroughly addressing the issues in a 30-page opinion, the District Court granted Plaintiffs' motions for a preliminary injunction.

The Government and environmental-group Intervenors disagree with that decision and request different stays pending appeal. Although the Government essentially concedes that the District Court correctly granted a preliminary injunction, it asks this Court to delay the sale until November 8 due to purported administrative difficulties and supposed unfairness to nonparties. But the IRA set forth a statutory deadline of September 30 that this Court cannot ignore, and any claims of administrative difficulties and unfairness are problems of the Government's own making (and flatly contradicted by the evidence to boot). Intervenors want the sale to proceed as scheduled with the (now-enjoined) unlawful vessel-restriction stipulation and acreage exclusion. But they likewise do not satisfy this Court's high standard for the extraordinary relief of a stay pending appeal. In short, against the backdrop of the Government's multi-year delays and given the September 30 statutory deadline, there is no reason to grant the Government's Congress-defying and unsubstantiated request for additional time—

2

and certainly not on the eve of a federal government shutdown—or Intervenors' request to reinstate provisions that even the Government does not defend.

## BACKGROUND

### A. The 2017–2022 Leasing Program Schedules 10 Regionwide Lease Sales In The Gulf Of Mexico.

The Outer Continental Shelf ("OCS") is a "vital national resource" that must be made "available for expeditious and orderly development" through five-year programs of scheduled lease sales. 43 U.S.C. §§ 1331(3), 1332(3), 1344(a). After years of planning, the Secretary approved the 2017–2022 Five-Year Leasing Program in a "Record of Decision" that directed BOEM to proceed with 10 scheduled lease sales in the Gulf of Mexico: one sale in 2017, two each year from 2018 to 2021, and one—Lease Sale 261—in 2022. These sales were to be "region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf" to "provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." Dkt. 14-22 PageID 3106. The 2017–2022 Five-Year Leasing Program also "assume[d] continuing implementation of protective measures required by statute, regulation, or current lease sale stipulations." Dkt. 14-24 PageID 3525; *see* Dkt. 14-25 PageID 4384. There were 10 such stipulations at the time, Dkt. 14-25 PageID 4384-85, 4127, 4406; Dkt. 14-24 PageID 3525, 3608; Dkt. 14-26 PageID 4424, and each of BOEM's subsequent

3

environmental reviews have included the same list, Dkt. 14-23 PageID 3231-35;

Dkt. 14-21 PageID 2782-83; Dkt. 16-1 PageID 4845-46.

**B.     The Federal Government And Environmental Groups Interfere With The Final Three Gulf Sales.**

BOEM conducted seven of the 10 scheduled Gulf-wide lease sales

consistent with the 2017–2022 Leasing Program's direction that the sales be

"region-wide and include unleased acreage not subject to moratorium or otherwise

unavailable, in the Western, Central, and Eastern Gulf of Mexico," implementing

the same 10 lease stipulations for each of those sales.  Dkt. 14-22 PageID 3106; *see*

Dkt. 14-1 (PI Br.) 8 n.1.  BOEM initially scheduled Lease Sale 257 to be a

regionwide lease sale in accordance with the Five-Year Program, but in January

2021, President Biden issued an executive order directing Interior to "pause new

oil and natural gas leases . . . in offshore waters pending completion of a

comprehensive review and reconsideration of Federal oil and gas permitting and

leasing practices."  86 Fed. Reg. 7,619, 7,624 (Jan. 27, 2021).  Interior therefore

cancelled Lease Sale 257, 86 Fed. Reg. 10,132, 10,132 (Feb. 18, 2021), and did not

schedule the Five-Year Program's two remaining Gulf sales, Lease Sales 259 and

261, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 287-289 (W.D. La. 2022).

Thirteen States, including Louisiana, sued to enjoin the "pause."  The district

court held that "pausing, stopping and/or cancelling lease sales scheduled" in the

Outer Continental Shelf Lands Act ("OCSLA") Five-Year Program "would be

4

significant revisions of the plan" that "the Agency Defendants have no authority to make . . . without going through the procedure mandated by Congress" and preliminarily enjoined the leasing pause. *Louisiana v. Biden*, 543 F. Supp. 3d 388, 413, 417 (W.D. La. 2021).[1]  BOEM accordingly held Lease Sale 257 in November 2021, offering "all the available unleased acreage in the GOM" with the familiar 10 lease stipulations.  Dkt. 14-17 PageID 2583.  But before BOEM issued leases to the winning bidders, environmental groups persuaded a district court to vacate the sale under the National Environmental Policy Act ("NEPA") on grounds that the pre-sale environmental analysis purportedly failed to adequately consider foreign oil consumption.  *See Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 128 (D.D.C. 2022), *vacated and remanded*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (per curiam).  The same environmental groups are currently challenging Lease Sale 259, *see Healthy Gulf v. Haaland*, No. 1:23-cv-00604 (D.D.C. filed Mar. 6, 2023), and the sale at issue in this case, Lease Sale 261, *see Healthy Gulf v. Haaland*, No. 1:23-cv-02487 (D.D.C. filed Aug. 25, 2023).

---

[1]  This Court later vacated that injunction as insufficiently specific, 45 F.4th 841 (5th Cir. 2022), and the district court reissued a detailed permanent injunction, 622 F. Supp. 3d at 298-300.

### C.    Congress Passes The Inflation Reduction Act To Require Remaining Sales Be Conducted In Accordance With The 2017–2022 Leasing Program.

Congress intervened in the leasing melee by enacting the IRA in August 2022.  Among other things, the IRA changed the law for "lease sales under the 2017–2022 Outer Continental Shelf Leasing Program," including the uncompleted Lease Sale 257 and the two remaining Gulf sales—Lease Sales 259 and 261.  *See* IRA § 50264 (capitalization altered).  For Lease Sale 257, Congress directed the Secretary to "promptly issue to the high bidder a fully executed lease."  *Id*. § 50264(b) (capitalization altered).  Because of this "nondiscretionary obligation on the Department to issue the leases," the D.C. Circuit ordered the environmental groups' challenge to Lease Sale 257 dismissed as moot.  *Friends of the Earth*, 2023 WL 3144203, at *2.

The IRA likewise listed specific "requirement[s]" for the two other Gulf sales, Lease Sales 259 and 261.  IRA § 50264(d)-(e) (capitalization altered). Congress specified that, "not later than September 30, 2023, the Secretary shall conduct Lease Sale 261 in accordance with the Record of Decision approved by the Secretary on January 17, 2017."  *Id.* § 50264(e).  The IRA also specified that "[t]he term 'Lease Sale 261' means the lease sale numbered 261 described in the 2017–2022 [OCS] Oil and Gas Leasing Proposed Final Program."  *Id.*

6

§ 50264(a)(4).  The IRA likewise mandated that Lease Sale 259 be held "not later than March 31, 2023."  *Id.* § 50264(a)(3), (d).

BOEM acknowledged that "the Inflation Reduction Act of 2022 . . . requires BOEM to hold both GOM Lease Sales 259 and 261."  Dkt. 16-1 PageID 4546. And although BOEM had "no discretion on whether to hold these lease sales," it chose to prepare a Supplemental Environmental Impact Statement ("EIS") "to follow its normal leasing process to the fullest extent possible."  *Id.* 4587.

In January 2023, BOEM sought public comment on the draft Supplemental EIS.  As they had in each preceding environmental review, environmental groups complained that oil-and-gas activity might pose a risk to the endangered Rice's (or Bryde's) whale.  BOEM had already determined in 2016 that any risk was negligible, as the Rice's whale habitat in the northeastern Gulf does not "overlap[] with the GOM Program Area" due to a leasing moratorium in most of the eastern Gulf, Dkt. 14-24 PageID 3548, meaning that "vessels expected to service leases . . . are unlikely to transit across" the Rice's whale habitat, Dkt. 16-1 PageID 4767. BOEM nevertheless agreed to impose a set of vessel restrictions on any minimal transit through that area off the coast of Florida—part of the "reasonable and prudent alternative" recommended by another agency—the National Marine Fisheries Service ("NMFS")—in its 2020 biological opinion.  Dkt. 16-2 PageID 5816-17.  Given the "limited vessel routes originating from the eastern GOM, and

the additional mitigations on vessels within the Rice's whale core area," BOEM

determined "the potential for vessel strikes to sperm and Rice's whale" to be

"extremely unlikely."  Dkt. 16-1 PageID 4705.  Environmental groups—

Intervenors in this case—sued NMFS in the District of Maryland attacking the

2020 biological opinion.  *Sierra Club v. NMFS*, No. 8:20-cv-3060 (D. Md.).

    As in that litigation, environmental groups commenting on the 2023

Supplemental EIS demanded that BOEM extend the vessel restrictions in the

reasonable and prudent alternative throughout the *entire* "100-400 meter isobath

across the western, central, and eastern planning areas," and "prohibit oil and gas

activities" in the same region.  Dkt. 16-1 PageID 5161-62.  Environmental groups

contended that these massive changes were warranted based on "significant new

information" in a study "that evaluated passive acoustic data indicating that it is

plausible that the Rice's whale's distribution is broader."  *Id.* 5095, 5099.

    BOEM disagreed.  "BOEM ha[d] reviewed the recent July 2022 publication

(Soldevilla et al. 2022)," but determined there was "not enough information . . . to

confirm [the whales'] distribution or any seasonal movements outside of the core

area" in the northeastern Gulf.  *Id.* 5095, 4705.  And because there was not

"enough conclusive data on the density, general distributions, and possible

migratory behaviors" of the Rice's whale, *id.* 4558, BOEM concluded it had "not

identified justifiable reasons to restrict the lease sale area" by "exclud[ing] blocks

8

from leasing in . . . the 100-400m isobath in the western and central Gulf" or

imposing additional vessel restrictions, as existing measures already "provide

adequate environmental protection," *id.* 5004, 5092-94.

BOEM accordingly held Lease Sale 259 in March 2023 as a regionwide sale

offering "all of the available unleased acreage in the GOM OCS" with the usual

stipulations.[2] Dkt. 14-14 PageID 2540. Industry bid nearly $310 million for 313

tracts covering 1.6 million acres of the Gulf. Op. 12.

Also in March 2023, BOEM published a Proposed Notice of Sale for Lease

Sale 261 that, like the nine preceding Gulf-wide sales, offered "all of the available

unleased acreage in the GOM OCS" and included the same stipulations as in Lease

Sale 259. Dkt. 14-8 PageID 2464; Dkt. 14-10 PageID 2493. The Proposed Notice

of Sale triggered the 60-day period for "Governors of affected States" to "review

and comment." 88 Fed. Reg. 16,030, 16,030 (Mar. 15, 2023).

### D. The Federal Government Suddenly Deviates From The 2017–2022 Leasing Program Scope And Terms.

BOEM soon flipped its position on the acreage exclusion and vessel-transit

restrictions it had rejected as unwarranted just a few months earlier. The about-

face was previewed in the background recitals of a stay agreement between

---

[2] BOEM converted three of the stipulations into areas excluded from leasing and added a stipulation for "Royalties on All Produced Gas" required by § 50263 of the IRA. Dkt. 14-14 PageID 2549-50.

environmental groups and NMFS in the District of Maryland litigation over the
2020 biological opinion, although BOEM was not a party to the agreement or the
litigation.  Dkt. 47-1 PageID 6710-11, 6722-23.

BOEM adopted both measures on August 23.  The Final Notice of Sale for
Lease Sale 261 announced that BOEM would withhold 6 million acres in an
"Expanded Rice's Whale Area" (shaded in blue in the figure below), running the
*entire* 100- to 400-meter isobaths along the Gulf coast, *see* Dkt. 14-2 PageID 2370-
72—a significant expansion of the "core area" identified in the 2020 biological
opinion (encircled by the dotted line), Dkt. 16-2 PageID 5818.



BOEM also added a new lease stipulation—Stipulation No. 4, Part B(4)—
requiring bidders to "implement" the same vessel restrictions as the reasonable-
and-prudent alternative throughout the entire "Expanded Rice's Whale Area,"

creating a barrier between offshore operations and shorebases.  Under this onerous stipulation, all vessels must abide by a "10-knot or less, year-round speed restriction," "avoid transit through the Expanded Rice's Whale Area after dusk and before dawn, and during other times of low visibility" "[t]o the maximum extent practicable," "maintain a minimum separation distance of 500 m from Rice's whales," and abide by new training, monitoring, record-keeping, and reporting requirements.  Dkt. 14-4 PageID 2412.

BOEM speculated that the new stipulation and acreage withdrawal "*could reduce risks*" to the Rice's whale because "a recent study" with "limited evidence" indicated that the Rice's whale "occurs" in the 100-400m isobaths across the entire Gulf, Dkt. 14-5 PageID 2439, 2449 (emphasis added)—the same Soldevilla 2022 study that BOEM had rejected a few months earlier as providing "not enough information" to justify any acreage exclusions or additional vessel restrictions, Dkt. 16-1 PageID 5095; *see* Dkt. 55 (Gov't Opp.) 28.  BOEM did not acknowledge—let alone explain—its changed position.

Plaintiffs immediately challenged the acreage exclusion and vessel-restriction stipulation (collectively, "challenged provisions") under the Administrative Procedure Act ("APA") and sought a preliminary injunction.  Dkt. 14; *Shell* Dkt. 4.  Plaintiffs contended that the challenged provisions (1) violated OCSLA's requirement that BOEM provide notice and an opportunity to comment

11

to Governors of affected States; (2) were arbitrary and capricious because BOEM failed to explain its complete reversal of position; and (3) violated the IRA's requirement that Lease Sale 261 be held "in accordance with" the 2017 Record of Decision. PI Br. 14-26; *Shell* Dkt. 4-1 (*Shell* PI Br.) 16-23. Plaintiffs also detailed the irreparable harm they faced from a lease sale tainted with BOEM's unlawful provisions. PI Br. 27-29; *Shell* PI Br. 23-24; Dkt. 69 (Reply) 12-16. Given the fast-approaching congressional deadline of September 30 for the sale, the District Court granted expedited briefing. Dkts. 10, 13. The District Court allowed environmental groups to intervene, Dkt. 58, over Plaintiffs' objections given the risk of delay, Dkt. 47. The court also granted the Government's request for additional time to file its opposition brief, Dkt. 41, again over Plaintiffs' objections, Dkt. 23 PageID 5973.

### E.    The District Court Enjoins The Last-Minute Changes.

On September 21, the District Court held a hearing on Plaintiffs' motions for a preliminary injunction. Dkt. 80. The Government repeatedly pressed the court to delay the sale until November 8 if it granted a preliminary injunction, claiming technical challenges in revising the list of available blocks to include the excluded acreage. Tr. 23:5-25:21, 37:6-21, 47:12-48:7. As for the vessel restrictions, however, the Government acknowledged that the stipulation could be removed "quickly"—by September 25. Tr. 48. The District Court subsequently enjoined

the acreage exclusion and vessel-restriction stipulation, holding that Plaintiffs were likely to succeed on their claims that BOEM failed to provide notice to Louisiana of the changes and that the changes were arbitrary and capricious. Op. 18-22. On the latter claim, the court explained that "BOEM offered no explanation for its new stance on the same body of evidence," "leav[ing] the impression that the 2023 Record of Decision is merely an attempt to provide scientific justification to a political reassessment of offshore drilling." Op. 21.[3]

The District Court then walked through the record evidence of irreparable harm stemming from the acreage removal and vessel-restriction stipulation, Op. 23-25, and concluded that the balance of equities favored injunctive relief, Op. 25-27. Given BOEM's "shaky justification," the court could not "find that the challenged provisions are so necessary that withholding them even on a preliminary basis will outweigh the risk of irreparable economic harm shown by plaintiffs." Op. 26. The court also denied the Government's request to delay the sale until November 8, concluding that it "failed to substantiate their claims of the complications arising from changes to the sale," and that the September 30 "statutory deadline [w]as a critical matter" given "the lengthy political fight over these sales" and "multiple contentious legal battles." Op. 27-29 & n.11.

---

[3] Given Plaintiffs' likelihood of success on those two claims, the court did not reach Plaintiffs' claim that the challenged provisions violated the IRA. Op. 16.

The court thus enjoined BOEM "from implementing the acreage withdrawal and Stipulation 4(B)(4) as described in the Final Notice of Sale and Record of Decision for Lease Sale 261" and ordered BOEM "to proceed with Lease Sale 261, absent the challenged terms, by September 30, 2023." Op. 30. BOEM removed the vessel-restriction stipulation the next day. CA5 Dkt. 31.

## ARGUMENT

An emergency stay is an "extraordinary remedy" for which the applicant bears a "substantial" "burden." *Texas v. United States*, 40 F.4th 205, 215 (5th Cir. 2022). The applicant must convince the Court to exercise its "equitable" authority to grant a stay by demonstrating (1) a "strong showing" of likelihood of success on the merits; (2) irreparable harm absent a stay; (3) that issuance of a stay will not substantially injure other interested parties; and (4) that a stay is in the public interest. *Id.* (citation omitted). "The district court's findings of fact are reviewed for clear error and its legal conclusions de novo." *Id.* Appellants come nowhere close to showing that a stay is warranted here.

## I.   DEFENDANTS AND INTERVENORS HAVE NOT MADE A STRONG SHOWING OF LIKELY SUCCESS ON THE MERITS.

The likelihood-of-success-on-the-merits factor is "arguably the most important factor" in the stay analysis. *Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022) (citation omitted). But the Government notably does not argue that the District Court erred on the merits. Instead, the Government claims only that the

14

court abused its discretion in crafting a remedy.  For their part, Intervenors contend that the District Court should not have granted any relief at all, or at least should not have issued a "mandatory" injunction.[4]  These arguments are flawed across the board.  The District Court correctly concluded that Plaintiffs are likely to succeed on the merits of at least two of their claims, and it also correctly determined that BOEM may not flout the September 30 deadline that Congress set forth in the IRA.

### A.    The Enjoined Provisions Are Procedurally Invalid.

Intervenors half-heartedly suggest (at 14-16) that the District Court erred in concluding that BOEM violated OCSLA's procedural requirements.  The Government does not dispute, however, that BOEM committed "particularly grave" procedural errors.  Op. 19.

OCLSA "entitle[s]" States "to an opportunity to participate" in the "policy and planning decisions made by the Federal Government" with respect to the OCS given the "significant impacts on coastal and non-coastal areas of the coastal States" that such decisions can have.  43 U.S.C. § 1332(4).  Consistent with that mandate, BOEM must send affected States (including Louisiana) a robust Proposed Notice of Sale containing "a description of the area proposed for leasing, the proposed lease terms and conditions of sale, and proposed stipulations to

---

[4]  Intervenors lack standing to seek "additional relief beyond that which [the Government] requests."  *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439-440 (2017); *see* Dkt. 47 (Pls. Opp.) 10-11; *infra* pp. 27-28.

mitigate potential adverse impacts on the environment." 30 C.F.R. § 556.304(c);

*see id.* § 556.304(a). States then have 60 days to submit "comments and

recommendations" regarding the "size, timing, and location of the proposed sale."

*Id.* § 556.305(a); *see* 43 U.S.C. § 1345(a)-(b). BOEM has a duty to "consider all

comments and recommendations" and must "accept the recommendations of a

State" so long as they "provide a reasonable balance between the national interest

and the well-being of the citizens of the State." 30 C.F.R. § 556.307(a)-(b); *see* 43

U.S.C. § 1345(c).

BOEM egregiously failed to comply with that process here. As the

Government concedes, the burdensome vessel restrictions now included in the

challenged stipulation "were not included with the Proposed NOS." Gov't Mot.

12. And the Proposed Notice of Sale said only that BOEM *might* remove acreage

in "the *northeastern* Gulf of Mexico and continental shelf break between the 100

meters and 400 meters in depth isobaths." Dkt. 14-8 PageID 2468 (emphasis

added). That statement did not provide notice that BOEM was considering

reversing its prior position and removing the whole 100-400 meter isobaths across

the entire "*western and central* Gulf," Dkt. 16-1 PageID 5004, nor did that single

statement explain why BOEM thought such a draconian restriction potentially

necessary to protect the Rice's whale. *Cf. Chemical Mfrs. Ass'n v. EPA*, 870 F.2d

177, 200 (5th Cir. 1989) ("[F]airness requires that the agency afford interested

parties an opportunity to challenge the underlying factual data relied on by the agency.").  As the District Court thus correctly held, BOEM committed an unlawful "bait and switch," as it added the challenged provisions (and the flawed reasoning behind them) to the Final Notice of Sale only after the States' comment period had closed.  Op. 19.

Intervenors' effort to resist that conclusion is futile.  Intervenors suggest that the Proposed Notice provided sufficient notice because it included statements like BOEM "reserve[s] the right to revise the . . . terms and conditions described in this Proposed NOS" and "reserves the right to revise the areas offered for bidding and associated terms and conditions described in this Proposed NOS."  Intervenors Mot. 9.  That argument is inconsistent with Intervenors' representations below, in which they conceded that BOEM's "decision" to add the challenged provisions "was made in accordance with a stipulated agreement in federal litigation" that *post-dated* the Proposed Notice and subsequent comment period.  Dkt. 70 (Intervenors Opp.) 1.  In all events, OCSLA affords States a "*meaningful* opportunity to comment."  Dkt. 55 PageID 6935 (emphasis added).  Such an opportunity requires an agency to provide notice of its proposed action with "reasonable specificity," *Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023) (citation omitted), and the exceedingly generic language on which Intervenors rely

does not get the job done.  Allowing such self-serving reservations to justify

significant changes would leave BOEM free to provide virtually no information.

Intervenors nevertheless posit that BOEM must have provided adequate

notice because "multiple Gulf states and two industry plaintiffs" purportedly

"commented on the very measures at issue in May."  Intervenors Mot. 15.  But

those comments had nothing to do with the lease stipulation, *see* CA5 Dkt. 20-20

at 23-24; Gov't Mot. 11—because BOEM never mentioned it in the Proposed

Notice of Sale—and instead concerned only the possibility of acreage removal.

Even as to the potential acreage removal, the commenters did not and could

not address BOEM's reasoning—precisely because BOEM never offered any in

the Proposed Notice.  Had the Proposed Notice suggested that the Soldevilla study

justified the potential acreage removal (BOEM's current position), Louisiana

would have explained the significant problems with that proposition.  But

Louisiana had no reason to think that BOEM would change its position based on

the Soldevilla study, since BOEM determined just a few months earlier that the

study did not justify removing acreage or applying additional mitigation.  Simply

put, because BOEM chose to remain silent in the Proposed Notice, Louisiana had

no meaningful opportunity to comment and instead had to race to court to

challenge BOEM's belatedly supplied reasoning.  *Cf. Mexican Gulf Fishing Co. v.*

*Department of Com.*, 60 F.4th 956, 972 (5th Cir. 2023) ("[T]he opportunity to

18

comment is meaningless unless the agency responds to significant points raised by the public." (citation omitted)).  Intervenors thus do nothing to disturb the straightforward conclusion that BOEM completely "depriv[ed]" Louisiana of "the opportunity for meaningful review and comment."  Op. 19.

## B.    The Enjoined Provisions Are Arbitrary And Capricious.

Intervenors are also unlikely to succeed in reversing the District Court's conclusion that the enjoined provisions are arbitrary and capricious.  The District Court carefully detailed BOEM's "about-face" from its January 2023 decision not to impose additional vessel restrictions or exclude acreage in the 100-400 meter isobaths, after "BOEM concluded on review of the Soldevilla study that 'not enough information is available at this time to confirm [the whales'] distribution or any seasonal movements.' "  Op. 20-21 (quoting Dkt. 16-1 PageID 5095).  Fast-forward to Lease Sale 261, and BOEM excluded and regulated the very same region based on the very "same body of evidence."  Op. 21.  Indeed, "the only scientific justification offered for the challenged provisions" was "the Soldevilla study" that BOEM had previously determined provided "not enough information" to justify the exclusions and restrictions demanded by environmental groups.  Op. 20-21.  That was an unlawful "unexplained about-face from a position taken by the agency just months before."  Op. 21.

Intervenors ignore BOEM's flip-flopping on the Soldevilla study, never addressing BOEM's "surprise switcheroo."  Op. 22.  But it is bedrock APA law that an "agency must at least display awareness that it is changing position," "show that there are good reasons for the new policy," and "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-222 (2016) (citations omitted).  BOEM's "[f]ailure to do so is fatal" here.  *Texas*, 40 F.4th at 227-228.

Intervenors' misdirection that the enjoined provisions are justified based on "reducing risk to the Rice's whale," Intervenors Mot. 16, is likewise unsuccessful, as BOEM stated last month that there is "no evidence that existing oil and gas development in the 100-400-meter isobath . . . has caused harm to the Rice's whale," even after NMFS proposed that area as critical habitat, Dkt. 54 at 34, *Healthy Gulf v. Haaland*, No. 23-cv-00604 (D.D.C. Aug. 7, 2023).  The same goes for Intervenors' implausible suggestion (at 17) that the enjoined provisions are necessary for BOEM to "comply with its obligation" under the Endangered Species Act.  Not even BOEM argued that the ESA required these actions—to the contrary, it insisted that "the legality of action under the ESA . . . ha[d] no bearing here."  Dkt. 55 PageID 6933.  Moreover, as Plaintiffs explained below, PI Br. 14, 25; Reply 11-12, speculation that the enjoined measures "could reduce risks" to the

Rice's whale, Dkt. 14-5 PageID 2449, amounts to an impermissible "precautionary principle," contrary to the ESA's "focus[ ] upon 'likely' outcomes, not worst-case scenarios," *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 598-599 (D.C. Cir. 2023). And as the District Court recognized, BOEM's actions here "look[ ] more like a weaponization of the Endangered Species Act than the collaborative, reasoned approach prescribed by the applicable laws and regulations." Op. 22.

## C. The Enjoined Provisions Violate the Inflation Reduction Act.

Having concluded that Plaintiffs were likely to succeed on their first two APA claims, the District Court did not address whether the challenged provisions also violated the IRA, Op. 16—which provides an additional reason that the Government and Intervenors will not succeed on the merits. As Plaintiffs detailed below, PI Br. 14-17; *Shell* PI Br. 17-18; Reply 4-6, BOEM's last-minute attempts to impose the vessel-restriction stipulation and withdraw substantial acreage run headlong into the IRA's command that BOEM "shall conduct Lease Sale 261 in accordance with the Record of Decision approved by the Secretary on January 17, 2017" for the 2017–2022 Leasing Program, IRA § 50264(e), which contemplated neither provision, Dkt. 14-22. The vessel-restriction stipulation is not among the 10 common lease stipulations contemplated by the 2017–2022 Leasing Program, *see supra* pp. 3-4, and BOEM's exclusion of millions of otherwise-available acres violates the Program's contemplated "region-wide" sales of all "unleased acreage

21

not subject to moratorium or otherwise unavailable," Dkt. 14-22 PageID 3106.

The enjoined provisions are thus not "in accordance with" the 2017–2022 Leasing

Program. IRA § 50264(e). And whatever OCSLA says about BOEM's *ordinary*

discretion to determine the scope and terms of lease sales, the IRA specifically

revoked BOEM's discretion as to Lease Sale 261. Concluding that the IRA

preserved BOEM's ordinary leasing power—including the ability to "cancel[ ]"

sales entirely, as Intervenors pressed below, *see* Intervenors Opp. 14—"would

contradict Congress' clear intent as expressed in its more recent, [Lease Sale 261]-

specific legislation," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

143 (2000).

For similar reasons, the Government is not likely to succeed on its argument

(at 17-24) that the District Court erred by refusing BOEM's request to blow past

the IRA's September 30 deadline. The court "view[ed] the statutory deadline as a

critical matter" "[g]iven the lengthy political fight over these sales" and the

resulting "statutory deadline imposed on this specific lease sale after multiple

contentious legal battles over the remaining leases in the 2017–22 Five-Year Plan."

Op. 27-29 & n.11. The Government's citations (at 21-22) to *Barnhart v. Peabody*

*Coal Co.*, 537 U.S. 149 (2003), and *Brock v. Pierce County*, 476 U.S. 253 (1986),

are inapposite, as those cases stand only for the principle that an agency's failure to

observe a statutory deadline does not usually "prevent [the agency] from acting

after the statutory period." *Barnhart*, 537 U.S. at 158 (citation omitted).  That an agency retains the authority to act after a statutory deadline has passed does not mean that the agency may ignore that deadline in the first instance.[5]

The Government is also unlikely to prevail on its argument that the District Court failed to "reconcil[e] the IRA's statutory deadline with OCSLA's 30-day notice mandate."  Gov't Mot. 24.  The District court correctly determined that the Government "fail[ed] to show" that Plaintiffs' request "that certain terms be stricken from the existing FNOS" "necessitates the issuance of a new Notice of Sale."  Op. 26-27 & n.10.  Putting aside BOEM's newfound respect for OCSLA's 30-day notice provision, the preliminary injunction did not trigger that provision because it left the remaining terms of Lease Sale 261 intact—terms that were already timely noticed.  But even if the injunction did trigger OCSLA's general 30-day notice provision, the IRA's specific mandate that BOEM hold Lease Sale 261 "not later than September 30, 2023" would control.  *See In re Prescription Home Health Care, Inc.*, 316 F.3d 542, 548 (5th Cir. 2002) ("[I]t is well established that a more specific statute controls over a more general one.").

---

[5]  Enjoining the vessel-restriction stipulation and acreage withdrawal does not make the District Court's order a "mandatory injunction," Intervenors Mot. 11-12, particularly where the IRA set the statutory deadline for the sale, not the court.  But even if it were, Intervenors offer nothing but ipse dixit in claiming they are likely to reverse the District Court's conclusion that "[P]laintiffs have met the heightened standard."  Op. 29.

## II.   THE EQUITABLE FACTORS WEIGH DECISIVELY AGAINST A STAY.

This Court need not consider the other stay factors given Appellants' failure to demonstrate a strong likelihood of success on the merits. *See Fath v. Texas Dep't of Transp.*, 670 F. App'x 294, 296 (5th Cir. 2016). In any event, Appellants do not justify the extraordinary relief sought.

### A.   The Government And Intervenors Face No Harm, Irreparable Or Otherwise, Absent A Stay.

The Government complains of the "administrative impracticality" of "hold[ing] an orderly sale in the limited time afforded to it," Gov't Mot. 25-26, but its complaints about technical "time-consuming changes" were limited solely to "add[ing] the 1,200 additional blocks" that were improperly excluded, not removing the vessel-restriction stipulation, Dkt. 55-6, Cruickshank Decl. ¶ 3. Indeed, the Government told the District Court that the vessel-restriction could be removed "quickly"—BOEM "could put a notice on their website by Monday [September 25] telling everyone that the stipulation has changed." Tr. 47:12-48:7. BOEM moved even faster than predicted—it removed the vessel-restriction stipulation and published the revised list of applicable lease stipulations on Friday, September 22. CA5 Dkt. 31. At best, the Government's arguments would support only a bifurcated lease sale: (1) proceeding with Lease Sale 261 as scheduled but

without the vessel-restriction stipulation, and (2) conducting a supplemental sale of the unlawfully excluded acreage on November 8, 2023.

Even as for the unlawfully excluded acreage, the Government's claim of irreparable harm boils down to the fact that it requested "10 business days to update its sale systems," but the District Court provided "6 business days to comply with the court's order," Gov't Mot. 1—eight days including the weekend. Weekend work hardly amounts to irreparable harm, nor does a two-day difference in allotted compliance time—particularly not where "BOEM has changed actual terms less than a week prior to a sale in order to comply with the law." Op. 27 n.10. Moreover, the District Court expressed extreme skepticism over the credibility of the Government's claimed harms, given that BOEM had "been working on [Lease Sale 261] for months" and "know[s] where the lease territory is." Tr. 25:3-8. That skepticism was warranted, as the Proposed Notice of Sale issued in March 2023 contained a map of the proposed sale area, including the acreage that BOEM subsequently (and unlawfully) removed. Dkt. 14-12 PageID 2527.

The Government's subsequent filing with this Court (CA5 Dkt. 31) also flatly contradicts its claim that "BOEM simply does not have sufficient time to update its internal bidding system to reflect the court-ordered terms." Gov't Mot. 26. Just hours after the Government filed its emergency motion, BOEM informed

all potential bidders on its website that, if this Court denies a stay, "Lease Sale 261 *will* be conducted on September 27, 2023, and in accordance with the court's order, BOEM will include lease blocks that were previously excluded." CA5 Dkt. 31 at 3 (emphasis added). Thus, BOEM's alleged administrative difficulties no longer appear to pose an insurmountable obstacle, even from the agency's perspective.

Even putting all that aside, the Government cannot satisfy the irreparable-harm requirement because "the harm complained of is self-inflicted." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (citation omitted). API and Chevron notified the Government on August 4 of a potential legal challenge if BOEM followed through with the lease stipulation and acreage withdrawal, soon after the stay agreement in the District of Maryland litigation first previewed those possibilities. Dkt. 47-2 PageID 6728. BOEM had almost two months to prepare its contingency plan. To the extent that BOEM sat on its hands, that is inexcusable given Congress's deadline and Plaintiffs' speed in seeking relief. Plaintiffs filed their complaints one day (Louisiana, API, and Chevron) and two days (Shell) after BOEM issued its Final Notice of Sale on August 23. They filed their preliminary injunction papers shortly thereafter. When BOEM finally filed its opposition (after seeking an extension), Plaintiffs filed their reply brief early. And Plaintiffs offered to waive the preliminary-injunction hearing or move it to an earlier date to ensure the court issued a decision even sooner, but the Government successfully opposed

those requests—claiming it would be "significantly prejudiced by any order waiving the scheduled hearing or moving it to an earlier date." Dkt. 61 PageID 7221. "The self-inflicted nature of the government's asserted harm" thus "severely undermines its claim for equitable relief." *Texas*, 10 F.4th at 558 (citation omitted).

Intervenors' irreparable-harm argument—resting on the proposition that "holding Lease Sale 261 without the protective measures poses an imminent threat of harm to the whales," Intervenors Mot. 23—is even weaker. As BOEM explained just a few months ago, "the potential for vessel strikes to . . . Rice's whale is *extremely unlikely to occur*," Dkt. 16-1 PageID 4705 (emphasis added), and BOEM admitted just last month that there is "*no evidence* that existing oil and gas development in the 100-400-meter isobath . . . has caused harm to the Rice's whale," Dkt. 54 at 34, *Healthy Gulf v. Haaland*, No. 23-cv-00604 (D.D.C. Aug. 7, 2023) (emphasis added). Intervenors also fail to connect any imaginary "irreparable harm to the Rice's whale" to their *own* interests. *Cf. Center for Biological Diversity v. EPA*, 937 F.3d 533, 537 (5th Cir. 2019) ("[C]ourts must carefully distinguish between injury to the petitioner and injury to the environment."). Not one of their four declarants alleged any "personal and particularized injury" in observing the Rice's whale, *id.* at 542 (citation omitted)— only that other unidentified members might have some unspecified "interests in the

whale," CA5 Dkt. 20-25, Steinhaus Decl. ¶ 15; *see* CA5 Dkt. 20-23, Manuel Decl. ¶ 6 (similar); CA5 Dkt. 20-24, Templeton Decl. ¶ 5 (similar); CA5 Dkt. 20-26, Monsell Decl. ¶¶ 3, 18 (similar).

### B.    A Stay Would Substantially Injure Plaintiffs And Other Parties.

Staying the preliminary injunction pending appeal would substantially harm Plaintiffs.  The District Court determined that Plaintiffs had "demonstrated substantial potential costs resulting from the challenged provisions."  Op. 25. Intervenors complain (at 19-20) that the District Court relied on "speculative and conclusory statements" of injury to Plaintiffs, but that ignores the court's detailed discussion of how the vessel-restriction stipulation imposes unrecoverable costs. Op. 23-24.  For example, Shell has "as many as 20 supply vessels transit through" the exclusion area "around-the-clock daily" to provide all supplies necessary to operate its offshore facilities; restrictions on transit during nighttime and "low visibility" conditions necessarily increase the number of ships required to provide the same supplies.  *Shell* Dkt. 4-2, Gonsalves Decl. ¶ 24; *see also* Op. 23 (finding that "[t]he same logistical complications apply to Chevron").  To the extent that Intervenors demand quantification of these injuries, such precision is not required. *See Restaurant Law Ctr. v. Department of Lab.*, 66 F.4th 593, 600 (5th Cir. 2023) (plaintiffs need "not convert each allegation of harm into a specific dollar amount").  Rather, "[i]t is not so much the magnitude but the irreparability that

counts." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (citation omitted).  Intervenors also ignore that the District Court credited Plaintiffs' numerous declarations as "show[ing] that the last-minute changes impact their ability to bid fairly on leases under Lease Sale 261 and to bid on the six million acres withdrawn from the sale."  Op. 24.  And Intervenors' assertion that the District Court focused "largely on allegations about the effects of the vessel restrictions" without identifying any "harm from [the] acreage exclusion," Intervenors Mot. 18, ignores the court's finding that the acreage exclusion risked "economic injury of up to $2.2 million to Louisiana, which is entitled to a share of offshore royalties," Op. 23.

Intervenors are also wrong to discount Plaintiffs' injuries based on the possibility that the challenged provisions *might* be "replaced by more permanent measures in a new biological opinion . . . currently projected for September 2024." Intervenors Mot. 19.  Projected completion dates for agency environmental reviews are hardly set in stone and can drag on for years.  *See*, *e.g.*, *Natural Res. Def. Council v. Bernhardt*, No. 10-cv-1882, Dkts. 118-2, 127, 143-2, 154, 163, 171-1 (E.D. La.) (settlement agreement requiring agency preparation of environmental review documents, and amendments extending the original projected deadline by five years).  As the District Court recognized, "[t]here's slow and then there's Government slow."  Tr. 41:1-2.

29

The Government at least does not dispute the District Court's findings of irreparable harm to Plaintiffs.  The Government instead opines (at 28-29) that Plaintiffs would not be harmed by a partial stay delaying Lease Sale 261 until November 8.  Even if this Court could ignore the IRA's command that BOEM "shall conduct Lease Sale 261" "not later than September 30, 2023," IRA § 50264(e), Plaintiffs would be harmed by a delayed sale.  Industry Plaintiffs have spent months preparing their bids with the expectation of a September 30 deadline, and even a delay until November 8 imposes additional costs on industry planning and operations.  Ex. B, Supp. Gonsalves Decl. ¶¶ 8-14; Ex. C, Supp. Webre Decl. ¶¶ 10-13.  Nonparties in the oil-and-gas industry face similar harms.  *See, e.g.*, Tr. 55:22-56:6 (testimony from nonparty oil-and-gas company that began preparing its bids "six months ago"); Ex. A, TIPRO Decl. ¶¶ 6-9 (non-party trade association explaining "it would be grossly unfair to delay Lease Sale 261 as the government is demanding").

The Government does not even commit to conducting Lease Sale 261 by November 8.  Nothing would prevent the Government from returning to this Court on November 7 with a new set of excuses to delay Lease Sale 261—including, perhaps, a lapse in appropriations and Government shutdown.

BOEM's request for additional time is just the latest in a series of efforts by the current administration to delay (or cancel) new oil-and-gas lease sales.  *See* Op.

27-29 & n.11 (acknowledging "the lengthy political fight over these sales" and "multiple contentious legal battles"); *see, e.g.*, *Louisiana*, 622 F. Supp. 3d at 287-289 (permanently enjoining Biden Administration's and Interior's "pause" on all new oil-and-gas leasing in the Gulf); *American Petroleum Inst. v. Department of Interior*, No. 22-1222 (D.C. Cir. filed Aug. 26, 2022) (seeking review of BOEM's failure to issue a new five-year leasing program and schedule lease sales). Agreeing to a delay of Lease Sale 261 would only encourage that behavior, and "[s]uch inequitable conduct is 'sufficient to deny' [the] request for an equitable stay pending appeal." *Texas*, 10 F.4th at 559.

### C.    The Public Interest Weighs Against An Extraordinary Stay.

Staying the preliminary injunction would also disserve the public interest. The Government claims (at 16) that the public interest factor "merges with harm to the government," but "[t]hat is mistaken," as those factors merge only "when the government is not the party applying for a stay"—not when "the government Defendants are applying for a stay and Plaintiffs are the opposing party." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 353 (5th Cir. 2022) (citation omitted).  The Government has not substantiated any public interest in delaying Lease Sale 261 to November 8.  As an initial matter, delaying the sale would violate the IRA's express directive that BOEM "shall conduct Lease Sale 261" "not later than September 30, 2023," IRA § 50264(e), and "there is generally no public interest in

the perpetuation of unlawful agency action," *Texas*, 10 F.4th at 560 (citation omitted).  And the Government has not substantiated its speculation that an on-time sale would be "unfair to sale participants who are not parties to this case," Gov't Mot. 27 (emphasis omitted), as "[t]hey have produced no evidence on behalf of these non-party bidders," Op. 26.  To the contrary, a small nonparty oil-and-gas company explained that the enjoined provisions were a "complete surprise" that were "going to cost [them] a lot of money."  Tr. 55:22-56:6; *see also* Ex. A, TIPRO Decl. ¶¶ 5-9.

To the extent the Government claims that nonparties who already submitted bids lack time "to withdraw their bids" by snail-mail because "bidders have to finalize and submit their bids no later than September 22" to meet BOEM's "mail-in deadline," Gov't Mot. 2, then *the Government* is the source of their harm—not the preliminary injunction.  *Cf.* Tr. 44:24-25, 45:4-7 (calling BOEM's mail-only requirement "an antiquated rule" and asking Government counsel why bidders cannot "hand deliver [bids] if they don't want to trust the postal service to get it there on time").  Perhaps recognizing as much, BOEM has since "extend[ed] the bid submission period to 3 p.m. CST on September 26" and eliminated the mailing requirement so that "bidders may hand deliver bids from 9:00 am – 3:00 pm CST on September 25 and 26."  CA5 Dkt. 31 at 3.

As for Intervenors, their claims (at 20-24) about the public interest merely recycle their speculative allegations of irreparable harm.  They also misstate (at 22) this Court's decision in *Aransas Project v. Shaw*, 775 F.3d 641 (5th Cir. 2014), which actually *rejected* "[t]he district court's assertion that there is a 'relaxed' standard for granting injunctions under the ESA" as "true only insofar as the balance of equities will lean more heavily in favor of protecting wildlife than it would *in the absence of the ESA*," *id.* at 663 (emphasis added).  As the case involved the appeal of a *permanent* injunction—this Court reiterated that an injunction may issue "only if future injury is certainly impending," *id.* at 664 (citation omitted)—it did not even involve the public interest factor in the preliminary injunction context, let alone a stay pending appeal.

## CONCLUSION

The Court should deny the motions.

Respectfully submitted,

/s/ Paul D. Clement
Paul D. Clement
Andrew Lawrence*
James Y. Xi*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
james.xi@clementrmurphy.com

*Supervised by principals of the firm
who are members of the Virginia Bar

*Counsel for Plaintiff American
Petroleum Institute*

/s/ Joseph S. St. John
Jeff Landry
    *Attorney General of Louisiana*
Elizabeth B. Murrill
    *Solicitor General*
Joseph S. St. John
    *Deputy Solicitor General*
Jordan B. Redmon
    *Assistant Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

/s/ Mark W. Mosier
Steven J. Rosenbaum
Mark W. Mosier
Bradley K. Ervin
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000
srosenbaum@cov.com

*Counsel for Plaintiff Shell Offshore
Inc.*

/s/ Catherine E. Stetson
Catherine E. Stetson
Sean Marotta
Dana A. Raphael
Hogan Lovells US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

*Counsel for Plaintiff Chevron U.S.A.
Inc.*

September 25, 2023

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this opposition complies with the requirements of

Federal Rule of Appellate Procedure 27(d) because it has been prepared in 14-

point proportionally spaced font.  This opposition contains 7,481 words, according

to the count of Microsoft Word, and is accompanied by a motion for leave to

exceed the Fed. R. App. P. 27(d)(2)(A) limit of 5,200 words.


Dated:  September 25, 2023                    /s/ Catherine E. Stetson
                                              Catherine E. Stetson

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2023, I electronically filed the foregoing response in opposition with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Catherine E. Stetson
Catherine E. Stetson