No. 23-30666

# United States Court of Appeals
## for the Fifth Circuit

STATE OF LOUISIANA, AMERICAN PETROLEUM INSTITUTE, CHEVRON USA INCORPORATED,
*Plaintiffs-Appellees*,

v.

DEB HAALAND, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE INTERIOR; LAURA DANIEL-DAVIS, IN HER OFFICIAL CAPACITY AS PRINCIPAL DEPUTY ASSISTANT SECRETARY OF THE INTERIOR FOR LAND & MINERALS MANAGEMENT; ELIZABETH KLEIN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF BUREAU OF OCEAN ENERGY MANAGEMENT; JAMES KENDALL, IN HIS OFFICIAL CAPACITY AS REGIONAL DIRECTOR OF BUREAU OF OCEAN ENERGY MANAGEMENT GULF OF MEXICO OFFICE; UNITED STATES DEPARTMENT OF INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND ENFORCEMENT,
*Defendants-Appellants*,

v.

SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE EARTH; TURTLE ISLAND RESTORATION NETWORK,
*Intervenors- Appellants.*

SHELL OFFSHORE, INCORPORATED,
*Plaintiff-Appellee*,

v.

UNITED STATES DEPARTMENT OF INTERIOR; BUREAU OF OCEAN ENERGY MANAGEMENT, REGULATION AND ENFORCEMENT; DEB HAALAND, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE INTERIOR; LAURA DANIEL-DAVIS, IN HER OFFICIAL CAPACITY AS PRINCIPAL DEPUTY ASSISTANT SECRETARY OF THE INTERIOR FOR LAND AND MINERALS MANAGEMENT; ELIZABETH KLEIN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF OCEAN ENERGY MANAGEMENT; JAMES KENDALL, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE GULF OF MEXICO REGIONAL OFFICE OF THE BUREAU OF OCEAN ENERGY MANAGEMENT,
*Defendants-Appellants*,

v.

SIERRA CLUB; CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE EARTH; TURTLE ISLAND RESTORATION NETWORK,
*Intervenors-Appellants.*

On Appeal from the United States District Court for the Western District of Louisiana, The Honorable James D. Cain, Jr. (Nos. 2:23-cv-01157 (Lead)
No. 2-23-cv-01167 (Member), consolidated)

# INTERVENORS' OPENING BRIEF

Date: October 6, 2023                    Christopher Eaton

EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-1526
ceaton@earthjustice.org
*Counsel for Intervenors-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

**Intervenors-Appellants:**

1. Sierra Club
2. Center for Biological Diversity
3. Friends of the Earth
4. Turtle Island Restoration Network

**Counsel for Intervenors-Appellants Sierra Club, Center for Biological Diversity, Friends of the Earth, and Turtle Island Restoration Network:**

5. Christopher Douglass Eaton, Earthjustice

**Plaintiffs-Appellees:**

6. State of Louisiana, by and through its Attorney General, Jeff Landry
7. American Petroleum Institute
8. Chevron USA Inc.
9. Shell Offshore Inc.

**Counsel for Plaintiffs-Appellees:**

10. Jeff Landry, Louisiana Dept. of Justice
11. Elizabeth B. Murrill, Louisiana Dept. of Justice
12. Joseph S. St. John, Louisiana Dept. of Justice
13. Jordan B. Redmon, Louisiana Dept. of Justice
14. James A. Holms, Christovich & Kearney
15. Kyle D. Anderson, Christovich & Kearney
16. Paul D. Clement, Clement & Murphy, PLLC
17. C. Harker Rhodes IV, Clement & Murphy, PLLC
18. Andrew Lawrence, Clement & Murphy PLLC

19.     James Y. Xi, Clement & Murphy, PLLC
20.     Michael R. Phillips, Kean Miller LLP
21.     Claire E. Juneau, Kean Miller LLP
22.     Jeffrey J. Gelpi, Kean Miller LLP
23.     Robert Kallam, Kean Miller LLP
24.     Catherine E. Stetson, Hogan Lovells US LLP
25.     Sean Marotta, Hogan Lovells US LLP
26.     Dana A. Raphael, Hogan Lovells US LLP
27.     Nikesh Jindal, King & Spalding LLP
28.     Sarah C. Bordelon, Holland & Hart LLP
29.     Steven J. Rosenbaum, Covington & Burling LLP
30.     Bradley K. Ervin, Covington & Burling LLP
31.     Samuel Howe, Covington & Burling LLP
32.     R. Keith Jarrett, Liskow & Lewis, APLC
33.     Kelly Brechtel Becker, Liskow & Lewis, APLC
34.     Michael J. Mazzone, Haynes & Boone, LLP

**Defendants-Appellants**

35.     Deb Haaland, in her official capacity as Secretary of the Interior
36.     Laura Daniel-Davis, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management
37.     Elizabeth Klein, in her official capacity as Director of the Bureau of Ocean Energy Management
38.     James Kendall, in his official capacity as Regional Director of the Bureau of Ocean Energy Management Gulf of Mexico Regional Office
39.     U.S. Department of the Interior
40.     Bureau of Ocean Energy Management

**Counsel for Defendants-Appellants**

41.     Andrew M. Bernie, U.S. Department of Justice, Environment & Natural Resources Division
42.     Michelle Melton, U.S. Department of Justice, Environment & Natural Resources Division

Date: October 6, 2023         /s/ Christopher D. Eaton
                              Christopher D. Eaton
                              EARTHJUSTICE

810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-1526
ceaton@earthjustice.org

*Counsel for Intervenors-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Intervenors-Appellees respectfully submit that oral argument on this preliminary injunction appeal would be appropriate and helpful to the Court, unless it would affect the ability of the Court to grant an expedited ruling prior to the November 8, 2023, date of the challenged lease sale.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .............................................. i

STATEMENT REGARDING ORAL ARGUMENT .................................. iv

TABLE OF AUTHORITIES ......................................................... vii

JURISDICTIONAL STATEMENT ............................................. 1

STATEMENT OF ISSUES ........................................................ 1

STATEMENT OF THE CASE ................................................... 2

    I.    Statutory and Regulatory Background. ................................................. 2

        A.    Outer Continental Shelf Lands Act. .............................................. 2

        B.    Administrative Procedure Act. ...................................................... 5

        C.    Inflation Reduction Act. ............................................................ 5

    II.    Factual Background. ........................................................ 6

        A.    The Critically Endangered Rice's Whale. .................................... 6

        B.    Gulf of Mexico Lease Sale 261. ................................................. 9

    III.    Procedural History. ........................................................ 11

SUMMARY OF THE ARGUMENT ....................................... 13

STANDARD OF REVIEW ................................................... 15

ARGUMENT ................................................................... 16

    I.    Intervenors Have Standing to Bring this Appeal. ................................. 16

    II.    The Injunction Violates Fundamental Principles of Administrative Law. ......................................................... 19

        A.    The Injunction Provides Relief Beyond What the District Court Could Grant on the Merits for Procedural Error. ............. 20

B. The Injunction Provides Relief Beyond What the District Court Could Grant on the Merits for a Finding of Arbitrary and Capricious Decisionmaking. ................................................. 21

C. The Injunction Improperly Usurps Agency Authority. ............... 26

III. The Injunction Ordered Mandatory Relief Without Justification. ........ 28

IV. Appellees Did Not Meet the Legal Requirements for an Injunction. ...................................................................................... 30

A. Appellees Did Not Show a Substantial Likelihood They Will Prevail on the Merits. ........................................................ 30

1. Venue is Not Proper with Respect to Shell's Challenge. ....................................................................... 30

2. Appellees' OCLSA Claim is Improper. ............................ 32

3. Appellees' Procedural Violations Under OCSLA Lack Merit. ................................................................................ 35

4. The Bureau's Decision Did Not Violate the APA. ............ 38

5. The Bureau's Decision Did Not Violate the IRA. ............. 43

B. The District Court Erred in Finding Irreparable Harm. .............. 46

C. The District Court Erred by Ignoring Irreparable Harm to the Rice's Whale in Considering the Balance of Equities and Public Interest. .......................................................................... 51

CONCLUSION ....................................................................................... 57

CERTIFICATE OF SERVICE .................................................................. 58

CERTIFICATE OF COMPLIANCE .......................................................... 59

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*All. for Wild Rockies v. Gassmann*,
  604 F.Supp.3d 1022 (D. Mont. 2022) ...................................................... 55

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ........................................................................... 54

*Aransas Project v. Shaw*,
  775 F.3d 641 (5th Cir. 2014) .................................................................. 54

*Argentine Republic v. Nat'l Grid Plc*,
  637 F.3d 365 (D.C. Cir. 2011)................................................................. 31

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
  894 F.3d 692 (5th Cir. 2018) .................................................................. 16

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
  875 F.2d 1174 (5th Cir. 1989)................................................................. 46

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983) ............................................................................... 5

*Bensman v. U.S. Forest Serv.*,
  984 F.Supp. 1242 (W.D. Mo. 1997) ........................................................ 57

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ........................................................................... 33

*Brock v. Pierce Cnty.*,
  476 U.S. 253 (1986) ........................................................................... 25

*California ex rel. Brown v. Watt*,
  668 F.2d 1290 (D.C. Cir. 1981) .............................................................. 42

*California ex rel. Brown v. Watt*,
  712 F.2d 584 (D.C. Cir. 1983) ................................................................ 44

*Burgess v. FDIC*,
   871 F.3d 297 (5th Cir. 2017) .................................................... 46

*Calcutt v. Fed. Deposit Ins. Corp.*,
   598 U.S. 623 (2023) ..................................................... 23, 25, 27

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ........................................................... 5

*Conserv. L. Found. v. Ross*,
   422 F.Supp.3d 12 (D.D.C. 2019) .............................................. 56

*Defs. of Wildlife v. BOEM*,
   791 F.Supp.2d 1158 (S.D. Ala. 2011) ...................................... 50

*Defs. of Wildlife v. U.S. Fish & Wildlife Serv.*,
   539 F.Supp.3d 543 (D.S.C. 2021) ........................................... 55

*Dennis Melancon, Inc. v. New Orleans*,
   703 F.3d 262 (5th Cir. 2012) ................................................. 47

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S.Ct. 1891 (2020)................................................... 24, 26, 28

*Duke Energy Field Servs. Assets, L.L.C. v. Fed. Energy Regul. Comm'n*,
   150 F.Supp.2d 150 (D.D.C. 2001) ........................................... 33

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................... 41

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir. 2023) .................................................. 29

*Fertilizer Inst. v. U.S. E.P.A.*,
   935 F.2d 1303 (D.C. Cir. 1991) .............................................. 20

*Fisheries Survival Fund v. Haaland*,
   858 F. App'x 371 (D.C. Cir. 2021) .......................................... 34

*Fla. Power & Light Co. v. Costle*,
   650 F.2d 579 (5th Cir. 1981) .................................................. 21

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ...........................................................17, 18

*GDF Realty Invs., Ltd. v. Norton*,
  169 F.Supp.2d 648 (W.D. Tex. 2001) ..................................... 54

*La., ex rel. Guste v. Verity*,
  853 F.2d 322 (5th Cir. 1988) .................................................. 54

*Heartland Reg'l Med. Ctr. v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009)................................................. 20

*Hendricks v. Bank of Am., N.A.*,
  408 F.3d 1127 (9th Cir. 2005)................................................. 31

*Hill Dermaceuticals, Inc. v. Food & Drug Admin.*,
  709 F.3d 44 (D.C. Cir. 2013).............................................25, 54

*Hinojosa v. Horn*,
  896 F.3d 305 (5th Cir. 2018) .................................................. 33

*Holland Am. Ins. Co. v. Succession of Roy*,
  777 F.2d 992 (5th Cir. 1985) .................................................. 47

*Hornbeck Offshore Services, L.L.C. v. Salazar*,
  696 F.Supp.2d 627 (E.D. La. 2010)....................................33, 34

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ............................................................... 17

*Illinois Pub. Telecomms. Ass'n v. F.C.C.*,
  123 F.3d 693 (D.C. Cir. 1997)................................................. 23

*Jones v. Tex. Dep't of Criminal Justice*,
  880 F.3d 756 (5th Cir. 2018) .................................................. 16

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.*,
  617 F.Supp.3d 478 (W.D. La. 2022)........................................ 47

*Maine Cmty. Health Options v. United States*,
  140 S.Ct. 1308 (2020).............................................................. 44

ix

*Marathon Oil Co. v. Babbitt*,
   966 F.Supp. 1024 (D. Colo. 1997) ........................................................... 27

*In Re Mariner Health Cent., Inc*,
   Case Nos.: 22-41079 WJL, 22-41080 WJL, 22-41081 WJL,
   2023 WL 187175 (Bankr. N.D. Cal. Jan. 12, 2023) ................................... 56

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) .................................................................................... 5

*Missouri v. Biden*,
   No. 23-30445, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) ......................... 52

*Mock v. Garland*,
   75 F.4th 563 (5th Cir. 2023) ..................................................................... 52

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................................... 5

*Munaf v. Geren*,
   553 U.S. 674 (2008) ................................................................................... 16

*N. Slope Borough v. Andrus*,
   642 F.2d 589 (D.C. Cir. 1980) ................................................................... 44

*McKinney ex rel. N.L.R.B. v. Creative Vision Res., L.L.C.*,
   783 F.3d 293 (5th Cir. 2015) ................................................................52, 57

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................................... 41

*Nat'l Wildlife Fed'n v. NMFS*,
   886 F.3d 803 (9th Cir. 2018) ................................................................53, 55

*Newby v. Enron Corp.*,
   443 F.3d 416 (5th Cir. 2006) ..................................................................... 16

*O'Reilly v. U.S. Army Corps of Eng'rs*,
   477 F.3d 225 (5th Cir. 2007) .........................................................22, 25, 26

*Oceana v. BOEM*,
   37 F.Supp.3d 147 (D.D.C. 2014) ............................................................... 44

x

*Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*,
  492 F.Supp.3d 701 (E.D. Tex. 2020) ...................................................... 46

*OXY USA Inc. v. Babbitt*,
  122 F.3d 251 (5th Cir. 1997) ................................................................. 45

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  579 U.S. 115 (2016) .............................................................................. 44

*Roark v. Individuals of the Fed. Bureau of Prisons*,
  Civ. A. No. 5:12cv60, 2013 WL 2153944 (E.D. Tex. May 16, 2013) ........ 29

*Roark v. Individuals of Fed. Bureau of Prisons, Former and Current*,
  558 Fed. App'x 471 (5th Cir. 2014) ......................................................... 29

*Sampson v. Murray*,
  415 U.S. 61 (1974) ................................................................................ 47

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F.Supp.3d 91 (D.D.C. 2017)............................................................ 50

*Wyo., ex rel. Sullivan v. Lujan*,
  969 F.2d 877 (10th Cir. 1992)............................................................27, 50

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) .............................................................................. 18

*Sw. Elec. Power Co. v. U.S. Env't Prot. Agency*,
  920 F.3d 999 (5th Cir. 2019) ................................................................. 22

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
  207 F.3d 789 (5th Cir. 2000) ................................................................. 17

*Texas v. Nuclear Regul. Comm'n*,
  78 F.4th 827 (5th Cir. 2023) ................................................................. 19

*UAW v. Brock*,
  477 U.S. 274 (1986) .............................................................................. 17

*United States v. Garner*,
  767 F.2d 104 (5th Cir. 1985) ................................................................. 26

*Valley v. Rapides Par. Sch. Bd.,*
    118 F.3d 1047 (5th Cir. 1997) ................................................. 16

*Wages & White Lion Invs., LLC v. USDA,*
    16 F.4th 1130 (5th Cir. 2021) ................................................. 42

*Watt v. Alaska,*
    451 U.S. 259 (1981) ................................................................ 45

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.,*
    80 F.4th 536 (5th Cir. 2023) ................................................. 15

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................*passim*

**Statutes**

5 U.S.C. § 706 ..................................................................... 5, 13, 19

16 U.S.C. § 1536 ....................................................................... 7, 8

28 U.S.C. § 1292 .......................................................................... 1

28 U.S.C. § 1331 .......................................................................... 1

28 U.S.C. § 1346 .......................................................................... 1

28 U.S.C. § 1361 .......................................................................... 1

28 U.S.C. § 1391 ..................................................................... 14, 31

43 U.S.C. § 1332 .............................................................. 3, 27, 42, 44

43 U.S.C. § 1334 .......................................................................... 2

43 U.S.C. § 1337 ................................................................... 3, 4, 50

43 U.S.C. § 1340 .......................................................................... 4

43 U.S.C. § 1344 .................................................................... 3, 42

43 U.S.C. § 1345 ...................................................................*passim*

43 U.S.C. § 1349 ...................................................................*passim*

43 U.S.C. § 1351 ................................................................. 4

**Regulations**

30 C.F.R. § 550.105 ........................................................... 53

30 C.F.R. § 550.207 ........................................................... 54

30 C.F.R. § 556.302 .......................................................27, 42

30 C.F.R. § 556.304 ............................................................. 3

30 C.F.R. § 556.305 ..........................................................4, 37

30 C.F.R. § 556.307 ............................................... 4, 36, 37, 38

30 C.F.R. § 556.308 ............................................................. 4

30 C.F.R. § 556.516 ..........................................................4, 50

**Federal Register Notices**

82 Fed. Reg. 6643 (Jan. 19, 2017) ...................................... 9

84 Fed. Reg. 15,466 (Apr. 15, 2019) .................................. 8

88 Fed. Reg. 916 (Jan. 5, 2023) ......................................... 6

88 Fed. Reg. 12,413 (Feb. 27, 2023) .................................. 9

88 Fed. Reg. 16,030 (Mar. 15, 2023) ............................... 10

88 Fed. Reg. 47,453 (July 24, 2023) .........................6, 7, 8, 41

**Other Authorities**

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ...................5, 6, 43, 44

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellees ("Appellees") invoked the district court's jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(a)(2) (United States as a defendant), and 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his duty). Appellees moved for a preliminary injunction, which the district court granted on September 21, 2023. ROA.7498. Intervenors-Appellants ("Intervenors") timely appealed on September 22, 2023. ROA.7528.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.    Whether the district court violated fundamental Administrative Procedure Act ("APA") principles by issuing an injunction that forced the U.S. Bureau of Ocean Energy Management ("Bureau") to include areas lying within endangered Rice's whale proposed critical habitat in an offshore lease sale and to erase a stipulation that would have temporarily protected the Rice's whale from dangerous vessel strikes, when such prescriptive relief is unavailable to Appellees under the APA and when the injunction improperly placed the court in the shoes of the Bureau.

2.    Whether the district court erred in issuing a mandatory, permanent injunction when it failed to demonstrate that the law and facts "clearly favor" Appellees.

3.    Whether the district court erred in granting an injunction when Appellees are unlikely to succeed on the merits because they did not meet the judicial review provisions of the Outer Continental Shelf Lands Act ("OCSLA") and because the Bureau properly followed OCSLA procedures and adequately explained its decision under the APA.

4.    Whether the district court erred in granting an injunction when Appellees only alleged speculative, financial harm that could be undone and when the district court ignored harm to the critically endangered Rice's whale in balancing the equities and considering the public interest.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background.

### A.    Outer Continental Shelf Lands Act.

OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf ("OCS"). 43 U.S.C. § 1331 *et seq.* OCSLA charges the Secretary of the Interior, acting through the Bureau, with managing oil and gas activities on the OCS. *Id.* §§ 1334(a), 1344(a). This management "shall be conducted in a manner which considers economic, social,

and environmental values of the renewable and nonrenewable resources contained in the [OCS]," as well as "the potential impact of oil and gas exploration on other resource values of the [OCS] and the marine, coastal, and human environments." *Id*. § 1344(a)(1). OCSLA further requires that the development of OCS resources be "subject to environmental safeguards." *Id*. § 1332(3).

OCSLA prescribes four, tiered stages for the Bureau to sell and allow development of offshore oil and gas deposits: (1) five-year leasing programs; (2) lease sales; (3) exploration plans; and (4) development and production plans. *Id*. §§ 1337, 1340, 1344, 1351. At the five-year program stage, the Bureau develops a schedule of proposed lease sales indicating "the size, timing, and location of leasing activity" over the five-year period. *Id*. § 1344(a). The Bureau retains discretion to modify, scale back, or cancel these proposed lease sales. *See id*. § 1344(a), (e).

At the lease sale stage, the Bureau decides whether and under what conditions to offer OCS areas for leasing. *Id*. § 1337. In conducting a sale, the Bureau publishes a proposed notice of sale in the Federal Register that "contains a description of the area proposed for leasing, the proposed lease terms and conditions of sale, and proposed stipulations to mitigate potential adverse impacts on the environment." 30 C.F.R. § 556.304(c). Governors of affected

states and local governments have a non-exclusive ability to submit comments "regarding the size, timing, and location" of the proposed sale. 43 U.S.C. § 1345(a); 30 C.F.R. § 556.305(a). The Bureau considers "all comments and recommendations received in response to the proposed notice of sale." 30 C.F.R. § 556.307(a). The Bureau then publishes a final notice of sale which, among other items, describes "the areas offered for lease, the lease terms and conditions of sale, and stipulations to mitigate potential adverse impacts on the environment." *Id.* § 556.308(a). The Bureau retains broad discretion to accept or reject bids made on such lease sales. 43 U.S.C. § 1337; *see* 30 C.F.R. § 556.516(b).

The third and fourth stages of OCS planning, which are not at issue here, involve exploration plans submitted to the Bureau by lessees, 43 U.S.C. § 1340, and the submission of development and production plans for recovering oil or gas from the lease area, *id.* § 1351.

OCSLA contains a citizen suit provision that applies to legal challenges involving "any alleged violation" of OCSLA, "any regulation" promulgated under that statute, "or of the terms of any … lease issued by" the Bureau under OCSLA. *Id.* § 1349(a).

4

**B.  Administrative Procedure Act.**

Challenges to an agency's decision brought under the APA must show that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Agency action will be upheld if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983) (citation omitted). The scope of review is narrow, and the court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**C.  Inflation Reduction Act.**

Enacted on August 16, 2022, the IRA establishes various measures to invest in clean energy, cut U.S. greenhouse gas emissions, and reduce the national deficit to curb inflation. Pub. L. No. 117-169, 136 Stat. 1818 (2022) ("IRA"). The IRA directs the Secretary of the Interior to take steps regarding four oil and gas lease sales—Lease Sales 257, 258, 259, and 261—that had been proposed under the 2017-2022 Outer Continental Shelf Leasing Program (the "2017-2022 Program") but were not held prior to the expiration of that program

in June 2022. *Id.* § 50264. As relevant here, the Secretary is required to "conduct Lease Sale 261" no later than September 30, 2023, in accordance with the Record of Decision adopting the 2017-2022 Program. *Id.* § 50264(e). The IRA does not further condition or prescribe how the Secretary conducts Lease Sale 261 or dictate the size, scope, or terms and conditions of the lease sale.

## II.   Factual Background.

### A.   The Critically Endangered Rice's Whale.

There are approximately 51 Rice's whales remaining on this planet and they exclusively inhabit the northern Gulf of Mexico. 88 Fed. Reg. 47,453, 47,460 (July 24, 2023). Once thought to exclusively inhabit the northeastern Gulf centered in De Soto Canyon, recent science demonstrates that the whale persistently occurs in the western and central Gulf. ROA.7423-25. This habitat occurs in water depths between 100 and 400 meters, which is believed to be conducive to its feeding. *See id.*; ROA.6461. More than 40% of the whale's population is believed to be found in the western and central Gulf. *See* 88 Fed. Reg. 916, 944 (Jan. 5, 2023) (stating "core habitat area [in De Soto Canyon] contains approximately 57 percent of predicted Rice's whale abundance"); *see also* ROA.6461; ROA.7424-30. On July 24, 2023, the National Marine Fisheries Service ("NMFS") proposed to formally designate areas in DeSoto Canyon and areas in the western and central Gulf as the species' critical habitat under the

Endangered Species Act ("ESA"). 88 Fed. Reg. at 47,453. That designation, when final, carries with it a prohibition on federal activities that destroy or adversely modify this habitat. 16 U.S.C. § 1536(a)(2).



Rice's whales are especially vulnerable to low levels of human-caused mortality. ROA.6318; ROA.6443. In particular, oil and gas activities in the Gulf pose a serious threat to the continued survival of the Rice's whale. ROA.6495-6499, ROA.6561-62; ROA.6329-30. The species is especially susceptible to vessel strikes because they spend most of their time near the water's surface. ROA.5593-612; ROA.6318. Oil and gas vessel traffic accounts for an average of 40% of traffic throughout the northern Gulf of Mexico. ROA.7432; ROA.7483-84. Other oil and gas exploration activities can injure Rice's whales and interfere

with essential behaviors like feeding and communicating. *See* ROA.5657-62, ROA.5701-15, ROA.5741-73; ROA.6462, ROA.6516. Oil spills pose an existential threat to the species. In 2010, the BP *Deepwater Horizon* oil spill disaster caused up to a 22% decline in the Rice's whale population. 88 Fed. Reg. at 47,455.

In 2019, NMFS listed the Rice's whale as endangered under the ESA primarily due to the small population size, restricted range, and harm from oil and gas activities. 84 Fed. Reg. 15,466 (Apr. 15, 2019). On March 13, 2020, the Bureau, in coordination with NMFS, completed ESA consultation pursuant to 16 U.S.C. § 1536, resulting in a "Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico." *See* ROA.5224. In the Biological Opinion, NMFS concluded that without mitigation measures, oil and gas activities in the Gulf are likely to jeopardize the continued existence of the Rice's whale. ROA.5803. NMFS has since concluded that "the loss of even a single reproductive female could lead this species to extinction." ROA.6138.

On October 22, 2022, the Bureau requested that NMFS formally reinitiate consultation on the Biological Opinion to reevaluate oil spill risks and address certain impacts to the Rice's whale. ROA.2601-02. The consultation is expected to be completed by September 2024. ROA.6298.

### B.  Gulf of Mexico Lease Sale 261.

On January 17, 2017, the Bureau issued its Record of Decision and approval for the 2017-2022 Program, which contemplated ten region-wide lease sales in the Gulf during the five-year period. *See* 82 Fed. Reg. 6643 (Jan. 19, 2017); ROA.3131. The 2017-2022 Program Record of Decision stated that at the lease sale and later stages of development "[a]dditional specific mitigation measures may also be developed and applied, as appropriate." ROA.3130. That Program noted that any proposed lease sales may be "scaled back," "reduce[d]," "limit[ed]," or "cancelled."[1]

The Bureau has regularly utilized its discretion to determine the appropriate size and conditions for Gulf lease sales in implementing the 2017-2022 Program. *See* ROA.2360, ROA.2363; ROA.38-40. Lease sale sizes and stipulations continue to evolve with each subsequent sale. With Lease Sale 259, for example, the Bureau approved a final sale of 73.3 million acres, far less than the more than 80 million acres that had been proposed, with eight lease stipulations that had been updated and combined from the 11 proposed. *See* 88 Fed. Reg. 12,413, 12,414 (Feb. 27, 2023). The 7-million acre reduction was due

---

[1] 2017-2022 Program at 4-10, 6-7, 6-9, https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-OCS-Oil-and-Gas-Leasing-PFP.pdf.

to the exclusion of areas for offshore wind leasing, ROA.2568-69, a potential conflict that was not anticipated in the 2017-2022 Program.[2]

The Bureau did not hold Lease Sales 259 or 261 prior to the expiration of the 2017-2022 Program. However, the IRA mandated that these sales go forward, and the Bureau prepared a supplemental environmental impact statement ("SEIS") for these sales, finalized in January 2023.

In March 2023, the Bureau published a Proposed Notice of Sale for Lease Sale 261. 88 Fed. Reg. 16,030 (Mar. 15, 2023); ROA.2487-506. The notice included the lease stipulations that were recently modified in Lease Sale 259. ROA.2496. The Bureau stated it "reserves the right to modify the sale area in the Final Notice of Sale, including removing additional areas from Lease Sale 261. Specifically, the Bureau "is considering removing the area comprising the northeastern Gulf of Mexico and continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area." ROA.2493. The Proposed Notice of Sale further stated that

---

[2] *Id.* at 6-23 ("BOEM has not received applications for renewable wind energy leasing in the GOM Program Area and is not aware of any specific plans or proposals to develop OCS renewable energy resources in this area at this time. Therefore, it appears unlikely that commercial leasing for renewable energy resources will proceed during the 2017-2022 timeframe.").

the Bureau "reserves the right to revise the areas offered for bidding and associated terms and conditions described in" the notice. ROA.2506.

On August 23, 2023, the Bureau issued the Record of Decision for Lease Sale 261 and decided to offer for lease a subset of the blocks analyzed in the final SEIS by removing the areas within the Rice's whale proposed critical habitat, as stated in the Proposed Notice of Sale. ROA.2463-76. These restrictions reduced the total estimated acreage available for lease from 73.4 million acres (Proposed Notice of Sale) to 67.3 million acres. ROA.2465. The Bureau also included an interim stipulation (Stipulation 4(B)(4)) to restrict vessel speed and transit in Rice's whale habitat and other protective measures until the Bureau and NMFS completed consultation on a new Biological Opinion, expected in September 2024. ROA.2474-75. The lease sale was scheduled to occur on September 27, 2023. ROA.2476.

## III.  Procedural History.

On August 24 and 28, 2023, Appellees filed complaints challenging the Bureau's inclusion of these protective measures for the Rice's whale in Lease Sale 261, alleging that the adoption of such measures violated the IRA, OCSLA, and the APA. *See* ROA.55-63. The district court granted Intervenors' motion to intervene as of right on September 14, 2023. ROA.7194-202.

Appellees moved for a preliminary injunction. ROA.2340-44. The Bureau and Intervenors opposed. ROA.6924-78; ROA.7361-92. On September 21, 2023, the district court held oral argument and granted Appellees' motion. ROA.7498-527. The district court concluded that Appellees would likely win on their claim that adoption of the measures was procedurally invalid under OCSLA, ROA.7514, despite recognizing that the Bureau noticed the changes in its Proposed Notice of Sale and that multiple governors and others specifically commented on that proposal, ROA.7509-11. The district court also found that Appellees were likely to succeed on their claim under the APA that the Bureau failed to adequately justify its decision to include Rice's whale protections in the lease sale. ROA.7517-19. The district court did not rule on Appellees' claim under the IRA. ROA.7513.

The district court then found that a mandatory injunction was warranted, and "enjoined" the government "from implementing the acreage withdrawal and Stipulation 4(B)(4)" in Lease Sale 261. ROA.7524-27. The district court ordered the Bureau "to proceed with Lease Sale 261, absent the challenged provisions, by September 30, 2023." ROA.7527. Intervenors promptly appealed on September 22, 2023. ROA.7528-29. Intervenors moved for an emergency stay pending appeal, and the Bureau moved for an emergency partial stay pending appeal, on September 22, 2023. On September 25, 2023, this Court

denied Intervenors' motion, but granted in part the Bureau's motion, ordering Lease Sale 261 to take place by November 8, 2023.

## SUMMARY OF THE ARGUMENT

The district court erred in issuing a mandatory, permanent injunction that required the Bureau to conduct Lease Sale 261 with certain specific conditions, including offering for lease proposed critical habitat for the critically endangered Rice's whale and removing a stipulation that provided a vessel speed limit and other interim protective measures for this species. Such a prescriptive remedy is not relief that Appellees are entitled to under the APA, 5 U.S.C. § 706(2), which directs a court to set aside an unlawful agency decision to allow the agency to follow the proper procedures or provide the required explanation. The injunction also improperly encroaches on the authority that Congress specifically gave to the Bureau to conduct offshore leasing under OCSLA. Nor did the district court demonstrate that this case is the rare instance in which the facts and law "clearly favor" the extraordinary remedy of a mandatory injunction.

Even if a mandatory, permanent injunction were proper here, the district court erred in finding Appellees met each of the four factors required to obtain injunctive relief. With regard to success on the merits, Appellees cannot prevail on their claim that the Bureau violated OCSLA and its implementing

regulations because they failed to satisfy the judicial review provisions of OCSLA, 43 U.S.C. § 1349, and improperly brought the claim under the APA. Even if Appellees could bring their procedural claim under the APA, the Bureau provided sufficient notice and opportunity for comment in its Proposed Notice of Sale and retained authority to alter the lease sale's terms and conditions in the final notice. And the Bureau did not otherwise violate the APA because it provided an adequate explanation regarding why it included the challenged provisions in Lease Sale 261, which the district court chose to ignore. There is also no merit to Appellees' claim that Lease Sale 261 violated the IRA, which directed the Bureau to conduct the lease sale by September 30, 2023, but did not otherwise constrain the Bureau's ordinary discretion to determine the size, location, or conditions of the sale. Moreover, the district court failed to address the fact that the Western District of Louisiana was not even a proper venue for the legal challenge filed by Appellee Shell Offshore Inc. given that Shell did not meet any of the factors in 28 U.S.C. § 1391(e)(1).

The district court also erred by finding that Appellees' alleged "economic harm and lost business opportunities" constituted irreparable harm for purposes of a preliminary injunction. Generally, financial injuries are not irreparable given that they can be easily corrected later. Here too, a favorable ruling on the merits could result in the Bureau removing the challenged provisions, thereby

eliminating the "potential costs" that Appellees complain of. Appellees' alleged harms were also highly speculative and supported by nothing more than conclusory statements regarding uncertain, future economic injury from the temporary conditions imposed in Lease Sale 261.

Finally, the district court erred by failing to consider Intervenors' undisputed evidence of harm to the Rice's whale when balancing the harms and the public interest. The Rice's whale is one of the most endangered marine mammals on the planet, with as few as 51 individuals remaining. The loss of even a single member of this species from a vessel strike or other harm caused by oil and gas activity could lead to the Rice's whale extinction. Considering the incalculable value of preserving every member of this species and the public interest in preventing the extinction of the only whale to solely inhabit U.S. waters, these factors should have weighed heavily in favor of denying the requested injunction.

## STANDARD OF REVIEW

This Court reviews "the grant or denial of a preliminary injunction for abuse of discretion, with any underlying legal determinations reviewed de novo and factual findings for clear error." *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co., Ltd.*, 80 F.4th 536, 543 (5th Cir. 2023) (citation omitted).

"A preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up); *see Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018). Rather, the grant of such relief "requires the movant to unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997) (citation omitted). A party seeking a preliminary injunction must demonstrate that: (1) it is likely to succeed on the merits; (2) it would suffer irreparable injury if the injunction were not granted; (3) the balance of the equities tips in its favor; and (4) the public interest would be furthered by the injunction. *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A party's failure to prove any one of the four factors renders its request for injunctive relief unwarranted. *See Winter*, 555 U.S. at 23-24.

## ARGUMENT

### I.    Intervenors Have Standing to Bring this Appeal.

"Article III does not require intervenors to independently possess standing where the intervention is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one subsisting party with standing to do so." *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006) (citation omitted). Consequently, Intervenors

are not required to demonstrate standing to participate in this matter alongside the Bureau.

To the extent that standing is required, Intervenors satisfy the requirements to bring this appeal. An organization has standing to bring an action on behalf of its members when: (1) its members have standing in their own right; (2) the interests which the organization seeks to protect in the lawsuit are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires members' individual participation in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000).

Intervenors satisfy all three requirements. Regarding the second criteria, Intervenors are all nonprofit organizations with environmental missions and seek to safeguard their members' conservation, recreational, and aesthetic interests in protecting the critically endangered Rice's whale. ROA.6606-36. Intervenors also satisfy the third criteria because vacating the district court's preliminary injunction does not require individual participation of Intervenors' members. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *UAW v. Brock*, 477 U.S. 274, 287-88 (1986) (associational standing

17

satisfied where statutory requirements do not require evaluation of "unique facts" personal to union members).

On the first requirement, Intervenors' members have Article III standing to sue in their own right if they have suffered "an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical…." *See Laidlaw*, 528 U.S. at 180-81. These injuries must be "fairly traceable to the challenged action of the defendant; and … it is likely, as opposed to merely speculative, that the injur[ies] will be redressed by a favorable decision." *Id*. In environmental cases, plaintiffs may satisfy the injury-in-fact requirement by "aver[ring] that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id*. at 183 (cleaned up); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to … the environment will not alone support standing, if that harm in fact affects the recreational or even the mere aesthetic interests of the plaintiff, that will suffice.").

Intervenors' members have suffered injury-in-fact. The district court's preliminary injunction directly harms Intervenors' members' aesthetic and recreational interests in protecting the Rice's whale. Intervenors' members live and recreate in and near areas that will be impacted by the modified Lease Sale 261. Intervenors' members regularly use Gulf waters, including nearshore and

deepwater areas, and coastal areas for boating, swimming, fishing, birdwatching, and other outdoor recreational activities in and near Rice's whale habitat. *See* Declaration of Robert Wiygul ("Wiygul Decl."), filed herewith, ¶¶ 8-14; Declaration of Kenneth Saxon ("Saxon Decl."), filed herewith, ¶¶ 9-11, 14, 17-18. Their enjoyment of these activities depends on the health of the Gulf ecosystem and the continued existence of Rice's whales, which are threatened by the district court's injunction. Wiygul Decl., ¶¶ 20-23; Saxon Decl., ¶¶ 12, 16, 19-23; *see Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 835 (5th Cir. 2023) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement").

## II.   The Injunction Violates Fundamental Principles of Administrative Law.

The district court's injunction suffers from an underlying, fundamental flaw: it mandates prescriptive relief that is not available under the APA, and in so doing, encroaches on the role that Congress specifically assigned to the Bureau. The court found Appellees showed a likelihood of success on their claim that the Bureau was "arbitrary, capricious" and acted "without observance of procedure required by law" in deciding to include provisions to protect the Rice's whale. ROA.7519, ROA.7525 (citing 5 U.S.C. § 706(2)(A)&(D)). Under the circumstances, the APA states that a court "shall" "hold unlawful and set aside" the offending agency action. 5 U.S.C. § 706(2). That is Congress'

designated default remedy. While the APA does not foreclose equitable relief, a preliminary injunction cannot be used to secure a result that extends well beyond what Appellees could achieve with a ruling on the merits of their administrative law claims. The injunction here, however, elevates the court's judgment over that of the agency tasked with defining the parameters of leasing in the OCS, overstepping well-established limits on judicial authority and inserting itself into matters that should be addressed on remand in the first instance.

### A. The Injunction Provides Relief Beyond What the District Court Could Grant on the Merits for Procedural Error.

The district court first found that Louisiana was likely to succeed on its claim that the Bureau deprived the state of its right to comment on measures to protect the Rice's whale. ROA.7516; *see also* ROA.7515. Intervenors dispute both the applicability of the APA to this claim at all, as well as the district court's finding as to the adequacy of the notice. *See infra* at Part IV.A.2-3.

Even leaving these errors aside, however, the result here is improper. Under the APA, courts will either vacate the agency's decision or remand without vacatur in order for an agency to reopen a proposal for comment. *Compare Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (finding that vacatur is "normally" the remedy) *with Fertilizer Inst. v. U.S. E.P.A.*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (allowing "exemptions to remain in place until the [the agency] conducts a new round of notice and comment"). Vacatur,

in other words, is the most expansive remedy Appellees could obtain. Forcing the Bureau to move forward with Lease Sale 261 on terms that Louisiana could raise in a re-opened comment period is an untenable result. Neither Appellees nor the district court cite a case that would support converting a paradigmatically procedural APA claim into a vehicle for achieving substantive results, especially in the context of a *preliminary* injunction and particularly when those results are directly contrary to the Bureau's authority to reject comments. 43 U.S.C. § 1345(c) (noting the option to "accept or reject"); *see also Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 590 (5th Cir. 1981) (stating that "a court of appeals may exercise equitable powers in its choice of a remedy, as long as the court remains within the bounds of statute and does not intrude into the administrative province" (citation omitted)).

## B.    The Injunction Provides Relief Beyond What the District Court Could Grant on the Merits for a Finding of Arbitrary and Capricious Decisionmaking.

Nor do the remaining bases for the injunction warrant the extraordinary step of imposing judicially mandated terms for Lease Sale 261. The district court found that the Appellees are likely to succeed on their claim that the Bureau "arbitrarily and capriciously" failed to: (1) adequately explain what the court considered to be a change in position; (2) justify the provisions related to the Rice's whale; or (3) consider other OCSLA-mandated factors. ROA.7517. But

these, again, relate to matters that the Bureau itself should take into consideration on remand. The Fifth Circuit has recognized that when "an agency decision is not sustainable on the basis of the administrative record, then 'the matter should be remanded to [the agency] for further consideration.'" *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 238-39 (5th Cir. 2007) (*quoting Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 905 (5th Cir. 1983)). It is thus routine for courts, after finding an agency's explanations "wanting in light of the agency record," to simply "remand to the agency for reconsideration." *Sw. Elec. Power Co. v. U.S. Env't Prot. Agency*, 920 F.3d 999, 1022 (5th Cir. 2019).

While the district court's opinion recognizes that ordering affirmative agency action rather than remand is permissible only in "rare circumstances," ROA.7525 (*citing O'Reilly*, 477 F.3d at 238-39), it then veers into and misapplies caselaw that concerns the distinction between remand with or without vacatur, depending on the severity of the error. ROA.7525-26. The question of vacatur, however, was never in dispute, as Appellees sought only injunctive and declaratory relief. As part of applying the test for remanding without vacatur, the district court assessed whether there was a "serious possibility" that the Bureau could "substantiate its decision given the opportunity to do so." *Id.*

(citations omitted). Beyond the fact that the district court's single-sentence dismissal is entirely conclusory, that framing of the issue misses the point.

Although courts typically order vacatur after determining that an agency is unlikely to be able to "substantiate" its position on remand, those decisions do not take the additional step of mandating particular results. *See Illinois Pub. Telecomms. Ass'n v. F.C.C.*, 123 F.3d 693, 694 (D.C. Cir. 1997). Nor could they. As with the district court's summary conclusion that—based on the limited record before it—the Bureau had not shown a "serious possibility" that it could justify its previous decision, such a finding does not satisfy the appropriate test. As the Supreme Court emphasized just this year, "rare circumstances" that would avert the need for remand are reserved for instances in which "there is not the slightest uncertainty as to the outcome of the proceedings on remand." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 630 (2023) (cleaned up); *see also id*. (describing the exception as applicable only in "narrow circumstances" where the agency is required to take a "particular action"). That rigorous standard has not been met here.[3]

---

[3] The IRA does not mandate the result that Appellees seek. *See infra* at Part IV.A.5.

Even assuming that a particular option may be foreclosed on remand does not establish that there remains only a single, narrowly defined path open to the agency. The error here is especially apparent in the district court's finding that the Bureau failed to recalibrate its assessment of several OCSLA factors in light of the added Rice's whale protections. ROA.7518 (citing 43 U.S.C. § 1344(a)(2)); *see also* ROA.7519 (faulting the Bureau for not considering reliance interests). Although Intervenors dispute the application of the court's cited OSCLA provisions at the lease sale stage, *see infra* at Part IV.A.4, the relief it ordered perversely deprives the agency of any opportunity to reassess its decision. *See, e.g.*, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1916 (2020) (finding that the "appropriate recourse" was to remand when the agency failed to consider important factors). The same is true where the district court found that the lease sale decision contained an "unexplained" about-face that the Bureau "failed to justify." ROA.7518-7519; *see also* ROA.7519 ("failed to explain" how alternatives were selected; "unexplained change in position"). Considering the relevant factors and explaining or justifying a decision are precisely what the agency must do in the first instance on remand; it is not for the Court to dictate the outcome of that reconsideration.

Furthermore, there are nearly limitless variations that the Bureau might decide to apply after remand, including altering the precise geography of the sale

or adjusting the terms of lease stipulations. *See Calcutt*, 598 U.S. at 630 (noting that on remand the agency could have to contend with factors such as "the severity and type of any sanction that could be imposed"). If the district court were to apply this same reasoning when considering the merits and find that the Bureau violated the APA, it may decide, at most, to remand Lease Sale 261 with vacatur.[4] There is no justification for reaching a far more intrusive result that directs the agency's conclusion in the context of a preliminary injunction. *See Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 46 n.1 (D.C. Cir. 2013) (observing that preliminary injunctions "may sometimes be appropriate in APA cases where time is of the essence" but "any such injunction would need to be limited only to vacating the unlawful action, not precluding future agency decisionmaking").

The scenario confronting the district court, far from a "rare circumstance," falls squarely within the bounds of a typical scenario for remand. In *O'Reilly*, the district court had concluded that the "administrative record did not contain sufficient information to support the agency's conclusion" but then

---

[4] The district court additionally placed undue weight on the timing of the sale specified in the IRA, a consideration that is no longer present given the Court's adjustment of the deadline. ROA.7526; *see Brock v. Pierce Cnty.*, 476 U.S. 253, 259 (1986) (finding that the agency retains authority to act following the expiration of a statutory deadline).

improperly directed the outcome of the agency's next step. 477 F.3d at 240. The Fifth Circuit reversed the court's injunction that would have compelled the agency to take particular action on remand, recognizing that the agency's ability to substantiate its original conclusion had not been "entirely foreclosed." *Id.*; *see also id.* (stating that at "no point did the district court conclude" that there was "no possibility" that the agency could justify its original result). As this Court has found, "the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985). The injunction here, however, improperly leverages the asserted procedural failings to direct a substantive result.

### C.   The Injunction Improperly Usurps Agency Authority.

The injunction encroaches on the role that Congress specifically assigned to the Bureau, and the Court should reverse based solely on this violation of separation of powers. The APA does not permit a court to "substitute its judgment for that of the agency." *Regents*, 140 S.Ct. at 1905 (citation omitted). OCSLA assigns to the Bureau the decisions that concern the private use of the OCS for energy development. To be sure, the Bureau must comply with applicable legal standards in doing so, but when it violates those standards, it is

necessary to remand to the agency (with or without vacatur) to correct the errors and make a new decision.

In particular, Congress gave the Bureau the discretion to determine the timing, size, and terms and conditions of lease sales to ensure "expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3); *see also* 30 C.F.R. § 556.302(a)-(b). Had the district court remanded, the Bureau would retain its authority to proceed in ways that are not contemplated by the rigidity of the injunction: it could better substantiate its original decision, reduce or alter the excluded acreage, or adjust the terms of the disputed stipulation, all the while applying OCSLA factors that could potentially ameliorate some of the concerns articulated by the Appellees. Yet the injunction instead assumes that any "outcome in this case is foreordained," denying "the flexibility in addressing issues" that Congress delegated through the passage of OCSLA. *Calcutt*, 598 U.S. at 630.

More specifically, courts cannot order the Bureau to conduct leasing in a particular manner: "federal courts do not have the power to order competitive leasing. By law, that discretion is vested absolutely in the federal government's executive branch and not in its judiciary." *Wyo., ex rel. Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992); *Marathon Oil Co. v. Babbitt*, 966 F.Supp. 1024, 1026 (D. Colo. 1997), *aff'd*, 166 F.3d 1221 (10th Cir. 1999). The district court does

not cite a single case where a court has issued such an injunction forcing the Bureau to offer certain lease areas for sale or prohibiting mitigation measures. The injunction, rather than restoring the Bureau's discretion, rewrites Lease Sale 261.

*                    *                    *

The district court's injunction presumes that the court is the institutional body best suited to reconsider the geographic contours of and lease stipulations for Lease Sale 261. But it is the Bureau that is tasked with responding to comments about a proposed sale and making decisions about leasing terms and conditions under OCSLA, as well as the host of other relevant considerations that may permissibly enter an agency's decisionmaking. Because the Appellees are not entitled to any particular result based on the APA violations found by the district court, remand—with or without vacatur—is the only appropriate remedy to redress their claims. *See Regents*, 140 S.Ct. at 1905.

## III.  The Injunction Ordered Mandatory Relief Without Justification.

The district court's "preliminary" injunction effectively grants Appellees permanent and final relief, bypassing consideration on the merits and directing agency action without meeting the stringent standards for mandatory relief. As this Court recently emphasized, "[t]he preliminary injunction's purpose is to maintain the status quo until the parties have the chance to adjudicate the

merits." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023). Yet the district court ignored this purpose entirely. Rather than issue a preliminary injunction that maintains the status quo by enjoining the lease sale until the court could reach the merits, the district court instead mandated particular action that effectively resolved the merits.

Under well-settled Fifth Circuit precedent, mandatory injunctions forcing a particular action, like the injunction here, are "particularly disfavored" and the party seeking relief must demonstrate that "the facts and law clearly favor the moving party." *Roark v. Individuals of Fed. Bureau of Prisons, Former and Current*, 558 Fed. App'x 471, 472 (5th Cir. 2014) (citation omitted). "Otherwise, the normal procedures of litigation would be short-circuited by the simple vehicle of trying a case by way of a motion for injunctive relief." *Roark v. Individuals of the Fed. Bureau of Prisons*, Civ. A. No. 5:12cv60, 2013 WL 2153944, at *4 (E.D. Tex. May 16, 2013), *aff'd*, 558 Fed. App'x at 472. That is precisely what occurred here.

Neither the Appellees nor the district court demonstrated this case is the "rare instance" in which the facts and law "clearly favor" the extraordinary remedy that Appellees seek. Appellees did not even address the issue. The district court *sua sponte* noted that the pendency of the sale and supposed unavailability of other recourse met the standard, without explaining how those

procedural circumstances "clearly favor" the Appellees. ROA.7526. The court failed at all to address whether the facts and law surrounding Appellees' likelihood of success or irreparable harm "clearly favor" the Appellees.[5] In so doing, the district court "short-circuited" normal litigation procedures and effectively decided the merits without making clear findings.

## IV.    Appellees Did Not Meet the Legal Requirements for an Injunction.

Even if this Court finds that the district court had the authority to issue a mandatory injunction that stepped into the agency's shoes and determined the appropriate terms and conditions of Lease Sale 261, this Court should still dissolve the preliminary injunction because it is legally defective under each of the four factors that Appellees must demonstrate to obtain injunctive relief. *See Winter*, 555 U.S. at 20.

### A.    Appellees Did Not Show a Substantial Likelihood They Will Prevail on the Merits.

#### 1.    *Venue is Not Proper with Respect to Shell's Challenge.*

Appellee Shell is unlikely to succeed because it did not establish proper venue. As Intervenors explained below, the Western District of Louisiana is not

---

[5] The district court also confusingly alludes to the Bureau's ability to "neatly undo" the injunction, should they prevail on the merits. ROA.7526. Yet the court does not explain how the government can "undo" a sale that will have already been held or "unscramble the egg." *See* ROA.2527.

proper venue for Shell's case because Shell is not a resident of the district (principal place of business in Houston), a substantial amount of the events leading to the case occurred elsewhere (in Washington, D.C. and Maryland) and real property is not at issue. ROA.7377-78; 28 U.S.C. § 1391(e)(1). Shell did not contest this argument below, nor could it.

The district court brushed aside this argument because it was not presented in a separate motion to dismiss or transfer. ROA.7514 (mischaracterizing argument as seeking an "advisory opinion"). But defenses about improper venue need not be presented in a stand-alone motion—they are routinely raised at later stages of litigation and specifically, at the preliminary injunction stage. *See, e.g., Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005) (finding that district court must consider improper venue defenses in preliminary injunction proceedings "because they attacked the district court's authority to grant relief," and were therefore "a logical predicate to its preliminary injunction order." (citation omitted)); *Argentine Republic v. Nat'l Grid Plc*, 637 F.3d 365, 367 (D.C. Cir. 2011) ("Contrary to Argentina's argument, National Grid had no obligation to raise its timeliness defense via a Rule 12(b) motion to dismiss."); *see also* ROA.7238 (Intervenors' answer asserting improper venue).

The district court's refusal to consider whether it had jurisdiction over Shell elevates form over substance and is a foundational clear error of law that also directly infects its erroneous factual findings that relied heavily on alleged harms to Shell. ROA.7520 (relying extensively on Shell's allegations to support findings of harm to Appellees' "business development"). These factual and legal errors alone are grounds for reversal.

### 2. Appellees' OCLSA Claim is Improper.

Appellees cannot succeed on their claim that the Bureau violated OCSLA and its implementing regulations because they fail to meet the judicial review provisions of OCSLA. *See* ROA.7381. Appellees allege that the Bureau violated 43 U.S.C. § 1345 and OCSLA's implementing regulations in holding Lease Sale 261 without proper notice and comment. *See* ROA.2370-73. However, OCSLA's citizen suit provision provides specific requirements for judicial review which apply to "any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the Secretary under this subchapter." 43 U.S.C. § 1349(a)(1)-(2). It requires specific procedures to be followed—including 60-day notice to the Bureau—prior to filing such a lawsuit. *Id*. Appellees do not even cite to 43 U.S.C. § 1349, let alone demonstrate how they fulfilled such pre-filing requirements.

The district court dismissed Intervenors' arguments on this issue by improperly: (1) concluding that Appellees sought review under the APA, and (2) determining that the violation would immediately affect a "legal interest" of the Plaintiff under 43 U.S.C. § 1349(a)(3). ROA.7514-15. In so doing, the district court committed clear legal error.

*First*, the district court is wrong that the APA provides a vehicle to circumvent the notice requirement of OCSLA's citizen suit provision. *See Duke Energy Field Servs. Assets, L.L.C. v. Fed. Energy Regul. Comm'n*, 150 F.Supp.2d 150, 156 (D.D.C. 2001). As the U.S. Supreme Court has made clear, where Congress establishes special procedures for review of agency actions, those procedures govern judicial review, and a lawsuit may not be brought under the APA. *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (APA "does not provide additional judicial remedies in situations where the Congress has provided special and adequate review procedures"); *see also Hinojosa v. Horn*, 896 F.3d 305, 312 (5th Cir. 2018) (dismissing APA claim where habeas corpus statute provided "adequate alternative remedy").

The single case that the district court cites, *Hornbeck Offshore Services, L.L.C. v. Salazar*, 696 F.Supp.2d 627 (E.D. La. 2010), is not relevant here. In *Hornbeck*, the plaintiff claimed that the Secretary of the Interior acted in an *arbitrary and capricious* manner in imposing a general moratorium on deepwater drilling. *Id.*

at 636-38. The district court held that § 1349(a) was irrelevant because "the issue does not seem to be whether the Secretary is in 'violation' of OCLSA or its regulations." *Id*. at 636. The opposite is true here. Appellees specifically allege that the Bureau "failed to comply" with OCSLA and its implementing regulations by failing to include the challenged provisions in the Proposed Notice of Sale. ROA.2370-73; ROA.7719-22. While Appellees may have properly brought their separate claim that the Bureau's decision ("rendered in fulfillment of its OCSLA duties") was *arbitrary and capricious* under the APA, *see Hornbeck*, 696 F.Supp.2d at 636, *Hornbeck* cannot save their OCSLA claim.

*Second*, the district court could not "excuse" Appellees from fulfilling OCSLA's judicial notice requirements under 43 U.S.C. § 1349(a)(3). *See* ROA.7514. In addition to never citing § 1349, Appellees did not demonstrate that any exception applied. The district court *sua sponte* implied that the Appellees have a legal interest in leases that they had not yet acquired, attempting to distinguish *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 374 (D.C. Cir. 2021) because oil and gas leases immediately authorize activities. ROA.7514. But that entirely misses the point. In *Fisheries Survival Fund*, the petitioners challenged leases that had *already been issued*, so there was a potential legal interest at stake (even though the court in that case determined that the leases themselves did not grant any immediate legal interests). 858 Fed. App'x

at 371-72. Here, Appellees have not bid on, much less acquired any leases, so there is no potential legal interest irrespective of what the prospective leases may authorize. Moreover, the exception in § 1349(a)(3) waives only the 60-day waiting period. Even if Appellees meet the waiver, which they do not, they were still required to provide pre-suit notice prior to commencement of any action, yet failed to do so. 43 U.S.C. § 1349(a)(3) (stating the plaintiff may file suit "immediately after notification of the alleged violation").

3. *Appellees' Procedural Violations Under OCSLA Lack Merit.*

Even if Appellees met the jurisdictional requirements to allege OCSLA violations, their claim lacks merit. Appellees argue that the Bureau did not provide sufficient notice and opportunity for comment on the acreage exclusion and vessel stipulation in its Proposed Notice of Sale. *See* ROA.7515. To the contrary, the Proposed Notice of Sale specifically stated that the Bureau reserved the right "to modify the sale area in the Final [Notice of Sale]" and was "considering removing the area comprising the northeastern Gulf of Mexico *and* continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area." ROA.2493 (emphasis added). The notice also stated that the Bureau "reserves the right to withdraw any block from this lease sale prior to issuance of a written acceptance of a bid for the block." ROA.2505. Furthermore, the Bureau explicitly

35

"reserve[d] the right to revise the … associated terms and conditions described in this Proposed [Notice of Sale]." ROA.2506.

Comment letters submitted by Appellees, governors of Gulf States, and Intervenors demonstrate that the Bureau provided sufficient notice. For example, Mississippi Governor Reeves commented that "removing additional acreage for Rice's Whales is premature and a decision that should be made only after the National Marine Fisheries Service has made a critical habitat designation." ROA.7019. Similarly, Texas Governor Abbott expressed disapproval that the Bureau was "considering limiting the acreage to account for animal migration through the area." ROA.7019. Appellees API and Chevron similarly urged the Bureau to include Rice's whale habitat in the lease sale. ROA.7020. And Intervenor Center for Biological Diversity requested that the Bureau exclude "all habitat for endangered Rice's whales," include a "prohibition on oil and gas vessel traffic related to Lease Sale 261 from traveling in Rice's whale habitat," and provided evidence to support additional protections for this species. ROA.7412-16, ROA.7020-21. The Bureau considered those comments and provided responsive letters to the relevant state governors, as required under 30 C.F.R. § 556.307(a). ROA.7020.

The district court ignored this evidence in concluding that the two measures first arose only in July "in a [separate] district court filing and then

appeared in the [Final Notice of Sale] for Lease Sale 261" and thus were not properly noticed. ROA.7516. While these measures were indeed *also* included in that stipulated stay agreement, comments from multiple stakeholders in May 2023—and the Proposed Notice of Sale itself in March 2023—belie the district court's finding that they "only arose in [] July 2023" and thereby deprived Louisiana an opportunity to comment. *Id*.

Regarding the challenged stipulation, in particular, there is no possible OSCLA violation from the Bureau's alleged failure to provide notice. The proposed notice of sale process is designed to obtain feedback from affected state and local governments on the "size, timing, and location" of the sale. 30 C.F.R. § 556.305(a); 43 U.S.C. § 1345(a) (allowing governors 60 days after the proposed notice of sale to provide comment "regarding the *size, timing, or location* of a proposed lease sale.") (emphasis added)). The challenged stipulation does not relate to the size, timing, or location of Lease Sale 261, a point which the district court failed to address.

Not surprisingly, it is routine for the stipulations and lease size in a Final Notice of Sale to differ from the Proposed Notice of Sale. For example, as the district court noted, the Bureau included stipulations to protect Rice's whales in its final notices for Lease Sales 256 and 257, despite not considering them as part of the 2012-2017 Program. ROA.7506. With Lease Sale 259—another IRA

mandated sale that took place in March 2023—the Bureau included multiple new elements in the Final Notice of Sale, including the exclusion of 7 million acres of wind energy areas that were not part of the Proposed Notice of Sale. *See* ROA.2568-69. Given the Bureau's procedures and its requirement to consider "all comments and recommendations received in response to the proposed notice of sale," 30 C.F.R. § 556.307, it would be arbitrary if the Bureau did not continue to evaluate the appropriate terms and conditions to be included in a final lease.

In sum, Appellees have failed to show that the Proposed Notice of Sale for Lease Sale 261 violated OCSLA, its implementing regulations, or the APA.

### 4.  *The Bureau's Decision Did Not Violate the APA.*

Appellees are not likely to succeed on their claim that the Bureau's decision was arbitrary and capricious under the APA. Here, the Bureau adequately explained why it included the challenged provisions in Lease Sale 261. As stated in the Record of Decision:

> [E]xcluding whole and partial blocks between the 100-meter and 400-meter isobaths across the northern Gulf of Mexico could reduce potential conflicts with the endangered Rice's whale. Recent limited evidence shows that the Rice's whale may be present in this area and removing the area reduces risks from new leasing while [the Bureau] and the Bureau of Safety and Environmental Enforcement (BSEE) are engaged in a reinitiated consultation with [NMFS].

ROA.2464.[6] The Bureau similarly explained that it updated the Protected Species Stipulation for these reasons. ROA.2472. The Bureau then spent several pages of its decision describing the biological opinion process and its reconsultation with NMFS. ROA.2473-75. The Bureau further detailed its reasoning in the record. ROA.7020 (detailing factors and concluding that exclusion of Rice's whale habitat provides "reasonable balance" between protecting species and "robust leasing"), ROA.7024 (explaining interim stipulation).

The district court improperly concluded that the Bureau's decision was arbitrary because it was based "only on an unexplained changed in position by [the Bureau] on a single study." ROA.7519. The district court is wrong both factually and legally.

*First*, factually, even the limited record available at this stage of the case demonstrates that the Bureau's decision was not based solely on the Soldevilla study, but rather on several considerations, including reducing risk to the Rice's

_____

[6] The recent evidence referenced by the Bureau includes, but is not limited to, Soldevilla et al. (2022), which found that Rice's whale habitat extends beyond what was once thought to be its core habitat (De Soto Canyon in the northeastern Gulf) into the central and western Gulf. ROA.6113-32. That study found evidence for the "persistent occurrence" of Rice's whales throughout the northern Gulf, which is "important to consider when designating critical habitat for this endangered species." ROA.6130.

whale while the agency is engaged in ESA reconsultation and NMFS' recent critical habitat proposal. ROA.7020 (detailing factors and concluding that exclusion of Rice's whale habitat provides "reasonable balance" between protecting species and "robust leasing"), ROA.7024 (explaining interim stipulation). As the Bureau explained, "the updated Protected Species Stipulation includes interim protective measures to require certain speed restrictions and other measures between the 100-meter to 400-meter isobaths," and those measures—which may ultimately dovetail with and ease transition to operations governed by the forthcoming biological opinion and corresponding incidental take statement—will remain in place during the consultation. ROA.2474-75. The Bureau also explained that removing the expanded area from the sale "could reduce risks to [the Rice's whale] while reinitiated consultation with NMFS is ongoing," ROA.2474, and that its decision to approve the sale would comply with its obligation "under Section 7 of the ESA to prevent jeopardy to listed species or adverse modification of designated critical habitat." ROA.2475.

Moreover, the Bureau explained that NMFS had recently proposed the same area excluded from the sale as critical habitat for the Rice's whale. ROA.7029-30 (citing 88 Fed. Reg. 47,453). The proposed critical habitat corresponds to the 100-meter to 400-meter isobath that BOEM has excluded

from Lease Sale 261. *See* 88 Fed. Reg. at 47,453, 47,456-47 (proposed habitat based on sightings and passive acoustic monitoring), 47,462 (depths "from the 100 m isobath to the 400 m isobath, incorporates nearly all of the recorded locations of Rice's whales and includes those continental shelf and slope waters and feature essential to Rice's whales."). The district court ignored all this evidence.

*Second*, legally, the Bureau provided adequate explanation for its decision. As the U.S. Supreme Court has stated, "An initial agency interpretation is not instantly carved in stone. On the contrary, the agency must consider varying interpretations and the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (cleaned up). So long as the agency's "new policy is permissible under the statute, [] there are good reasons for it, and [] the agency believes it to be better," it must be upheld. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Bureau has met these standards here. As discussed above, the Bureau detailed a number of good reasons for inclusion of the challenged provisions in Lease Sale 261, including upcoming critical habitat protections and the need to align with ongoing ESA reconsultation, and clearly stated that it believed this to be the better course of action. ROA.2474-75; ROA.7022-24; ROA.7029-30.

There is no merit to the district court's assertion that the Bureau's decision amounts to a "surprise switcheroo" by an agency against regulated entities. ROA.7519 (citing *Wages & White Lion Invs., LLC v. USDA*, 16 F.4th 1130, 1138 (5th Cir. 2021)). In *Wages*, the issue was the Food and Drug Administration's "new policy" that reusable e-cigarettes pose risks to youth which "rested upon factual findings that contradict[ed] those which underlay its prior policy" that only disposable cigarettes pose such risks. 16 F.4th at 1139 (cleaned up). Yet the Bureau's decision here about an individual offshore lease sale is nothing like the change to a longstanding policy at issue in *Wages*, especially given the Bureau's broad discretion to determine the appropriate terms and conditions for each lease sale in a 5-year plan. *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1317 (D.C. Cir. 1981), *aff'd*, 712 F.2d 584 (D.C. Cir. 1983).

Similarly, the district court's suggestion that the Bureau was required to reevaluate "other factors" before making the changes at issue here is based on provisions that do not apply here. ROA.7518 (citing 43 U.S.C. § 1344(a)(2) and 30 C.F.R. § 556.302(a)(1)). At the lease sale stage, the Bureau has broad authority to consider the environmental impacts of its decision, 43 U.S.C. § 1332(3), and to "develop measures to mitigate adverse impacts, including lease stipulations" and environment impacts. 50 C.F.R. § 556.302(a)-(b). The part of OCSLA cited by the district court, Section 1344(a)(2), refers to the factors that

the Bureau must consider when drafting and finalizing a five-year program, which is not at issue here. And as explained *supra* at Section II, even if these factors applied, the court may only remand for the Bureau to consider them, not make the decision for the agency in the first instance.

Ultimately, the Bureau adequately explained its decision and properly exercised its discretion under OCSLA by including the challenged provisions in Lease Sale 261. The district court erred in concluding otherwise.

5.  *The Bureau's Decision Did Not Violate the IRA.*

Appellees are unlikely to succeed in their claim that the Bureau's decision violated the IRA. The district court did not reach this claim and it lacks merit.

The plain language of the IRA only directed the Bureau to take a specific action: to "conduct Lease Sale 261 in accordance with the Record of Decision" for the 2017-2022 Program, no later than September 30, 2023. IRA § 50264(e). Section 50264(e) says nothing about the Bureau's ordinary discretion over holding the lease sale and does not dictate the size, location, or conditions of the sale, such as including stipulations to curb potential environmental impacts. Instead, Congress left these important determinations to the Bureau, allowing it to exercise its usual decisionmaking authority and still comply with the IRA's mandate to hold the sale.

43

As discussed above, the Bureau has significant discretion in conducting the offshore leasing program under OCSLA, including discretion to require measures for protection of the environment. *See* 43 U.S.C. §§ 1332, 1345; *Watt*, 712 F.2d at 588; *N. Slope Borough v. Andrus*, 642 F.2d 589, 595 (D.C. Cir. 1980) ("In order to minimize possible injury to the environment, the Secretary has drafted various lease stipulations which circumscribe activities permitted to the lessees."); *Oceana v. BOEM*, 37 F.Supp.3d 147, 179 (D.D.C. 2014) ("[The Bureau] included stipulations in Lease Sale 216/222 to provide for the protection of certain species."). Congress knows exactly how to amend or repeal otherwise applicable legal requirements when it intends to do so. *See, e.g., Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 127 (2016) ("[If] Congress intended to alter this fundamental detail we would expect the text of the amended provision to say so. Congress does not, one might say, hide elephants in mouseholes." (cleaned up)). In contrast to its silence in Section 50264, Congress expressly repealed different statutory requirements in other sections of the IRA. *See, e.g.,* IRA §§ 10101(k)(1)(B)(i) & (ii)(II), (D)(i) (exempting compliance with Internal Revenue Code of 1986); *see Maine Cmty. Health Options v. United States*, 140 S.Ct. 1308, 1323 (2020) (stating "when Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning" (cleaned up)). Because repeals by implication

are disfavored, and because both OCSLA and the IRA are easily reconciled, the Court must read the statutes harmoniously. *Watt v. Alaska*, 451 U.S. 259, 266-67 (1981); *see also OXY USA Inc. v. Babbitt*, 122 F.3d 251, 258 (5th Cir. 1997) ("In construing statutes not entirely harmonious with one another, courts presume that the legislature intended to maintain consistency in the law.").

Appellees' contention that the IRA deprived the Bureau of its ability to determine the scope or terms of the sale by requiring that it be held "in accordance with" the 2017-2022 Program Record of Decision greatly mischaracterizes that decision. *See* ROA.2367-68; ROA.7718-19. The 2017-2022 decision defined each lease sales' scope broadly, affording the Bureau plenty of flexibility to shape each sale. ROA.3130 ("Additional specific mitigation measures may also be developed and applied, as appropriate"). The 2017-2022 Program itself also provides that proposed lease sales may be "scaled back," "reduce[d]," "limit[ed]," or "cancelled."[7]

Consistent with the 2012-2017 decision, the Bureau has continued to adjust the scope and terms of lease sales under the 2017-2022 Program, most recently in its post-IRA Lease Sale 259, where it reduced the size of the sale by 7 million acres in the final notice of sale with no objections—and certainly no

---

[7] *See* 2017-2022 Program, *supra* note 1.

45

litigation—from Appellees. *See supra* at 9-10. The 2017-2022 Program does not specify particular lease sizes or locations; it simply contemplates a "region-wide sale" that encompasses "unleased acreage not subject to moratorium or otherwise unavailable." ROA.3130-31. Lease Sale 261 fulfills these conditions in accordance with the 2017-2022 Program. ROA.2463-65.

In sum, nothing in the IRA repeals the Bureau's discretion to determine the scope or conditions for Lease Sale 261, and Appellees' argument to the contrary lacks merit.

### B.   The District Court Erred in Finding Irreparable Harm.

The district court erred by finding that Appellees' alleged "economic harm and lost business opportunities" would cause "irreparable harm in the absence of preliminary relief." ROA.7520; *Winter*, 555 U.S. at 20. For an injury to be "irreparable," the alleged harm "cannot be undone" through later remedies in this case. *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017) (citation omitted). For that reason, as a general rule, "a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989); *see Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F.Supp.3d 701, 725-26 (E.D. Tex. 2020) ("Only in narrow circumstances may monetary loss establish irreparable harm, such as 'where the loss threatens the very existence

46

of the movant's business.'" (quoting *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Even injuries that are "substantial, in terms of money, time and energy … are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Here, the district court found that Appellees had identified "potential costs resulting from the challenged provisions" but, without explanation, stated that such costs "would not be undone by the Court's entry of a permanent injunction and order of another sale." ROA.7522. There is no basis for this finding. If the district court ruled in Appellees' favor on the merits, the Bureau may be required to conduct future offshore leasing without the challenged provisions, thereby eliminating any "potential costs" that Appellees complain of. The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (cleaned up). The fact that the federal government generally enjoys sovereign immunity for monetary damages, *see* ROA.7521-22, is not relevant here given that no damages are currently at issue.

Moreover, irreparable injury "must not be a mere possibility of some remote future injury. The harm must be more than mere speculation." *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F.Supp.3d 478, 498-99 (W.D. La. 2022) (cleaned up); *see also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992,

997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant.").

In the court below, Appellees offered little but conclusory statements regarding potential economic harms from the challenged provisions. *See, e.g.*, ROA.2425 ("[T]he new stipulation *could* result in significant economic loss or other lost business opportunities." (emphasis added)); ROA.2548 ("[The stipulation] *may* cause Chevron not to bid on certain leases." (emphasis added)); ROA.4551 ("[The challenged restrictions] *could* result in heightened safety risks, economic loss, or other lost business opportunities." (emphasis added)); ROA.7734 (operational restrictions "*may* impact a much broader swath of Shell's operations" and "*may* severely restrict Shell's ability to obtain seismic survey data" (emphasis added)); ROA.7521 (noting potential future costs for drilling in Lease Sale 261 leases "*if* supply disruptions cause drilling to be suspended") (emphasis added).

The district court and Appellees also failed to address the fact that the challenged stipulation applies only until the conclusion of the reinitiated consultation with NMFS. A new biological opinion is currently projected for September 2024. Appellees' claims of harm are largely based on their allegations of harm from activities that may take place, if at all, years in the future. ROA.7520 (citing Shell declarant statements about harm from exploration and

development at ROA.7733). *But see* ROA.7731 (admitting that exploration and development phases "typically take[] several years … prior even to obtaining plan approval" from the Bureau). The district court was required to limit its consideration of irreparable harm to the temporal confines of the action it enjoined in this case—protections that will last only until they are replaced by more permanent measures in a new biological opinion in 2024—but failed to do so. The district court erred by resting its findings of harm on vague claims about costs that would not occur, if at all, until after the challenged measures expire.

Appellee State of Louisiana similarly offered only a simplistic calculation that because the amount of acreage offered in Lease Sale 261 was reduced, revenue generated and shared with the state from the lease sale would be reduced by a similar percentage. ROA.4468-70. Yet, as this analysis shows, there is no direct correlation between acreage offered in a lease sale and dollar value of bids or revenue distributed to the states. ROA.4469. And nowhere does Louisiana acknowledge that, if it prevailed on the merits, these areas may be available for leasing in the future and royalty revenues will not be lost.

Moreover, even if the Bureau offered the entire, originally proposed area for leasing, it would not necessarily accept bids from Appellees or issue any or all leases receiving bids. OCSLA does not require the Bureau to issue leases offered in a sale, giving the agency broad discretion in deciding whether to award

leases after reviewing bids. 43 U.S.C. § 1337(a)(1); 30 C.F.R. § 556.516(b); *Defs. of Wildlife v. BOEM*, 791 F.Supp.2d 1158, 1178 (S.D. Ala. 2011) (explaining agency "discretion to reject [bids] and to consider noneconomic factors in deciding whether or not to approve them"); *Lujan*, 969 F.2d at 882 (finding that state's alleged loss of royalties from federal coal lease "is a conjecture based on speculation that is bottomed on surmise" given Interior's discretion over leasing).

Finally, there is no legal basis for the district court's finding that compliance "with a regulation later held invalid" could result in "irreparable harm of nonrecoverable compliance costs." ROA.7522 (citing *Texas v. EPA*, 829 F.3d at 433). There is no invalid regulation at issue; instead, Lease Sale 261 is instead an exercise of the Bureau's general contract authority and its broad discretion under OCSLA to offer public resources under certain terms and conditions for lease to private interests. And even if these alleged costs were accurate and came to pass, they are no different than the myriad factors that figure into bidders' strategies and "the nature of doing business" in a highly regulated field. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F.Supp.3d 91, 104 (D.D.C. 2017). Indeed, the risk that lessees may later need to comply with additional requirements to protect the environment is something that bidders routinely assume in a lease sale. *See* ROA.2520 (notifying lessees

that the "most current" endangered species protections developed in the future "will be applied to post-lease approvals"). Even the district court acknowledges that the Bureau retains the authority to impose such measures, and the resulting costs, through its oversight of the remaining phases of offshore leasing. *See* ROA.7523 (noting "if the government finds justification for additional measures to protect Rice's whale, it may pursue these through the Department of the Interior's oversight of lessees' exploration and production plans").

For all these reasons, the district court erred in finding that Appellees' speculative and conclusory statements regarding economic injury constitute irreparable harm.

## C. The District Court Erred by Ignoring Irreparable Harm to the Rice's Whale in Considering the Balance of Equities and Public Interest.

The district court further erred by failing to consider Intervenors' undisputed evidence of harm to the Rice's whale in evaluating the balance of harms and the public interest. As the Supreme Court has made clear, a party seeking a preliminary injunction "must establish" that all four preliminary injunction factors weigh in its favor. *Winter*, 555 U.S. at 20-22. Consistent with this precedent, this Court recently stated that in addition to a likelihood of success on the merits and irreparable harm, "Plaintiffs seeking a preliminary injunction *must show* that … the balance of the equities weighs in their favor, and

an injunction is in the public interest." *Missouri v. Biden*, No. 23-30445, 2023 WL 6425697, at *28 (5th Cir. Oct. 3, 2023) (emphasis added) (citing *Winter*, 555 U.S. at 22). Accordingly, a district court cannot issue such relief without properly considering each factor. *See McKinney ex rel. N.L.R.B. v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 298 (5th Cir. 2015) (district court abused its discretion in granting injunctive relief where it failed to consider "the specific impact on the union or its employees in this case"); *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023) (stating "even with a strong likelihood of success, a district court cannot give the other factors short shrift").

In the proceedings below, Intervenors presented uncontested evidence of harm to the Rice's whale from the requested injunction. Dr. Aaron Rice, a marine mammal expert with experience in the Gulf of Mexico, explained to the district court that vessel strikes and other harms resulting from increased oil and gas development are among the primary threats to the survival of this species. ROA.7423, ROA.7426-28. Even a small number of potentially fatal vessel strikes would push the species closer to extinction. ROA.7423, ROA.7431-32. As NMFS has found, the Rice's whale is in an extremely perilous condition such that "the loss of even a single reproductive female could lead this species to extinction." ROA.6138. It is well-settled that "once a member of an endangered species has been injured, the task of preserving that species becomes all the more

difficult." *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 818-19 (9th Cir. 2018) (cleaned up).

Dr. Rice's testimony explains that the challenged measures are "necessary … to reduce the likelihood of harm to Rice's whales from the effects of Lease Sale 261." ROA.7434. Excluding Rice's whale habitat from the sale reduces not only the potential for vessel strikes, but also reduces the potential for oil spills and other harmful noise and activities. ROA.7431-34 (explaining that extending protection measures into the expanded habitat is "essential" to protect whales from oil and gas development). Given that oil and gas vessels constitute an average 40% of the traffic transiting the whales' habitat, requiring new lessees to slow vessels as they transit that habitat and restricting travel at night, even for an interim period, is a vital first step to reduce the risk of vessel strikes from this significant source of vessel traffic. ROA.7432.

Unlike the speculative economic harm Appellees allege, there is no legitimate dispute that holding Lease Sale 261 without the protective measures poses an imminent threat of irreparable harm to the whales. The oil and gas leases that the Bureau will issue from Lease Sale 261 in the Gulf permit the lessee to immediately begin "ancillary" activities on the lease, including geological and geophysical activities, without any further approvals. *See* 30 C.F.R. § 550.105 (defining "ancillary activities" as "activities on your lease or unit that you … can

conduct without [Interior's] approval of an application or permit"); 30 C.F.R. § 550.207. These ancillary activities together result in increased vessel strike risk as well as chronic and acute noise that can harass and harm the whales. ROA.7430-31, 7433-34; ROA.5657-62, ROA.5712-15.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). The plain language and legislative history of the ESA "shows clearly that Congress viewed the value of endangered species as 'incalculable,'" making it "abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities." *Hill*, 437 U.S. at 187, 194. This Circuit has recognized that where, as here, there is an established likelihood of irreparable harm, "the balance of equities will lean more heavily in favor of protecting wildlife." *Aransas Project v. Shaw*, 775 F.3d 641, 663-64 (5th Cir. 2014); *see also La., ex rel. Guste v. Verity*, 853 F.2d 322, 331 (5th Cir. 1988) ("Although we do not denigrate appellants' concern with the expense and inconvenience the regulations will visit on Louisiana's shrimping industry, Congress has decided that these losses cannot compare to the 'incalculable' value of genetic heritage embodied in any protected living species") (citing *Hill*, 437 U.S. at 179); *GDF Realty Invs., Ltd. v. Norton*, 169 F.Supp.2d 648, 662 (W.D. Tex. 2001), *aff'd*, 326

F.3d 622 (5th Cir. 2003) ("[I]t is reasonable for Congress to decide that conservation of species will one day produce a substantial commercial benefit to this country and that failure to preserve a species will result in permanent, though unascertainable, commercial loss." (citation omitted)).

By harming the whales that Intervenors' members depend on for their recreational and aesthetic enjoyment of activities ranging from fishing to wildlife observation, the district court's ruling will likely cause irreparable harm to Intervenors' members who have cognizable recreational, aesthetic, and research interests in protecting Rice's whales. *See* ROA.6606-36. For example, Robert Wiygul, a member of the Sierra Club, describes his interests in observing the Rice's whales in the Gulf and the harm that will occur to him absent the protective measures for this species that the Bureau had finalized for Lease Sale 261. *See* Wiygul Decl., ¶¶ 10-14, 20-23. Because of their documented interests in Rice's whale conservation, Intervenors' members face "irreparable harm to their own interests stemming from the irreparable harm to the listed species." *See Nat'l Wildlife Fed'n*, 886 F.3d at 822; *All. for Wild Rockies v. Gassmann*, 604 F.Supp.3d 1022, 1035 (D. Mont. 2022) ("Plaintiff has shown irreparable harm to its members' recreational and aesthetic interests, which depend in part upon the health of the grizzly bear and lynx populations, stemming from the irreparable harm to those listed species" from challenged logging project); *Defs. of Wildlife v.*

*U.S. Fish & Wildlife Serv.*, 539 F.Supp.3d 543, 559 (D.S.C. 2021) (finding that harm to threatened red knot from horseshoe crab harvest would likely cause irreparable harm to plaintiffs' interests in the birds and their habitat).

Finally, the U.S. Supreme Court has cautioned that "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Here, the district court gave almost no consideration to the public interest factor, other than to state that "there is generally no public interest in the perpetuation of unlawful agency action." ROA.7523 (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022)). Intervenors do not disagree with this principle, but aside from the fact that the Bureau followed the law, *see supra* Part IV.A, such a limited interpretation of the public interest factor would render it superfluous from the first factor, contrary to the Supreme Court's mandate in *Winter*. *See, e.g., In Re Mariner Health Cent., Inc*, Case Nos.: 22-41079 WJL, 22-41080 WJL, 22-41081 WJL, 2023 WL 187175, at *19 (Bankr. N.D. Cal. Jan. 12, 2023) (declining interpretation that would "collapse the first and fourth elements" and "render the public interest factor superfluous").

Despite the imminent irreparable harm to the Rice's whale, nowhere did the district court consider the public interest in preventing the extinction of a critically endangered species. *See Conserv. L. Found. v. Ross*, 422 F.Supp.3d 12,

34 (D.D.C. 2019) ("[T]he public interest in preventing the extinction of the [North Atlantic right] whale ... is beyond dispute."); *Bensman v. U.S. Forest Serv.*, 984 F.Supp. 1242, 1250 (W.D. Mo. 1997) ("[T]he continued decline and possible extinction of a species weigh heavily to tip the balance to favor granting the injunction. The public interest is best served by protecting endangered species."). The district court's failure to properly consider this factor further warrants reversal of the injunction. *See McKinney*, 783 F.3d at 298.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's preliminary injunction order and vacate the injunction.

Respectfully submitted,

Dated: October 6, 2023

/s/ Christopher D. Eaton

Christopher D. Eaton
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-1526
ceaton@earthjustice.org
*Counsel for Intervenors-Appellants*

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on October 6, 2023. I certify that this motion was served on counsel for all parties via email and the Court's CM/ECF system.

/s/ Christopher D. Eaton

Christopher D. Eaton
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-1526
ceaton@earthjustice.org

*Counsel for Intervenors-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,678 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.1.

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Calisto MT 14-point font.

Dated: October 6, 2023          /s/ Christopher D. Eaton

Christopher D. Eaton
EARTHJUSTICE
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-1526
ceaton@earthjustice.org

*Counsel for Intervenors-Appellants*