No. 23-30666

# In the United States Court of Appeals for the Fifth Circuit

STATE OF LOUISIANA, AMERICAN PETROLEUM INSTITUTE,
AND CHEVRON U.S.A. INC.,

*Plaintiffs-Appellees*,

v.

DEB HAALAND, et al.,

*Defendants-Appellants*.

SHELL OFFSHORE INC.,

*Plaintiff-Appellee*,

v.

U.S. DEPARTMENT OF THE INTERIOR, et al.,

*Defendants-Appellants*.

On Appeals from the United States District Court for the Western District of
Louisiana, Lake Charles Division, Case Nos. 2:23-cv-1157, 2:23-cv-1167
Hon. Judge James D. Cain, Jr.

## BRIEF OF PLAINTIFFS-APPELLEES

Paul D. Clement
Andrew Lawrence*
James Y. Xi*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
james.xi@clementrmurphy.com

Jeff Landry
  *Attorney General of Louisiana*
Elizabeth B. Murrill
  *Solicitor General*
Joseph S. St. John
  *Deputy Solicitor General*
Jordan B. Redmon
  *Assistant Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street

**ADDITIONAL COUNSEL LISTED ON INSIDE COVER**

*Supervised by principals of the firm
who are members of the Virginia Bar

*Counsel for Plaintiff American
Petroleum Institute*


Steven J. Rosenbaum
Mark W. Mosier
Bradley K. Ervin
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000
srosenbaum@cov.com

*Counsel for Plaintiff Shell Offshore
Inc.*

Baton Rouge, LA 70804
(225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


Catherine E. Stetson
Sean Marotta
Dana A. Raphael
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Sarah C. Bordelon
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

*Counsel for Plaintiff Chevron U.S.A. Inc.*

October 13, 2023

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Plaintiffs-Appellees:

> State of Louisiana
> American Petroleum Institute
> Chevron U.S.A. Inc.
> Chevron U.S.A. Holdings Inc.
> Texaco Inc.
> Chevron Investments Inc.
> Chevron Corporation
> Shell Offshore Inc.
> SOI Finance Inc.
> Shell US E&P Investments LLC
> Shell USA, Inc.
> Shell plc

2. Counsel for Plaintiffs-Appellees:

> Jeff Landry, Louisiana Department of Justice
> Elizabeth B. Murrill, Louisiana Department of Justice
> Joseph S. St. John, Louisiana Department of Justice
> Jordan B. Redmon, Louisiana Department of Justice
> Paul D. Clement, Clement & Murphy, PLLC
> Andrew Lawrence, Clement & Murphy, PLLC
> James Y. Xi, Clement & Murphy, PLLC
> Catherine E. Stetson, Hogan Lovells US LLP
> Sean Marotta, Hogan Lovells US LLP
> Dana A. Raphael, Hogan Lovells US LLP
> Sarah C. Bordelon, Holland & Hart LLP
> Steven J. Rosenbaum, Covington & Burling LLP
> Mark W. Mosier, Covington & Burling LLP

i

Bradley K. Ervin, Covington & Burling LLP

3. <u>Defendants-Appellants:</u>

Deb Haaland
Laura Daniel-Davis
Elizabeth Klein
James Kendall
U.S. Department of the Interior
Bureau of Ocean Energy Management

4. <u>Counsel for Defendants-Appellants:</u>

Michelle Melton
Andrew Marshall Bernie
Luther L. Hajek
Alexis G. Romero

5. <u>Intervenor-Appellants:</u>

Sierra Club
Center for Biological Diversity
Friends of the Earth
Turtle Island Restoration Network

6. <u>Counsel for Intervenor-Appellants:</u>

Christopher Eaton, Earthjustice
Brettny E. Hardy, Earthjustice
Elizabeth Grace Livingston de Calderon, Earthjustice
Stephen D. Mashuda, Earthjustice

<u>/s/ Catherine E. Stetson</u>
Catherine E. Stetson

## STATEMENT REGARDING ORAL ARGUMENT

The District Court's order granting a preliminary injunction is appropriate for summary affirmance or for the appeal dismissed without oral argument. The Government does not appeal the preliminary injunction as amended, and Intervenors lack standing to continue the appeal on their own. The District Court also acted well within its discretion in granting a preliminary injunction. But Plaintiffs-Appellees are prepared to present oral argument should the Court find it helpful in resolving this appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF AUTHORITIES ...................................................................................vi

STATEMENT OF JURISDICTION..........................................................................1

INTRODUCTION ....................................................................................................2

STATEMENT OF THE ISSUES..............................................................................4

STATEMENT OF THE CASE..................................................................................5

      A.    The 2017–2022 Leasing Program Schedules 10 Regionwide Lease Sales In The Gulf Of Mexico........................................................5

      B.    The Federal Government And Environmental Groups Interfere With The Final Three Gulf Sales ..........................................6

      C.    Congress Passes The Inflation Reduction Act Requiring That Remaining Sales Be Conducted In Accordance With The 2017–2022 Leasing Program ...............................................................7

      D.    The Federal Government Suddenly Deviates From The 2017–2022 Leasing Program Scope And Terms ...............................11

      E.    The District Court Enjoins The Challenged Provisions......................13

SUMMARY OF ARGUMENT ...............................................................................16

STANDARD OF REVIEW .....................................................................................18

ARGUMENT ..........................................................................................................19

    I.    INTERVENORS LACK STANDING TO APPEAL ................................................19

      A.    Because The Government Does Not Challenge The Amended Injunction, Intervenors Must Demonstrate Standing ..........................19

# TABLE OF CONTENTS—Continued

Page

B.  Intervenors Have Not Established Standing To Appeal ....................20

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .............................23

A.  The Enjoined Provisions Are Procedurally Invalid ...........................24

B.  The Enjoined Provisions Are Arbitrary And Capricious ....................35

C.  The Enjoined Provisions Violate The Inflation Reduction Act ......................................................................................43

III.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION ..........................................................46

IV.  THE REMAINING FACTORS LIKEWISE SUPPORT PRELIMINARY RELIEF..........................................................................................52

V.  THE DISTRICT COURT PROPERLY GRANTED INJUNCTIVE RELIEF .................54

VI.  THE GOVERNMENT'S ALTERNATIVE DELAY REQUEST IS PREMATURE AND UNWARRANTED ...............................................57

CONCLUSION ...................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*Abdullah v. Paxton*,
  65 F.4th 204 (5th Cir. 2023) ................................................................ 23

*Amerada Hess Corp. v. Department of Interior*,
  170 F.3d 1032 (10th Cir. 1999) ...................................................... 33, 34

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................ 33, 34, 54

*Brown v. Offshore Specialty Fabricators, Inc.*,
  663 F.3d 759 (5th Cir. 2011) ............................................................... 35

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ............................................................... 40

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) ............................................................. 50

*Center for Biological Diversity v. EPA*,
  937 F.3d 533 (5th Cir. 2019) .................................................... 20, 21, 22

*Central Tr. Co. v. McGeorge*,
  151 U.S. 129 (1894) ........................................................................... 51

*Chemical Mfrs. Ass'n v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................................... 28

*Chesapeake Climate Action Network v. EPA*,
  952 F.3d 310 (D.C. Cir. 2020) ............................................................ 30

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ........................................................................... 20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................................................................... 22

*Clarke v. Commodity Futures Trading Comm'n*,
  74 F.4th 627 (5th Cir. 2023) .................................................... 18, 19, 55

# TABLE OF AUTHORITIES—Continued

Page

*Department of Com. v. New York*,
   139 S. Ct. 2551 (2019) ............................................................ 40

*Duke Energy Field Servs. Assets, LLC v. FERC*,
   150 F. Supp. 2d 150 (D.D.C. 2001) ....................................... 33

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ........................................................... 39, 40

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................ 38

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ................................................................ 45

*Fertilizer Inst. v. EPA*,
   935 F.2d 1303 (D.C. Cir. 1991) ............................................. 30

*Friends of the Earth v. Haaland*,
   583 F. Supp. 3d 113 (D.D.C. 2022) ......................................... 7

*Friends of the Earth v. Haaland*,
   No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ................................. 7

*Gezu v. Charter Commc'ns*,
   17 F.4th 547 (5th Cir. 2021) ................................................. 51

*Hornbeck Offshore Servs., LLC v. Salazar*,
   696 F. Supp. 2d 627 (E.D. La. 2010) ................................... 33

*In re S. Scrap Material Co., LLC*,
   541 F.3d 584 (5th Cir. 2008) ................................................. 45

*Kane v. De Blasio*,
   19 F.4th 152 (2d Cir. 2021) ................................................. 57

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
   140 S. Ct. 2367 (2020) ......................................................... 20

# TABLE OF AUTHORITIES—Continued

Page

*Louisiana v. Becerra*,
  577 F. Supp. 3d 483 (W.D. La. 2022) .................................................. 47

*Louisiana v. Biden*,
  45 F.4th 841 (5th Cir. 2022) ................................................................. 6

*Louisiana v. Biden*,
  543 F. Supp. 3d 388 (W.D. La. 2021) ................................................... 6

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ........................................... 19, 43, 51, 52

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) ................................................... 6

*Louisiana v. Biden*,
  No. 2:21-cv-778, 2021 WL 4312502 (W.D. La. Aug. 23, 2021) ................. 26, 47

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................... 21, 22

*Maine Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020) ......................................................................... 44

*Maine Lobstermen's Ass'n v. NMFS*,
  70 F.4th 582 (D.C. Cir. 2023) ................................................... 42, 53, 54

*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) ............................................................. 56

*McConnell v. FEC*,
  540 U.S. 93 (2003) ............................................................................... 20

*Missouri v. Biden*,
  __ F.4th__, 2023 WL 6425697 (5th Cir. Oct. 3, 2023) ........................ 50

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) ................................................. 23, 27, 29, 32

# TABLE OF AUTHORITIES—Continued

Page

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
  915 F.3d 197 (4th Cir. 2019) ................................................................. 56

*National Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007) ............................................................................. 45

*Newby v. Enron Corp.*,
  443 F.3d 416 (5th Cir. 2006) ................................................................ 20

*OXY USA Inc v. Babbitt*,
  122 F.3d 251 (5th Cir. 1997) ................................................................ 32

*Porretti v. Dzurenda*,
  11 F.4th 1037 (9th Cir. 2021) ............................................................... 57

*Restaurant L. Ctr. v. Department of Lab.*,
  66 F.4th 593 (5th Cir. 2023) ................................................... 18, 46, 50

*R.J. Reynolds Vapor Co. v. FDA*,
  65 F.4th 182 (5th Cir. 2023) ................................................................ 39

*Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*,
  968 F.3d 419 (5th Cir. 2020) ................................................................ 22

*Sierra Club v. Babbitt*,
  995 F.2d 571 (5th Cir. 1993) ................................................................ 20

*Southwestern Elec. Power Co. v. EPA*,
  920 F.3d 999 (5th Cir. 2019) ................................................................ 41

*Team Worldwide Corp. v. Wal-Mart Stores, Inc.*,
  287 F. Supp. 3d 651 (E.D. Tex. 2018) ................................................. 51

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ................................................................ 56

*Town of Chester v. Laroe Ests., Inc.*,
  581 U.S. 433 (2017) ............................................................................. 19

# TABLE OF AUTHORITIES—Continued

<u>Page</u>

*TVA v. Hill*,
  437 U.S. 153 (1978) ............................................................. 53

*University of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
  985 F.3d 472 (5th Cir. 2021) .................................... 35, 42, 43

*Virginia House of Delegates v. Bethune-Hill*,
  139 S. Ct. 1945 (2019) ........................................................ 19

*Wages & White Lion Invs., LLC v. FDA*,
  16 F.4th 1130 (5th Cir. 2021) ........................................ 46, 50

*Wentz v. Kerr-McGee Corp.*,
  784 F.2d 699 (5th Cir. 1986) ............................................... 32

**STATUTES:**

5 U.S.C. § 703 .......................................................................... 56

5 U.S.C. § 706(2)(A) ......................................................... 24, 33

5 U.S.C. § 706(2)(D) ......................................................... 24, 33

16 U.S.C. § 1540(g) ................................................................. 33

28 U.S.C. § 1292(a)(1) ............................................................... 1

43 U.S.C. § 1331(3) .................................................................... 5

43 U.S.C. § 1332(3) .................................................................... 5

43 U.S.C. § 1332(4) .................................................................. 24

43 U.S.C. § 1337(g)(5)(A) ....................................................... 46

43 U.S.C. § 1340(c)(1) ............................................................. 54

43 U.S.C. § 1344(a) .................................................................... 5

43 U.S.C. § 1344(a)(2) ............................................................. 42

# TABLE OF AUTHORITIES—Continued

Page

43 U.S.C. § 1345(a) .................................................. 25, 26, 47

43 U.S.C. § 1345(b) .................................................. 25, 26, 47

43 U.S.C. § 1345(c) .................................................. 25, 26, 47

43 U.S.C. § 1349(a) ...................................................... 32, 33

43 U.S.C. § 1349(a)(1) ......................................................... 32

43 U.S.C. § 1349(a)(2)(A) ................................................... 32

43 U.S.C. § 1349(a)(3) ......................................................... 34

43 U.S.C. § 1351(c) ............................................................. 55

Inflation Reduction Act of 2022,
   Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) .......................................... 2

   § 50251(a) ................................................................. 44

   § 50251(b)(2) ............................................................ 44

   § 50263 ..................................................................... 10

   § 50264 ....................................................................... 7

   § 50264(a)(4) .............................................................. 8

   § 50264(b) .................................................................... 7

   § 50264(d) .................................................................... 8

   § 50264(e) ...................................... 2, 3, 8, 17, 18, 44, 54, 55

Tax Relief and Healthcare Act of 2006,
   Pub. L. No. 109-432, 120 Stat. 2922 .................................. 46

**REGULATIONS:**

30 C.F.R. § 556.302(a)(1) ..................................................... 43

xi

## TABLE OF AUTHORITIES—Continued

Page

30 C.F.R. § 556.304(a)..................................................................... 25

30 C.F.R. § 556.304(c)................................................... 25, 26, 31, 47

30 C.F.R. § 556.305(a)......................................................... 25, 31, 47

30 C.F.R. § 556.307(a)..................................................................... 26, 31

30 C.F.R. § 556.307(b) ..................................................................... 26

30 C.F.R. § 556.308 ......................................................................... 31

50 C.F.R. § 402.02 ........................................................................... 43

86 Fed. Reg. 7,619 (Feb. 1, 2021) ............................................. 6

86 Fed. Reg. 10,132 (Feb. 18, 2021) .......................................... 6

88 Fed. Reg. 16,030 (Mar. 15, 2023)......................................... 10

88 Fed. Reg. 69,660 (Oct. 6, 2023)............................. 3, 15, 57, 58

**LEGISLATIVE MATERIAL:**

H.R. Rep. 95-590 (1977)............................................... 24, 25, 28

**OTHER AUTHORITIES:**

Melissa Soldevilla et al., *Rice's Whales in the Northwestern Gulf of Mexico*,
48 Endang. Species Res. 155 (2022),
https://www.int-res.com/articles/esr2022/48/n048p155.pdf ......................... 36, 41

32 Wright & Miller, *Federal Practice & Procedure* § 8183 (2d ed.) ................... 30

7C Wright & Miller, *Federal Practice & Procedure* § 1918 (3d ed.) .................. 51

No. 23-30666

# In the United States Court of Appeals for the Fifth Circuit

STATE OF LOUISIANA, AMERICAN PETROLEUM INSTITUTE,
AND CHEVRON U.S.A. INC.,

*Plaintiffs-Appellees*,

v.

DEB HAALAND, et al.,

*Defendants-Appellants*.

SHELL OFFSHORE INC.,

*Plaintiff-Appellee*,

v.

U.S. DEPARTMENT OF THE INTERIOR, et al.,

*Defendants-Appellants*.

On Appeals from the United States District Court for the Western District of
Louisiana, Lake Charles Division, Case Nos. 2:23-cv-1157, 2:23-cv-1167
Hon. Judge James D. Cain, Jr.

## BRIEF OF PLAINTIFFS-APPELLEES

## STATEMENT OF JURISDICTION

The District Court entered its preliminary injunction on September 21, 2023,

and the Government and Intervenors appealed on September 22, 2023. This Court

has jurisdiction over the Government's appeal under 28 U.S.C. § 1292(a)(1). But

the Court lacks jurisdiction over Intervenors' appeal because they lack Article III

standing to seek relief the Government does not. *Infra* pp. 19-23.

1

# INTRODUCTION

This case involves an upcoming competitive, sealed-bid auction of offshore oil-and-gas leases. Congress set specific parameters for that sale—Lease Sale 261—as part of a carefully negotiated package responding to the Biden Administration's and environmental groups' years-long efforts to derail oil-and-gas leasing in the Gulf of Mexico. Inflation Reduction Act of 2022, § 50264(e), Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ("IRA").

Seven months ago, the Bureau of Ocean Energy Management ("BOEM") issued its required Proposed Notice of Sale setting out areas for sale and the stipulations that would attach to awarded leases. But just weeks before the sale, which was originally set for September 27, BOEM radically altered the scope and terms. BOEM imposed a burdensome new lease stipulation restricting vessel transit across the 100- to 400-meter isobaths for the entire Gulf of Mexico and withdrew that same six-million-acre area from the sale entirely. BOEM made those last-minute changes in a claimed effort to further protect the Rice's whale, even though BOEM failed to provide the statutorily required notice to affected States like Louisiana, and even though BOEM had repeatedly rejected the same vessel restrictions and acreage exclusion as unjustified only months before.

Plaintiffs in these consolidated cases—the State of Louisiana, the American Petroleum Institute ("API"), Chevron U.S.A. Inc. ("Chevron"), and Shell Offshore

Inc. ("Shell")—immediately sought to enjoin BOEM's last-minute changes to prevent an irreparably tainted sale.  After considering thousands of pages of briefing and exhibits, holding oral argument, and thoroughly addressing the issues in a 30-page opinion, the District Court granted Plaintiffs' motions for a preliminary injunction.  The court declined to grant the Government's requested extension until November 8 to hold the sale, citing the IRA's direction that BOEM hold the sale "not later than September 30, 2023."  IRA § 50264(e).  A motions panel of this Court granted the Government's requested extension and "amended" the preliminary injunction "only in that the sale that was set for September 27, 2023, is ordered to take place by November 8, 2023," specifying that "[n]o extension will be granted."  Stay Order 2-3 (capitalization altered).

The Government does not challenge the amended preliminary injunction. The Government instead urges this Court to "leave intact the November 8 deadline," as "BOEM fully intends to hold the sale by November 8."  Gov't Br. 20, 22.  Plaintiffs join the Government's request to maintain the firm November 8 date. BOEM has since issued a Revised Final Notice of Sale removing the vessel-restriction stipulation, offering the previously excluded acreage, and rescheduling the sale for November 8.  88 Fed. Reg. 69,660 (Oct. 6, 2023), *available at* https://www.govinfo.gov/content/pkg/FR-2023-10-06/pdf/2023-22316.pdf.

The environmental-organization Intervenors nonetheless insist that this Court should vacate the preliminary injunction in full. This Court should reject that invitation for two reasons. First, Intervenors lack standing to appeal the preliminary injunction, as they have not identified any member harmed by it. Second, the District Court did not abuse its discretion in awarding preliminary relief. The court correctly concluded that Plaintiffs are likely to demonstrate that the enjoined provisions violate the Administrative Procedure Act ("APA"), that Plaintiffs faced irreparable harm absent an injunction, and that the remaining equitable factors favored injunctive relief.

The Court should accordingly affirm the injunction as amended.

## STATEMENT OF THE ISSUES

1. Whether Intervenors lack standing to appeal the preliminary injunction where the Government does not challenge the amended injunction and Intervenors cannot identify any members harmed by the injunction.

2. Whether the District Court abused its discretion in entering a preliminary injunction to prevent BOEM from making last-minute changes to offshore oil-and-gas Lease Sale 261 in contravention of the Inflation Reduction Act, Outer Continental Shelf Lands Act, and the Administrative Procedure Act.

## STATEMENT OF THE CASE

**A.    The 2017–2022 Leasing Program Schedules 10 Regionwide Lease Sales In The Gulf Of Mexico.**

Under the Outer Continental Shelf Lands Act ("OCSLA"), the Outer Continental Shelf ("OCS") is a "vital national resource" that must be made "available for expeditious and orderly development" through five-year programs of scheduled lease sales.  43 U.S.C. §§ 1331(3), 1332(3), 1344(a).  The Secretary of the Interior approved the 2017–2022 Five-Year Leasing Program in a Record of Decision that directed BOEM to proceed with 10 scheduled lease sales in the Gulf of Mexico: one sale in 2017, two each year from 2018 to 2021, and one—Lease Sale 261—in 2022.  These sales were to be "region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf" to "provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks."  ROA.3131.  The 2017–2022 Program also "assume[d] continuing implementation of protective measures required by statute, regulation, or current lease sale stipulations."  ROA.3550; *see* ROA.4409.  There were 10 such stipulations at the time, ROA.4409-10; ROA.4152; ROA.4431; ROA.3550, ROA.3633; ROA.4449, and each of BOEM's subsequent environmental reviews have included the same list, ROA.3256-60; ROA.2807-08; ROA.4875-76.

**B.    The Federal Government And Environmental Groups Interfere With The Final Three Gulf Sales.**

BOEM conducted seven of the 10 scheduled Gulf-wide lease sales

consistent with the 2017–2022 Program.  ROA.3131; *see* ROA.2360 & n.1.

BOEM planned the same for Lease Sale 257, but in January 2021, President Biden

issued an executive order directing Interior to "pause new oil and natural gas

leases" pending a "comprehensive review and reconsideration of Federal oil and

gas permitting and leasing practices."  86 Fed. Reg. 7,619, 7,624 (Feb. 1, 2021).

Interior subsequently cancelled Lease Sale 257 and did not schedule the two

remaining Gulf sales—Lease Sales 259 and 261.  *See* 86 Fed. Reg. 10,132 (Feb.

18, 2021); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 287-289 (W.D. La. 2022).

Thirteen States, including Louisiana, sued to enjoin the "pause."  The district

court did so, holding that "pausing, stopping and/or cancelling lease sales

scheduled in [the] OCSLA Five-Year Plan would be significant revisions of the

plan" that "the Agency Defendants have no authority to make . . . without going

through the procedure mandated by Congress."  *Louisiana v. Biden*, 543 F. Supp.

3d 388, 413, 417 (W.D. La. 2021).[1]  BOEM accordingly held Lease Sale 257 in

November 2021, offering "all the available unleased acreage in the GOM" with the

---

[1]  This Court later reversed the injunction as insufficiently specific, 45 F.4th 841 (5th Cir. 2022), and the district court reissued a detailed permanent injunction, 622 F. Supp. 3d at 298-300.

familiar 10 lease stipulations.  ROA.2608.  But before BOEM issued leases to the winning bidders, environmental groups—Intervenors here—persuaded another court to vacate the sale under the National Environmental Policy Act.  *See Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 128 (D.D.C. 2022), *vacated and remanded*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (per curiam).  The same environmental groups are also currently challenging Lease Sale 259, *see Healthy Gulf v. Haaland*, No. 1:23-cv-00604 (D.D.C. filed Mar. 6, 2023), and Lease Sale 261, *see Healthy Gulf v. Haaland*, No. 1:23-cv-02487 (D.D.C. filed Aug. 25, 2023).

>   **C.    Congress Passes The Inflation Reduction Act Requiring That Remaining Sales Be Conducted In Accordance With The 2017–2022 Leasing Program.**

Congress intervened in the leasing melee in August 2022 through the IRA.  Among other things, the IRA changed the law for "lease sales under the 2017–2022 Outer Continental Shelf Leasing Program," including uncompleted Lease Sale 257 and the two remaining Gulf sales—Lease Sales 259 and 261.  *See* IRA § 50264 (capitalization altered).  Congress directed for Lease Sale 257 that the Secretary "promptly issue to the high bidder a fully executed lease."  *Id.* § 50264(b).  Because of this "nondiscretionary obligation on the Department to issue the leases," the D.C. Circuit ordered the environmental groups' challenge to Lease Sale 257 dismissed as moot.  *Friends of the Earth*, 2023 WL 3144203, at *2.

The IRA likewise listed specific "requirement[s]" for the two other Gulf sales, Lease Sales 259 and 261. IRA § 50264(d)-(e) (capitalization altered). Congress specified that, "not later than September 30, 2023, the Secretary shall conduct Lease Sale 261 in accordance with the Record of Decision approved by the Secretary on January 17, 2017." *Id.* § 50264(e). The IRA specified that "[t]he term 'Lease Sale 261' means the lease sale numbered 261 described in the 2017–2022 [OCS] Oil and Gas Leasing Proposed Final Program." *Id.* § 50264(a)(4).

BOEM acknowledged that "the Inflation Reduction Act of 2022 . . . requires BOEM to hold both GOM Lease Sales 259 and 261." ROA.4576. Although BOEM had "no discretion on whether to hold these lease sales," it chose to prepare a Supplemental Environmental Impact Statement ("EIS") "to follow its normal leasing process to the fullest extent possible." ROA.4617.

BOEM sought public comment on the draft Supplemental EIS. As in preceding reviews, environmental groups complained that oil-and-gas activity might pose a risk to the endangered Rice's (or Bryde's) whale. BOEM had already determined in 2016 that any risk was negligible, as the Rice's whale habitat in the northeastern Gulf off the coast of Florida does not "overlap[ ] with the GOM Program Area" due to a leasing moratorium in most of the eastern Gulf, ROA.3573, meaning that "vessels expected to service leases . . . are unlikely to transit across" the Rice's whale habitat, ROA.4797. BOEM nevertheless agreed to

impose a set of vessel restrictions on any minimal transit through that area—part of the "reasonable and prudent alternative" recommended by the National Marine Fisheries Service ("NMFS") in its 2020 biological opinion.[2]  ROA.5846-47.  Given the "limited vessel routes originating from the eastern GOM, and the additional mitigations on vessels within the Rice's whale core area," BOEM determined "the potential for vessel strikes" to Rice's whales to be "extremely unlikely." ROA.4735.

Intervenors' comments on the 2023 Supplemental EIS demanded that BOEM extend the vessel restrictions in the reasonable and prudent alternative throughout the *entire* "100-400 meter isobath across the western, central, and eastern planning areas" and "prohibit oil and gas activities" in the same region. ROA.5191-92.  Intervenors contended that these massive changes were warranted based on "significant new information" in a study "that evaluated passive acoustic data indicating that it is plausible that the Rice's whale's distribution is broader." ROA.5125; ROA.5129.

BOEM disagreed.  "BOEM ha[d] reviewed the recent July 2022 publication (Soldevilla et al. 2022)," but determined there was "not enough information . . . to confirm [the whales'] distribution or any seasonal movements outside of the core

_____

[2]  Intervenors sued NMFS in the District of Maryland attacking the 2020 biological opinion as insufficient.  *Sierra Club v. NMFS*, No. 8:20-cv-3060 (D. Md.).

area" in the northeastern Gulf.  ROA.5125; ROA.4735.  And because there was not "enough conclusive data on the density, general distributions, and possible migratory behaviors" of the Rice's whale, ROA.4588, BOEM concluded it had "not identified justifiable reasons to restrict the lease sale area" by "exclud[ing] blocks from leasing in . . . the 100-400m isobath in the western and central Gulf" or imposing additional vessel restrictions, as existing measures already "provide adequate environmental protection," ROA.5034; ROA.5122-24.

BOEM held Lease Sale 259 in March 2023 as a regionwide sale offering "all of the available unleased acreage in the GOM OCS" with the usual stipulations.[3] ROA.2565; ROA.2574-75.  Industry bid nearly $310 million for 313 tracts covering 1.6 million acres.  ROA.7509.

Also in March 2023, BOEM published a Proposed Notice of Sale for Lease Sale 261 that offered "all of the available unleased acreage in the GOM OCS" and included the same stipulations as in Lease Sale 259.  ROA.2489; ROA.2496-97; ROA.2512-43.  The Proposed Notice of Sale triggered the 60-day period for "Governors of affected States" to "review and comment."  88 Fed. Reg. 16,030, 16,030 (Mar. 15, 2023).

---

[3]  BOEM converted three of the stipulations into areas excluded from leasing and added a stipulation for "Royalties on All Produced Gas" required by IRA § 50263. ROA.2574-75.

**D.     The Federal Government Suddenly Deviates From The 2017–2022 Leasing Program Scope And Terms.**

BOEM later flipped its position on the acreage exclusion and vessel-transit restrictions it had rejected just a few months earlier.  The about-face was previewed in the background recitals of a stay agreement between environmental groups and NMFS in the District of Maryland litigation over the 2020 biological opinion.  *See* ROA.6740-41; ROA.6752-53; *Sierra Club v. NMFS*, No. 8:20-cv-3060 (D. Md.).  That agreement's "operative language, however, did not (and could not) commit BOEM, a non-party to that case, to taking any particular course of action."  Gov't Br. 12.  API, Chevron, and other parties who had intervened in the litigation nevertheless notified BOEM that they "reserve[d] all rights to challenge BOEM's actions in an appropriate venue and at the appropriate time" if the agency followed through.  ROA.6757-58.

BOEM did just that on August 23.  The Final Notice of Sale for Lease Sale 261 announced that BOEM would withhold six million acres in an "Expanded Rice's Whale Area"—shaded in blue in the figure below, ROA.2438—running the *entire* 100- to 400-meter isobaths along the Gulf coast, ROA.2395-97, a significant expansion of the "core area" identified in the 2020 biological opinion, which is encircled by the dotted line below, ROA.5848.



BOEM also added a new lease stipulation—Stipulation No. 4, Part B(4)—requiring bidders to "implement" the same vessel restrictions as the biological opinion's reasonable-and-prudent alternative throughout the entire "Expanded Rice's Whale Area." ROA.2437-38. All vessels must abide by a "10-knot or less, year-round speed restriction," "avoid transit through the Expanded Rice's Whale Area after dusk and before dawn, and during other times of low visibility" "[t]o the maximum extent practicable," "maintain a minimum separation distance of 500 m from Rice's whales," and abide by new training, monitoring, record-keeping, and reporting requirements. ROA.2437-38.

BOEM speculated that the new stipulation and acreage withdrawal "could reduce risks" to the Rice's whale because "a recent study" with "limited evidence" indicated that the Rice's whale "occurs" in the 100-400m isobaths across the entire

Gulf, ROA.2464; ROA.2474—the same Soldevilla 2022 study that BOEM had

rejected a few months earlier as providing "not enough information" to justify any

acreage exclusions or additional vessel restrictions, ROA.5125; *see* ROA.6960;

ROA.4561.  BOEM did not acknowledge—let alone explain or justify—its

changed position.

Plaintiffs immediately challenged the acreage exclusion and vessel-

restriction stipulation under the APA and sought a preliminary injunction.

ROA.2340-41; ROA.7693-94.  Plaintiffs contended that the challenged provisions

(1) violated OCSLA's requirement that BOEM provide affected States' Governors

notice and an opportunity to comment; (2) were arbitrary and capricious because

BOEM failed to explain its complete reversal of position, could not substantiate the

challenged provisions, and failed to consider important factors; and (3) violated the

IRA's requirement that Lease Sale 261 be held "in accordance with" the 2017

Record of Decision.  ROA.2366-78; ROA.7717-24.  Plaintiffs also detailed the

irreparable harm they faced from a lease sale tainted by BOEM's unlawful

provisions.  ROA.2379-81; ROA.7724-25; ROA.7350-54.

### E.    The District Court Enjoins The Challenged Provisions.

On September 21, the District Court heard argument on Plaintiffs' motions

for a preliminary injunction.  ROA.7497.  The Government pressed the court to

delay the sale until November 8 if it granted a preliminary injunction, claiming

technical challenges in revising the list of available blocks to include the excluded acreage.  ROA.7610-12; ROA.7624; ROA.7634-35.  As for the vessel restrictions, however, the Government acknowledged that the stipulation could be removed "quickly"—by September 25.  ROA.7635.

The court enjoined both provisions, holding that Plaintiffs were likely to succeed on their claims that BOEM failed to provide notice to Louisiana of the changes and that the changes were arbitrary and capricious.  ROA.7515-19.  On the latter claim, the court explained that "BOEM offered no explanation for its new stance on the same body of evidence," "leav[ing] the impression that the 2023 Record of Decision is merely an attempt to provide scientific justification to a political reassessment of offshore drilling."  ROA.7518.[4]

The District Court then found that Plaintiffs had demonstrated irreparable harm stemming from the acreage removal and vessel-restriction stipulation, and concluded that the balance of equities favored injunctive relief.  ROA.7520-24.  Given BOEM's "shaky justification," the court could not "find that the challenged provisions are so necessary that withholding them even on a preliminary basis will outweigh the risk of irreparable economic harm shown by plaintiffs."  ROA.7523.  The court also denied the Government's request to delay the sale until November

---

[4]  Given Plaintiffs' likelihood of success on those two claims, the court did not reach Plaintiffs' claim that the challenged provisions violated the IRA.  ROA.7513.

8, concluding that it "failed to substantiate [its] claims of the complications arising from changes to the sale," and that the September 30 "statutory deadline [w]as a critical matter" given "the lengthy political fight over these sales" and "multiple contentious legal battles." ROA.7524-26 & n.11.

The court thus enjoined BOEM "from implementing the acreage withdrawal and Stipulation 4(B)(4) as described in the Final Notice of Sale and Record of Decision for Lease Sale 261" and ordered BOEM "to proceed with Lease Sale 261, absent the challenged terms, by September 30, 2023." ROA.7527. BOEM removed the vessel-restriction stipulation the next day. Dkt. 31.

The Government and Intervenors each sought a stay pending appeal. While Intervenors challenged every aspect of the injunction, the Government no longer defended the lease stipulation and acreage exclusion. The Government instead requested "only" that this Court delay the sale until November 8 to "give BOEM sufficient time to revise and publish a new sale notice." Gov't Stay Mot. 3. The motions panel denied Intervenors' motion but granted the Government's, while also clarifying that the preliminary injunction was "amended only in that the sale that was set for September 27, 2023, is ordered to take place by November 8, 2023," and that "[n]o extension will be granted." Stay Order 2-3 (capitalization altered). BOEM issued a Revised Final Notice of Sale on October 6. 88 Fed. Reg. at 69,660.

## SUMMARY OF ARGUMENT

**I.**  Intervenors lack standing to appeal.  They cannot rely on the Government's standing because the Government obtained its sole requested relief on appeal when the motions panel amended the preliminary injunction to allow BOEM until November 8 to hold Lease Sale 261.  Because Intervenors seek far greater relief than the Government, Intervenors must establish standing to appeal. They have not done so; they have not identified any member with an injury traceable to the District Court's injunction and redressable by this Court.

**II.**  Even if Intervenors had standing, this Court should affirm, as Plaintiffs are likely to prevail on the merits.

**A.**  The District Court correctly concluded that the challenged provisions are procedurally invalid.  OCSLA requires BOEM to provide States and local governments with a Proposed Notice of Sale that includes the lease stipulations and describes the area slated for sale.  The District Court rightly determined that BOEM engaged in a bait-and-switch when it added the challenged provisions to the Final Notice of Sale without providing States and local governments an opportunity to comment.

**B.**  The District Court also correctly determined that Plaintiffs are likely to succeed in demonstrating that the lease stipulation and acreage exclusion are

arbitrary and capricious because BOEM failed to explain its change in position, justify the challenged provisions, and consider other important factors.

**C.**  Plaintiffs are also likely to prevail on their claim that the enjoined provisions violate the IRA, although the District Court did not rule on this ground. The IRA directed that BOEM "shall conduct Lease Sale 261 in accordance with the Record of Decision" for the 2017–2022 Program, IRA § 50264(e), and neither the vessel-restriction stipulation nor the acreage exclusion were contemplated by the 2017–2022 Program Record of Decision.

**III.**  The District Court correctly concluded that Plaintiffs face a significant threat of irreparable injury without a preliminary injunction.  Louisiana is statutorily entitled to a share of the revenue generated from OCS lease sales, and allowing the enjoined provisions to take effect would decrease available revenue and produce unrecoverable losses.  Louisiana also has a legal right to OCSLA's procedural protections.  Industry Plaintiffs likewise face irreparable injury in the form of a skewed sale and unrecoverable compliance costs.

**IV.**  The District Court correctly found that the remaining factors support a preliminary injunction.  There is no public interest in maintaining unlawful agency action.  Intervenors ask the Court to depart from this well-established standard based on speculation that the enjoined provisions might possibly reduce risk to the Rice's whale.  But BOEM itself recently determined that any harm is extremely

unlikely and that no credible evidence supports Intervenors' position. If any evidence ever emerges, BOEM can take steps to protect the whales at later stages of the OCSLA process.

**V.** The District Court's injunction was well within its discretion to remedy BOEM's unlawful actions. The IRA—not the District Court's order—compels BOEM to conduct Lease Sale 261. *See* IRA § 50264(e). And the APA confirms the District Court's equitable authority to enjoin unlawful agency action.

**VI.** BOEM's request for a further delay of Lease Sale 261 is both premature and unwarranted. It improperly assumes that BOEM would rescind its newly issued Revised Final Notice of Sale—which is far from certain given the Government's decision not to defend the challenged provisions on appeal—and wrongly asserts that already noticed terms require additional noticing. Lease Sale 261 should proceed as planned.

## STANDARD OF REVIEW

The decision to grant a preliminary injunction is reviewed for abuse of discretion. *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 640 (5th Cir. 2023). The district court's factual findings are reviewed for clear error and its legal conclusions are reviewed de novo. *Restaurant L. Ctr. v. Department of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). A preliminary injunction is warranted where the movant shows (1) a likelihood of success on the merits; (2) a substantial threat of

irreparable injury if the injunction is not granted; (3) the potential injury outweighs any harm that will result to the other side; and (4) an injunction will not disserve the public interest. *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022). The last two factors "merge when the Government is the opposing party." *Clarke*, 74 F.4th at 643 (citation omitted).

## ARGUMENT

### I.   INTERVENORS LACK STANDING TO APPEAL.

#### A.   Because The Government Does Not Challenge The Amended Injunction, Intervenors Must Demonstrate Standing.

The Government does not challenge the preliminary injunction as amended by the motions panel. Intervenors, by contrast, urge this Court to "vacate the injunction" in full. Intervenors Br. 57. Intervenors thus "pursue relief that is different from that which is sought by a party with standing," and therefore "must have Article III standing." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017); *see also Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) ("As the Court has repeatedly recognized, to appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing.").

Intervenors insist they need not demonstrate standing "where the intervention is into a subsisting and continuing Article III case or controversy and the ultimate relief sought by the intervenors is also being sought by at least one

19

subsisting party with standing to do so."  Intervenors Br. 16 (quoting *Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006)).  But Intervenors seek "ultimate relief" that the Government does not—vacating the District Court's injunction and reinstating the unlawful lease stipulation and acreage exclusion.  *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020) (no need to establish appellate standing where "*both* the Federal Government and the [intervenors] asked the court to dissolve the [preliminary] injunction" (emphasis added)).  Intervenors stand alone in asking this Court to dissolve the preliminary injunction.  Their position is thus not "identical to" that of the Government, and Intervenors must demonstrate standing to appeal.  *McConnell v. FEC*, 540 U.S. 93, 233 (2003), *overruled in part on other grounds*, *Citizens United v. FEC*, 558 U.S. 310 (2010).

### B.    Intervenors Have Not Established Standing To Appeal.

"Where standing to appeal is at issue, appellants must demonstrate some injury *from the judgment below*."  *Sierra Club v. Babbitt*, 995 F.2d 571, 575 (5th Cir. 1993).  Intervenors forfeit any claim to organizational standing by failing to raise it in their opening brief.  *See Center for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019).  And Intervenors' claim of associational standing fails because their members have suffered no injury caused by the preliminary injunction and that is redressable by this Court.  *Id.* at 536.

20

Intervenors claim aggrievement based on their members' "aesthetic and recreational interests" in "the continued existence of Rice's whales," which they say "are threatened by the district court's injunction." Intervenors Br. 18-19. But Intervenors have not identified any member with a "concrete and particularized" interest in the Rice's whale that faces "actual or imminent" harm from the injunction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Their declarants describe general threats to the Rice's whale, but "[i]n environmental cases, courts must carefully distinguish between injury to the [appellant] and injury to the environment." *Center for Biological Diversity*, 937 F.3d at 537. Purported threats to the Rice's whale are complaints of "[i]njury to the environment" that are "insufficient" to establish Article III standing, *id.*, as Intervenors have not alleged that any such threats "affect [their members] in a personal and individual way," *Defenders of Wildlife*, 504 U.S. at 560 n.1. Intervenors' four declarants in the District Court never claimed any personal interest in the Rice's whale—only that other unidentified "members" might have some unspecified "interests in the whale." ROA.6627 (Steinhaus Decl. ¶ 15); *see* ROA.6607-08 (Manuel Decl. ¶ 6) (similar); ROA.6615-16 (Templeton Decl. ¶ 5) (similar); ROA.6630, ROA.6635 (Monsell Decl. ¶¶ 3, 18) (similar).

Intervenors' two new declarations likewise fail to establish any personal interest in the Rice's whale. *See* Dkt. 96-2 (Wiygul Decl.); Dkt. 96-3 (Saxon

Decl.).  Neither member alleges that he has ever seen a Rice's whale, ever attempted to view a Rice's whale, or even ever traveled to the 100-400 meter isobath region at issue in this lawsuit.  *Center for Biological Diversity*, 937 F.3d at 538 ("Without a geographic nexus, [Intervenors'] members cannot suffer an injury in fact.").  Nor does either member describe any plans to attempt to view Rice's whales in the future.  Instead, both profess only their "hop[es]" to "someday be lucky enough to see one of these whales," Wiygul Decl. ¶ 14; *see* Saxon Decl. ¶ 11 (similar).  The Supreme Court has already rejected standing based on members' "hope[s] to observe" a particular species as mere "'some day' intentions." *Defenders of Wildlife*, 504 U.S. at 563-564.

Intervenors also do not allege that any interest in the Rice's whale (if one existed) faces "a 'certainly impending' harm or a 'substantial risk' of harm" from the District Court's injunction.  *Shrimpers & Fishermen of RGV v. Texas Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (citation omitted).  Their members claim that the Rice's whale is "already suffering" from existing oil-and-gas activities, Saxon Decl. ¶ 12, and say that the enjoined "modest measures" would "reduce risk to the whales," Wiygul Decl. ¶ 22.  But whether the enjoined provisions might *reduce* risk is immaterial; what matters is whether the District Court's order—directing that Lease Sale 261 proceed without those measures— substantially *increases* the risk of harm.  *See Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 414 n.5 (2013).  Musing that "new oil and gas development *could* be the final nail in the coffin for the Rice's whale," Saxon Decl. ¶ 12 (emphasis added), are "[a]llegations of only a 'possible' future injury [that] similarly will not suffice," *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023) (citation omitted).  And Intervenors' broader claims about harms to the Gulf from oil-and-gas activities more generally, *see, e.g.*, Wiygul Decl. ¶¶ 15-20, are irrelevant to this litigation and therefore not redressable by this Court.

Because Intervenors have failed to establish that any one of their members would have standing individually, they have failed to establish associational standing.  And because the Government does not challenge the amended injunction—and both the Government and Plaintiffs ask the Court not to disturb the November 8 sale-date—this Court should dismiss the appeal.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The likelihood-of-success-on-the-merits factor is generally considered "the most important of the preliminary injunction factors."  *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023).  As the Government does not challenge the amended preliminary injunction, the merits rise and fall with Intervenors' arguments.  The motions panel denied Intervenors' emergency motion pressing the same contentions, which have not improved since.

## A.    The Enjoined Provisions Are Procedurally Invalid.

1.  The challenged provisions are procedurally flawed.  By adding them to the Final Notice of Sale at the last minute without providing requisite notice in the Proposed Notice of Sale, BOEM failed to comply with its procedural obligations under OCSLA.  *See* 5 U.S.C. §§ 706(2)(A), (D) (court "shall . . . hold unlawful and set aside agency action" "not in accordance with law" or taken "without observance of procedure required by law").

The Proposed Notice of Sale is a critical step in the lease-sale process, as it provides the last opportunity for stakeholders—especially States and local governments—to provide input on BOEM's plans before the Final Notice issues and the lease sale proceeds.  Consistent with that understanding, OCSLA declares that States and affected local governments "are entitled to an opportunity to participate" in the "policy and planning decisions made by the Federal Government" with respect to the OCS in light of the "significant impacts on coastal and non-coastal areas of the coastal States" that such decisions can have. 43 U.S.C. § 1332(4); *see* H.R. Rep. 95-590, at 50 (1977) (a "major purpose of [OCSLA] is to involve the states and affected local areas . . . to a greater degree"); *id.* at 152 (OCSLA gives States "a leading role in OCS decisions and particularly as to potential lease sales").  To protect those interests, OCSLA provides that, "within sixty days after notice of [a] proposed lease sale," States and local

governments are entitled to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale."  43 U.S.C. § 1345(a)-(b). The Secretary "shall" accept any such recommendations so long as they "provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State" and "shall communicate to the [State], in writing, the reasons for his determination to accept or reject" those recommendations.  *Id.* § 1345(c); *see* H.R. Rep. 95-590, at 123 (recognizing the need to provide States and local governments with "timely access to information, an opportunity to participate in the formulation of policy and planning decisions, and an opportunity to actually review and comment on final decisions").

BOEM's own regulations similarly require it to send to affected States, including Louisiana, and publish in the Federal Register a robust Proposed Notice of Sale containing "a description of the area proposed for leasing, the proposed lease terms and conditions of sale, and proposed stipulations."  30 C.F.R. § 556.304(c); *see id.* § 556.304(a) ("lease stipulations and conditions" "will be contained, or referenced, in the proposed notice of sale").  States and local governments then have 60 days to submit "comments and recommendations to BOEM regarding the size, timing, and location of the proposed sale."  *Id.* § 556.305(a); *see* 43 U.S.C. § 1345(a)-(b).  The regulations confirm that BOEM "will consider all comments and recommendations received in response to the

proposed notice of sale" and "will accept the recommendations of a State and/or local government(s)" so long as they "provide a reasonable balance between the national interest and the well-being of the citizens of the State." 30 C.F.R. § 556.307(a)-(b); *see* 43 U.S.C. § 1345(c). That procedure guarantees States and local governments—and through them, the public at large—one last opportunity to review the terms of the proposed lease sale and provide any final comments or objections before the Final Notice of Sale issues.

BOEM did not comply with that process here. Notwithstanding BOEM's own clear and explicit regulations requiring that the Proposed Notice contain the "proposed lease terms and conditions of sale" and "proposed stipulations to mitigate potential adverse impacts on the environment," 30 C.F.R. §556.304(c), the Proposed Notice here said *not one word* about the additional lease stipulation imposing burdensome vessel restrictions. BOEM thus violated Louisiana's right to submit comments taking that additional stipulation into account. *See Louisiana v. Biden*, No. 2:21-cv-778, 2021 WL 4312502, at *11 (W.D. La. Aug. 23, 2021) (States have "statutory right to participate in the [OCSLA] leasing process"). And as the District Court rightly observed, BOEM's "procedural error is particularly grave here," ROA.8729, because BOEM previously determined (and publicly announced) that adequately protecting the Rice's whale did *not* require any

additional lease stipulations—giving Louisiana every reason to believe that it need not submit further comments on this issue. *See supra* pp. 8-10; *infra* pp. 36-38.

BOEM's procedural failures with respect to the acreage removal are also grave. The Proposed Notice of Sale included just a single sentence stating that "BOEM is considering removing the area comprising the northeastern Gulf of Mexico and continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area." ROA.270. It is far from clear whether that statement—which focused on "the *northeastern* Gulf of Mexico," *id.*, where the Rice's whale's recognized habitat lies—meant to suggest that BOEM might remove the 100-400 meter isobaths across the entire "*western and central* Gulf," ROA.5034, as the Final Notice of Sale attempted to do. *See Mock*, 75 F.4th at 584 (explaining that a proposed notice must describe any potential rule with "reasonable specificity").

Indeed, given that BOEM had previously concluded that it had "not identified justifiable reasons" to "exclude blocks from leasing in . . . the 100-400m isobath in the western and central Gulf," ROA.5034, the most natural reading of BOEM's statement is that it did not pertain to the western and central Gulf at all. But even assuming it did, BOEM's single sentence did not explain *why* BOEM thought it necessary to remove vast swathes of acreage across the entire Gulf from Lease Sale 261 to protect the Rice's whale. That omission is no mere foot-fault.

27

To the contrary, ensuring that States and local governments receive "timely access to information" is the only way that the OCSLA process can operate properly. H.R. Rep. 95-590, at 123; *see Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 200 (5th Cir. 1989) ("[F]airness requires that the agency afford interested parties an opportunity to challenge the underlying factual data relied on by the agency.").

The District Court therefore correctly determined that BOEM committed an unlawful "bait and switch," ROA.8729, in adding both enjoined provisions to the Final Notice of Sale only after the States' comment period had closed. And the reason why BOEM engaged in these shenanigans is obvious. As Intervenors candidly acknowledged below, and as the District Court recognized, *see* ROA.8729, "BOEM made its decision" to add the enjoined provisions "in accordance with" the July 2023 stipulated agreement in the District of Maryland litigation which *post-dated* the Proposed Notice of Sale and comment period. ROA.6015. BOEM's backroom dealings blatantly violated OCSLA, the APA, and basic due-process principles.

2. Intervenors' efforts to resist those straightforward conclusions are unavailing. Intervenors first suggest that the Proposed Notice of Sale "provided sufficient notice" of both challenged provisions because it included statements like BOEM "reserved the right 'to modify the sale area in the Final [Notice of Sale]'" and "reserve[d] the right to revise the . . . associated terms and conditions

described in this Proposed [Notice of Sale]." Intervenors Br. 35-36 (citation omitted). But the Government has repeatedly conceded that OCSLA affords States and local governments a "*meaningful* opportunity to comment," ROA.6965 (emphasis added); *see* ROA.6951 (referencing the "meaningful state participation contemplated by OCSLA"), which requires an agency to provide notice of its proposed action with "reasonable specificity," *Mock*, 75 F.4th at 584. The exceedingly generic language on which Intervenors rely does not suffice. Intervenors' position would allow BOEM to provide *no information at all* in a Proposed Notice except general reservation-of-rights language.

Intervenors also posit that BOEM provided adequate notice of the challenged provisions because the Proposed Notice included a sentence saying that BOEM could possibly "remov[e] the area comprising the northeastern Gulf of Mexico and continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area." Intervenors Br. 35 (emphasis and citation omitted). Intervenors do not explain how that sentence has anything to do with the challenged stipulation. And Intervenors do not and cannot deny that the sentence references a singular "area," which is described as located in the "northeastern" Gulf.

Intervenors nevertheless insist that "[c]omment letters" submitted from States *other* than Louisiana "demonstrate" that BOEM provided adequate notice.

29

Intervenors Br. 36.  But an agency "cannot bootstrap notice from a comment."

*Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (citation omitted).

Instead, "'notice must come from the [proposal],' not the comments arising out of

it."  *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 320 (D.C. Cir.

2020) (citation omitted); *see* 32 Wright & Miller, *Federal Practice & Procedure*

§ 8183 (2d ed. May 2023 update) ("The mere fact that a person has submitted a

comment on an issue does not necessarily demonstrate that an agency provided

'sufficient notice' regarding that issue.").  That aside, the comments that

Intervenors reference had nothing to do with the lease stipulation.  *See* ROA.7019-

20.  Instead, the comments concerned only BOEM's vague sentence about an

acreage removal.  And even as to the acreage removal, not a single comment

addressed BOEM's reasoning—because BOEM never supplied any.  If BOEM had

suggested then that the Soldevilla study justified this potential removal, States and

local governments could have explained the significant problems with that

proposition.

 Nor do Intervenors' remaining arguments about the lease stipulation move

the needle.  Intervenors claim that BOEM's failure to include it in the Proposed

Notice is immaterial because OCSLA and the implementing regulations allow

States and local governments to comment on the "size, timing, and location" of a

lease sale, and the challenged stipulation purportedly "does not relate to the size,

timing, or location of Lease Sale 261." Intervenors Br. 37 (citation omitted).

Nonsense. The regulatory scheme in *general* operates on the understanding that

lease stipulations relate to the size, timing, and location of a lease sale: They state

that BOEM must "send [the] proposed notice of sale"—including "proposed

stipulations"—"to the governors of affected States" for "comments and

recommendations . . . regarding the size, timing, and location of the proposed

sale," 30 C.F.R. §§ 556.304(c), 556.305(a), and that BOEM must "consider all

comments and recommendations," *id.* § 556.307(a), before issuing a final notice of

sale that includes the final "stipulations," *id.* § 556.308. It defies the English

language to say that the *specific* stipulation at issue here "does not relate to the size

. . . or location of Lease Sale 261," Intervenors Br. 37, when that stipulation

attaches to all 67.3 million acres for sale in Lease Sale 261 and when it involves a

whale that allegedly swims in a location called the "Expanded Rice's Whale Area"

smack in the middle of the sale area. Little wonder why Intervenors never asserted

this argument previously.

Intervenors lastly assert that "it is routine for the stipulations and lease size

in a Final Notice of Sale to differ from the Proposed Notice of Sale." *Id.* That

argument fares no better. While some difference between proposed and final

agency action is acceptable, the proposed action must provide "fair notice" of the

final action. *Mock*, 75 F.4th at 583. BOEM's "bait and switch," ROA.8729, did not.

3. Intervenors assert that Plaintiffs' claim is barred by OCSLA's 60-day notice requirement for citizen suits. Intervenors Br. 32-35 (citing 43 U.S.C. § 1349(a)). They apparently believe that, instead of filing suit in late August, Plaintiffs should have provided pre-suit notice at that time and then twiddled their thumbs until late October, at which point the sale would be complete.

That argument is as wrong as it sounds. OCSLA's citizen suit provision created a "new private right of action," *Wentz v. Kerr-McGee Corp.*, 784 F.2d 699, 701 (5th Cir. 1986), which provides that certain citizens "may" initiate lawsuits to "compel compliance" with OCSLA, 43 U.S.C. § 1349(a)(1). In general, a citizen suit cannot be filed "prior to sixty days after the plaintiff has given notice of the alleged violation." *Id.* § 1349(a)(2)(A). If the plaintiff satisfies these timing requirements, he acts as a "'private attorney general' with regard to OCSLA enforcement," which authorizes him to seek relief like civil penalties. *Wentz*, 784 F.2d at 701.

As this Court has explained, however, OCSLA's citizen suit provision did not "implicitly repeal[ ]" APA review for OCSLA-related claims. *OXY USA Inc v. Babbitt*, 122 F.3d 251, 258 (5th Cir. 1997). OCSLA's citizen-suit provision instead applies "*only* to actions brought under" that particular provision. *Hornbeck*

*Offshore Servs., LLC v. Salazar*, 696 F. Supp. 2d 627, 636 (E.D. La. 2010).[5]  As a result, when plaintiffs "challenge agency decisions" that are "subject to judicial review under the APA," the citizen suit provision is simply "not available." *Amerada Hess Corp. v. Department of Interior*, 170 F.3d 1032, 1034 (10th Cir. 1999).

The same is true with respect to citizen-suit provisions in other statutes.  The Endangered Species Act ("ESA"), for example, has a similar citizen suit provision. *See* 16 U.S.C. § 1540(g).  But as the Supreme Court concluded when construing that provision, it is "not an alternative avenue for judicial review of the [Secretary's] implementation of the statute"; rather, a plaintiff pursuing such a claim must bring it under the APA.  *Bennett v. Spear*, 520 U.S. 154, 173 (1997).

These principles easily dispose of Intervenors' objection.  Plaintiffs are not seeking to act as private attorneys general to enforce OCSLA.  Plaintiffs instead are seeking judicial review on the grounds that BOEM's actions are "not in accordance with law" or ignored "procedure[s] required by law."  5 U.S.C. §§ 706(2)(A), (D); *see* ROA.57-60 (¶¶ 97-110), ROA.7678-80 (¶¶ 54-62).  This is a classic APA claim.  Plaintiffs therefore are not only permitted, but *required*, to

---

[5]  Intervenors (at 33) reference *Duke Energy Field Servs. Assets, LLC v. FERC*, 150 F. Supp. 2d 150 (D.D.C. 2001).  But as *Hornbeck* explained, "[t]hat decision is not helpful" because it rests on the incorrect premise that "all OCSLA cases are subject to the presuit conditions in § 1349(a)."  696 F. Supp. 2d at 636.

bring this claim under the APA, which has no 60-day notice requirement. *See Amerada Hess*, 170 F.3d at 1034.

Intervenors offer no meaningful response. Although they concede that the notice requirement does not apply to OCSLA-based APA claims, they assert that the notice requirement does apply when the claim alleges a "violation" of OCSLA's procedural requirements. Intervenors Br. 33-34. Yet even the Government, which receives pre-suit notifications, has rejected that bifurcation: "[T]he citizen suit provision of the Outer Continental Shelf Lands Act does not authorize suits against agencies for alleged failure to follow [OCSLA's] procedural requirements," and plaintiffs must bring such suits under "the APA." Dkt. 14 at 7, *Center for Biological Diversity v. Haaland*, No. 22-cv-6996 (C.D. Cal. filed Jan. 19, 2023). Intervenors also reference a line of cases explaining that plaintiffs may not invoke the APA when another statute provides an "adequate alternative remedy." Intervenors Br. 33. Those cases do not concern OCSLA, and as the cases cited above show, OCSLA does not provide an adequate alternative remedy. *Cf. Bennett*, 520 U.S. at 175 (reaching same conclusion in the ESA context).

Because Plaintiffs correctly brought their OCSLA-related claim under the APA, the Court need not address the exception to the 60-day notice requirement for violations that "would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). Regardless, the District Court correctly concluded that the

challenged provisions would "immediately impact" the "exclusive" legal interests that industry Plaintiffs would enjoy under awarded leases, ROA.8727 n.7.[6]  Those provisions would also immediately affect Louisiana's legal interest in the revenue generated from lease sales.  *See infra* pp. 46-47.  And Plaintiffs put the Government on notice of this challenge in the District of Maryland litigation.  ROA.6757-58.  Intervenors thus do nothing to disturb the conclusion that BOEM's violations of OCSLA's procedural requirements amply support a preliminary injunction.

## B.    The Enjoined Provisions Are Arbitrary And Capricious.

Plaintiffs are also likely to succeed in demonstrating that the lease stipulation and acreage exclusion are arbitrary and capricious.  ROA.7517-19.

1.  BOEM's decision to adopt the enjoined provisions is an "unexplained departure from precedent [that] must be overturned as arbitrary and capricious."  *University of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 480 (5th Cir. 2021) (citation omitted).  In four separate environmental reviews over the last seven years, BOEM has consistently concluded that protections for Rice's whales are unnecessary outside of their "core" habitat in the eastern Gulf—an area that has

---

[6]  Intervenors suggest that leases must have "already been issued" for industry Plaintiffs to have a "potential legal interest" affected.  Intervenors Br. 34 (emphasis omitted).  This Court has indicated that concrete plans to obtain the interests suffice.  *See, e.g.*, *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 768 (5th Cir. 2011).

long been excluded from leasing.  *See supra* pp. 8-10; *see also* ROA.3573;

ROA.3253; ROA.2992-93; ROA.2999-3000; ROA.4588; ROA.4735; ROA.4797;

ROA.5035; ROA.5043; ROA.5123-37.

As BOEM prepared the 2023 Supplemental EIS, environmental groups

pressed BOEM to implement the two provisions that the District Court enjoined.

ROA.5191-92.  Environmental groups insisted these measures were necessary

because of "recent evidence suggesting that the whale occurs" in the 100-400

meter isobaths across the Gulf—the Soldevilla 2022 study.  ROA.5129.

BOEM reviewed "the recent July 2022 publication (Soldevilla et al. 2022)

. . . indicating that it is plausible that the Rice's whale's distribution is broader."

ROA.5125.  The Soldevilla study attempted to locate Rice's whales in the Gulf by

evaluating acoustic data from June 2016-August 2017 but acknowledged that

determining "how many whales are found in the western GOM" was "a difficult

question to answer from [the study's] sparse single-sensor autonomous moored

passive acoustic units."  Melissa Soldevilla et al., *Rice's Whales in the*

*Northwestern Gulf of Mexico*, 48 Endang. Species Res. 155, 170 (2022),

https://www.int-res.com/articles/esr2022/48/n048p155.pdf.  The study concluded

only that there "seem to be fewer whales or more sparsely spaced whales in the

western GOM compared to the eastern GOM"—perhaps just two animals, although

"it remains unknown" whether those were the same whales detected in the whales'

core habitat in the eastern Gulf, and it "remains unknown whether [the] animals occur in the northcentral GOM" or "in deeper waters." *Id.* at 170, 172-173.

BOEM concluded on review of the Soldevilla study that "not enough information is available at this time to confirm [the Rice's whale's] distribution or any seasonal movements outside of the core area that is already considered." ROA.5125.  It therefore rejected environmental groups' proposed measures for Lease Sales 259 and 261, concluding that there were no "justifiable reasons to restrict the lease sale area" by "exclud[ing] blocks from leasing in . . . the 100-400m isobath in the western and central Gulf" and that existing lease stipulations "provide adequate environmental protection," as "the potential for vessel strikes" remains "extremely unlikely."  ROA.4735; ROA.5034; ROA.5122-24.  There was simply "not enough conclusive data on the density, general distributions, and possible migratory behaviors" of Rice's whales to support any additional restrictions.  ROA.4588; ROA.4735; ROA.5034.

BOEM accordingly conducted Lease Sale 259 in March 2023 and issued the Proposed Notice of Sale for Lease Sale 261—without the vessel-restriction stipulation or acreage exclusion.  In environmental groups' pending challenge to Lease Sale 259, the Government defended "BOEM's determination that there was not sufficient information to confirm the persistent presence of the Rice's whale" in the 100-400 meter isobaths, even after "BOEM considered relevant evidence,

including the Soldevilla 2022 Study." Dkt. 54 at 32-33, *Healthy Gulf v. Haaland*, No. 23-cv-00604 (D.D.C. Aug. 7, 2023). Indeed, BOEM insisted there was "*no evidence* that existing oil and gas development in the 100-400-meter isobath outside of the Rice's whale core area has caused harm to the Rice's whale." *Id.* at 34 (emphasis added).

BOEM took the complete opposite position—at the last possible moment—for Lease Sale 261. In the Final Notice of Sale, BOEM stated that it was adopting the vessel-restriction stipulation and excluding acreage in the 100-400 meter isobaths "based on a recent study that the endangered Rice's whale occurs" there. ROA.2474. That "recent study," BOEM admits, "is the Soldevilla 2022 study, which is the same study referenced in the 2023 SEIS." ROA.6960.

As the District Court recognized, BOEM's new position that the Soldevilla 2022 study justified the vessel-restriction stipulation and acreage exclusion was "an unexplained about-face from a position taken by the agency just months before." ROA.7518. Because BOEM's new position "rest[ed] upon factual findings that contradict those which underlay its prior policy," BOEM was obligated to explain why it was discarding its previous findings. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But "BOEM offered no explanation for its new stance on the same body of evidence." ROA.7518.

Making matters worse, BOEM refused to acknowledge that it had even changed positions, telling the District Court that there were "no inconsistencies in Interior's analysis or presentation of the information in the Soldevilla 2022 study." ROA.6960. The Government's refusal to "at least display awareness that it is changing position" also renders the acreage exclusion and lease stipulation arbitrary and capricious. *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)).

Intervenors try to distract from BOEM's unexplained about-face by insisting that BOEM's "decision was not based *solely* on the Soldevilla study." Intervenors Br. 39 (emphasis added). Putting aside that BOEM *itself* stated that its decision was based on the Soldevilla study, ROA.2474, Intervenors' newfound justifications suffer from the same problem. Intervenors gesture at BOEM's reinitiated consultation with NMFS on the 2020 biological opinion (at 39-40), but BOEM had *already* reinitiated consultation months before it issued the Supplemental EIS for Lease Sales 259 and 261 and conducted Lease Sale 259. ROA.2601-03; ROA.2562; ROA.4567. Intervenors also point (at 40-41) to NMFS's proposal to designate the 100-400 meter isobaths as critical habitat, but BOEM rejected the same argument in the Lease Sale 259 litigation. BOEM explained that NMFS has not "issued a *final* critical habitat designation," and

"BOEM will apply any additional measures" only "[w]hen the critical habitat is *finalized*." Dkt. 54 at 32-33 & n.9, *Healthy Gulf v. Haaland*, No. 23-cv-00604 (D.D.C. Aug. 7, 2023) (emphases added). Intervenors have not pointed to any changed facts or circumstances that would support BOEM's reversal in position.

Indeed, BOEM confirmed that "no new information or circumstances substantially affect the conclusions" in the Supplemental EIS for Lease Sales 259 and 261, when BOEM concluded that additional mitigation was unnecessary. ROA.2469, *see* ROA.2464. As Intervenors have candidly acknowledged throughout this litigation, BOEM "only made the decision at issue in this case as a result of a mediated agreement in separate federal litigation [Intervenors] brought" against another agency, and "[b]ut for that agreement, Federal Defendants would not have issued the decision at issue here." ROA.6008; *see also* ROA.6015; ROA.7367. The surrounding context constitutes a "strong showing," *Department of Com. v. New York*, 139 S. Ct. 2551, 2573-76 (2019), that BOEM adopted the enjoined provisions to placate environmental groups into agreeing to a stay in separate litigation against NMFS, *see supra* p. 11, not out of any threat to the Rice's whale. BOEM's "reversal here strains credulity, as does its pretextual basis." *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021).

2. BOEM also failed to "show that there are good reasons for [its] new policy" on the enjoined provisions. *Encino Motorcars*, 579 U.S. at 221. BOEM's

sole scientific explanation for the vessel-restriction stipulation and acreage exclusion was the Soldevilla study's suggestion that "the Rice's whale *may* be present." ROA.2464 (emphasis added). Yet one of the sites analyzed in the Soldevilla study located in the central Gulf—well-within BOEM's new "Expanded Rice's Whale Area"—did not detect *any* Rice's whales. Soldevilla et al. at 157, 172. "No record evidence affirmatively makes th[e] case" for the lease stipulation and acreage exclusion. *Southwestern Elec. Power Co. v. EPA*, 920 F.3d 999, 1019 (5th Cir. 2019). Indeed, "the evidence . . . runs in the opposite direction," *id.*, as the Government admitted there is "no evidence that existing oil and gas development in the 100-400-meter isobath outside of the Rice's whale core area has caused harm to the Rice's whale." Dkt. 54 at 34, *Healthy Gulf v. Haaland*, No. 23-cv-00604 (D.D.C. Aug. 7, 2023). And BOEM concluded in August that conducting Lease Sale 261—regardless of the terms and scope—was "not likely to jeopardize the continued existence" of the Rice's whale. ROA.7029.

Intervenors' arguments (at 39-40) that the enjoined provisions are justified based on "reducing risk to the Rice's whale," or are necessary for BOEM to "comply with its obligation" under the ESA, are misguided. Not even BOEM argued that the ESA required these actions—to the contrary, it insisted that "the legality of action under the ESA . . . ha[d] no bearing here." ROA.6963. Moreover, speculation that the enjoined measures "could reduce risks" to Rice's

whales, ROA.2474, amounts to an impermissible "precautionary principle" contrary to the ESA's "focus[ ] upon 'likely' outcomes, not worst-case scenarios," *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 598-599 (D.C. Cir. 2023). The statutory focus on likely outcomes "avoid[s] needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Id.* at 595 (citation omitted). Yet that is precisely what BOEM did here, kowtowing to environmental groups. As the District Court aptly described, BOEM's actions "look[ ] more like a weaponization of the Endangered Species Act than the collaborative, reasoned approach prescribed by the applicable laws and regulations." ROA.7519.

3. BOEM's decision adopting the enjoined provisions was also arbitrary and capricious because it was "premised on reasoning that fails to account for relevant factors." *University of Tex.*, 985 F.3d at 475 (citation omitted). The Record of Decision for Lease Sale 261, *see* ROA.2463-76, does not show that BOEM balanced the purported need for the enjoined provisions against the IRA's prescription of this sale to address national energy needs, or all the other factors that OCSLA requires BOEM to consider, such as "the relative needs of[ ] regional and national energy markets," "the interest of potential oil and gas producers," the "laws, goals, and policies of affected States," and the "relative environmental sensitivity and marine productivity" of the areas at issue. 43 U.S.C. § 1344(a)(2);

*see* 30 C.F.R. § 556.302(a)(1).  And if BOEM had adopted the lease stipulation and

acreage exclusion as part of the formal consultation process under the ESA, it

would have been required to ensure that these measures were "economically and

technologically feasible," "with[in] the scope of the Federal agency's legal

authority and jurisdiction," and could be "implemented in a manner consistent with

the intended purpose of the action."  50 C.F.R. § 402.02.  BOEM circumvented

that process, and the challenged provisions cannot be upheld under the APA.

*University of Tex.*, 985 F.3d at 475 ("Put simply, we must set aside any action

premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear

error of judgment.'" (citation omitted)).

## C.     The Enjoined Provisions Violate The Inflation Reduction Act.

This Court could also find for Plaintiffs on the alternative ground that the

vessel-restriction stipulation and acreage exclusion violate the IRA.  *Louisiana*, 55

F.4th at 1022 ("[T]his court may affirm the district court's judgment on any

grounds supported by the record." (citation omitted)).  As Plaintiffs detailed below,

ROA.2366-70; ROA.7718-19; ROA.7342-44, BOEM's last-minute attempts to

impose the vessel-restriction stipulation and withdraw substantial acreage run

headlong into the IRA's command that BOEM "shall conduct Lease Sale 261 in

accordance with the Record of Decision approved by the Secretary on January 17,

2017" for the 2017–2022 Program, which contemplated neither provision.  IRA § 50264(e); ROA.3129-31.

The vessel-restriction stipulation is not among the 10 common lease stipulations contemplated by the 2017–2022 Program, *see supra* p. 5, and BOEM's exclusion of millions of otherwise-available acres violates the Program's contemplated "region-wide" sales of all "unleased acreage not subject to moratorium or otherwise unavailable," ROA.3131.  The enjoined provisions are thus not "in accordance with" the Record of Decision for the 2017–2022 Program.  IRA § 50264(e).

The IRA's text reflects BOEM's inability to change the scope and terms of Lease Sale 261.  Congress specified that "the Secretary *shall* conduct Lease Sale 261 in accordance with" the 2017–2022 Program, *id.* (emphasis added), and "[t]he first sign that the statute imposed an obligation is its mandatory language: 'shall.' " *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020).  Context confirms that Congress used "shall" in is ordinary, mandatory sense.  The IRA "differentiates between when the [Interior] Secretary 'shall' take certain actions and when she 'may' exercise discretion."  *Id.* at 1321; *see* IRA § 50251(a) ("The Secretary *may* grant leases, easements, and rights-of-way[.]" (emphasis added)); *id.* § 50251(b)(2) ("The Secretary *may* conduct wind lease sales[.]" (emphasis added)).

44

Intervenors fall back on BOEM's traditional leasing authority under OCSLA, insisting (at 43-44) that because OCSLA affords BOEM discretion in ordinary lease sales to modify or cancel sales described in a five-year plan, BOEM must have the same discretion here. But whatever OCSLA says about BOEM's *ordinary* discretion to determine the scope and terms of lease sales, the IRA specifically revoked BOEM's discretion as to Lease Sale 261.

Intervenors half-heartedly invoke (at 44-45) the presumption against implied repeals, but the presumption has no force when, as here, "the later statute expressly contradicts the original act." *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (cleaned up). Concluding that the IRA preserved BOEM's ordinary leasing power—including the ability to "cancel[ ]" sales entirely, *see* Intervenors Br. 45—"would contradict Congress' clear intent as expressed in its more recent, [Lease Sale 261]-specific legislation," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000), and "render the new clauses meaningless, thereby violating the canon of statutory construction that discourages courts from adopting a reading of a statute that renders any part of the statute mere surplusage," *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 594 (5th Cir. 2008) (cleaned up).

## III.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

The District Court also correctly concluded that Plaintiffs face "a substantial threat of irreparable injury" absent injunctive relief. *Restaurant L. Ctr.*, 66 F.4th at 597; *see* ROA.8733-35. Intervenors have not demonstrated that any of the District Court's extensive factual findings were in clear error.

1. As the District Court recognized, and Intervenors do not dispute, Louisiana "is entitled to a share of offshore royalties" generated from OCS lease sales and benefits from the funds deposited in the Land and Water Conservation Fund ("GOMESA"). ROA.7520; *see* 43 U.S.C. § 1337(g)(5)(A); Tax Relief and Healthcare Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922, 3000. The District Court's finding that the enjoined provisions "will result in lost revenue"—an "economic injury of up to $2.2 million to Louisiana"—is not clearly erroneous. ROA.7520. The District Court credited Louisiana's unrebutted expert declaration detailing how "[a]ny reduction in acreage, less favorable terms, or delay in conducting the sale will harm" Louisiana "by reducing production, bonus bids, royalties, and rentals from federal oil and gas leases in the GOM," resulting in as much as a $2.2 million decrease in GOMESA funding. ROA.2245-47 (¶¶ 28-34). Those financial losses are unrecoverable due to sovereign immunity. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Moreover, fewer lease sales would result in depressed oil and gas production, a critical

revenue-raising and job-creating industry in Louisiana. In 2021, energy-based manufacturing accounted for $6.8 billion in wages in Louisiana, representing 47.4% of total manufacturing wages. *See* ROA.2249 (¶ 43); *see also Louisiana*, 2021 WL 4312502, at *10 (reduced oil and gas production leads to "lost economic benefits includ[ing] not only the loss of direct lease sale revenue, but also lost tax revenue and employment opportunities").

In addition to these irreparable economic injuries, Louisiana also has a legal right to receive notice of a proposed lease sale, including "a description of the area proposed for leasing" and the "proposed stipulations," and a legal right to submit recommendations on that proposal. *See* 43 U.S.C. § 1345(a)-(c); 30 C.F.R. §§ 556.304(c), 556.305(a). BOEM denied Louisiana those rights and deprived it of any meaningful opportunity to comment on the challenged provisions— provisions that directly affect Louisiana's economic interests. That is irreparable injury too. *See, e.g.*, *Louisiana v. Becerra*, 577 F. Supp. 3d 483, 502 (W.D. La. 2022) ("Being deprived of a procedural right to protect [a State's] concrete interests . . . is irreparable injury.").

Intervenors ignore the State's irreparable procedural injury and instead focus only on the irreparable economic injury. Intervenors claim that the evidence submitted below substantiating this injury—a declaration from an expert economist, *see* ROA.4462—is "simplistic," but Intervenors never offered any

rebutting evidence.  And while Intervenors suggest that BOEM might not accept

*any* Lease Sale 261 bids—apparently inviting BOEM to ignore the will of

Congress—the Government's acknowledgement (at 24) that Louisiana "will not be

deprived of its potential revenue" if the sale proceeds as scheduled on November 8

demonstrates that BOEM fully intends to accept bids received because, if BOEM

rejected all bids, Louisiana will not receive any revenue.  Intervenors also overlook

that Louisiana cannot recover monetary damages from the Government for the

"delay" in obtaining revenues.  ROA.4469.

2.  Industry Plaintiffs likewise face irreparable harm absent an injunction.

Industry offered extensive evidence to the District Court that the challenged

provisions would seriously distort the sale.  *See, e.g.*, ROA.4550-52 (API, Hopkins

Decl. ¶¶ 8-15); ROA.2546-50 (Chevron, Carpenter Decl. ¶¶ 4-22); ROA.2558-60

(Chevron, Webre Decl. ¶¶ 14-18); ROA.7729-35 (Shell, Gonsalves Decl. ¶¶ 7-28).

As the District Court correctly found, there was no dispute that BOEM's "last-

minute changes impact [industry's] ability to bid fairly on leases under Lease Sale

261."  ROA.7521.  Even the Government admitted that BOEM's actions "may

have changed the competitive dynamics of the sale."  ROA.6966.

Aside from tainting the sale, the District Court also found that industry

Plaintiffs would "suffer economic injury and impairment to their business

development."  ROA.7520.  The court credited industry's declarations in finding

that industry would lose out on the chance "to bid on the six million acres

withdrawn from the sale," and that the vessel restrictions would "increase attendant

costs for all leases issued from Lease Sale 261 as well as some issued from non-

Lease Sale 261 sales."  ROA.7520-21.  The court found that the vessel restrictions,

which "apply to an area of the northern Gulf that separates [industry's] existing

offshore leases from the onshore infrastructure that supports them," would

"undermine long-term planning for and execution of [their] lease operations."

ROA.7520.  That included "reducing the available hours for supply and increasing

the number of ships necessary to make supply runs," restricting industry's "ability

to obtain seismic survey data for areas obtained in other lease sales," and "creating

'costly and unreasonable complications' for [industry] as it loses the ability to

consolidate operations across leases because of the new restrictions."  *Id.*; *see*

ROA.7733-34 (Shell, Gonsalves Decl. ¶¶ 23-27); ROA.2596-99 (Chevron,

Robichaux Decl. ¶¶ 7-16); ROA.4556 (Hess Corp., Cordingley Decl. ¶ 14);

ROA.2425 (Anadarko Petroleum Corp., Janiszewski Decl. ¶¶ 11-12); ROA.2509-

10 (BP, Polk Decl. ¶ 4).

The District Court found that such "logistical complications . . . will likely

add to the amount of time needed to complete projects in the Lease Sale 261 and

increase drilling costs on Lease Sale 261 leases 'by a significant factor,'"

highlighting that if "supply disruptions cause drilling to be suspended," "this cost

could rise to a million dollars or more per vessel." ROA.7520-21 & n.9; *see* ROA.2598-99 (Chevron, Robichaux Decl. ¶ 14). These costs are unrecoverable due to sovereign immunity, and it is well-established in this Circuit that "complying with an agency order later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Wages & White Lion Invs.*, 16 F.4th at 1142 (cleaned up). And the inability to bid on excluded acreage is a "loss of business opportunities" that provides "valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

Intervenors do not dispute that the challenged provisions would have seriously skewed bidding dynamics. And their only response to the industry Plaintiffs' numerous, detailed declarations is to complain that this evidence is somehow "speculative" and "conclusory." Intervenors Br. 47-48. The District Court's detailed account of the evidence demonstrates otherwise, and Intervenors have not explained how those findings are clearly erroneous. To the extent Intervenors demand proof of inevitable or quantifiable injury, that is not required. Plaintiffs need only "show that irreparable injury is 'likely' absent an injunction," *Missouri v. Biden*, __ F.4th__, 2023 WL 6425697, at *28 (5th Cir. Oct. 3, 2023) (citation omitted), and Plaintiffs need "not convert each allegation of harm into a specific dollar amount," *Restaurant L. Ctr.*, 66 F.4th at 600. Intervenors do not

dispute that Plaintiffs detailed "compliance costs" that are "more than de minimis." *Louisiana*, 55 F.4th at 1034-35 (citation omitted).  And "it is not so much the magnitude but the irreparability that counts."  *Id.* at 1034 (citation omitted).

Apparently recognizing the force of industry's declarations, Intervenors urge the Court (at 32) to ignore any evidence from Shell because venue was supposedly improper.  But Intervenors "did not file a motion to strike [Shell's] declaration before the district court," and thus forfeit the issue by "raising it for the first time on appeal."  *Gezu v. Charter Commc'ns*, 17 F.4th 547, 555 (5th Cir. 2021).  Moreover, "the Supreme Court has held that intervenors cannot question venue, where a defendant has not exercised that privilege."  *Team Worldwide Corp. v. Wal-Mart Stores, Inc.*, 287 F. Supp. 3d 651, 659 (E.D. Tex. 2018) (citing *Central Tr. Co. v. McGeorge*, 151 U.S. 129, 135 (1894)); *see* 7C Wright & Miller, *Federal Practice & Procedure* § 1918 (3d ed. Apr. 2023 update) ("By voluntarily entering the action the intervenor has waived the privilege not to be required to engage in litigation in that forum.").  At any rate, Shell alleged that it "maintains facilities and operations within th[e] judicial district in support of its Gulf of Mexico offshore leasing, exploration, and production program," ROA.7663, and Shell is the "leading private leaseholder on the Gulf of Mexico" OCS, and its operations are supported from facilities throughout Louisiana, *see* ROA.7729-34.  And Shell is an API member, meaning that Shell's irreparable-harm declaration can be

considered as part of API's properly venued suit. Intervenors' venue griping is a red herring.

Intervenors' effort (at 48) to discount Plaintiffs' injuries based on speculation that a "new biological opinion" "currently projected for September 2024" *might* replace the lease stipulation is similarly misguided. Projected completion dates for agency environmental reviews are hardly set in stone and can drag on for years. *See, e.g.*, *Natural Res. Def. Council v. Bernhardt*, No. 10-cv-1882, Dkts. 118-2, 127, 143-2, 154, 163, 171-1 (E.D. La.) (settlement agreement requiring agency preparation of environmental review documents, and amendments extending the original projected deadline by five years). As the District Court recognized, "[t]here's slow and then there's Government slow." ROA.7628. Even if a new biological opinion emerges next September, Plaintiffs would still endure a tainted lease sale and suffer a year's worth of unrecoverable compliance costs—interim harms that Intervenors do not even address.

## IV.  THE REMAINING FACTORS LIKEWISE SUPPORT PRELIMINARY RELIEF.

The public interest and the balance of equities—which merge in this context—also support a preliminary injunction. As the District Court explained, *see* ROA.8736, and as Intervenors "do not disagree," Intervenors Br. 56, "there is generally no public interest in the perpetuation of unlawful agency action." *Louisiana*, 55 F.4th at 1035.

Intervenors nevertheless insist that the public interest favors them because BOEM's unlawful measures *might* help avoid "irreparable harm to the whales." Intervenors Br. 53. But Intervenors are alone in their belief that this sale poses irreparable harm to the species. BOEM itself determined just months ago—after reviewing the Soldevilla study—that "the potential for vessel strikes to [the] Rice's whale is *extremely unlikely to occur*," even in its "primary core habitat" in the northeastern Gulf, ROA.4735 (emphasis added), and BOEM admitted in August that there is "no evidence that existing oil and gas development in the 100-400-meter isobath . . . has caused harm to the Rice's whale," Dkt. 54 at 34, *Healthy Gulf v. Haaland*, No. 23-cv-00604 (D.D.C. Aug. 7, 2023).

Intervenors thus suggest that even speculative environmental injuries are enough to tilt the equities in their favor, as "[t]he plain language and legislative history of the ESA 'shows clearly that Congress viewed the value of endangered species as incalculable,' making it 'abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities.' " Intervenors Br. 54 (quoting *TVA v. Hill*, 437 U.S. 153, 187, 194 (1978)). But Congress promptly amended the "plain language" of the ESA referenced in *TVA v. Hill* to avoid stopping "economic activity . . . in its tracks" based on "speculative" harm to species, *Maine Lobstermen's Ass'n*, 70 F.4th at 596. And both the D.C. Circuit and the Supreme Court have since explicitly cautioned against reading the

ESA today in a way that produces "needless economic dislocation," *Bennett*, 520 U.S. at 176-177, such as by "relying upon worst-case scenarios or pessimistic assumptions," *Maine Lobstermen's Ass'n*, 70 F.4th at 586.

As the District Court thus explained, nothing indicates that including the challenged provisions in Lease Sale 261 is "so necessary that withholding them even on a preliminary basis will outweigh the risk of irreparable economic harm shown by plaintiffs." ROA.8736. And if any non-speculative evidence that oil-and-gas operations within the Lease Sale 261 area poses a likely threat to the Rice's whale ever materializes, BOEM can always seek to impose additional (lawful) restrictions at later stages of the OCSLA process—as the District Court again emphasized. *See id.* (citing 43 U.S.C. §§ 1340(c)(1), 1351(c)).

## V.    THE DISTRICT COURT PROPERLY GRANTED INJUNCTIVE RELIEF.

Intervenors believe the District Court granted improper "prescriptive relief" or a "mandatory injunction" by "[f]orcing the Bureau to move forward with Lease Sale 261," rather than remanding the case back to BOEM. Intervenors Br. 19-28. As an initial matter, the IRA—not the District Court's order—dictates that BOEM "shall conduct Lease Sale 261." IRA § 50264(e). Because the IRA mandated that BOEM conduct the sale "not later than September 30, 2023," *id.*, the District Court declined the Government's requested extension until November 8 to conduct the sale. That the motions panel ultimately granted an extension to allow BOEM the

time it averred was necessary to update the sale terms—while also admonishing that "[n]o extension will be granted," Stay Order 3—effectively recognizes that the legal compulsion comes from the IRA, not the District Court.

Intervenors are also wrong (at 20-26) that the proper remedy for BOEM's APA violations would be to remand the case to BOEM.  Not even BOEM asks for a remand; BOEM agrees that the amended sale should proceed on November 8.  And injunctive relief is appropriate for APA violations like BOEM's.  *See*, *e.g.*, *Clarke*, 74 F.4th at 641, 644 (finding likely APA violation because agency gave "no explanation whatsoever" for its action and directing district court to enter preliminary injunction pending final adjudication).

Moreover, Congress was clear that BOEM "shall conduct Lease Sale 261 . . . not later than September 30, 2023."  IRA § 50264(e).  That the motions panel granted a limited extension based on BOEM's claims of impossibility and hardship does not transform the congressional deadline into a mere suggestion.  There is no reason to allow BOEM to "re-open[ ] [the] comment period" for States on a proposed notice of sale, Intervenors Br. 21, and restart the OCSLA review from scratch.  BOEM committed its about-face just 36 days before the IRA's September 30 deadline, meaning that BOEM lacked sufficient time to reissue a proposed notice of sale containing the lease stipulation and acreage exclusion, solicit comments from the States, *and* publish a final notice of sale 30 days before the

IRA's deadline. Intervenors' proposed remand would perversely allow BOEM to achieve a result that it could not have achieved had BOEM complied with the law in the first instance. Likewise, there is no reason to give BOEM any further opportunity to attempt "to substantiate its decision," *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022), particularly not where the Government has yet to acknowledge it even changed positions, has recognized there is "no evidence" of harm to the Rice's whales in the 100-400 meter isobaths from oil-and-gas activities, and has already balanced the relevant factors when it issued the Proposed Notice of Sale in March. And if Plaintiffs prevail on their IRA argument, no amount of bureaucratic opining could salvage provisions that were never contemplated in the Record of Decision for the 2017–2022 Program.

Even if the District Court's order could be characterized as a mandatory injunction, the APA expressly recognizes actions for "mandatory injunction," 5 U.S.C. § 703, and the District Court correctly held that "the facts and law clearly favor" Plaintiffs, *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *see* ROA.7524-26. This is not a close case. Even the Government—the enjoined party—does not appeal the amended injunction. "[W]here the applicants' right to relief is indisputably clear, as here, mandatory injunctive relief remains available." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (cleaned up); *see also id.* at 223 (affirming preliminary injunctions

greenlighting pipeline construction); *Kane v. De Blasio*, 19 F.4th 152, 163 n.11, 176 (2d Cir. 2021) (preliminary injunction against COVID vaccination requirement was warranted whether mandatory or prohibitory); *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 n.4, 1052 (9th Cir. 2021) (same for preliminary injunction requiring prison officials to provide medications).

## VI.   THE GOVERNMENT'S ALTERNATIVE DELAY REQUEST IS PREMATURE AND UNWARRANTED.

The Government's request (at 30-31) for an additional 37-day delay if this Court "vacates, dissolves, or further modifies the injunction" is premature.  On October 6, BOEM issued a "Revised Final Notice of Sale" detailing the corrected scope and terms of the sale scheduled for November 8.  88 Fed. Reg. at 69,660. This is separate, final agency action above and beyond what the District Court ordered, which only barred enforcement of the challenged provisions in the original August 23 Final Notice of Sale.  The Government has not stated that, should this Court vacate the preliminary injunction, BOEM would choose to rescind its Revised Final Notice of Sale while the parties litigate summary judgment.  BOEM may very well choose not to rescind the Revised Final Notice, as the Government does not contest that Plaintiffs are likely to succeed on the merits of their claims, nor has the Government sought expedited merits briefing in the District Court.  This uncertainty, combined with this Court's expedited briefing schedule, renders any request for further delay premature.

Further delay is also unwarranted.  BOEM does not explain why any other changes could not be noticed online, just as BOEM notified potential bidders following the District Court's decision before the motions panel extended the sale date to November 8.  Dkt. 31.  BOEM has already told potential bidders in the Revised Notice of Sale that "BOEM would announce any such orders and changes to the sale on its website."  88 Fed. Reg. at 69,660.

Moreover, Plaintiffs would be harmed by any further delay in Lease Sale 261.  Industry Plaintiffs have spent months preparing bids, and continued delays impose additional costs on industry planning and operations with knock-on effects for oil and gas production.  Dkt. 49-3, Suppl. Gonsalves Decl. ¶¶ 8-13; Dkt. 49-4, Suppl. Webre Decl. ¶¶ 10-12.  Nonparties in the oil-and-gas industry face similar harms.  *See* ROA.7642-43 (testimony from nonparty oil-and-gas company that began preparing its bids "six months ago"); Dkt. 49-2, TIPRO Decl. ¶¶ 6-9 (non-party trade association explaining "it would be grossly unfair to delay Lease Sale 261 as the government is demanding").  And Congress determined that a September 30 sale date was important to address the Nation's energy needs.  There is no basis to delay Lease Sale 261 any longer.

## CONCLUSION

The Court should affirm the District Court's preliminary injunction as amended by the motions panel.

Respectfully submitted,

/s/ Paul D. Clement

Paul D. Clement
Andrew Lawrence*
James Y. Xi*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
james.xi@clementrmurphy.com

*Supervised by principals of the firm
who are members of the Virginia Bar

*Counsel for Plaintiff American
Petroleum Institute*

/s/ Mark W. Mosier

Steven J. Rosenbaum
Mark W. Mosier
Bradley K. Ervin
COVINGTON & BURLING LLP
850 Tenth Street, N.W.
Washington, D.C. 20001
(202) 662-6000
srosenbaum@cov.com

*Counsel for Plaintiff Shell Offshore
Inc.*

/s/ Elizabeth B. Murrill

Jeff Landry
   *Attorney General of Louisiana*
Elizabeth B. Murrill
   *Solicitor General*
Joseph S. St. John
   *Deputy Solicitor General*
Jordan B. Redmon
   *Assistant Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
(225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

/s/ Catherine E. Stetson

Catherine E. Stetson
Sean Marotta
Dana A. Raphael
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Sarah C. Bordelon
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

October 13, 2023

*Counsel for Plaintiff Chevron U.S.A. Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,845 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

Dated:  October 13, 2023              /s/ Catherine E. Stetson
                                      Catherine E. Stetson

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2023, I electronically filed the foregoing response brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Catherine E. Stetson
Catherine E. Stetson
